**UNITED STATES**

v.

**E. I. DU PONT DE NEMOURS & CO.**

**Civ. A. 1216.**

United States District Court
D. Delaware.
Dec. 14, 1953.

William Marvel, U. S. Atty., of Wilmington, Del., James L. Minicus, Julius C. Renninger, Philip L. Roache, Jr., Joseph M. Fitzpatrick, Matthew Miller, Forrest A. Ford, Newell A. Clapp, Marcus A. Hollabaugh, Margaret H. Brass, Mollie Strum, William Amory Underhill, Joseph F. Tubridy and William J. McAuliffe, Jr., Sp. Assts. to the Atty. Gen., all of Washington, D. C., for plaintiff.

Hugh M. Morris and Alexander L. Nichols (of Morris, Steel, Nichols & Arsht), of Wilmington, Del., Gerhard A. Gesell, William M. Aiken, James H. McGlothlin, David C. Acheson, Harvey Levin and George Kuehnl (of Covington & Burling), of Washington, D. C., and Francis J. Zugehoer, of Philadelphia, Pa., for defendant.

## TABLE OF CONTENTS.

COMPARISON OF THE ECONOMIC AND LEGAL CONCEPTS OF MO-
NOPOLY.

THE PRESENT ECONOMIC AND LEGAL VIEWS OF MONOPOLY AND
COMPETITION

a. Competition and monopoly in the economic sense.
b. The competition intended by the Sherman Act.
c. The economic view of the effect of potential competition upon monopoly.
d. The economic view of the effect of substitute products upon monopoly.

PART I—CELLOPHANE.
A. DuPONT'S POSITION DOES NOT VIOLATE § 2 OF THE SHERMAN
ACT.
1. DuPONT DOES NOT HAVE MONOPOLY POWER.
a. Plaintiff must establish duPont has sufficient power arbi-
trarily to raise prices or to exclude competitors.

FINDINGS OF FACT.
I. Description of Defendant duPont (Findings 1–6).
II. Description of Cellophane (Findings 7–12).
III. DuPont's Entry Into the Cellophane Business and
Organization of duPont Cellophane Company
(Findings 13–36).
IV. The "Market Setting" in Which Cellophane is Sold
(Findings 37–79).
V. DuPont Competed by Research to Improve Quality
and Lower Cost (Findings 80–122).
VI. DuPont Competed by Lowering Prices (Findings
123–149).
VII. Competition Between Cellophane and Other Flex-
ible Packaging Materials (Findings 150–278).

SPECIFIC USES:
1. WHITE BREAD.
2. SPECIALTY BREADS.
3. CAKE AND SWEET GOODS.
4. MEAT.
5. CANDY.
6. CRACKERS AND BISCUITS.
7. FROZEN FOODS.
8. POTATO CHIPS, POP CORN AND SNACKS.
9. CEREALS.
10. FRESH PRODUCE.
11. PAPER GOODS AND TEXTILES.
12. CIGARETTES.
13. BUTTER.
14. CHEWING GUM.
15. OTHER FOOD PRODUCTS.
16. OTHER TOBACCO PRODUCTS.
17. CHEESE.
18. OLEOMARGARINE.

VIII. Results of duPont's Competition With Other Materials (Findings 279–292).

IX. DuPont Competed With Sylvania (Findings 293–330).

X. The Basic Moistureproof Patents (Findings 331–339).

XI. DuPont Did Not Engage in Predatory Practices as Alleged.
 A. DuPont's decisions as to changes in its business capacity were made on the basis of proper business considerations, and not to suppress competition or to create artificial shortages (Findings 340–353).
 B. Potential competitors were not excluded (Findings 354–388).
 C. Distribution outlets were not controlled (Findings 389–455).
 D. Patents were not abused (Findings 456–532).

XII. DuPont Did Not Conspire to Monopolize.
 A. With Sylvania (Findings 533–591).
 1. PATENT LICENSE AGREEMENT (FINDINGS 533–583).
 2. PRICES (FINDINGS 584–591).
 B. With foreign concerns to exclude imports (Findings 592–645).

XIII. DuPont Did Not Attempt and Is Not Now Attempting to Monopolize.
 A. General (Findings 646–660).
 B. Olin license (Findings 661–686).

XIV. DuPont Has Not Monopolized (Findings 687–732).

CAPS AND BANDS (Findings 733–819).

OTHER FACTS (Findings 820–834).

CONCLUSIONS OF THE MASTER FACTS (Findings 835–854).

RESUMPTION OF THE OPINION.
 b. Competitive conditions preclude acquisition of market control and hence of monopoly powers over cellophane.
 i. "MARKET SETTING".
 ii. CANDY—A CASE HISTORY.
 iii. TESTIMONY OF INDEPENDENT WITNESSES.
 c. DuPont has not "power to raise cellophane prices".
 d. DuPont has not the "power to exclude competition".
 1. GENERAL.
 2. POTENTIAL COMPETITORS.
 3. PATENTS.
 4. SYLVANIA COMPETITION.
 e. Application of recognized economic tests further evidences the lack of monopoly power.

2. DuPONT'S POSITION IS NOT TO BE ATTACKED BECAUSE IT RESULTS FROM TECHNICAL SKILL AND COMPETITIVE ACTIVITY.
 a. The moistureproof patent is, I conclude, a defense.
 b. Monopolization requires a factual showing of illegality.
 c. Technical skill and other competition were responsible for duPont's position in the field.

B. IS ORIGIN OF DuPONT'S POSITION LAWFUL?

C. WAS DuPONT'S POSITION MAINTAINED BY PREDATORY ASSERTION OF MONOPOLY POWER?
 1. TESTS TO BE APPLIED.
 2. ALLEGED SUPPRESSION OF SYLVANIA.
 a. The Moistureproof Patent License Agreement.
 b. The Alleged Price Agreement.
 3. PATENT PRACTICES.
 1. ULTRA-VIOLET LIGHT LICENSE.
 2. RIBBON LICENSES.
 3. ETHYLENE GLYCOL LICENSE.
 4. MARATHON LICENSE.
 5. THE SEALING LICENSES.
 6. INTERFERENCES.
 7. TYING PROVISIONS.
 4. CONTROL OF DISTRIBUTION OUTLETS.
 5. EVIDENCE PLAINTIFF IGNORES.

**PART II—CAPS AND BANDS.**

NO FACTUAL BASIS EXISTS FOR CLAIMING A VIOLATION OF § 2 AS TO CAPS AND BANDS.

**CONCLUSION OF LAW.**

---

LEAHY, Chief Judge.

This is a civil suit by United States of America under § 4 of the Sherman Act, 15 U.S.C.A. § 1 et seq., charging defendant with monopolizing, attempting to monopolize and combining and conspiring to monopolize trade and commerce among the several states of the United States in cellophane and caps and bands. The Act of July 2, 1890, 26 Stat. 209, commonly known as the Sherman Act as amended, provides in part:

"Sec. 2. Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor * * *. [15 U.S.C.A. § 2].

* * * * * *

"Sec. 4. The several circuit courts of the United States are hereby invested with jurisdiction to prevent and restrain violations of this act; and it shall be the duty of the several district attorneys of the United States, in their respective districts, under the direction of the Attorney-General, to institute proceedings in equity to prevent and restrain such violations. * * * [15 U.S.C.A. § 4.]"

This case was instituted originally in the District Court of the United States

for the District of Columbia on December 13, 1947. On April 28, 1949, the case was transferred to the District of Delaware.

Defendant, E. I. duPont de Nemours and Company, is a Delaware corporation. It is successor to duPont Cellophane Company, Inc. Throughout the period covered by the complaint, it or its predecessors manufactured and sold, in interstate and foreign commerce, regenerated cellulose in the form of film (cellophane) and in the form of bands. Prior to the filing of the complaint in this case, it also manufactured and sold cellulosic caps.

DuPont entered the cellophane business in 1923. It collaborated, under written agreements with La Cellophane (a subsidiary of the Comptoir which is the largest French rayon producer), in establishing the first duPont cellophane company. In 1929 duPont Cellophane Company, Inc., was reincorporated as a wholly owned subsidiary of duPont. In 1936, duPont took over the operation of this business and dissolved duPont Cellophane Company, Inc.

In addition to La Cellophane, the following European producers have been named as co-conspirators but not party defendants: British Cellophane, Ltd. (England); Canadian Industries, Ltd. (Canada); Kalle & Co. (Germany); Viscose Francaise (France); and Viscose Development Company, Ltd. (England).

Plaintiff's argument and briefs treated in a highly interesting fashion the comparison of the economic and legal concepts of monopoly. But the final legal definition of the economic view of monopoly is to be left for decision by the Supreme Court.

## COMPARISON OF THE ECONOMIC AND LEGAL CONCEPTS OF MONOPOLY.

Economic philosophies concerning monopoly and what should be done about it are legion; no one view can be said to be "the economic" concept. While these philosophies can not be classified into air-tight compartments, they do fall into distinct schools of thought. These schools are presently engaged in debate over the degree of monopoly power which is economically desirable and which the law should permit. The economic discussion had its genesis in an attempt to bridge what was believed to be a gap between the legal and economic concepts of monopoly. This discussion has resulted in some agreement among economists upon classifications of various types of competition which exist in the market today, but in sharp disagreement upon their significance as indicia of monopoly.

Plaintiff contrasted first the legal and economic concepts of competition and monopoly as presently understood, and as affected by potential competition and the presence of substitute products. Second, it discussed the coalescence of the old patterns of economic and legal thought. Third, it discussed the economic concepts of monopoly whose application is proposed for the future and their contrast with the existing legal tests of monopoly.

## THE PRESENT ECONOMIC AND LEGAL VIEWS OF MONOPOLY AND COMPETITION.

Recent economic discussion has focused attention upon differences of opinion which exist among economists themselves and between economists and the courts as to the type and degree of competition which public policy, as expressed in the Sherman Act, contemplates. Differences also appear in the significance certain economists and courts attach to potential competition and to presence in the market of alternative or substitute products.

a. Competition and monopoly in the economic sense.

Today economists regard "perfect competition" and "pure monopoly" only as theoretical ideals of the opposite boundaries of possible market situa-

tions.[1] While economists have not crystallized their terms, in a semantic sense, they recognize between the two extremes of perfect competition and pure monopoly there are "pure competition", "imperfect competition", "oligopoly", and "monopolistic competition".[2] We start, Clark tells us, "with recognition that all practicable forms of competition are 'imperfect', and that the 'perfect competition' of economic theory is academic."[3] Pure competition, sometimes defined as a less perfect form of competition than perfect competition, has been said by Mason to be that state of the market wherein "no buyer or seller could, by his own action, influence the price of the goods to be bought and sold."[4] Mason views the concept of "pure competition of the economic theorists" as "divorced from time and space and independent of technological and other considerations."[5]

Imperfect competition in economic parlance is a term which includes all market situations falling between pure competition and pure monopoly, including what is known as oligopoly and monopolistic competition.[6] Monopolistic competition is now recognized as embracing those situations where either a few or many sellers trade in differentiated products, whereas "oligopoly" is regarded as consisting of those situations where a few sellers sell only a standardized product.[7]

There is much debate among economists with respect to the significance which should be attached to market behavior in industries which are oligopolistic.[8] While some economists take the view oligopolistic competition or oligopolies controvert the spirit of the antitrust laws, others contend oligopolies are able to pass along the benefits of efficiency of size to the consumer and are not socially disadvantageous.[9] Some admit in oligopolistic industries a considerably higher degree of competition than that which exists would be "workable" or effective.[10]

1. Stocking and Watkins, Monopoly and Free Enterprise, Twentieth Century Fund, pp. 13, 49 (1951); J. M. Clark, Alternative to Serfdom, pp. 68–69 (1948); Oppenheim, Divestiture as a Remedy Under the Federal Anti-Trust Laws, Economic Background, 19 G.Wash.L.Rev., pp. 120–122, (1950).

2. Stocking and Watkins, p. 13; Clark, Toward a Concept of Workable Competition, 30 Am.Econ.Rev., June 1940, pp. 241–56, reprinted in Readings, pp. 452–75.

3. Clark, Guideposts in Time of Change, p. 143 (1948).

4. Edward S. Mason, Current Status of the Monopoly Problem, 62 Harv.L.Rev. 1265, 1272 (1949). Clair Wilcox states: "Under pure competition, information as to present and prospective conditions of supply and demand may be imperfect or unequally distributed; custom may restrain complete independence of action; friction may impede the movement of capital between industries, products, and firms; minor obstacles may limit access to and withdrawal from the field. But other of the conditions of perfect competition must be preserved; commodities must be standardized; sellers and buyers must be numerous and small; no one of them may control enough of the supply or the demand appreciably to affect the price; each of them must take price as given and

adjust his output or purchases to it. * * * Pure competition undoubtedly does exist, but its occurrence is comparatively rare." Wilcox, Competition and Monopoly in American Industry, TNEC Monograph No. 21, p. 3 (1941).

5. Mason, Workable Competition versus Workable Monopoly, Symposium under Federal Antitrust Laws, 1951, CCH, pp. 67, 68.

6. See Stocking and Watkins, op. cit., p. 13; Clark, Readings, pp. 458–9.

7. See Stocking and Watkins, op. cit., pp. 13, 86, n. 7; Clark, Readings, op. cit., pp. 458–9. Chamberlin first defined "monopolistic competition" as a broad term, including within it oligopolistic situations involving a few sellers of either standard or differentiated products as well as situations involving many sellers of differentiated products. Chamberlin, The Theory of Monopolistic Competition, Harvard University Press (1933).

8. See Stocking and Watkins, op. cit., pp. 110–111.

9. Compare Stocking and Watkins, op. cit., p. 296, with Mason, The Antitrust Laws: A Symposium, 39 Am.Econ.Rev. 689, 713 (1949).

10. Fellner, Competition Among the Few, p. 290.

In attempting to evolve an economic approach to the concepts of monopoly and competition, some economists have proposed a theory of "Workable competition."[11] This theory has, as yet, received no precise definition.[12] Rather it is an approach by which some economists propose to determine, in any given industry, whether the industry is competitive or monopolistic, and what degree of competition is obtainable by a practical policy without substantial loss of efficiency.[13]

Monopoly, then, in economics, is not the simple test of perfect monopoly. In between the theoretical economic concepts of perfect competition and perfect monopoly lie various forms of imperfect competition which possess varying degrees and characteristics of monopoly. Pure monopoly which stands at the other extreme in economic thought from pure competition, has been defined by Stocking and Watkins as follows:[14]

"Pure monopoly means a single seller of a product for which no substitute is available. But, like perfect competition, such a monopoly is a theoretical ideal."

While some economists stress what they believe to be the efficiencies of oligopoly, others believe while a competitive structure may have imperfections, it is nevertheless the greater spur to progress and benefits to society. Corwin Edwards states:[15]

"But although the maintenance of competition will not guarantee that the economy will work well, impairment of competition by monopolistic restrictions, public or private, increases the chance that it will work badly. Although the imperfections of the competitive process are too great to make economic adjustments quick, neat, and exact, the forces of competition tend to reduce many substantial economic maladjustments."

Stocking and Watkins state:[16]

"To maximize his earnings a monopolist must so regulate the inflow of new capital as not to impair the value of the old, whether it is a question of new processes or of new products that will compete with old. Where a monopolist can realize profits from a new product only by accepting smaller revenues from an old, he will be reluctant to introduce the new. Unless he can expect a monopoly return from the new that more than offset the losses of monopoly revenue from the old, he will not put the new product on the market. A monopolist restricts not only output but new investment as well. In this way monopoly tends to block innovation and change, to retard technological progress and to deprive society of its benefits."

b. The competition intended by the Sherman Act.

■ Plaintiff shows the Sherman Act does not define the degree of competition which its policy contemplates, nor label it as either "perfect", "pure", "monopolistic", or "atomistic". The purpose of Congress in passing the Sherman Act was to preserve our system of free trade and competitive economy in order to protect the public from the evils thought to flow from undue restraints and monopolies. The object of Congress was "to secure competition and

---

11. Clark, Toward a Concept of Workable Competition, op. cit., Readings, pp. 452–475.

12. Stocking and Watkins, op. cit., p. 97.

13. Fellner, op. cit., p. 200.

14. Stocking and Watkins, op. cit., p. 13, n. 8, p. 49, n. 89. See also: Clark, Alternative to Serfdom, pp. 68–9, who points out that if one were to ask any graduate student to define "monopoly", "He may start by telling you that there is an element of monopoly in all trading, but he will probably not start with a definition of 'perfect' monopoly, which turns out, like perfect competition, to be nonexistent, or substantially so, outside Soviet Russia." And see: Oppenheim, op. cit., p. 122, who points out that the "perfect" monopoly of earlier economists is now generally considered to be an abstraction.

15. Edwards, Maintaining Competition, p. 8 (1949).

16. Stocking and Watkins, op. cit., pp. 11–12; see also: Fellner, op. cit., p. 288.

preclude combinations which tend to defeat it." International Harvester Co. of America v. State of Missouri, 234 U.S. 199, 209, 34 S.Ct. 859, 862, 58 L.Ed. 1276. The purpose of the statute was "to prohibit monopolies, contracts and combinations which probably would unduly interfere with the free exercise of their rights by those engaged, or who wish to engage, in trade and commerce —in a word to preserve the right of freedom to trade." United States v. Colgate & Co., 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992.

As Chief Justice White remarked in Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 56, 31 S.Ct. 502, 514, 55 L.Ed. 619, both at common law and under the Sherman Act, "practical common sense caused attention to be concentrated not upon the theoretically correct name to be given to the condition or acts which gave rise to a harmful result, but to the result itself and to the remedying of the evils which it produced."

c. The economic view of the effect of potential competition upon monopoly.

Freedom of entry of new firms into a given industry has been suggested by some economists as the distinguishing feature between competitive and monopolistic industries. As pointed out by Stocking and Watkins:[17]

"Economists who believe it impracticable to change greatly the structure of American industry count on potential competition and the competition of substitute products to make the existing structure of industry workably competitive by curbing monopoly power over the long run."

Under this approach the continuation of monopoly is condoned so long as there is sufficient likelihood potential competition will act as a brake upon the monopolist's use of its power, and regardless of the effect which the monopoly may have upon actual competitors.

Edwards views potential competition as a curb upon monopoly power "so long as entry is easy."[18] Clark, who thinks industries having large scale production may be competitively workable, ascribes lesser effect to the power of potential competition. He says neither potential competition nor the presence of substitutes "is a perfect check; but both together may come near it under favorable conditions."[19] Lewis represents another view when he states:[20]

"The key to the effectiveness of competition is to be found in its power systematically and predictably to compel economic decisions, and I do not believe that any such power or force characterizes the competition present in industries composed of, or dominated by either a single firm or a few large firms. * * * To speak of potential competition as a compelling regulatory force in this situation is to be blind to the strength of the factors that retard and will continue to retard the drive of potential competition to become actual competition."

Plaintiff argues potential competition does not serve as adequate legal test of the existence of monopoly, although the ability of new firms to enter an industry may give some indication of the strength of the barriers erected by the monopolist. One eminent legal writer, Milton Handler, pointed out some time ago that a combination may be held unlawful even though it has imposed no restraints upon new competition. Handler stated:[21]

"Many economists who have disagreed with the major purpose of the anti-trust laws have felt that the public is adequately safeguarded if potential competition remains free and unfettered at all times. This is not the premise on which

17. Stocking and Watkins, op. cit., p. 98.

18. Edwards, op. cit., p. 186.

19. Clark, Toward a Concept of Workable Competition, op. cit., Readings, p. 460.

20. Lewis, The Antitrust Laws; A Symposium, 1949, 39 Am.Econ.Rev., pp. 689, 707.

21. Handler, Industrial Mergers—Antitrust Laws, 32 Col.L.Rev. 179, 258 (1932).

the Sherman Law is based. The instrument of control under this statute is both actual and potential competition."

### d. The economic view of the effect of substitute products upon monopoly.

Economists differ on the question of what significance should be attached to the presence in the market of products which are substitutes or alternatives for the product said to be monopolized.

In an address before the New York State Bar Association in 1950, Professor Meriam decried the action of Judge Learned Hand in United States v. Aluminum Co. of America, 2 Cir., 148 F.2d 416, both in restricting his consideration of the product involved to virgin aluminum ingot and ruling out secondary aluminum which competes with virgin, and in paying "no attention to the very significant business fact that aluminum competes with other light metals of different chemical composition." [22]

Other economists point out there are few commodities for which no substitutes are available.[23] The "monopolistic competition" school of thought is based upon the premise differentiation in products confers some degree of monopoly power. Wallace, in expressing his understanding of that school of thought, states: [24]

"The theory of monopolistic competition emphasizes the significance of variation or differentiation of products. Successful differentiation confers some monopoly power by attracting a clientele which has some preference for the article of a particular seller."

Chamberlin, a pioneer of the monopolistic competition school states: [25]

"A monopoly of 'Lucky Strikes' does not constitute a monopoly of cigarettes, for there is no degree of control whatever over substitute brands. But if, in order to possess a perfect monopoly, control must extend to substitutes, the only perfect monopoly conceivable would be one embracing the supply of everything, since all things are more or less imperfect substitutes for each other. * * * The term 'monopoly' is meaningless without reference to the thing monopolized. A monopoly of diamonds is not a monopoly of precious stones, nor, to go still further, of jewelry. Differentiation implies gradations, and it is compatible with perfect monopoly of one product that control stop short of some more general class of which this product is a part, and within which there is competition."

After pointing out this idea was no departure from accepted doctrine, and citing as his authority both Taussig and Ely,[26] Chamberlin writes (p. 67):

"Of course, prices might be higher yet if, instead of a monopoly of each different brand, there existed a monopoly of the entire class of product. The more substitutes controlled by any one seller, the higher he can put his price. But that is another matter. As long as the substitutes are to any degree imperfect, he still has a monopoly of his own product and control over its price within the limits imposed upon any monopolist—those of the demand."

22. Meriam, The Sherman Antitrust Act and Business Economics, Antitrust Law Symposium, 1950, p. 98.

23. See Stocking and Watkins, op. cit., p. 503, where it is noted that aluminum is interchangeable in electrical transmission lines and that it also competes with "light steel, plywood and more recently with plastics, in the making of furniture, household appliances, and other products. Plastics compete with leather, rubber, and glass."

24. Wallace, Monopolistic Competition and Public Policy, 36 Am.Econ.Rev., March 1936, pp. 77–87.

25. Chamberlin, The Theory of Monopolistic Competition, Chap. 9, pp. 65–67, Harvard University Press (1948).

26. Taussig, Principles of Economics, 3rd Ed. revised, Vol. II, p. 114, and Ely, Monopolies and Trusts, p. 35.

Clearly, there are different schools of thought in economic circles with respect to the effect upon monopoly of the presence of substitute products.

In general, plaintiff charges defendant maintains a monopoly position in the production and sale of cellophane and bands. It is charged defendant unlawfully acquired and maintains a monopoly position in the field of cellophane and bands—that defendant's predatory practices in the markets for these products demonstrate an intent to monopolize and the exercise of monopoly power. The unlawful acquisition is traced, in the beginning, to defendant's foreign relations with European companies, which resulted in a cartel which divided world markets. There is the charge of abuse of patents; exclusionary and oppressive acts and practices; and restraint of trade in distribution of the products in connection with both direct and indirect sales.

## PART I—CELLOPHANE.

Certain issues of fact and law must control the decision in this case. When these controlling issues are isolated, it will be apparent there are fatal deficiencies in the Government's proof, and the record fails to establish those facts which are essential to support the charges in the complaint.

The history of duPont's cellophane business is a record of competitive achievement. DuPont was the first American company to manufacture this new wrapping material. To pioneer the cellophane business required foresight, and a willingness to take risks. DuPont had little technical experience in this line of chemistry. The product had not been proven as a packaging material. It had had little acceptance in this country.

DuPont entered the business in the only manner that was practicable. It acquired the commercial process from the French. This process was obtained on the best terms duPont could negotiate. The two groups, American and French, had already been successful partners in rayon. No desire to limit competition was involved, for neither partner to the venture was engaged in business in competition with the other, and there is no indication anyone was interested.

DuPont saw the chance for profit and utility for cellophane if it could be introduced into the mass production packaging markets of the United States. It decided to bring a new competing material into the flexible packaging market, an established field of competitive business activity.

Cellophane was not at first acceptable in the trades to which it was offered. Manufacturing techniques were crude; quality unsatisfactory, and costs made price of cellophone prohibitive for many uses. There were distribution and merchandising problems to be met. Only by effective competition could duPont hope to gain recognition for its product in markets where other materials were entrenched. The business had to be built up by creative research.

DuPont's technological achievements were of high order. Through research it improved manufacturing efficiency, reduced costs, improved quality, developed new types of materials and lowered prices to obtain acceptance for its product, all in the face of competition. Research results were continuously put to use in its plants.

The product obtained from the French did not meet the needs of the American market. DuPont invented a new product, moistureproof cellophane, which proved to be the product upon which the cellophane business has been built. It obtained a product patent under which all its moistureproof cellophane was produced during the period of the monopoly charged in the complaint. It then exploited that patent, well within the purposes and intentions of the patent grant. Its production expanded; it made many types of moistureproof cellophane; it gave increasing service to its customers; it neither curtailed its initiative nor restricted the capital which it

was willing to devote to the enterprise. DuPont achieved through business method an increasing success in its competition with other packaging materials.

As cellophane got recognition in the trade, others entered various phases of the business as converters, users, suppliers of raw materials, manufacturers of equipment, and the like. Cellophane creates competition. Throughout the flexible packaging markets this competition is felt. It stimulates efforts of other producers to manufacture more efficiently. It stimulates research. The consumption of flexible packaging materials including cellophane has grown at a rapid rate. Within these markets the competition is intense. New producers have entered. No one material or one supplier controls—certainly not duPont, which has neither the power to raise prices nor to exclude competitors.

After reviewing the development of this business, plaintiff has been unable to bring a single person who says he was injured or who claims to have been denied an opportunity to participate. Prices have consistently been lowered and reflect competitive pressures. Production has expanded. Benefits from research have been passed on to consumers. DuPont has not conducted its cellophane business in a restrictive way. There are no artificial controls which it can exercise in the markets where its product is sold.

### A. DuPONT'S POSITION DOES NOT VIOLATE § 2 OF THE SHERMAN ACT.

The charge here is duPont monopolizes cellophane. The charge involves two questions: 1. does duPont possess monopoly powers; and 2., if so has it achieved such powers by "monopolizing" within the meaning of the Act and under United States v. Aluminum Company of America, 2 Cir., 148 F.2d 416, 429. Unless the first is decided against defendant, the second is not reached. First, then, to the question of existence of monopoly power.

### 1. DuPONT DOES NOT HAVE MONOPOLY POWER.

**a.** Plaintiff must establish duPont has sufficient power arbitrarily to raise prices or to exclude competitors.

Ultimate determination of issues raised by a charge § 2 has been violated, involves application of established principles. The tests are clear. They have been laid down in numerous cases. The issues in this litigation are fact issues, not law issues. When facts are analyzed in the light of established tests, result is clear.

The voluminous record in this case requires the distillation of a great mass of facts which are basic to a decision.

### FINDINGS OF FACT.

**I.** Description of Defendant duPont.

(Findings 1–6)

1. E. I. duPont de Nemours & Co. (hereafter called "duPont") is a Delaware corporation. It manufactures chemical products, including many types of plain and moistureproof cellophane.[27]

Prior to 1936, duPont engaged in the manufacture of these products through subsidiary companies: From 1923 to 1929, through duPont Cellophane Company in which duPont had 52% interest, and from 1929 to 1936, through duPont Cellophane Company, Inc., in which duPont had a 100% interest.[28]

2. Within the duPont organization responsibility for the manufacture and sale of cellophane and bands rests with the Film Department which makes and sells other products, such as cellulose acetate film, polyethylene film, cellulose sponges, and cellulose bands.[29] From

---

27. Answer, Para. 3. GX 1103, p. 1213, 7/2/36.

28. Carpenter, Tr. 6261–62, 6268–71. GX 1, pp. 5, 8, 2/17/44.

29. R. R. Smith, Tr. 5663.

1936 until formation of the Film Department in April 1950, cellophane was handled with other products by the Cellophane Division of the Company's Rayon Department.[30] The Cel-O-Seal section of the division handled caps and bands.[31]

3. DuPont built cellophane manufacturing plants and commenced operations in them:

| Plant and Location | Operation Started | |
|---|---|---|
| Buffalo #1 (N.Y.) | April, | 1924 |
| Old Hickory #1 (Tenn.) | October, | 1929 |
| Old Hickory #2 (Tenn.) | August, | 1930 |
| Spruance #1 (Richmond, Va.) | November, | 1930 |
| Buffalo #2 (N.Y.) | February, | 1932 |
| Spruance #2 (Richmond, Va.) | May, | 1937 |
| Clinton #1 (Iowa) | March, | 1941 |
| Clinton #2 (Iowa) | February, | 1947 [32] |

All plants are operating today except plant known as Buffalo #1 which was closed in 1942 and thereafter converted to manufacture of rayon for tire cord at the request of the United States to meet urgent production problems during the war.[33]

4. DuPont sells types of cellophane designed to serve specific packaging needs.[34] In 1949, duPont sold 108 varieties of cellophane.[35]

5. In 1950, duPont produced 202,000,000 lbs. of cellophane [36] and its sales in that year totalled $99,181,192 of which $89,850,416 was moistureproof cellophane.[37]

6. DuPont sells cellophane in interstate trade.[38] Cellophane is sold in foreign commerce.[39]

II. Description of Cellophane.

(Findings 7–12)

7. Plain cellophane is a thin flexible non-fibrous film of regenerated cellulose containing glycerol as a softener. It has little resistance to the passage of moisture vapor and is used for wrapping products as to which the gain of moisture is not important.[40]

Moistureproof cellophane is a different product. It is a thin transparent flexible non-fibrous film of regenerated cellulose containing a softener, one of which is glycerol, combined with a moistureproofing composition. Moistureproof cellophane is used for packaging foodstuffs; gain or loss of moisture is important.[41]

Plain cellophane is manufactured in various thicknesses, colors, as well as transparent form.[42] Types of moistureproof cellophane differ in their resistance to moisture vapor, ability to be sealed by heat and anchoring of the coating to the base film.[43] Specific types of moistureproof cellophane were developed to meet the packaging requirements of specific products.[44]

30. Carpenter, Tr. 6265–66.

31. DX 941, p. 1915, 1/23/45.

32. Answer, Para. 17.

33. Answer, Para. 17. Yerkes, Tr. 6950. GX 32, pp. 153–61, 8/23/44.

34. DX 408, pp. 794–808, 10/1/48. Mitchell, Tr. 5504–30.

35. GX 396, pp. 5494–97, 5/15/50.

36. DX 537, p. 993, 1951.

37. DX 536, p. 992, 1951.

38. Answer, Para. 20.

39. GX 594, p. 7554, 9/28/48.

40. GX 9, pp. 71–73, 12/2/38; GX 11, pp. 85–86, 3/27/45; GX 25, pp. 129–31; GX 26, p. 136, 5/21/46.

41. GX 9, pp. 71–73, 12/2/38; GX 25, pp. 129–32, 7/2/43; GX 26, pp. 136–38, 5/21/46; GX 11, pp. 86–90, 3/27/45; Cook, Tr. 2202–03.

42. GX 11, p. 85, 3/27/45; GX 396, p. 5490, 5/15/50.

43. GX 11, pp. 86–90, 3/27/45; GX 396, pp. 5495–97, 5/15/50. Mitchell, Tr. 5481–82.

44. DX 408, pp. 794–808, 10/1/48. Mitchell, Tr. 5517, 5525.

8. In commercial practice moisture-proof cellophane is 100 times as impervious to the transmission of moisture vapor as plain cellophane.[45]

9. Plain cellophane is manufactured by extruding viscose made to specifications through a narrow slot in a hopper into a chemical bath where it coagulates in the form of a thin sheet; this sheet is run through a succession of purifying baths and while wet is immersed in a water solution of glycerol, some of which is absorbed; excess moisture is then removed from the surface of the film and the material is dried to a predetermined moisture content.[46]

Moistureproof cellophane is manufactured by combining with a base thin transparent film of regenerated cellulose, containing a softener, one of which is glycerol, a moistureproofing coating composition, which may comprise waxes, resins, nitrocellulose or other film forming materials and plasticizers.[47]

The manufacturing processes are chemical in nature and require for successful commercial operation a degree of technical knowledge and controls. The mechanical aspects of the operations are intricate.[48]

10. Until the invention and development of moistureproof film, cellophane sales were relatively unimportant.[49]

Production of moistureproof cellophane, which began in 1927, by 1930 had exceeded production of plain cellophane.[50] Subsequent growth of cellophane sales has been due to moistureproof cellophane.[51] In 1936, United States production of plain cellophane amounted to 24,650,000 lbs. and by 1947 had increased to only 25,780,000 lbs. During the same period, United States production of moistureproof cellophane increased from 50,941,000 lbs. to 148,769,000 lbs.[52]

11. After preparation of viscose solution, cellophane is extruded through a casting machine. These machines are 200 feet long and are operated by du-Pont at speeds up to 120 meters per minute, carrying a film 1/1,000th of an inch thick (300 gauge) from a semi-coagulated to a coagulated condition with an allowable variation in gauge of only 1/10,000th of an inch.[53] DuPont's moistureproof cellophane goes through the further stage of a six story coating tower in which the film running at a speed of 200 meters per minute has applied to it on each side a coating of 1/100,000th of an inch thick, with an allowable tolerance in coating thickness of approximately 1/1,000,000th of an inch.[54]

12. Plain and moistureproof cellophane are separate products from cellulose caps and and bands which are made by separate processes, used for different purposes and sold to a different trade.[55]

III. DuPont's Entry Into the Cellophane Business and Organization of duPont Cellophane Company.

(Findings 13–36)

13. DuPont was the first company to manufacture plain cellophane in the United States,[56] and the first to manufacture moistureproof cellophane anywhere in the world.[57]

45. DX 107, p. 231, 6/29; DX 291, p. 543, 8/5/37 (Table). GX 6005, p. 7930.

46. Answer, Para. 12. GX 9, pp. 71–73, 12/2/38; GX 25, pp. 129–31, 7/2/43; GX 999, pp. 11–14, 10/41.

47. GX 25, pp. 131–32, 7/2/43; GX 26, pp. 136–38, 5/21/46.

48. DX 367, p. 686, 11/27/40. GX 594, p. 7552, 9/28/48. Benger, Tr. 5433–36.

49. Cook, Tr. 2094.

50. GX 2467, p. 3157, 7/13/43; GX 485, p. 6439, 1/22/31.

51. GX 395, p. 5488, 5/15/50. Cook, Tr. 2094, 2117–18.

52. GX 532, p. 2098.

53. McCune, Tr. 5542, 5555–56, 5558–59.

54. McCune, Tr. 5543, 5567–72.

55. Cook, Tr. 2202–04. DX 407, pp. 794–808, 10/1/48.

56. GX 26, p. 136, 5/21/46.

57. Benger, Tr. 5437–38. GX 28, pp. 142–43, 11/30/45.

14. La Cellophane, Societe Anonyme, referred to as "La Cellophane", is a French corporation with principal place of business at Paris, France.[58] Prior to 1941 it had association with an organization known as Comptoir des Textiles Artificiels, referred to as "Comptoir", a French organization with interests in rayon.[59] La Cellophane produces cellophane in France.[60] It was the first company to manufacture plain cellophane on a commercial basis, and was engaged in this business in France in 1917.[61]

15. Jacques Brandenberger of France invented the process and machinery for the manufacture of plain cellophane about 1912. He obtain patents both in Europe and United States on his inventions. Brandenberger's processes and patents were transferred to La Cellophane on its formation, at which time Brandenberger joined La Cellophane. The United States patents were assigned to duPont Cellophane Company in 1923. Some of these were subsequently used in duPont Cellophane Company's operations.[62]

16. Prior to duPont's decision to manufacture plain cellophane, duPont had been associated with Comptoir in the manufacturing of viscose rayon in the United States through a jointly owned company called duPont Fibersilk Company (later, duPont Rayon Company). This association had been profitable. The processes and technical information, including viscose chemistry, engineering and other details of manufacture of rayon, had been acquired from the Comptoir after fruitless experimentation by duPont to develop an artificial fiber.[63]

17. DuPont management decided to invest money in cellophane manufacture as part of a policy determined after World War I to diversify into a broad line of chemical products.[64] In entering the cellophane business, duPont had no intention to commit any act violative of the Sherman Act.[65]

18. About 1923, duPont became interested in cellophane when it learned through the Comptoir, La Cellophane had developed and was operating a commercial process for the manufacture of plain cellophane. DuPont conducted negotiations with the French interests for the American rights to this process, which culminated in the formation of duPont Cellophane Company and execution of certain technical agreements.[66] No evidence exists any other concern in the United States was interested in securing the French process at this time.

19. The French would not disclose any aspect of their cellophane process to duPont unless duPont would agree to refrain from manufacturing cellophane for five years in the event it determined after disclosure not to take a license.[67]

20. The French were not willing to make their process available to duPont unless duPont agreed the French could participate in the profits of United States manufacture [68] and unless duPont was willing to confine to North and Central America its manufacture and sale of cellophane made by the French process.[69] DuPont sought to obtain ex-

58. Answer, Para. 4.

59. GX 1, p. 4, 2/17/44.

60. Goland, DX 1015, p. 170.

61. Answer, Para. 15. GX 28, p. 142, 11/30/45. Ernst, Tr. 5339–41, 5371.

62. GX 26, p. 136, 5/21/46; GX 28, pp. 142–43, 11/30/45; GX 999, p. 4, 10/41. Ernst, Tr. 5340–41.

63. Carpenter, Tr. 6257–60. GX 1, p. 4, 2/17/44.

64. Carpenter, Tr. 6257, 6275. Yerkes, Tr. 6938–39.

65. Carpenter, Tr. 6276–83. Yerkes, Tr. 6940–57.

66. GX 1, pp. 4–8, 2/17/44; GX 28, pp. 142–43, 11/30/45. Carpenter, Tr. 6257–61.

67. GX 1458, p. 6001, 1/23; GX 392, p. 5429, 4/1/23.

68. Carpenter, Tr. 6262; GX 1459, p. 6009, 11/29/22.

69. Carpenter, Tr. 6264–65; DX 738, p. 1571, 10/15/23; DX 741, p. 1575, 8/25/23.

**58**

clusive right to La Cellophane's patents and processes and responsibility for the manufacturing operations.[70]

21. By contract dated June 9, 1923, duPont and the French agreed to form duPont Cellophane Company to manufacture cellophane in the United States. Each party agreed it would not prior to December 31, 1935 except by duPont Cellophane Company become interested in any other business in North or Central America engaged in the manufacture of cellophane.[71]

22. By agreement of June 9, 1923, duPont Cellophane Company was organized to manufacture cellophane in the United States. DuPont contributed $866,666.67 and received 52% of the voting stock. La Cellophane contributed its patents, processes, technical assistance, and $133,333.33, for all of which it received 48% of the voting stock.[72]

23. The contribution of La Cellophane to duPont Cellophane Company in exchange for 48% of its voting stock was neither cash nor patents but its secret process and technical assistance.[73]

24. On December 26, 1923, an agreement was executed between duPont Cellophane Company and La Cellophane by which La Cellophane licensed duPont Cellophane Company exclusively under its United States cellophane patents, and granted duPont Cellophane Company the exclusive right to make and sell in North and Central America under La Cellophane's secret processes for cellophane manufacture. DuPont Cellophane Company granted to La Cellophane exclusive rights for the rest of the world under any cellophane patents or processes du-

Pont Cellophane Company might develop.[74]

25. There was no agreement between La Cellophane and duPont beyond the written agreements of June 9, 1923 and December 26, 1923.[75]

26. La Cellophane had four representatives on the Board of eleven (later nine) Directors of duPont Cellophane Company.[76] La Cellophane had a minority interest and veto power over major expenditures, over obligations of the company which would alienate, mortgage or diminish the corporate assets, and over changes in the number of Directors. Similar veto powers were held by the minority over changes in the charter and by-laws.[77]

27. The representatives of La Cellophane on the Board of duPont Cellophane Company attended Directors' meetings and participated in the functions of the Board.[78] The French were most actively represented by a New York lawyer, Benjamin Paskus, and two American businessmen, Messrs. Henry Blum and Albert Blum.[79]

28. In 1929 duPont purchased the shares of the French in duPont Cellophane Company, and reorganized it as du Pont Cellophane Company, Inc. In exchange for the French shareholding in the duPont Rayon and Cellophane Companies the French interests received duPont Company stock with a market value at that time of nearly $90,000,000. French interests continued their membership on the Board of duPont Cellophane Company, Inc., maintained their previous degrees of participation in the management of the affairs of the company, and technical cooperation con-

70. Carpenter, Tr. 6264.

71. GX 1001, pp. 986–87, 993–94, 6/9/23.

72. GX 1001, p. 987, 6/9/23. Carpenter, Tr. 6261–62.

73. DX 735, p. 1568, GX 402, pp. 5579–80, 5/15/50. GX 392, 545–55, 4/14/23.

74. GX 1002, pp. 998–1001, 12/26/23.

75. Carpenter, Tr. 6264–65. Yerkes, Tr. 6921.

76. DX 734, p. 1566; DX 732, pp. 1543–45, 4/4/26.

77. GX 1458, pp. 6005–06, 1/6/23; GX 1001, pp. 994–96, 6/9/23; DX 732, pp. 1537–39, 6/20/23. Carpenter, Tr. 6262–63.

78. Carpenter, Tr. 6266–68. Yerkes, Tr. 6917–18.

79. Carpenter, Tr. 6266–68. Yerkes, Tr. 6916–17.

tinued between duPont Cellophane Company, Inc. and La Cellophane.[80]

29. At the time duPont decided to enter the cellophane business it had limited technical resources useful in such business, and had no knowledge as to how to make cellophane or of the chemistry of the product.[81] It was not staffed to develop the necessary chemical and engineering techniques at a cost which would have been reasonable.[82] This information was essential to commercial manufacture of plain cellophane.[83]

30. Although duPont believed it was a business risk to undertake manufacture of cellophane in the United States, success of the venture was not assured.[84] The buildings for the initial casting machines at Buffalo were designed to permit conversion to use in rayon manufacture in the event the cellophane venture failed.[85]

31. In France plain cellophane was sold in sheet form for hand application in the packing of luxury items, such as perfume bottles and for decorative uses. It was sold in small volume at high prices.[86] DuPont felt while the business risks were substantial, it stood a chance of promoting cellophane in the United States by improving its quality and manufacturing processes so it could be sold for mass packaging uses at lower cost in competition with other flexible packaging materials already established in the American market.[87]

32. Evidence shows duPont could not have developed a successful process for cellophane manufacture in less than five to eight years and then only at very substantial cost.[88]

DuPont has continued to use La Cellophane's basic process,[89] and evidence shows the only other process commercially developed for continuous manufacture, Wolff's casting on a wheel, was inferior in cost of manufacture and quality of product.[90]

33. Technical information which La Cellophane granted duPont Cellophane Company represented the entire knowledge gained by La Cellophane as the result of years of research in developing the process. It included designs for all machinery including the hopper and all casting machine apparatus, together with information as to chemical compositions and controls from the initial step in the formulation of the viscose solution to the ultimate product. The French disclosed through plant inspection, manuals and training of personnel both in France and in the United States all phases of their own proven production line know-how. French technicians designed the initial duPone Cellophane plant, manufactured some of the machinery in France, and supervised the operations and training of essential personnel.[91]

34. Communication of the process to duPont by La Cellophane was in confidence. The process for cellophane manufacture had been kept in secrecy by the French prior to its communication to duPont by a system of fences, plant guards, passes and an effort on the part of management to maintain secrecy. Following the communication of the process to duPont Cellophane Company, both it and

80. GX 1003, p. 1004–06, 3/18/29. DX 734, p. 1566; DX 735, p. 1568. Carpenter, Tr. 6268–71.

81. Yerkes, Tr. 6919. Benger, Tr. 5417–18.

82. Benger, Tr. 5435.

83. Yerkes, Tr. 6919. Ernst, Tr. 5352, 5354. Benger, Tr. 5424.

84. GX 392, pp. 5428–74, 4/1/23.

85. Ernst, Tr. 5345.

86. GX 28, pp. 142–43, 11/30/45; GX 392, p. 5439, 4/1/23. Yerkes, Tr. 6938–39.

87. GX 392, p. 5439, 4/1/23. Yerkes, Tr. 6938–39.

88. Benger, Tr. 5424–25.

89. McCune, Tr. 5549. Ernst, Tr. 5363–64.

90. Olsen, Tr. 6812–13. DX 504, p. 943, 11/19/24; DX 508, p. 949, 5/4/27; DX 512, p. 957, 1/21/29; DX 513, p. 958, 2/23/29; DX 514, p. 959, 5/31/29. GX 1455, p. 1947, 9/11/30.

91. Ernst, Tr. 5339–64. DX 742, p. 1579, 9/29/23; DXs 743–757, pp. 1580–1613.

**60**

La Cellophane used similar means to maintain secrecy of the process and the interior of the plants.[92]

35. Some information as to La Cellophane's process became available through the patent literature,[93] but many key facts were not disclosed at any time prior to World War II and all phases of the process were kept secret by duPont until that time.[94]

36. DuPont still employs the fundamentals of the secret process received from La Cellophane for continuous casting of an endless sheet of regenerated cellulose.[95]

IV. The "Market Setting" in Which Cellophane is Sold.

(Findings 37–79)

37. The relevant market for determining the extent of duPont's market control is the market for flexible packaging materials (judicial notice after examination and observation).

38. Both plain and moistureproof cellophane are packaging materials.[96] Only 6 percent of duPont's cellophane production is sold or used for non-packaging purposes.[97]

39. When cellophane was first made by duPont, wax paper, glassine, and sulphite paper were the flexible packaging materials in use. These products were established in the trade and accepted.[98] They remain today dominant materials

sold for the end uses where cellophane is also employed by some packagers.[99]

40. Since 1923 new types of flexible materials have been developed for packaging. These include, among others, rubber hydrochloride film,[100] moistureproof cellophane,[101] polyethylene coated paper,[102] heat sealing glassine,[103] and polyethylene film.[104]

41. From the beginning of duPont's cellophane duPont has been aware of competition of other flexible packaging materials, particularly waxed paper and glassine, and has directed its price and sales policies toward selling successfully against these materials. This awareness is reflected from 1923 to the filing of this suit in correspondence and reports within the duPont organization.[105]

42. Since 1923 there has been a growth in the use of flexible packaging materials; measured in millions of square yards, total United States production and imports of the principal flexible packaging materials has grown from approximately 4,170,000 in 1925 to 14,720,000 in 1949.[106] This has resulted from improvements in all the materials themselves; the rapid development of self-service distribution with its emphasis upon retail packaging units, higher standards of living and increased consumption, emphasis upon protective and other health aspects of packaging, the development of new merchandising techniques and the increased utility of the

92. Yerkes, Tr. 6919–20. Benger, Tr. 5421–23. Ernst, Tr. 5352, 5365, 5377.

93. GX 2014, p. 2070, 2/4/46; GX 1329, p. 1685, 4/6/44.

94. GX 4449, p. 6214, 1/23/40; GX 1329, p. 1684, 3/29/44; GX 2014, p. 2070, 2/4/46. Ernst, Tr. 5377. Yerkes, Tr. 6922.

95. McCune, Tr. 5608–09. DX 369, p. 689.

96. R. R. Smith, Tr.5665. DX 409, p. 809, 2/9/50.

97. R. R. Smith, Tr. 5665. DX 409, p. 809, 2/9/50.

98. DX 982. Nelson, DX 1020, p. 301. Ramsay, DX 1017, p. 226.

99. DXs 989–992. Ramsay, DX 1017, p. 226.

100. DX 297, p. 568, 1947. GX 583 (Imp. Doc.No.39), pp. 28–29, 31, 5/16/49. Ellies, DX 1014, p. 134.

101. GX 532, p. 2098.

102. Croy, DX 1021, pp. 341, 344.

103. Nelson, DX 1020, p. 316.

104. GX 583 (Imp.Doc.No.39), pp. 3–4, 10, 27, 31, 5/16/49. Leeds, DX 1011, p. 92.

105. GX 392, p. 5429, 4/14/23; GX 1483, p. 7048, 4/23/26; GX 5047, p. 4558, 4/28/41; DX 298, p. 570, 8/13/24; DX 299, p. 571, 8/19/24; DXs 304–326, pp. 585, 632; DXs 328–334, pp. 634–40.

106. Ramsay, DX 1017, pp. 233–34. Leeds, DX 1011, pp. 93–94. McCurry, DX 1016, p. 222. Tindal, DX 1012, p. 107. DX 981. DX 982.

materials themselves.[107] All principal flexible packaging materials have shared in this development and much of the growth of duPont's cellophane business is due to the factors mentioned.[108]

43. There is tremendous increase in packaging since the end of World War II in both transparent and non-transparent materials. Most of this increase has been in consumer-size packages.[109]

44. DuPont employs sixty men in the selling of cellophane.[110] These men are trained to have technical familiarity with packaging design, with packaging machinery, including printing and bag making machines, with physical and chemical properties of the various types of cellophane, and with the distribution, costs, sales promotion and other business problems of concerns that are direct users of cellophane and of concerns that process it for resale.[111]

45. DuPont sells about 55% of its cellophane direct through its own salesmen to users who package products of their own manufacture for retail distribution such as bakers, food chains, candy manufacturers, meat packers, cereal manufacturers, and tobacco companies.[112] This cellophane is sold without printing or other processing in roll or sheet form in various sizes to suit the customer's needs.[113] Most customers run cellophane through packaging machines to wrap their products.[114]

46. DuPont sells cellophane to converters who print cellophane or process it into packaging units such as bags or special wraps and in turn sell in a form for use as a primary part of a package to concerns which package their products.[115] About 35% to 40% of duPont cellophane is sold in this manner.[116] The same customer often buys unprinted cellophane from duPont for certain purposes and buys converted cellophane from converters for other or the same purposes.[117]

DuPont sells cellophane in quantities to jobbers and to fabricators.[118] The latter use cellophane in the manufacture of non-packaging items such as straws, pressure-sensitive cellulose tape, Christmas ornaments and ribbon.[119]

47. Most companies engaged in converting cellophane into bags or printed packaging material, including all of the principal converters of duPont cellophane also convert other flexible packaging materials, such as glassine, other papers, Pliofilm, polyethylene, Saran, and others.[120] The products of such a converter made of flexible packaging materials other than cellophane are sold by the same salesmen who sell the converter's products made of cellophane, to customers who are potential users of converted cellophane as well.[121]

107. DX 6002, p. 8116, 6/8/51. Martin, Tr. 6380–82. McCurry, DX 1016, pp. 218–19. Elmstrom, DX 1019, p. 290. Croy, DX 1021, pp. 343–44.

108. DX 981; DX 982. Leeds, DX 1011, pp. 93–94. Nelson, DX 1020, p. 326. Tindal, DX 1012, p. 107.

109. Leeds, DX 1011, pp. 93–94. Tindal, DX 1012, p. 119. McCurry, DX 1016, pp. 214, 218–19, 222. Ramsay, DX 1017, pp. 233, 234. Elmstrom, DX 1019, p. 290. Nelson, DX 1020, p. 326. Croy, DX 1021, pp. 343–44. GX 6002, pp. 8116–21, 6/8/51.

110. R. R. Smith, Tr. 5661.

111. R. R. Smith, Tr. 5662–63.

112. R. R. Smith, Tr. 5665–67; DX 409, p. 809, 2/9/50; DX 595, pp. 1149–50, 1949.

113. R. R. Smith, Tr. 5668.

114. R. R. Smith, Tr. 5666, 5668. Tindal, DX 1012, pp. 104–05.

115. GX 5457, p. 5342, 9/10/45.

116. DX 409, p. 809, 2/9/50. GX 6002, pp. 8128–29, 6/8/51.

117. E.g., Elmstrom, DX 1019, pp. 282, 284.

118. DX 409, p. 809, 2/9/50; DX 595, pp. 1149–50, 1949.

119. GX 5457, p. 5342, 9/10/45.

120. Martin, Tr. 6334. Goland, DX 1015, p. 184. Ramsay, DX 1017, pp. 225, 228–29. Hanson, DX 1018, pp. 248–51. Leeds, DX 1011, p. 79. DX 988.

121. Martin, Tr. 6363. Goland, DX 1015, p. 198. Hanson, DX 1018, p. 255. Ramsay, DX 1017, p. 245. Leeds, DX 1011, p. 89.

48. Most converters who handle du-Pont cellophane also handle other flexible packaging materials at the same time for sale for the same end uses.[122]

49. Converters produce wrappers for nearly every type of customer.[123] Converters hold themselves out to the public through advertising in trade journals, as ready to serve any type of customer with any type of flexible packaging material or combination.[124]

50. Concerns which purchase cellophane from duPont, or converted duPont cellophane from converters, will purchase other packaging materials (such as glassine, foil, etc.) from manufacturers of such materials and from converters of them.[125]

51. In addition to duPont two companies, American Viscose Corporation and Olin Industries, Inc., also manufacture and sell cellophane throughout the United States and in foreign commerce.[126]

52. Sylvania Industrial Corporation was a Virginia corporation [127] organized in 1929 and began production of cellophane at a plant in Fredericksburg, Virginia in 1930.[128] In 1946 it was acquired by American Viscose Company, a Delaware corporation, which is the largest producer of viscose and of viscose rayon in the United States,[129] with assets in 1949 in excess of $222,000,-000.[130] The term "Sylvania" is used with reference to events since that acquisition as meaning the Sylvania Division of the American Viscose Company, and prior thereto to mean Sylvania Industrial Corporation.

53. Olin Industries, Inc., referred to as "Olin", is a Delaware corporation having a place of business at East Alton, Illinois.[131] Ecusta Paper Corporation is a Delaware corporation having its principal place of business at Pisgah Forest, North Carolina.[132] Ecusta is owned and controlled by Olin and carries on the entire cellophane business of Olin.[133] Ecusta began production of cellophane in June 1951 at its plant in Pisgah Forest, North Carolina.[134]

54. Manufacturers of flexible packaging materials other than cellophane promote their products by many of the means employed by duPont to promote cellophane.[135]

55. Manufacturers of flexible packaging materials hold themselves out to the trade, through advertising as able to satisfy the packaging requirements of

122. DX 988. Martin, Tr. 6334. Hanson, DX 1018, pp. 248–51. Ramsay, DX 1017, pp. 228–29. Goland, DX 1015, p. 184.

123. Martin, Tr. 6336–38.

124. Martin, Tr. 6454, 55. Hanson, DX 1018, pp. 254–56. Croy, DX 1021, p. 346. Ramsay, DX 1017, p. 245. DX 239, p. 472; DX 257, p. 491; DX 264, p. 498; DX 271, p. 505; DX 280, p. 514; DX 281, p. 515; DX 284, p. 518; DX 286, p. 522.

125. Jakes, DX 1006, p. 10. Hopping, DX 1007, pp. 19, 21; Southwick, DX 1008, pp. 30, 32; Torrence, DX 1009, p. 43; Horn, DX 1010, pp. 69–70; Leeds, DX 1011, pp. 79–80, 87–88; Tindal, DX 1012, pp. 105–06; Wilcox, DX 1013, pp. 125–26; Ellies, DX 1014, pp. 142–43, 145; Goland, DX 1015, p. 184; McCurry, DX 1016, pp. 205–06, 213, 219; Ramsay, DX 1017, pp. 225, 228–30; Hanson, DX 1018, pp. 248, 250, 253–54; Nelson, DX 1020, pp. 303–04; Croy, DX 1021, pp. 339–40, 342.

126. Reichel, Tr. 6019, 6044. Olsen, Tr. 6809, 6830. DX 600, p. 1216. GX 580, pp. 7331–32, 8/8/50.

127. Answer, Para. 18.

128. Answer, Para. 18. Reichel, Tr. 6024–32. GX 434, p. 5723, 1/25/30; GX 436, p. 5743, 1/7/31.

129. Answer, Para. 18.

130. DX 983 (Moody's Industrials, 1950).

131. DX 974, p. 1985, 11/4/49.

132. DX 976, p. 2005, 3/6/50.

133. DX 976, p. 2005, 3/6/50; DX 978, p. 2008, 1951.

134. DX 978, p. 2008, 1951. Olsen, Tr. 6829.

135. Hopping, DX 1007, pp. 19–22. Torrence, DX 1009, pp. 42–44. Leeds, DX 1011, pp. 86–87. Tindal, DX 1012, p. 111. Ellies, DX 1014, pp. 138–39, 141–43. McCurry, DX 1016, p. 221. Ramsay, DX 1017, pp. 236, 245. Elmstrom, DX 1019, p. 285. Nelson, DX 1020, pp. 323, 324.

the principal customer trades. This advertising material appears in the principal packaging periodicals such as *Modern Packaging, Package Parade,* and the *Modern Packaging Encyclopedia* and in trade journals representing various end uses, such as *Bakers Weekly, The Confectioner's Journal, Food Industries National Provisioner,* etc. These advertising appeals constitute claims each material, including cellophane, has the desirable degree of protective property (against moisture, dirt, rough handling, etc.), consumer appeal and reasonable price to act as an economical merchandising medium and protective package for food and other products.[136]

56. For any specific end use there is available a variety of flexible packaging materials that will satisfy the requirements of packaging a product. A number of materials can provide the combination of properties. It is solved by choosing combination of qualities and price which is considered most profitable to the purchasing concern at the time of the particular purchase. Persons who use cellophane for packaging a product regard cellophane as only one of several possible packages and often change to others on short notice.[137]

57. A customer for packaging materials is in the market for additional packaging material within a few weeks. All such customers are open to change from one packaging material to another at any time.[138]

58. Cellophane is not a unique flexible packaging material in any functional or economic sense. In terms of uses for which cellophane is sold, and the qualities it brings to each use as a wrapping material, cellophane is interchangeable and *in fact* continually interchanged with many flexible packaging materials[139]

59. The accompanying Table[140] compares, descriptively, physical properties of cellophane and other flexible packaging materials:

136. Hanson, DX 1018, p. 254–55. DXs 231–288, pp. 464–524.

137. Southwick, DX 1008, p. 31. Horn, DX 1010, pp. 68–69, 75–76. Ellies, DX 1014, pp. 154–55. McCurry, DX 1016, pp. 209, 211–12, 222. Ramsay, DX 1017, pp. 230–31. Hanson, DX 1018, pp. 253–55. Elmstrom, DX 1019, pp. 279–80. Nelson, DX 1020, pp. 305–06. Leeds, DX 1011, p. 97. Martin, Tr. 6349–50.

138. Leinbach, Tr. 6805–06. Russell, Tr. 6471–72. Martin, Tr. 6355–58. GX 583 Imp.Doc.No.39), p. 32.

139. Jakes, DX 1006, pp. 1–5, 13–16. Hopping, DX 1007, pp. 19–23. Southwick, DX 1008, p. 31. DX 1008A, p. 35. Torrence, DX 1009, pp. 42–47. Horn, DX 1010, pp. 68–73, 75–77. Leeds, DX 1011, pp. 89–92, 97, 100–01. Tindal, DX 1012, pp. 105–09, 112–19. Wilcox, DX 1013, pp. 121–30. Ellies, DX 1014, pp. 136–39, 143–56. Goland, DX 1015, pp. 181, 190–97. McCurry, DX 1016, pp. 207–12, 221–24. Ramsay, DX 1017, pp. 228–44. Hanson, DX 1018, pp. 248–54, 256. Elmstrom, DX 1019, pp. 271–82, 285–87. DX 1019–B, pp. 295–99, 8/14/51. Nelson, DX 1020, pp. 304–23. Croy, DX 1021, 339–45.

140. DX 1008–A, p. 35.

## Physical Properties

| Packaging Materials | Heat Sealability | Printability | Clarity | Tear Strength (Elmendorf) | Bursting Strength | Water Absorption in 24 hrs. Immersion | Moisture Permeability | Permeability to Gases (2) | Dimens. Change With Humid. Diff. | Resistance to Grease & Oils | Wrapping Machine Running Qualities |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Cellophane (plain) | Yes (if coated) | Yes | Highly Transparent | Low | High | High | High | Very Low | Large | Excellent | O.K. |
| Cellophane (Moisture-proof) | Yes (if coated) | Yes | Highly Transparent | Low | High | High | Low-Medium | Very Low | Large | Excellent | O.K. |
| Plain grease-proof paper | No | Yes | Opaque | Good | Low | High | High | Medium | Moderate | Good | O.K. |
| Plain Glassine | No | Yes | Commercially Transparent to Opaque | Good | Low | High | High | Low | Moderate | Good | O.K. |
| Lacquered Glassine | Yes | Yes | Commercially Transparent to Translucent | Good | Low | Low | Low-Medium | Low | Moderate | Good | O.K. |
| Waxed Glassine | Yes | (1) | Commercially Transparent to Translucent | Good | Low | Low | Low | Low | Moderate | Good | O.K. |
| Vegetable Parchment | No | Yes | Tends to be Opaque | Good | Good | High | High | Low | Moderate | Good | O.K. |
| Waxed Paper (18 lbs. or over) | Yes | (1) | Commercially Transparent | High | Good | Low | Low-Medium | High | Moderate | None | O.K. |
| Aluminum Foil | No | Yes | Opaque | Low | Low | Nil | Very Low | Very Low | None | Excellent | O.K. |
| Aluminum Foil (Heat Sealing) | Yes | Yes | Opaque | Low | Low | Nil | Nearly Nil | Very Low | None | Excellent | O.K. |
| Cellulose Acetate | Yes | Yes | Highly Transparent | Low | High | Low | High | Variable | Very Small | Excellent | O.K. |
| Pliofilm (rubber hydrochloride) | Yes (3) | Yes (3) | Highly Transparent with Slight Haze | Medium | High | Low | Medium | Low | Very Small | Excellent | Good (3) |
| Saran (Vinylidene Chloride) | Yes (3) | Yes (3) | Highly Transparent | High | High | Low | Very Low | Very Low | None | Excellent | Poor (3) |
| Polyethylene | Yes (3) | Yes (3) | Transparent with Slight Haze | High | High | Low | Medium | High | None | (4) | Poor (3) |
| Cry-O-Rap | Yes (3) | Yes (3) | Transparent with Slight Haze | High | High | Low | Medium | Low | None | Excellent | Poor (3) |
| Sulphite (high finish wrapper and label paper) | No | Yes | Opaque | High | Medium | High | Very High | High | Moderate | None | O.K. |

References:
(1). Normally printed before waxing.
(2) The permeability to gases can vary greatly depending upon the gas and the humidity conditions. The levels indicated in this chart apply particularly to flavor type volatiles as found in many food products.
(3) Plastic films may require special heat sealing techniques, and printing processes or special machines.
(4) Not affected by greases but penetrated by some oils.
(5) The information on this chart is based upon the generally accepted properties of the materials listed; however, materials produced by different processes, formulations, coatings, raw materials, surface treatments, and thicknesses can show considerable variation from the properties indicated,

60. Users and converters of these flexible packaging materials purchase materials principally on the basis of two criteria: (a) the composite of physical properties of a particular material, and (b) the price, or cost of using, a particular material. Neither price alone nor a single quality governs selection.[141]

61. Different purchasers of flexible packaging materials make different appraisals of the composite of properties and the importance of cost, and make widely varied selections of materials.[142]

62. Other flexible packaging materials are sold to the same customers who buy cellophane from duPont and for the same uses.[143] These materials include without limitation:

*Aluminum foil* is a thin aluminum sheet. The gauges used for packaging are from .0015 to .00035 inches. The foil is used as a packaging medium. It is laminated to glassine, paper or tissue, to other films, or to cellophane. It is opaque, brilliant of surface, highly moistureproof, and readily takes a semipermanent set, known as "dead folding". It can be printed and like cellophane can be sealed by heat when coated.[144]

*Cellulose acetate* is a film made by the flowing of a solvent solution of cellulose acetate onto a large diameter, slow moving casting wheel, or metal belt. The solvent evaporates, and the dry film is stripped from the wheel or belt as it turns. The film can be made by an extrusion process. It is waterproof. It can be printed, and sealed by heat, if coated. It has a high surface gloss.[145]

*Cry-O-Rap* is the trade name of a film made from a modified polyvinylidene chloride resin. Its chief characteristics are chemical inertness, transparency, durability, and flexibility at low temperatures. It can be shrunk around irregularly shaped objects by application of moderate heat.[146]

*Greaseproof paper* is made by beating wood pulp in a vat filled with water until the fibers become saturated and gelatinous in texture. Resulting product is translucent and resistent to oil and grease.[147]

*Glassine* is produced by finishing greaseproof paper between highly polished metal rollers under heat and at pressure. This process develops the transparency and surface gloss which are characteristic of glassine. It is greaseproof, and can be sealed by heat, if coated. It is made moistureproof by coating and with appropriate lacquers or waxes and may be printed.

Glassine and waxed paper are the two materials which have been sold in the largest quantities in direct competition with cellophane for the longest period of time.[148]

*Pliofilm* is a trade name of a film produced by flowing a solvent solution of rubber hydrochloride onto a moving web. The web passes through a heated chamber, which evaporates the solvent and leaves a transparent film. Pliofilm is

141. Leinbach, Tr. 6774–75. Jakes, DX 1006, 13–15. Horn, DX 1010, pp. 68–69. McCurry, DX 1016, p. 211. Ramsay, DX 1017, pp. 230–31. Hanson, DX 1018, p. 256.

142. Leinbach, Tr. 6790. Ramsay, DX 1017, p. 231.

143. Martin, Tr. 6334. DXs 984, 986, 988–93. Jakes, DX 1006, pp. 3, 13. Hopping, DX 1007, pp. 19–21. Torrence, DX 1009, pp. 42–43. Horn, DX 1010, pp. 69–73. Leeds, DX 1011, pp. 89–97. Wilcox, DX 1013, pp. 121–23. Ellies, DX 1014, pp. 135–38, 143. Ramsay, DX 1017, pp. 228–30, 237–42. McCurry, DX 1016, pp. 206–10. Hanson, DX 1018, pp. 248–

51, 253–54. DX 1019–B, pp. 295–96. Nelson, DX 1020, pp. 305–06, 310–13.

144. DX 1008–B, p. 37; DX 289, pp. 533–34, 1/30; DX 292, pp. 545–48.

145. DX 1008–B, p. 37; DX 291, p. 543, 8/5/37.

146. DX 1008–B, p. 37.

147. DX 1008–B, p. 38. GX 6004, p. 7924. DX 294, p. 556, 11/45; DX 296, pp. 562–66, 1947.

148. DX 1008–B, p. 38. GX 6004, p. 7924. DX 289, pp. 526–28, 1/30; DX 291, p. 543, 8/5/37; DX 294, pp. 555–58, 11/45; DX 296, pp. 562–66, 1947; DX 297, p. 568, 1947.

tough, can be stretched to 5 or 6 times its original dimensions. It is moisture-proof, and is capable of weldtype heat sealing. Heavier gauges are cloudy. It can be shrunk around an object by application of moderate heat, and can be printed.[149]

*Polyethylene* film is made from a solution formed from high-pressure polymerization of ethylene gas. This solution can be cast or extruded to produce the film. Principal characteristics of the film are chemical inertness, flexibility at low temperatures, and good inherent moistureproofness. Polyethylene film is transparent, but slightly hazy.[150]

*Saran* is the trade name of a film made from polyvinylidene chloride. It is characterized by strength, toughness, flexibility, transparency, and chemical inertness. It has the highest moistureproofness of all the packaging materials.[151]

*Sulphite Paper* is high grade, machine-glazed paper used as wrapping, for the packaging of food and other merchandise. It is the usual basis of wrappers (e. g. paper component of cigarette pack), waxing stock (for waxed paper) and other uses where moderate strength, flexibility and good coating and printing surface is required.[152]

*Vegetable Parchment* is made by passing unsized raw paper through a sulphuric acid bath, and drying on regular paper machine dryers. This "parchmentizing" covers the paper with a thin layer of gelatinous cellulose which fills the interstices of the fibres and cements them into a cohesive mass. Vegetable parchment is highly greaseproof, has wet strength, and is slightly translucent.[153]

*Waxed Paper* is made by applying melted wax to sulphite or sulphate paper. Waxed paper is made in various degrees of transparency, and is sealable by heat. Resins are added to the wax to enhance surface gloss, heat-sealing properties and low-temperature flexibility. In the printed forms, print is usually applied prior to waxing.[154]

63. There are respects in which other flexible packaging materials are as satisfactory as cellophane:

*Waxed Paper—for an instance.*

Transparency is not necessarily desirable in a wrap,[155] although waxed papers can be made with a degree of transparency.[156]

Waxed paper wraps have eye appeal arrived at through gloss, opacity, and colored printing.[157]

Waxed paper is not difficult to heat-seal, and is as good as cellophane, in this respect.[158]

Waxed paper runs on high speed machines as well as cellophane.[159]

Better printing effects are available with waxed paper than with cellophane.[160]

Waxed paper affords as good moisture protection as cellophane.[161]

149. DX 1008–B, p. 38; DX 297, p. 568, 1947.

150. DX 1008–B, pp. 38–39.

151. DX 1008–B, p. 39.

152. DX 1008–B, p. 39.

153. DX 1008–B, p. 39; DX 289, pp. 529–30, 1/30; DX 293, pp. 549–54, 5/44; DX 297, pp. 568–69, 1947.

154. DX 1008–B, p. 40; DX 289, pp. 526–28, 1/30; DX 295, pp. 559–61, 1947; DX 297, p. 569, 1947.

155. Martin, Tr. 6436–37. DX 339, p. 646, 4/23/26.

156. Leinbach, Tr. 6787. DX 70, p. 153; DX 290, p. 536; DX 1005.

157. Leinbach, Tr. 6752. Ramsay, DX 1017, pp. 232, 243. Hanson, DX 1018, pp. 253–54; Croy, DX 1021, pp. 341, 344. DX 119, p. 265, 4/21/48.

158. Mitchell, Tr. 5531. Tindal, DX 1012, pp. 106–08. Ramsay, DX 1017, p. 237. Croy, DX 1021, pp. 341, 344. DX 123, p. 271, 1/21/49. DX 1008–A.

159. Croy, DX 1021, p. 341. Tindal, DX 1012, p. 117. DX 125, p. 273, 1/21/49; DX 127, p. 275, 4/28/49.

160. DX 119, p. 265, 4/21/48.

161. Mitchell, Tr. 5531. Tindal, DX 1012, p. 107. Hanson, DX 1018, p. 252.

Moistureproof coating of moisture-proof cellophane will separate more readily in contact with fats and oils than waxed paper coatings.[162]

Waxed paper is cheaper than cellophane.[163]

Waxed paper is superior to cellophane in resistance to rancidity-inducing ultra-violet rays.[164]

Waxed paper is superior to cellophane in durability under rough handling, at low temperatures.[165]

Printing is applied to waxing papers prior to coating.[166]

### Glassine.

Glassine is, in some types, about 90 % transparent, so printing is legible through it.[167]

Glassine affords low cost transparency.[168]

Moisture protection afforded by waxed or lacquered glassine is as good as that of moistureproof cellophane.[169]

Glassine has greater resistance to tearing and breakage than cellophane.[170]

Glassine runs on packaging machinery with ease equal to that of cellophane.[171]

Glassine can be printed faster than cellophane, and can be run faster than moistureproof cellophane on bag machines.[172]

Glassine has greater resistance than cellophane to rancidity-inducing ultra-violet rays.[173]

Glassine has dimensional stability superior to cellophane.[174]

Glassine is more durable in cold weather than cellophane.[175]

Printed glassine can be sold against cellophane on the basis of appearance.[176]

Glassine may be more easily laminated than cellophane.[177]

Glassine is cheaper than cellophane in some types, comparable in others.[178]

### Aluminum Foil.

Aluminum foil is most commonly used in .00035 gauge which is comparable to cellophane.[179]

In .00035 gauge aluminum foil is cheaper than moistureproof cellophane in cents per 1,000 sq. in.[180]

Aluminum foil after laminating and coating is within competitive range of the price of moistureproof cellophane.[181]

Moisture resistance of coated aluminum foil, even in .00035 gauge, is comparable with moistureproof cellophane, and is one of the selling points for aluminum foil.[182]

Heat-sealing foil gives a heat-seal comparable with cellophane.[183]

Aluminum foil has dimensional stability in the presence of humidity changes, and offers protection against water

162. DX 12, p. 15, 10/25/27; DX 14, p. 18, 9/28/28.

163. DX 994; DX 995.

164. DX 151, p. 322, 12/13/48.

165. DX 122, p. 269, 12/23/48.

166. Croy, DX 1021, p. 340.

167. Leinbach, Tr. 6738–39. DX 53, p. 125, 10/11/40; DX 290, p. 536.

168. Leinbach, Tr. 6738–39. DX 1005; GX 6004, p. 7920.

169. Leinbach, Tr. 6750–51. Nelson, DX 1020, pp. 306, 323. DX 47, p. 84, 5/27/38; DX 78, p. 175, 6/18/34; DX 193, p. 385, 7/18/34; DX 1008–A.

170. Leinbach, Tr. 6804. DX 223, p. 454, 11/10/49; DX 1008–A.

171. Tindal, DX 1012, pp. 107, 117.

172. Leinbach, Tr. 6750.

173. Leinbach, Tr. 6751. Martin, Tr. 6391–93. DX 151, p. 322, 12/13/48.

174. DX 1008–A.

175. Nelson, DX 1020, pp. 313–14.

176. Nelson, DX 1020, p. 322.

177. Leinbach, Tr. 6572.

178. Leinbach, Tr. 6749. DX 994. DX 995.

179. Torrence, DX 1009, p. 44. Hanson, DX 1018, p. 252.

180. DX 995.

181. DX 1009, p. 45.

182. Torrence, DX 1009, p. 46. Hanson, DX 1018, p. 252. DX 1008–A.

183. DX 195, p. 398, 8/2/37. DX 1008–A.

absorption. Cellophane is susceptible to water absorption and dimensional change.[184]

Aluminum foil has a degree of eye appeal, and can be attractively printed.[185]

Foil has a dead-folding property which cellophane lacks, which enables foil to give more complete protection to the contents of a package.[186]

Aluminum foil, being opaque, is superior to cellophane in resistance to rancidity-inducing ultraviolet rays.[187]

### Cellulose Acetate.[188]

· There is no evidence the water-insensitivity of CA is a disadvantage. This feature is the basis of CA's superior shrink resistance and dimensional stability.[189]

CA is less susceptible than cellophane to softening by water, and is a superior wrap for fresh produce.[190]

CA permits free passage of moisture and gases more readily than cellophane, and is a superior wrap for fresh produce, fruit, iced cakes and doughnuts, and pies.[191]

CA is made in heat-sealing type, selling at the same price as ordinary CA film.[192]

Improvements have been made in elimination of static electricity when running CA film on machines. Static eliminators can be obtained for as little cost as 15¢.[193]

Largest producer of CA is attempting to reduce the price gap between CA and cellophane. This policy is intended to reduce a competitive disadvantage of CA and to stimulate sales.[194]

CA is superior to cellophane in clarity, luster and eye appeal.[195]

CA is used on a variety of food and other products including: fresh produce, bacon, tomatoes, fresh meat, pies, rolls, iced cakes, laminations, window boxes. 40% of CA film made by its largest producer is sold for packaging food.[196]

CA's major competition is cellophane.[197]

It is not more expensive to run CA on packaging machinery than cellophane.[198]

### Cry-O-Rap.

Cry-O-Rap can be shrunk around irregular objects, unlike cellophane, and for this reason is used to wrap frozen poultry.[199]

Cry-O-Rap is superior to cellophane as a wrap for frozen poultry because of its durability at low temperatures.[200]

Cry-O-Rap is superior to cellophane in its resistance to tearing, to water absorption, and in its dimensional stability.[201]

184. DX 1008–A.

185. Torrence, DX 1009, p. 42. Leeds, DX 1011, p. 94. Wilcox, DX 1013, pp. 129–130.

186. Torrence, DX 1009, p. 42. Wilcox, DX 1013, p. 122. DX 1008–B, p. 37.

187. Martin, Tr. 6393–94. DX 289, p. 525.

188. Abbreviated hereafter "CA".

189. Hopping, DX 1007, p. 22. Martin, Tr. 6389. DX 1008–A.

190. GX 6010, p. 7955. DX 142, p. 301, 11/7/49. DX 144, p. 303, 11/18/49. DX 139, p. 298, 8/18/48.

191. Hopping, DX 1007, pp. 19, 22. GX 6010, p. 7955. DX 132, p. 287, 11/4/47; DX 133, p. 288, 12/4/47; DX 135, p. 290; DX 136, p. 291, 4/13/47; DX 137,

p. 292; DX 140, p. 299, 12/7/48; DX 141, p. 300, 11/1/49; DX 331, p. 637, 1/6/47.

192. Hopping, DX 1007, p. 18.

193. Hopping, DX 1007, p. 22. Leeds, DX 1011, p. 91. Hanson, DX 1018, p. 253.

194. Hopping, DX 1007, p. 22.

195. Hopping, DX 1007, p. 22.

196. Hopping, DX 1007, pp. 18–19.

197. Hopping, DX 1007, p. 20.

198. Tindal, DX 1012, p. 114.

199. DX 129, p. 278, 11/14/49. DX 1008–B.

200. R. R. Smith, Tr. 5812–13. DX 1008–B.

201. DX 1008–A.

### Pliofilm.

Pliofilm, although 5 or 10 points less transparent than cellophane, is not cloudy when stretched.[202]

The odor of Pliofilm was a characteristic of the early years, and never a serious technical problem.[203]

Pliofilm is superior to cellophane in moistureproofness, resistance to tearing and heat-sealing.[204]

Static electricity can be inexpensively eliminated from machines using Pliofilm.[205]

The heat-sealing range of Pliofilm is not a narrow one.[206]

Pliofilm may be printed on the same presses that print cellophane.[207]

Pliofilm is tough, tougher than cellophane.[208]

Pliofilm is more flexible than cellophane at low temperatures.[209]

Pliofilm's resistance to shrinkage and resistance to water absorption are greater than cellophane.[210]

90% of Pliofilm production goes for packaging, most of this for food packaging. In this field it competes with cellophane.[211]

It is not more expensive to run Pliofilm on packaging machinery than cellophane.[212]

### Polyethylene.

Problems in heat-sealing and machine running of Polyethylene have been solved; it is now handled on packaging machines with no difficulty. Polyethylene has excellent heat-sealing properties. It is now printed by converters.[213]

Polyethylene has only appeared commercially since World War II, and has a promising sales potential.[214]

In resistance to tearing, resistance to water absorption, and dimensional stability, Polyethylene is superior to cellophane.[215]

Polyethylene is more durable and flexible than cellophane, particularly at low temperatures.[216]

### Saran.

Saran is superior to cellophane in moisture protection, resistance to tearing, resistance to water absorption, and dimensional stability.[217]

Saran can be run and heat sealed on the same model of the Hayssen machine that handles cellophane.[218]

Electronic sealing can be used where heat-sealing Saran raises technical difficulties.[219]

64. Fresh meat turned black in a few hours if wrapped in MSAT. MSAT 80 film was developed, with the coating applied only to one side of the film, as an answer to the technical problem posed by fresh meat. This film will hold the color of fresh meat over a period of several days, which is something none of the previous types would do.[220]

202. Ellies, DX 1014, pp. 151–52.

203. Ellies, DX 1014, p. 147.

204. Leeds, DX 1011, p. 96. Ellies, DX 1014, p. 150. DX 1008–A.

205. Ellies, DX 1014, p. 151.

206. Ellies, DX 1014, p. 152.

207. Leeds, DX 1011, p. 91.

208. Leeds, DX 1011, p. 92. R. R. Smith, Tr. 5753. Ramsay, DX 1017, p. 239. DX 1008–A; DX 1008–B.

209. DX 116, p. 258.

210. DX 1008–A.

211. Ellies, DX 1014, pp. 135–36.

212. Tindal, DX 1012, p. 114.

213. Southwick, DX 1008, p. 30. Leeds, DX 1011, p. 101. Tindal, DX 1012, p. 108.

214. Leeds, DX 1011, p. 92.

215. DX 1008–A.

216. R. R. Smith, Tr. 5812. DX 1008–B.

217. Ellies, DX 1014, p. 150. DX 1008–A.

218. Tindal, DX 1012, p. 115.

219. Martin, Tr. 6440. DX 170, p. 346.

220. Mitchell, Tr. 5477–84, 5504, 5513, 5525–26. GX 11, p. 84, 3/27/45. GX 396, p. 5490. DX 1008–A.

65. Varieties of cellophane manufactured by duPont have different properties or degrees of the same properties. Varieties have more properties, and are capable of more specific functions, in common with some types of glassine and other materials, than with other types of cellophane.[221]

66. The principal manufacturers of flexible packaging materials include established concerns with assets which are competent to compete for flexible packaging business. The following list of companies indicates name, date of organization, and total assets in 1949 in thousands of dollars.

| Name | Date of Organization | Total Assets in 1949 in Thousands of Dollars |
|---|---|---|
| Riegel Paper Corp. | 1873 | $15,285 |
| Rhinelander Paper Co. | 1903 | 14,720 |
| Kalamazoo Vegetable Parchment Co. | 1909 | 29,269 |
| Marathon Corp. | 1909 | 61,888 |
| Goodyear Tire & Rubber Co. | 1898 | 424,126 |
| Celanese Corporation of America | 1918 | 254,886 |
| Aluminum Corporation of America | 1888 | 525,870 |
| American Viscose Corp. | 1910 | 222,396 [222] |

67. Ten companies in the United States produce glassine and greaseproof papers. Their volume of output increased since 1941 and since 1946. Demand exceeded their ability to supply during World War II, from early 1947 to mid-1948 and from mid-1950 to November 1951.[223]

68. Some of the companies making glassine, waxed paper and other packaging papers are:[224]

| Company | Material |
|---|---|
| Riegel Paper Corporation | Glassine and greaseproof, waxing paper, other specialty papers |
| Rhinelander Paper Company | Glassine and greaseproof |
| Westfield River Paper Company, Inc. | Glassine |
| Deerfield Glassine Company | Glassine |
| Paterson Parchment Paper Company | Vegetable parchment and greaseproof |
| Kalamazoo Vegetable Parchment Company | Vegetable parchment and greaseproof |
| Marathon Corporation | Sulphite and sulphate paper and paperboard |
| Consolidated Water Power & Paper Company | Sulphite, wrapping tissue and coated papers |
| Fraser Companies Ltd. (owns Fraser Paper Co.) | Sulphite and groundwood specialty papers |
| Nicolet Paper Company (subsidiary of Milprint, Inc., a major cellophane converter) | Glassine [225] |

221. Leinbach, Tr. 6738–41, 6747–52. Nelson, DX 1020, pp. 307–09. GX 11, p. 84, 3/27/45. GX 396, p. 5490, 5/15/50. DX 1005.

222. DX 983 (Table from Moody's Industrials, 1950).

223. Nelson, DX 1020, pp. 302, 325–26.

224. DX 983 (Moody's Industrials, 1950). Bricker, Tr. 4468–69.

225. Hanson, DX 1018, p. 248.

69. There are three domestic manufacturers of cellulose acetate film: Celanese Corporation of America, duPont, and Eastman Kodak Company, and two smaller producers.[226] Celanese produces more than all others combined.[227] DuPont manufactures less than 20% of the total domestic production of cellulose acetate packaging films.[228]

70. Aluminum foil is manufactured in U. S. by Aluminum Company of America, Reynolds Metals Co., Johnson Aluminum & Metal Co., Cochrane Foil Co., Republic Foil Co., Stranahan Foil Co., Kaiser Chemical & Aluminum Co., Aluminum Foils Co., and Standard Rolling Mills.[229]

71. There are 300 firms in the United States manufacturing polyethylene film,[230] including Visking Corporation, Plax Corporation, Fabricon Products, Inc., duPont, and the Harwid Company.[231] DuPont manufactures less than 10% of the polyethylene film made in the United States.[232]

72. Goodyear Tire and Rubber Company is the producer in the United States of rubber hydrochloride film, which Goodyear calls Pliofilm.[233] The Dow Chemical Company is the domestic producer of Saran, and Dewey and Almy Chemical Company is the producer of Cry-O-Rap.[234]

73. All other flexible packaging materials are, like cellophane, sold direct to the packager by the manufacturer [235] and are sold indirectly through converters.[236]

74. Cellophane and other flexible packaging materials are sold for packaging retail merchandise, particularly food products.[237]

75. The converting business is competitive both as among converters and among alternative materials. Converters selling wraps to a certain trade compete with wraps of the same or different materials sold by other converters to the same trade, and business gained by one converter is denied to the rest. In addition, converters compete with each other in the development of new uses for packaging materials in trades where no packaging is used.[238]

76. Elements of competition among converters include: price differentials, technical service to customer's production departments, merchandising service to the customer's sales departments, quality of printing or manufacture of

226. Hopping, DX 1007, p. 17. GX 583 (Imp.Doc.No.39), p. 14, 5/16/49. GX 6012 (Imp.Doc.No.1), p. 18 and appendix Table IV, 5/18/49. DX 983 (Moody's Industrials, 1950). Bricker, Tr. 4468–69.

227. Hopping, DX 1007, p. 17.

228. R. R. Smith, Tr. 5663–64. GX 573 (Imp.Doc.No.13), p. 3, 1/26/51. Hopping, DX 1007, p. 17.

229. Torrence, DX 1009, p. 41. DX 983 (Moody's Industrials, 1950). Bricker, Tr. 4468–69.

230. Martin, Tr. 6442.

231. GX 6013 (Imp.Doc.No.45), 1/4/50. GX 6020, p. 8094, 1950. GX 6012 (Imp.Doc.No.40), p. 4, 5/18/49. Martin, Tr. 6443. Olsen, Tr. 6809.

232. GX 580, p. 7330, 8/8/50. R. R. Smith, Tr. 5663–64.

233. GX 6012 (Imp.Doc.No.1), pp. 8–10, 5/18/49.

234. GX 6012 (Imp.Doc.No.1), p. 10, 5/18/49.

235. Jakes, DX 1006, p. 10. Hopping, DX 1007, p. 18. Torrence, DX 1009, p. 43. Wilcox, DX 1013, p. 126. Ramsay, DX 1017, pp. 228–30. Nelson, DX 1020, p. 303.

236. Martin, Tr. 6334. Jakes, DX 1006, p. 10. Hopping, DX 1007, p. 18. Torrence, DX 1009, p. 43. Leeds, DX 1011, p. 79. Wilcox, DX 1013, p. 126. Goland, DX 1015, p. 184. McCurry, DX 1016, p. 219. Ramsay, DX 1017, pp. 226, 228–30. Hanson, DX 1018, pp. 248–51. Elmstrom, DX 1019, p. 284. Nelson, DX 1020, p. 303. DX 984, 986, 988. DX 1014–C, pp. 166, 174, 8/30/51.

237. R. R. Smith, Tr. 5672–73. Martin, Tr. 6336–38.

238. Martin, Tr. 6372–74, 6454–55. Leeds, DX 1011, p. 87. Goland, DX 1015, pp. 189–90. Ramsay, DX 1017, pp. 228–30. Hanson, DX 1018, pp. 250–51. Croy, DX 1021, p. 342. Elmstrom, DX 1019, pp. 283–85. DX 988.

converted products, degree of protection afforded by the converted wrap to customer's product, advertising, direct salesmanship brought to bear upon individual customers or potential customers, and degree of cooperation that can be obtained from the manufacture of the packaging materials used by any given converter.[239]

77. About 4,000 converter salesmen are engaged in selling converted flexible packaging materials to customers in the food industry and other trades.[240] Most

converter salesmen sell a full line of materials, but concentrate upon a single trade. Some salesmen are specialists in the baking industry, or the meat packing industry, but each salesman sells cellophane and other flexible packaging materials to his trade. Each type of wrap may be sold separately or in combination with others, according to the needs and desires of each customer at the time.[241]

78. Some of the principal converters of flexible packaging materials are:

American Paper Goods Co.
Benj. C. Betner Co.
Dixie Waxpaper Co., Inc.
Dobeckmun Co.
Fabricon Products, Inc.
Forbes Lithograph Mfg. Co.
Kalamazoo Vegetable Parchment Co.
Marathon Corporation
Munson Bag Co.
Milprint, Inc.

Nashua Gummed & Coated Paper Co.
Oneida Paper Products, Inc.
Reynolds Metals Co.
Shellmar Products Corp.
Traver Corporation
Union Bag and Paper Corp.
U. S. Envelope Co.
Waxide Paper Co.
Western Waxed Paper Co.[242]

---

None of these companies converts cellophane exclusively.

An analysis of the 1949 sales by these companies of concerted flexible packaging materials showed cellophane to be 19.3% of the total business of these companies. The other 80.7% of their sales comprised aluminum foil, glassine, Pliofilm, polyethylene, cellulose acetate, waxed paper, sulphite, vegetable parchment, a small amount of kraft paper and all combinations and laminations of these materials.[243]

79. Converters sell two or more flexible packaging materials in combination to produce a particular wrap or package. Nineteen major representative converters produced the following combinations in 1949:[244]

*Cellophane and Combinations*

Cello MT
Cello PT
Duplex Cello MT
Coated Cello, MT
Cello MT & Glassine, Window Type
Duplex Cello PT
Cello MT & Kraft, Window Type
Cello PT & Kraft, Window Type
Laminated Cello MT
Coated Laminated Cello MT
Duplex Cello MT & Glassine
Cello MT & Vellum, Paper Window Type
Laminated Cello MT to Foil
Laminated Cello MT to Kraft
Cello PT & Greaseproof, Window Type
Laminated Cello MT to Waxed Sulphite

239. Martin, Tr. 6371–74, 6454–55. Leeds, DX 1011, p. 87. Hanson, DX 1018, pp. 254–55. Ramsay, DX 1017, p. 245. Elmstrom, DX 1019, p. 284.

240. R. R. Smith, Tr. 5667.

241. Hanson, DX 1018, p. 255. Leeds, DX 1011, p. 89. Ramsay, DX 1017, p. 245. Martin, Tr. 6363.

242. Bricker, Tr. 4472–74.

243. DX 986.

244. DX 987. Bricker, Tr. 4472–84. Croy, DX 1021, p. 15.

Laminated Cello MT to Opaque Glassine

Miscellaneous Cellophane Combinations

*Foil and Combinations* (Except with Cellophane)

Foil
Laminated Foil to Tissue
Laminated Foil to Waxed Tissue
Laminated Foil to Glassine
Laminated Foil to Bond
Laminated Foil to Glassine to Coated Foil
Laminated Foil to Acetate
Laminated Coated Foil to Parchment
Laminated Coated Foil to Tissue
Laminated Foil to Kraft
Laminated Foil to Tissue to Tissue
Laminated Foil to Parchment
Laminated Foil to Acetate to Pliofilm
Miscellaneous Foil Combinations
Laminated Foil to Sulphite

*Glassine and Combinations* (Except with Cellophane or Foil)

Glassine
Waxed Glassine
Laminated Glassine
Duplex Glassine & Kraft
Duplex Glassine & Bleached Kraft
Laminated Glassine to Kraft
Duplex Waxed Glassine
Coated Glassine
Duplex Laminated Glassine & Bleached Kraft
Duplex Glassine
Duplex Laminated Glassine & Kraft
Opaque Glassine
Waxed Laminated Glassine
Duplex Glassine & Sulphite
Laminated Glassine to Opaque Sulphite
Duplex Waxed Glassine & Sulphite
Triplex Glassine & Kraft & Kraft
Miscellaneous Glassine Combinations

*Films and Combinations* (Except with Cellophane, Foil, Glassine or Other Papers)

Pliofilm
Polyethylene
Cellulose Acetate
Coated Pliofilm
Visten 10
Vinyl
Laminated Pliofilm
Miscellaneous Synthetic Films

*Papers and Combinations* (Except with Cellophane, Foil or Glassine)

Waxed Bleached Sulphite
Waxed Opaque Sulphite
Waxed Kraft
Parchment
Sulphite
Kraft
Waxed Clear Transparent
Moldproofed Sulphite
Bleached Kraft
Kraft & Mesh, Window Type
Waxed Parchment
Waxed Twisting
Laminated Waxed Sulphite
Dry Waxed
Waxed Manila
Greaseproof
Duplex Kraft
Laminated Sulphite
Waxed Tissue
Duplex Kraft & Waxed Kraft
Waxed Opaque Twisting
Manila
Casein Coated Sulphite
Tissue
Duplex Wet Strength Kraft
Duplex Kraft & Asphalt Laminated Kraft
Duplex Kraft & Bleached Kraft
Coated Sulphite
Laminated Waxed Sulphite to Tissue
Waxed and Treated Sulphite
Laminated Waxed Manila
Triplex Kraft & Kraft & Kraft
Asphalt Laminated Sulphite
Waxed Bleached Kraft
Miscellaneous Papers

V. DuPont Competed by Research to Improve Quality and Lower Cost.

(Findings 80–122)

80. When duPont commenced sale of cellophane, it was not of a quality which would enable it to compete for flexible packaging business. Cellophane was brittle, not available in the roll form essential for machine packaging operations, non-moistureproof.[245] It was necessary for duPont to engage in research to overcome these deficiencies, and, as they were overcome to continue research looking toward a quality improvement so cellophane would remain competitive with other flexible packaging materials in meeting the requirements of buyers of flexible packaging materials.[246]

81. DuPont did not engage in cellophane research with the intent of monopolizing the manufacture of cellophane.[247]

82. In duPont organization there were no chemists skilled in viscose chemistry. Research facilities were inadequate and research chemists were difficult to find.[248]

83. DuPont by research[249] improved efficiency of its manufacture,[250] reduced cost of production,[251] improved quality of cellophane,[252] and developed new types.[253]

DuPont cellophane technical activities expense totalled $24,361,065 during the period 1924–1950. Annual amounts expended for such activities by duPont increased:[254]

| | |
|---|---|
| 1924 | $ 9,139 |
| 1931 | 471,374 |
| 1939 | 793,195 |
| 1944 | 1,131,790 |
| 1949 | 2,289,507 |
| 1950 | 2,782,706 |

84. Research projects by duPont originate in problems of sales group, from production problems in plants, or as idea of one of the research men. Research relating to specific problems was discussed with sales, technical and production management in Wilmington before projects were approved.[255]

85. The purpose of duPont's research has been to enable it to improve profits and to compete with other manufacturers of flexible packaging materials, including other makers of cellophane, by reducing cost, improving quality and developing types of moistureproof cellophane designed to meet specific packaging needs.[256] This research has involved developments at all stages of the manufacturing processes, and improvement in every phase of cellophane quality.[257]

86. Cellophane and other flexible packaging materials are sold to and used interchangeably on packaging machines and converters' equipment. DuPont's efforts by research to improve quality and broaden cellophane markets not only gave impetus to cellophane sales but also stimulated improvements in other materials and caused improvement in utility

245. McCune, Tr. 5538. DX 388–A, p. 719, 7/10/24; DX 390–A, p. 723, 9/5/24; DX 392, pp. 726, 727, 5/21/24; DX 299, pp. 571–74, 8/19/24; DX 305, p. 586, 1/10/28.

246. Carpenter, Tr. 6276. Yerkes, Tr. 6940, 6943. Mitchell, Tr. 5477–81. McCune, Tr. 5538–39, 5580. Benger, Tr. 5438–40. DX 396, p. 736, 5/7/30.

247. Carpenter, Tr. 6275–76. Yerkes, Tr. 6940. W. W. Smith, Tr. 6506–09. McCune, Tr. 5538–39, 5580. Benger, Tr. 5440. Mitchell, Tr. 5528. DX 398–402.

248. Benger, Tr. 5417–20.

249. Benger, Tr. 5418–20. DX 398, p. 740.

250. McCune, Tr. 5539–49. DX 386, p. 716.

251. GX 575 (Imp.Doc.No.16), 1950. GX 494, pp. 6626–27, 1/18/40.

252. Mitchell, Tr. 5477–90, 5504–10, 5513–16. DX 346, p. 661, 8/1/29.

253. Benger, Tr. 5437–38. Mitchell, Tr. 5482. GX 396, pp. 5490–93.

254. DX 387, p. 717.

255. Mitchell, Tr. 5475–76. Benger, Tr. 5440–41.

256. Carpenter, Tr. 6275–76. McCune, Tr. 5538–39, 5580. Yerkes, Tr. 6940, 6943. DX 398, pp. 740–41; DX 396–404. GX 442, p. 5783, 1/23/34.

257. McCune, Tr. 5539–82, 5610. Mitchell, Tr. 5477–81, 5486–5528.

and acceptance of flexible packaging materials generally.[258]

87. DuPont's research to improve quality of cellophane was for purpose of enabling it to meet competition of waxed paper and glassine, and its research to reduce costs of cellophane manufacture was for purpose of lowering costs so prices might be reduced and markets broadened.[259]

88. DuPont did not engage in research for purpose of blocking competitors. DuPont's research has not been channeled into any emphasis for anti-competitive reasons.[260]

89. Results of duPont's research are reflected in manufacturing efficiency of film, and solution of problems in the use of cellophane. Following are illustrations typical of these various results.

(a) *Quality:* Uniformity of sheet flatness, which is essential to printing; and uniformity of film thickness, which is essential to production of rolls that will handle on high speed machines.[261]

(b) *Manufacturing Efficiency:* Average pounds cast per casting machine day increased from 3,292 in 1931 to 9,963 in 1950; maximum casting machine speeds increased from 30 meters per minute in 1932 to 120 meters per minute in 1952; average pounds coated per coating tower day increased from 3,956 in 1931 to 15,371 in 1950; finishing waste dropped from 15.7% in 1924 to

3.5% in 1950,[262] and solvent recovery increased from 83% to 97%.[263]

(c) *New Types:* Basic moistureproof cellophane; moistureproof coatings with greater resistance to passage of moisture; types of moistureproof cellophane tailored for dry or humid climates; types with coating anchored to permit use on wet products; special formulations of moistureproof cellophane for fresh meats, differing types of breads and candies, milk bottle hoods and other specialized types.[264]

(d) *Solution of Problems in the Use of Cellophane:* Development of adhesives for sealing moistureproof cellophane; heat-sealable coatings; improvement of slip and other machine running characteristics; determination of type best suited for a particular product; determination of qualities in a wrap for a new product.[265] Research work on the examples given in most cases was conducted over a number of years.[266]

90. High speed packaging machines require material in roll form for continuous operation.[267] Uniformity of the rolls is important at all speeds and becomes critical as speeds of the packaging machines increase.[268]

91. When duPont began production of cellophane, packaging machinery was in existence that handled waxed paper and glassine satisfactorily.[269] Such machinery would not handle cellophane.[270]

258. Leinbach, Tr. 6768, 6770–71, 6774. R. R. Smith, Tr. 5706, 5727–29. Tindal, DX 1012, pp. 109–10, 113–14. Ramsay, DX 1017, p. 233.

259. Carpenter, Tr. 6275–76. Yerkes, Tr. 6940. McCune, Tr. 5538–39, 5580. Mitchell, Tr. 5470–94. DX 398, pp. 740–41; DX 395, p. 734, 6/4/28; DX 399, p. 742, 12/29/28. GX 431, p. 5678, 4/26/29; GX 435, p. 5728, 7/21/30; GX 455, p. 5885–89, 4/21/30; GX 28, p. 143, 11/30/45.

260. Benger, Tr. 5440–41. W. W. Smith, Tr. 6506–09. McCune, Tr. 5538–39, 5580. Mitchell, Tr. 5528. DX 398.

261. Mitchell, Tr. 5477–78. Martin, Tr. 6378. DX 396, p. 736, 1930. DX 397, p. 737, 1930.

262. McCune, Tr. 5540–42. DX 386, p. 716.

263. McCune, Tr. 5544.

264. Mitchell, Tr. 5481–84, 5504, 5524. Benger, Tr. 5437–38. GX 396, pp. 5490–93. DX 408, pp. 794–808, 10/1/48.

265. Mitchell, Tr. 5493–94, 5513–16.

266. E.g., Mitchell, Tr. 5470–71. GX 587, p. 17, 4/28/50.

267. Tindal, DX 1012, p. 105. Leinbach, Tr. 6746.

268. Goland, DX 1015, p. 185. Leeds, DX 1011, p. 82. Russell, Tr. 6470. Martin, Tr. 6366–67.

269. Tindal, DX 1012, p. 104. Russell, Tr. 6476.

270. Russell, Tr. 6479–80.

Shortly after the start of its manufacture of cellophane, duPont promoted development and use of packaging machinery that could handle both cellophane and other flexible packaging materials interchangeably.[271] This program included work with the manufacturers of packaging machinery to assist them with problems created by the attempt to use cellophane on their machines,[272] promotion of use of such machinery for cellophane by customers,[273] and technical service to customers who encountered difficulty in use of cellophane on packaging machinery.[274] The work was done by a group of mechanical engineers employed and retained by duPont.[275] DuPont's work in the development of packaging machinery and its use has contributed to the growth of sales of cellophane.[276]

92. Mechanization of wrapping enabled duPont to obtain new cellophane customers, in industries where cost of hand wrapping prohibited use of the material.[277]

93. When duPont commenced manufacturing cellophane the product was not of adequate quality for sale in roll form. Since cellophane has a thickness of 1/1000 of an inch, when wound in commercial rolls of 9″ outside diameter, consisting of thousands of layers of film, irregularities of thickness in cellophane as then manufactured created a lumpy, unusable roll. DuPont recognized need for roll cellophane if sales in volume were to be obtained.[278] The characteristic of cellophane for sales in rolls is uniformity of gauge to fine tolerance.

DuPont offered rolls in 1925.[279] By 1930 approximately 50% of its production was sold in roll form.[280] Not much of the production in that period would be salable today for slit rolls.[281] Currently, duPont sells 90% of its production in roll form.[282]

DuPont's development of quality rolls was for the purpose of increasing sales, and had that effect.[283]

94. DuPont's development of moistureproof cellophane was stimulated by duPont's inability to sell non-moistureproof cellophane in competition with waxed glassine and waxed paper for wrapping cookies, crackers, candies, biscuits and baked goods.[284]

95. DuPont still strives to improve quality of its product and reduce cost of production by the application of research to its manufacturing processes.[285]

96. DuPont's sales efforts increased competition between flexible packaging materials. Through technical research and market analysis, and development of new types of film duPont was able to penetrate markets previously dominated by other materials, and to enter markets that did not use flexible wrapping materials. This stimulated technical developments by other producers of flexible wrapping materials to produce new types that would better compete in the same markets. General development of the market of flexible wrapping materials has stimulated development of new types of films.[286]

271. Russell, Tr. 6484–88.

272. Tindal, DX 1012, p. 109. Russell, Tr. 6484–85.

273. Russell, Tr. 6476–77.

274. Russell, Tr. 6480.

275. Tindal, DX 1012, p. 109. Russell, Tr. 6475–76.

276. Russell, Tr. 6487–88.

277. GX 435, p. 5728, 7/21/30. Russell, Tr. 6487–88.

278. GX 392, p. 5439, 4/14/23. Martin, Tr. 6378.

279. GX 398, pp. 5509–10, 5/15/50.

280. McCune, Tr. 5579.

281. McCune, Tr. 5580.

282. McCune, Tr. 5579.

283. DX 452, p. 882, 3/4/29.

284. DX 388–A, p. 719, 7/10/24; DX 391–A, p. 725, 10/17/24; DX 393, pp. 728–33, 9/25/24; DX 339, p. 647, 4/23/26; DX 7A, p. 9, 5/25/26; DX 12, p. 15, 10/25/27; DX 304, p. 585, 1/13/28; DX 305, p. 586, 1/10/28.

285. GX 587, p. 17, 4/28/50.

286. GX 589, p. 7531, 6/8/51; GX 6013 (Imp.Doc.No.45), 1/4/50. Jakes, DX

97. DuPont after years of development produced a type of cellophane that would retain the natural color of fresh meat for the necessary period of sales life. In 1947, when this film was introduced, Pliofilm was unsuitable for wrapping fresh meat.[287] After duPont's success, Goodyear was stimulated to research which resulted in development of a type of Pliofilm satisfactory for fresh meat packaging.[288] Fresh meat became one of the most important markets for Pliofilm.[289]

98. Cellophane has been successful as a packaging medium. Continued success in the sale of cellophane for packaging depends upon further research to improve quality.[290]

99. Plain cellophane was not suitable for wrapping where moisture protection was necessary.[291] DuPont's experience in attempting to sell plain cellophane for packaging such products as hard candies and bakery goods confirmed plain cellophane could not compete for these uses.[292] In 1924, the same year it began production of plain cellophane, duPont commenced research to discover moistureproof cellophane.[293] This work was successful and experimental production of moistureproof cellophane began by 1926.[294] Prices for moistureproof cellophane were regularly listed for the first time in November, 1928.[295] The basic product patent on moistureproof cellophane, U. S. Patent No. 1,737,187 was issued on November 26, 1929.[296]

100. Invention of moistureproof cellophane enabled sales to customers who were mass producers of low cost products requiring moisture protection.[297] These included most foods and tobacco products. Earliest of such industries was the cigarette and cigar industry, which in the early 1930's changed to cellophane [298] as a protective wrapper in place of waxed glassine and other materials previously used.[299]

101. After invention of moistureproof cellophane much of duPont's research was directed to improvements of the basic product moistureproof cellophane.[300] Forty different types of moistureproof cellophane were developed by duPont.[301] Research work connected with moistureproof cellophane included development of adhesives,[302] development of coatings that could be sealed by heat without the use of adhesives,[303] development of anchoring the coating,[304] and development of coatings with special characteristics required by different

1006, pp. 15–16. Torrence, DX 1009, p. 44. Horn, DX 1010, p. 73. Leeds, DX 1011, p. 94. Tindal, DX 1012, p. 108. Ellies, DX 1014, pp. 134, 137–39. Ramsay, DX 1017, p. 233. Hanson, DX 1018, p. 254. Nelson, DX 1020, p. 316. Croy, DX 1021, p. 344. R. R. Smith, Tr. 5713. Leinbach, Tr. 6742–43, 6774, 6780–81.

287. GX 589, p. 7531, 6/8/51.

288. Ellies, DX 1014, p. 137.

289. Ellies, DX 1014, p. 138.

290. GX 583 (Imp.Doc.No.39), pp. 1–2. DX 408, pp. 794–808. Carpenter, Tr. 6276. Mitchell, Tr. 5527–28.

291. GX 392, p. 5437, 5/1/23.

292. DX 390, p. 723, 9/5/24; DX 391, p. 724, 10/17/24; DX 338, p. 718, 7/10/24; DX 389, p. 721, 7/11/24.

293. DX 392, p. 726, 5/21/24; DX 393, p. 728, 9/25/24; DX 394, p. 733, 10/1/24.

294. GX 481, p. 6370, 1/17/27; GX 2467, p. 3157, 7/13/43.

295. GX 398, p. 5524, 5/15/50.

296. GX 2001. Schedule A, p. 1981, 7/13/49.

297. GX 431, p. 5678, 4/26/29.

298. DX 348, p. 663, 1/1/30. GX 435, p. 5728, 7/21/30. DX 194, p. 395, 7/16/37. GX 438, p. 5755, 2/9/32.

299. R. R. Smith, Tr. 5822. Leinbach, Tr. 6769. DX 194, p. 395, 7/16/37.

300. GX 489, pp. 6489–90. DX 400, p. 752, 10/11/28. Mitchell, Tr. 5477–82.

301. GX 11, pp. 86–90, 3/27/45. Mitchell, Tr. 5482.

302. DX 403, p. 769, January 1927.

303. Mitchell, Tr. 5478, 5513–15. DX 554, p. 1063, 1/30/41. GX 440, p. 5770, 1/27/33; GX 441, p. 5779, 7/27/33; GX 442, p. 5723, 1/23/34.

304. DX 399, p. 745, 4/29/30. Mitchell, Tr. 5504–10.

products.[305] DuPont was issued patents from time to time on various of its inventions.[306] Validity of patents is not challenged.[307]

102. DuPont developed over fifty types of cellophane tailored for end uses.[308] For example, different types are manufactured for fresh vegetables,[309] for cigarettes,[310] for hot hard candies,[311] for cold hard candies,[312] for wet products,[313] for frozen products,[314] for prepared meats,[315] and for fresh meats.[316]

103. Since entering cellophane, duPont has produced 174 varieties of cellophane.[317] In 1949, duPont made sales of 108 different varieties of cellophane.[318]

104. Original moistureproof cellophane could not be sold for mass-produced bakery products,[319] which were packaged by machines in heat sealing materials, especially waxed paper and waxed glassine.[320] Moistureproof cellophane, since not sealable by heat, would not work on these machines.[321] Adhesives necessary to seal moistureproof cellophane had an objectionable reaction on bakery products.[322] DuPont research developed a heat sealing moistureproof cellophane by 1932.[323] This enabled penetration of the bakery industry to which duPont had been unable to sell in volume.[324] During 1933 duPont direct sales to that industry amounted to 4,500,000 lbs.[325] and in 1934 to 7,000,000 lbs.[326] This increased over 13,000,000 lbs. in 1937, and continued to grow.[327] The bakery industry is now the largest single consumer of cellophane, accounting for 52,700,000 lbs. of duPont cellophane in 1949.[328]

105. Moistureproof coatings unless anchored have tendency to slough off in the presence of considerable moisture,[329] and unanchored moistureproof film is unsuitable for packaging such products as frozen foods and fish, fresh produce, and meats.[330] Research on anchoring the coating was undertaken by duPont in 1928 to obtain a film adaptable to such uses.[331] DuPont's research resulted in an anchored coating,[332] and research has continued for the purpose of improving quality of product and reducing cost of its production.[333] A further development by duPont of a film for fresh meat opened that market to cellophane.[334] Du-

305. DX 47, p. 85, 5/27/38. GX 11, pp. 86–90, 3/27/45. Mitchell, Tr. 5517–18, 5525–26.

306. GX 2001, p. 1981, et seq. Mitchell, Tr. 5490.

307. Minicus Tr. 6960–62.

308. GX 11, pp. 85–90. DX 408, pp. 794–808.

309. DX 408, p. 801.

310. DX 408, p. 795.

311. DX 408, p. 795.

312. DX 408, p. 795.

313. DX 408, p. 807.

314. DX 408, p. 799.

315. DX 408, p. 798.

316. DX 408, p. 798.

317. GX 396, pp. 5490–93, 5/15/50.

318. GX 396, pp. 5494–97, 5/15/50.

319. DX 388, p. 718, 7/10/24; DX 6, p. 6, 3/19/26; DX 339, p. 647, 4/23/26.

320. DX 70, pp. 153–61, 10/49. Russell, Tr. 6476. R. R. Smith, Tr. 5682–83.

321. Russell, Tr. 6479. Mitchell, Tr. 5478.

322. Mitchell, Tr. 5513, 5516.

323. GX 440, p. 5770, 1/28/33; GX 441, p. 5779, 7/27/33. Mitchell, Tr. 5513.

324. GX 442, p. 5783, 1/23/34. Mitchell, Tr. 5517–18.

325. GX 489, p. 6487, 1/22/35.

326. GX 77, p. 252, 2/11/36.

327. GX 492, p. 6564, 1/25/38; GX 78, p. 268, 2/2/38.

328. DX 409, p. 809, 2/9/50.

329. DX 399, p. 743, 12/29/28. Mitchell, Tr. 5479.

330. DX 399, p. 751, 12/29/28. Mitchell, Tr. 5504

331. DX 399, p. 743, 12/29/28. Mitchell, Tr. 5505.

332. Mitchell, Tr. 5479.

333. Mitchell, Tr. 5510.

334. Mitchell, Tr. 5525–26. R. R. Smith, Tr. 5763–64.

Pont's research on anchoring the moistureproof coating led to substantial improvement in duPont's sales.[335]

106. Development of anchoring for the moistureproof coating on duPont cellophane was stimulated by loss of business to glassine, resulting from loss of cellophane's moistureproofness when the coating came into contact with greasy or wet products.[336]

107. Manufacturing process obtained by duPont from the French was sound from engineering standpoint.[337] However, duPont made improvements by placing the process under control for quality purposes, improving machine efficiencies and redesigning machines to enable more continuous operation.[338]

108. DuPont by its efforts made improvements in the efficiency and cost of each step in the manufacture of plain cellophane and of moistureproof cellophane. Phases of manufacture at which improvements were made include steeping the wood pulp, shredding the pulp into alkali cellulose, ripening the alkali cellulose, xanthation, mixing xanthate with caustic soda to form into viscose, control and design of casting hopper and lips, handling of film through baths of the casting machine, design of rolls, drying film, application and drying of moistureproof coatings, recovery of solvent, and slitting of finished film into commercial rolls.[339]

109. The amount of raw materials required to make one pound of cellophane has been reduced as follows:

wood pulp .....................20%
caustic soda ...................40%
carbon bisulphide .............33%
sulphuric acid ................60% [340]

Finished product output per payroll hour has been increased 380%.[341]

Finished waste has been reduced from 15.3% to 3.5%.[342]

Maximum casting speeds have increased from 30 meters per minute to 120 meters per minute in 1952.[343]

Speed of film in the coating towers has increased from 30 meters per minute to upwards of 200 meters per minute.[344]

Solvent recovery has been increased from 83% up to 97%.[345]

The speed at which rolls are slit increased from 150 feet a minute to 1,000 feet a minute.[346]

DuPont's productive capacity in 1941 for 56 machines was 110,000,000 pounds, while in 1952 with the same number of machines, its production capacity was 218,000,000 pounds.[347]

The average pounds of film produced per casting machine day by duPont increased from 3,292 in 1931 to 5,698 in 1944 and 9,963 in 1950. Average pounds of film coated per coating tower day by duPont increased from 3,956 in 1931 to 8,107 in 1944 and 15,371 in 1950.[348]

All of this indicia of the efficiency of manufacture is persuasive.[349]

110. In the last two years there has been one lost time accident among the 4,000 employees in duPont's cellophane

335. R. R. Smith, Tr. 5764.

336. Mitchell, Tr. 5504. DX 11, p. 14, 5/18/27; DX 12–15, pp. 15–19, 1927; DX 309, p. 594, 12/4/31.

337. Ernst, Tr. 5345–48, 5356–64. Benger, Tr. 5436–37.

338. McCune, Tr. 5549–50, 5553, 5557, 5560. DX 386, p. 716, 1950; GX 481, p. 6385, 1/17/27; GX 483, p. 6419, 1/21/29.

339. McCune, Tr. 5549–79.

340. McCune, Tr. 5539.

341. McCune, Tr. 5540.

342. McCune, Tr. 5540. DX 386, p. 716, 1950.

343. McCune, Tr. 5542.

344. McCune, Tr. 5543–44.

345. McCune, Tr. 5543–44.

346. McCune, Tr. 5548.

347. McCune, Tr. 5548.

348. DX 386, p. 716, 1950.

349. McCune, Tr. 5548–49.

plants, despite the existence of dangerous elements in cellophane manufacture.[350]

111. Since duPont commenced manufacture of cellophane, it has carried out laboratory analyses of flexible packaging materials which compete for the same end uses as cellophane. These tests cover physical and chemical properties that are important in packaging.[351] They are not made with any anti-competitive intent, but for the purpose of appraising the characteristics of competing materials as a guide to improvements in duPont's products. DuPont tries to maintain as high performance in its cellophane, relative to the performance of other flexible packaging materials, as it can.[352]

112. Since invention of moisture-proof cellophane duPont has improved cellophane as to uniformity of gauge, degree of moistureproofness, ease of heat sealing, reduction of the brittleness of the film when exposed to humidity changes, and facility of operating of cellophane on high speed presses and converting and packaging machinery.[353]

113. Waxed paper, glassine, Pliofilm, foil, Saran polyethylene and other flexible packaging materials have been improved for packaging use in the last 20 years. These improvements include strength, printability, ease of use on packaging machinery and variation of characteristics to serve specific uses.[354] Competition of cellophane has stimulated these improvements in other flexible packaging materials.[355]

114. Improvements with respect to glassine since 1924 include:

1. An increase in strength, both bursting strength and strength when wet.[356]

2. Improvement in flexibility and folding qualities so as to make it less brittle and more acceptable as a wrap for a small merchandise where creases and corners in a wrap occur.[357]

3. Development and improvement of more transparent types.[358]

4. Development and improvement of new coatings for glassine to provide better protection against moisture, grease, vapors, etc.[359]

5. Improvement of printing.[360]

6. Improvement of transparency.[361]

7. Improvement in variety of types produced for different packaging use.[362]

115. Improvements in waxed paper since 1924 include:

1. Development and improvement of translucent types of waxed sulphite.[363]

2. Development and improvement of highly opaque types of waxed paper for better background to printing.[364]

---

350. McCune, Tr. 5582–83.

351. DX 46, p. 80, 5/15/36. DX 47, p. 84, 5/27/38. DX 48, p. 95, 1/11/39. DX 49, p. 105, 1/16/41. DX 51, p. 111, 5/3/39; DX 52, p. 119, 1/17/40. DX 78, p. 175, 6/18/34. DX 84, p. 188, 1/29/40. DX 183, p. 366, 5/22/40. DX 193, p. 385, 7/18/34. DX 195, p. 398, 8/2/37.

352. McCune, Tr. 5584. Mitchell, Tr. 5470–84, 5534. R. R. Smith, Tr. 5831.

353. Martin, Tr. 6380. Mitchell, Tr. 5468–90, 5504–26. Jakes, DX 1006, p. 9. Horn, DX 1010, p. 68. Wilcox, DX 1013, p. 132.

354. Jakes, DX 1006, pp. 15–16. Hopping, DX 1007, pp. 22–23. Southwick, DX 1008, p. 30. Torrence, DX 1009, p. 44. Horn, DX 1010, p. 73. Leeds, DX 1011, p. 94. Tindal, DX 1012, p. 108. Ellies, DX 1014, pp. 134, 137–39. Ramsay, DX 1017, p. 233.

355. Leinbach, Tr. 6742–43, 6774, 6780, 6781. R. R. Smith, Tr. 5713. Nelson, DX 1020, p. 316. Ramsay, DX 1017, p. 233.

356. Jakes, DX 1006, p. 15. Horn, DX 1010, p. 73.

357. Martin, Tr. 6381.

358. Leinbach, Tr. 6773.

359. Leinbach, Tr. 6773.

360. Jakes, DX 1006, p. 15. Horn, DX 1010, p. 73.

361. Leinbach, Tr. 6773.

362. Leinbach, Tr. 6773.

363. Nelson, DX 1020, p. 312. Leinbach, Tr. 6753–54.

364. Martin, Tr. 6381. R. R. Smith, Tr. 5810. Ramsay, DX 1017, p. 233.

3. Development of hard crystalline waxes which are not sticky, will not rub off, and are glossy.[365]

4. Development and improvement of process printing methods which enable highly decorative effects, including direct color photographic reproductions, to be obtained with waxed paper wraps.[366]

5. Improvement of moisture resistance.[367]

6. Improvement of ease and strength of seal.[368]

116. Polyethylene film produced had disadvantages in limpness, sealability, printability and other factors.[369] Many of these deficiencies could be corrected through research,[370] and were.[371] These improvements made it an effective competitor for uses previously served by cellophane and other flexible wrapping materials.[372]

117. Although duPont in January, 1949, thought cellophane was secure against competition from other transparent films for self-service merchandising of fresh meat, luncheon meats, and fresh produce,[373] in fact Goodyear in 1950 developed a type of Pliofilm satisfactory for fresh meats, which became a major Pliofilm market.[374] Polyethylene and cellulose acetate were being improved, and making increased penetrations in the fresh produce field.[375] DuPont's development of specialized types for self-service selling of meats and fresh produce gave it a start over other materials, but improvements in the other materials enabled them to capture part of these markets from cellophane.

118. Saran, Pliofilm and polyethylene when first on the market were difficult to heat seal and run on packing machines, but are *now* heat sealed and mechanically run on a commercial basis on commonly used equipment.[376]

119. Qualities of types of Pliofilm have been improved since its appearance in the 1930's.[377] Odor has been eliminated, and the film has been made durable at low temperatures.[378] Important to Pliofilm sales are improvements in adaptability of machines to convert and package with Pliofilm.[379] Types have been developed that enabled penetration of new markets, notably fresh meat and dried fruit packaging.[380]

120. Cellulose acetate has been improved as to toughness of film. Improvements have been made in handling cellulose acetate film mechanically to avoid generation of static electricity.[381] Heat sealing cellulose acetate film is now under development.[382]

121. Sales of cellophane bags are vulnerable to competition from polyethylene.[383]

365. Martin, Tr. 6381. Hanson, DX 1018, p. 254. DX 70, pp. 153 (picture and note), 155, 10/49.

366. R. R. Smith, Tr. 5810. Hanson, DX 1018, p. 254.

367. Croy, DX 1021, p. 344.

368. Croy, DX 1021, p. 344.

369. GX 6038, p. 8166, 2/1/49.

370. GX 6038, p. 8166, 2/1/49.

371. GX 6013 (Imp.Doc.No. 45), 1/4/50.

372. GX 6013 (Imp.Doc.No. 45), 1/4/50.

373. GX 6039, pp. 8168–74, 1/28/49.

374. R. R. Smith, Tr. 5751–61, 5975–76. Ellies, DX 1014, pp. 137–38.

375. Hopping, DX 1007, p. 19. Martin, Tr. 6353. DX 133, p. 288, 12/4/47. DX 139, p. 298, 8/18/48. DX 140, p. 299, 12/7/48. DX 141, p. 300, 11/1/49.

DX 143, p. 303, 5/10/50. R. R. Smith, Tr. 5820, 5996.

376. Martin, Tr. 6438–40. Russell, Tr. 6467, 6474. Southwick, DX 1008, p. 30. Tindal, DX 1012, pp. 108, 114–15. Ellies, DX 1014, p. 139. Deeds, DX 1011, p. 101. Ramsay, DX 1017, pp. 235–36. GX 6012 (Imp.Doc.No. 40), pp. 11–12, 5/18/49.

377. Ellies, DX 1014, p. 147. Martin, Tr. 6382.

378. Ellies, DX 1014, p. 147.

379. Tindal, DX 1012, p. 108.

380. Ellies, DX 1014, pp. 137–39.

381. Hopping, DX 1007, p. 22.

382. Hopping, DX 1007, p. 18.

383. GX 6032, p. 8156, 6/11/48. GX 6013 (Imp.Doc.No. 45), 1/4/50. Southwick, DX 1008, p. 30.

122. Other manufacturers of flexible packaging materials engage in research to improve their products and sales. DuPont does not have power to subvert use or to engross trade secrets and technical knowledge either as to cellophane or as to flexible packaging materials.[384]

## VI. DuPont Competed by Lowering Prices.

### (Findings 123–149)

123. The objective of duPont was to reduce price to a level where cellophane could compete with other flexible packaging materials. Price of cellophane in relation to prices of other flexible packaging materials was such that only luxury items would use it as a wrap. It was necessary to develop volume, lower cost and improve quality and bring the price of cellophane down to a point where it would receive acceptance in the packaging markets. DuPont sought a low profit per unit of sale in effort to achieve lower prices which would develop volume sales and increase profits.[385]

124. From start of production of cellophane in 1924 until 1947 duPont made 21 price reductions which lowered price of plain cellophane (300 gauge) per pound from $2.65 to 33¢.[386] During period from the first commercial offer of moistureproof film to 1947 duPont reduced the price per pound (300 gauge) from $1.60 to 41¢.[387] Since 1947 duPont's prices for these types have increased to 49¢ and 51¢, respectively, as of December 15, 1950.[388]

125. Above price reductions cellophane customers enjoyed reductions in

cost of using duPont cellophane during the period 1924 to date as the result of improvement in quality of duPont cellophane [389] without any increase in price per pound.[390]

126. Annual average prices received by duPont per pound of cellophane sold have been:[391]

| Year | Average Price |
|------|---------------|
| 1924 | 2.508 |
| 1925 | 1.927 |
| 1926 | 1.713 |
| 1927 | 1.431 |
| 1928 | 1.211 |
| 1929 | 1.066 |
| 1930 | .863 |
| 1931 | .643 |
| 1932 | .556 |
| 1933 | .504 |
| 1934 | .481 |
| 1935 | .431 |
| 1936 | .413 |
| 1937 | .415 |
| 1938 | .416 |
| 1939 | .398 |
| 1940 | .380 |
| 1941 | .382 |
| 1942 | .396 |
| 1943 | .404 |
| 1944 | .419 |
| 1945 | .416 |
| 1946 | .401 |
| 1947 | .419 |
| 1948 | .460 |
| 1949 | .483 |
| 1950 | .490 |

127. DuPont's price reductions were made by improvement in efficiency of manufacturing and by increased volume

384. Reichel, Tr. 6020, 6045–46, 6048. Jakes, DX 1006, pp. 15–16. Tindal, DX 1012, pp. 108, 111. Ellies, DX 1014, pp. 137–39, 142. Ramsay, DX 1017, pp. 225–26, 233. Nelson, DX 1020, pp. 308–09, 323. Croy, DX 1021, pp. 340–41, 344.

385. Yerkes, Tr. 6939–42. Carpenter, Tr. 6275–76. DX 337, p. 643, 12/11/24. DX 338, p. 645, 2/2/25. DX 339, pp. 648, 650–3, 4/23/26. GX 1483, p. 7051, 4/25/26. GX 347, pp. 866–69, 12/31/29. GX 483, p. 6412, 1/21/29. GX 431, p.

5678, 4/26/29. GX 490, p. 6499, 1/27/36. See also DX 340–365.

386. GX 1, p. 12, 2/17/44. GX 396, pp. 5498–5502, 5/15/50.

387. GX 1, p. 12, 2/17/44. GX 396, pp. 5498–5502, 5/15/50.

388. DX 591, p. 1128.

389. Mitchell, Tr. 5477–81.

390. DX 336, p. 642, 1950.

391. DX 336, p. 642, 1950.

of sales attained by improvements in the quality of duPont's cellophane.[392]

128. All types of duPont moisture-proof cellophane are sold at prices different from those of duPont plain cellophane.[393]

129. Types of duPont moistureproof cellophane are sold at different prices, and have different characteristics.[394]

130. 1949 average wholesale prices of flexible packaging materials in the United States were:[395]

| Packaging Material | Price per 1,000 sq. in. (cents) | Price per lb. (cents) | Yield per. lb. (sq. in.) |
|---|---|---|---|
| Saran | | | |
| 100 Gauge #517 | 6.1 | 99.0 | 16,300 |
| Cellulose Acetate | | | |
| .00088″ | 3.3 | 82.0 | 25,000 |
| Polyethylene | | | |
| .002″—18″ Flat Width | 5.4 | 81.0 | 15,000 |
| Pliofilm | | | |
| 120 Gauge N 2 | 3.8 | 80.8 | 21,000 |
| Aluminum Foil | | | |
| .00035″ | 1.8 | 52.2 | 29,200 |
| Moistureproof Cellophane | | | |
| 300 MST–51 | 2.3 | 47.8 | 21,000 |
| Plain Cellophane | | | |
| 300 PT | 2.1 | 44.8 | 21,500 |
| Vegetable Parchment | | | |
| 27# | 1.4 | 22.3 | 16,000 |
| Bleached Glassine | | | |
| 25# | 1.0 | 17.8 | 17,280 |
| Bleached Greaseproof | | | |
| 25# | .9 | 15.8 | 17,280 |
| Plain Waxed Sulphite | | | |
| 25# Self-Sealing | 1.1 | 15.2 | 14,400 |
| Plain Waxed Sulphite | | | |
| 25# Coated Opaque | .7 | 11.9 | 17,280 |
| Cry-O-Rap | Sold only in converted form. No unconverted quotations. | | |

131. December 15, 1950, the latest date for which list prices are in the record, duPont's price for 300 gauge moistureproof heat sealing cellophane was 51¢ per lb.; for 300 moistureproof heat sealing anchored cellophane, 59¢ per lb.; for 300 gauge non-moistureproof cellophane, 49¢ per lb.; and for 300 gauge non-moistureproof rancidity resistent colored cellophane, 67¢ per lb.[396]

132. The price of cellophane is today an obstacle to its sales in competition with other flexible packaging materials.[397]

392. Yerkes, Tr. 6940–42. Carpenter, Tr. 6278–79. DX 338, p. 645, 2/2/25. DX 348, p. 663, 2/1/30. DX 340–41, 344–46, 348–51, 353–54, 357, 360–61, 363–64, 368.

393. GX 396, pp. 5498–5502, 5/15/50. GX 6002, p. 8110, 6/8/51.

394. GX 396, pp. 5498–5502, 5/15/50. GX 6002, p. 8110.

395. DX 995.

396. DX 591, p. 1128, 1951.

397. Horn, DX 1010, p. 73. Leeds, DX 1011, pp. 91–92. McCurry, DX 1016, pp. 207, 211. Elmstrom, DX 1019, pp. 284–85. Croy, DX 1021, p. 341.

133. Cellophane has always been higher priced than the two largest selling flexible packaging materials, wax paper and glassine, and this has represented a disadvantage to sales of cellophane.[398]

134. DuPont considered as a factor in the determination of its prices the prices of waxed paper, glassine, greaseproof, vegetable parchment, and other flexible packaging materials.[399]

135. DuPont, in reducing its prices, intended to narrow price differential between cellophane and packaging papers, particularly glassine and waxed paper.[400] The objective of this effort has been to increase the use of cellophane. Each price reduction was intended to open up new uses for cellophane, and to attract new customers who had not used cellophane because of its price.[401]

136. The ratio between moistureproof cellophane prices and glassine prices, and between moistureproof cellophane and waxed paper prices, diminished during 1929–1949. In January, 1929, the price of MT cellophane was seven times that of glassine; in June, 1934, 4 times the price of glassine and 4¼ times the price of waxed paper. In January, 1949, MST cellophane price was little more than twice that of glassine, and only twice that of waxed paper.[402]

137. Relationship between prices for various types of cellophane and prices for various types of glassine affects ability of the producers of the respective materials to sell their products.[403]

138. DuPont's proportion of the United States production of flexible packaging materials has increased in almost direct relation to the steady decrease of the ratio of cellophane prices to glassine and waxed paper prices.[404]

139. Steady narrowing of price gap between cellophane and glassine and waxed paper enables duPont to get new marginal business from time to time, i. e., accounts who had previously not used cellophane because of its relatively high price compared to the price of waxed paper and glassine.[405]

140. Some users are sensitive to the cost of flexible packaging materials;[406] others are not.[407] Users to whom cost is important include substantial business: for example, General Foods, Armour, Curtiss Candy Co., and smaller users in the bread industry, cracker industry, and frozen food industry.[408] These customers are unwilling to use more cellophane because of its relatively high price,[409] would use more if the

398. R. R. Smith, Tr. 5674–5842. Nelson, DX 1020, p. 317. Leeds, DX 1011, pp. 91–92. GX 347, p. 869, 12/31/29. DX 375, p. 704, 6/22/48. DX 378, p. 708, 6/22/48. DX 994 (Graph).

399. Yerkes, Tr. 6942. GX 347, p. 869, 12/31/29. DX 327, p. 633, 11/20/39. DX 355, p. 670, 6/19/34. DX 375, p. 704, 6/22/48. DX 378, p. 708, 6/22/48.

400. Carpenter, Tr. 6277. GX 347, p. 869, 12/31/29. DX 337, p. 643, 12/11/24. DX 355, p. 670, 6/19/34. DX 327, p. 633, 11/20/39. DX 201, p. 415, 11/20/39.

401. Yerkes, Tr. 6940–41. Carpenter, Tr. 6275–76. DX 344, p. 659, 5/29/28. DX 348, p. 663, 2/1/30. DX 354, p. 669, 5/14/34. DX 363, p. 679, 12/5/38. DX 367, p. 686, 11/27/40. GX 1483, p. 7051, 4/25/26. GX 347, pp. 866–69, 12/31/29. GX 483, p. 6412, 1/21/29. GX 490, p. 6499, 1/27/36. GX 6031, p. 8155, 2/7/39. See also DXs 355–365, pp. 641–83.

402. DX 994 (Graph). Bricker, Tr. 4494–98.

403. Nelson, DX 1020, pp. 317–18. Leinbach, Tr. 6779, 6782–83. Martin, Tr. 6379. R. R. Smith, Tr. 5674–5842.

404. DX 982. DX 994.

405. Carpenter, Tr. 6276–77. R. R. Smith, Tr. 5840–42. Horn, DX 1010, pp. 69–70. DX 344, p. 659, 5/29/28. DX 367, p. 686, 11/27/40.

406. R. R. Smith, Tr. 5677, 5800, 5815, 5817, 5841–42.

407. Leinbach, Tr. 6769–70.

408. Jakes, DX 1006, p. 10. Horn, DX 1010, pp. 69–70. Elmstrom, DX 1019, p. 280. DX 91, p. 209, 11/19/47. DX 120, p. 267, 1/26/49. DX 124, p. 272, 4/28/49. DX 125, p. 273, 1/21/49.

409. McCurry, DX 1016, p. 224. DX 86, p. 201, 10/28/40. DX 93, p. 211, 11/17/47.

price were reduced,[410] and have increased their use as the price of cellophane has been reduced.[411]

141. The cost factor slips accounts away from cellophane. This hits at the precarious users, whose profit margins on their products are low, and has been put in motion by competitive developments in the user's trade. Examples include the losses of business to glassine in candy bar wraps in the 30's,[412] frozen food business to waxed paper in the late 40's,[413] and recent losses to glassine in cracker packaging.[414]

142. The price of cellophane was reduced to expand the market for cellophane. DuPont did not reduce prices for cellophane with intent of monopolizing manufacture or with intent of suppressing competitors.[415]

143. DuPont reduced cellophane prices to enable sales to be made for new uses from which higher prices had excluded cellophane, and to expand sales. Reductions were made as sales volume and market conditions warranted. In determining price reductions, duPont considered relationship between its manufacturing costs and proposed prices, possible additional volume that might be gained by the price reduction, effect of price reduction upon the return duPont

would obtain on its investment. It considered the effect its lowered price might have on the manufacture by others, but this possible result of a price reduction was never a motive for the reduction.[416]

144. DuPont never lowered cellophane prices below cost, and never dropped cellophane prices temporarily to gain a competitive advantage.[417]

145. As duPont's manufacturing costs declined, 1924 to 1935, duPont reduced prices for cellophane.[418] When costs of raw materials increased subsequent to 1935, it postponed reductions until 1938 and 1939.[419] Subsequent increases in cost of raw material and labor brought about price increases after 1947.[420]

146. During period 1932–35, duPont made reductions in cellophane prices, but was unable to sell productive capacity of its cellophane plants.[421]

147. In May 1930, it made an announcement of a reduction and of further reductions to be effective in August and October.[422] DuPont's principal reasons for advance announcement were to influence consumers to use up their inventories rather than to place further orders, since new productive capacity was expected to come into operation in

410. Jakes, DX 1006, p. 10. DX 76, p. 173, 10/12/32. DX 125, p. 273, 1/21/49.

411. Horn, DX 1010, pp. 69–70.

412. R. R. Smith, Tr. 5771. DX 77, p. 174, 9/18/33. DX 86, p. 201, 10/28/40.

413. R. R. Smith, Tr. 5810–11. Hanson, DX 1018, p. 251. Croy, DX 1021, p. 341. DX 120, p. 267, 1/26/49. DX 123, p. 271, 1/21/49. DX 124, p. 272, 4/28/49. DX 125, p. 273, 1/21/49. DX 126, p. 274, 2/7/49.

414. R. R. Smith, Tr. 5804–05. DX 68, p. 151, 9/27/49.

415. Yerkes, Tr. 6940–43. Carpenter, Tr. 6275–79. DX 337, p. 643, 12/11/24. GX 1483, p. 7049, 4/23/26. GX 347, p. 869, 12/31/29. DX 367, p. 686, 11/27/40.

416. Yerkes, Tr. 6940–47. GX 347, p. 866, 12/31/29. DX 347, p. 662, 12/31/29. GX 465, p. 5941, 10/1/30. DX 352, p.

667, 12/31/32. DX 362, pp. 677–78, 6/17/38. DX 365, p. 683, 11/16/39. DX 367, p. 686, 11/27/40.

417. Yerkes, Tr. 6943–44. DX 367, pp. 685–87, 11/27/40. GX 575 (Imp.Doc. No. 16), 8/11/47.

418. GX 1, pp. 8–9, 2/17/44. GX 575 (Imp.Doc.No. 16), 8/11/47. DXs 338, 340, 341, 344, 345, 346, 348, 349, 350, 351, 353, 354, 357, 360, 361, 363, 364, 368.

419. GX 492, p. 6551, 1/25/38. GX 355, p. 888, 8/30/38.

420. DX 591, p. 1128, 1951. GX 501, p. 6895, 1/27/48.

421. DX 598, p. 1214, 1951. DX 358, p. 673, 1951. GX 188, p. 526, 5/1/37 (Price chart). GX 1, p. 9, 2/17/44. GX 394, pp. 5481–82 (footnotes 1–2–3), 5/15/50. GX 393, p. 5476, 5/15/50. GX 395, p. 5488, 5/15/50.

422. GX 477, p. 5991, 5/26/30.

October, 1930, and to stimulate interest on the part of users who were not interested in cellophane at the current price but would be interested in anticipation of lower future prices. The advance announcement would give anyone contemplating cellophane manufacture notice of duPont's idea of the proper price level.[423] The price reductions made by duPont in August and October 1930 were greater than had been announced in advance.[424]

When a second advance announcement was suggested in 1936, management rejected the suggestion because business conditions which impelled the 1930 announcement did not exist; i. e., in 1936 customers were purchasing only for immediate use, and not to build up inventory.[425]

148. Same individuals were the principal duPont executives in duPont Rayon Co. and duPont Cellophane Co.[426] Same policies of improving quality, lowering cost of production, and reducing unit price to gain greater volume of sales were followed as to both companies.[427]

149. When duPont commenced manufacture of viscose rayon, it made a low percentage of the United States output, and for years its percentage of domestic sales was 20%. During that period its price policy for rayon was the same as for cellophane, which was the more the price could be reduced within limits the more of the article could be sold.[428]

## VII. Competition Between Cellophane and Other Flexible Packaging Materials.

### (Findings 150–278)

150. DuPont has promoted sale of cellophane for packaging material for products previously wrapped in other materials or not packaged. Growth of cellophane industry has been due to development of new uses, rather than an increase of volume in established uses.[429] The baking industry, the tobacco industry and the meat industry, each of which accounted for less than 2% of the small total sales in the early years, have become end uses of major importance, consuming millions of pounds annually.[430]

151. DuPont did not promote the sale of cellophane with intent of monopolizing the manufacture and sale of cellophane, or with intent of monopolizing the manufacture and sale of flexible packaging materials.[431]

152. DuPont promoted use of cellophane under an idea of developmental sales. DuPont acted on belief to increase volume of cellophane sales it was necessary to promote it for uses where advantages to the user were sufficient to offset the price advantage of competing flexible packaging materials. From selling standpoint, duPont's implementation of the developmental concept involved these activities: [432]

(a) Reduction of price per pound to reduce cost of cellophane.[433]

423. Yerkes, Tr. 6944–45. GX 462, p. 5935, 5/12/30.

424. GX 463, p. 5937–38, 5/14/30. GX 477, p. 5991, 5/26/30. GX 478, p. 5992, 8/1/30. GX 479, p. 5993, 9/30/30.

425. GX 469, p. 5945, 9/15/36. GX 470, p. 5946, 9/17/36.

426. Carpenter, Tr. 6265.

427. Yerkes, Tr. 6947.

428. Yerkes, Tr. 6945–47.

429. GX 481, pp. 6367–68, 1/17/27. GX 482, pp. 6389–91, 1/13/28. GX 485, p.

6439, 1/22/31. GX 487, p. 6462, 1/23/33. GX 488, p. 6475, 1/22/34. GX 492, p. 6548, 1/25/38. GX 494, p. 6621, 1/18/40. GX 496, pp. 6765–66, 1/21/43. GX 499, p. 6858, 1/15/46.

430. GX 460, p. 5915, 1/14/25. DX 409, p. 809, 2/9/50.

431. Yerkes, Tr. 6938–43. Carpenter, Tr. 6275–78.

432. R. R. Smith, Tr. 5651–5722.

433. GX 431, pp. 5678–79, 4/26/29. GX 439, p. 5748, 7/28/32.

(b) Development of packaging machinery and promotion of its use to reduce cost of application of cellophane.[434]

(c) Detailed study of the products and distribution practices of industries that appeared to be potential volume users, in order to determine what characteristics cellophane would require to function effectively, and to determine in what ways cellophane could justify its cost by increasing sales of product, reducing distribution costs for product.[435]

(d) Packaging development service to assist customers in designing practical packages with cellophane.[436]

(e) Technical services to assist customers in solving problems created by the use of cellophane.[437]

(f) Market studies to determine purchasing habits of retail consumers of packaged products.[438]

(g) Marketing studies to determine effect on sales of packaging a given product in cellophane.[439]

(h) Consumer advertising to popularize products packaged in cellophane.[440]

(i) Sales and technical assistance to converters engaged in the manufacture and sale of cellophane processed for packaging purposes.[441]

153. To increase use of cellophane duPont urged installation by customers of packaging machinery, wrapping and bag making machines. Use of such machines lowered cost of using cellophane, and tended to increase amount used. Purpose of such promotion by duPont of the use of packaging machinery was to lower the cost of packaging with cellophane and to enable cellophane to compete with other materials and to encourage use of cellophane by various types of customers.[442]

154. DuPont provided service to machine use of cellophane to users and prospective users without imposing obligation they purchase duPont cellophane, and without regard to size of possible purchases. Such services were rendered to persons using only Sylvania cellophane, to persons using both duPont and Sylvania cellophane, and to persons using no cellophane at all.[443]

155. Users of flexible packaging materials redesign packages seeking new ways of advertising their products, increasing protection or reducing cost. All manufacturers of such materials compete by rendering in varying degree technical services to these users including aid in package design,[444] development of material to meet special needs.[445]

156. DuPont considered as part of the future market for cellophane much of the business enjoyed by waxed paper and glassine. This is reflected in estimates by duPont of the potential for cellophane sales.[446]

157. In uses which account for 75% of duPont cellophane sold (packaging in food industries, textiles, paper goods, tobacco products) cellophane competes with aluminum foil, cellulose acetate, Cry-O-Rap, greaseproof paper, glassine, Pliofilm, polyethylene film, Saran, sulphite paper, vegetable parchment and

434. GX 431, pp. 5678–79, 4/26/29.

435. McCurry, DX 1016, pp. 211, 217. Elmstrom, DX 1019, p. 285. R. R. Smith, Tr. 5689.

436. GX 431, p. 5678, 4/26/29. GX 493, p. 6582, 1/30/39.

437. GX 431, pp. 5678–79, 4/26/29.

438. Wilcox, DX 1013, p. 130. Goland, DX 1015, p. 189. McCurry, DX 1016, p. 211. R. R. Smith, Tr. 5717.

439. McCurry, DX 1016, p. 211. R. R. Smith, Tr. 5721.

440. GX 431, pp. 5678–79, 4/26/29.

441. Goland, DX 1015, p. 188. Leeds, DX 1011, p. 84.

442. Russell, Tr. 6476, 6486. GX 455, p. 5888, 4/21/30. GX 435, p. 5728, 7/21/30. DX 410–435.

443. Russell, Tr. 6483–85.

444. Jakes, DX 1006, p. 8. Nelson, DX 1020, p. 324. Leinbach, Tr. 6772–73.

445. Jakes, DX 1006, pp. 15–16. Torrence, DX 1009, p. 44. Ellies, DX 1014, pp. 134–35, 137, 142. Nelson, DX 1020, p. 316. Leinbach, Tr. 6741–42.

446. GX 6018, pp. 8056–57, 3/14/51. GX 6011, pp. 7963, 7968, 2/1/50.

waxed paper. DuPont cellophane competes with waxed paper and glassine, and with one or more of the balance of these materials in every subdivision of the food industry.[447]

158. Cellophane is forced to meet competition of other flexible packaging materials. The competition between the materials is intense and duPont cannot exercise market control or monopoly powers.

159. These are elements considered by users of flexible packaging materials in the selection of a material:

1. Type of protection the contents of the package will require, e. g., protection against dirt, handling, moisture transmission, flavor contamination, etc.[448]

2. Degree of protection required.[449]

3. Facility of materials that satisfy considerations to run on the type of machinery operated by the user of the material.[450]

4. Degree of tradition of a certain package appearance. This must be judged by the user of the material against the nature of the market in which he sells his product.[451]

5. Degree of merchandising appeal.[452]

6. Economy offered by various materials. Both the selling price of materials and economies or expenses resulting from their use must be weighed.[453]

160. Packaging application presents problems arising from the nature of the product to be wrapped.[454]

161. Manufacturer of packageable products has a choice of materials from which to choose. Purchase price, cost of application, service available, and functional qualities of each material are factors which control choice, and control volume of material that can be sold in competition with others.[455]

162. Throughout the period of sale of cellophane, it has been at a price disadvantage as against flexible packaging materials of other kinds. Evidence is throughout the period of duPont Manufacture and sale of cellophane the price of cellophane, including both purchase price and cost of use, has been a factor in its competition with other flexible packaging materials.[456]

447. DX 409, p. 809, 2/9/50. DXs 984, 985, 986, 988–93. DX 996 (Physical Samples). GX 6004, pp. 7927–28. R. R. Smith, Tr. 5671. Nelson, DX 1020, pp. 303–04. Ramsay, DX 1017, pp. 228–29.

448. Jakes, DX 1006, pp. 5, 13. Horn, DX 1010, p. 68. Elmstrom, DX 1019, p. 279. McCurry, DX 1016, p. 212.

449. Horn, DX 1010, p. 68.

450. Jakes, DX 1006, p. 5.

451. Horn, DX 1010, p. 69. Elmstrom, DX 1019, p. 277.

452. Jakes, DX 1006, pp. 5, 13. Elmstrom, DX 1019, pp. 277–79.

453. Jakes, DX 1006, p. 13. Horn, DX 1010, pp. 68–69. Elmstrom, DX 1019, pp. 278–80.

454. Southwick, DX 1008, pp. 31–32. Hanson, DX 1018, p. 256. Ellies, DX 1014, pp. 154–55. R. R. Smith, Tr. 5561, 5688–5702, 5901. Martin, Tr. 6340–50.

455. GX 589, p. 7532, 6/8/51. Jakes, DX 1006, pp. 5, 13. Horn, DX 1010, pp. 68–69. McCurry, DX 1016, p. 212. Elmstrom, DX 1019, pp. 277–80.

456. Specific cases of competition where price played an important role are noted, broken down by end uses, and subdivided by competing materials.
Baked Goods
 *Glassine*
 DX 18, pp. 30, 32–36, 4/28. DX 308, p. 594, 12/7/31. GX 438, p. 5760, 2/9/32. DX 27, p. 46, 2/26/32. DX 315, pp. 601–02, 5/4/32. DX 316, pp. 603–04, 6/8/32. GX 439, p. 5767, 7/28/32. DX 25, p. 44, 8/8/32. DX 317, p. 606, 8/10/32. DX 319, p. 608, 9/1/32. DX 320, p. 610, 10/32. DX 321, pp. 611–12, 11/4/32. GX 440, pp. 5770, 5774, 1/27/33. DX 35, p. 59, 2/7/33. DX 37, p. 61, 5/22/33. DX 39, p. 63, 9/25/33. DX 34, p. 58, 10/30/33. DX 41, p. 65, 11/15/33. DX 42, p. 66, 12/20/33. DX 50, p. 110, 7/22/39. DX 55, p. 128, 9/10/41. DX 65, 6/2/49. DX 70, p. 160, 10/49. McCurry, DX 1016, p. 212. R. R. Smith, Tr. 5686–87, 5791–95.
 *Pliofilm and polyethylene*
 DX 71, p. 164, 10/24/49.
 *Waxed paper*
 DX 18, p. 30, 4/28. DX 32, p. 56, 1/9/33. GX 440, p. 5774, 1/27/33. DX

163. Evidence is throughout the period of duPont manufacture and sale of cellophane, it has competed with other flexible packaging materials on the basis of the composite physical properties of each material and the degree of each such property.[457]

35, p. 59, 2/7/33. DX 33, p. 57, 3/20/33. DX 36, p. 60, 5/3/33. DX 38, p. 62, 6/8/33. DX 131, p. 286, 8/15/33. DX 40, p. 64, 10/27/33. DX 42, p. 66, 12/20/33. R. R. Smith, Tr. 5696. DX 379, p. 709, 6/22/48. DX 64, p. 146, 6/2/49. DX 69, p. 152, 9/28/49. DX 71, p. 164, 10/24/49. DX 70, pp. 159–60, 10/49. McCurry, DX 1016, p. 210. R. R. Smith, Tr. 5686–87, 5696–99, 5777–80, 5791–95.

Chewing Gum, Candy and Nuts
*General*
DX 337, p. 643, 12/11/24. DX 74, p. 167, 8/31.
*Glassine*
DX 76, p. 173, 10/12/32. DX 320, p. 609, 10/32. DX 42, p. 66, 12/20/33. DX 85, pp. 199–200, 2/7/40. DX 86, pp. 201–02, 10/28/40. DX 88, pp. 205–06, 11/11/40. DX 93, p. 211, 11/17/47. DX 95, p. 213, 11/18/47. DX 97, p. 215, 6/48. Goland, DX 1015, p. 193. R. R. Smith, Tr. 5770–71.
*Pliofilm*
Jakes, DX 1006, p. 4.
*Wax Paper*
DX 42, p. 66, 12/20/33. R. R. Smith, Tr. 5781. Goland, DX 1015, p. 195.

Frozen Foods
*Parchment*
DX 111, p. 243, 3/9/39. DX 112, p. 244, 11/6/39. R. R. Smith, Tr. 5811.
*Wax paper*
DX 371, p. 693, 2/7/47. DX 436, p. 848, 6/22/49. DX 123, p. 271, 1/21/49. DX 124, p. 272, 4/28/49. DXs 125–28, pp. 273–77, 1949. DX 120, p. 267, 1/26/49. Croy, DX 1021, p. 341. Hanson, DX 1018, p. 251. Horn, DX 1010, p. 72. R. R. Smith, Tr. 5809–11.

Snacks
*Glassine*
DX 152, p. 324, 2/49. McCurry, DX 1016, p. 209. R. R. Smith, Tr. 5815.
*Pliofilm*
DX 326, p. 630, 10/9/39. McCurry, DX 1016, p. 209.

Cereals
*Glassine*
DX 163, p. 337, 10/24/33. Horn, DX 1010, pp. 70–71.
*Wax paper*
DX 163, p. 337, 10/24/33. DX 164, p. 338, 1/21/41. R. R. Smith, Tr. 5817.

Meats
*Greaseproof and parchment*
DX 339, p. 648, 4/23/26. DX 320, p. 609, 10/32. DX 174, p. 355, 12/13/40.

Other Foods
*Aluminum foil*
DX 177, p. 360, 3/23/33.
*Glassine*
DX 339, p. 648, 4/23/26. DX 187, p. 376, 8/25/33. DX 178, p. 361, 8/13/47. Horn, DX 1010, p. 73. R. R. Smith, Tr. 5827.
*Parchment*
R. R. Smith, Tr. 5827
*Pliofilm*
DX 172, p. 351, 10/27/48. DX 173, p. 352, 6/6/49.
*Wax paper*
DX 187, p. 376, 8/25/33.

Tobacco
*Aluminum foil*
DX 207, p. 427, 3/48.
*Glassine*
DX 339, p. 651, 4/23/26. DX 197, p. 407, 1/13/19. DX 198, p. 409, 4/12/39. DX 202, p. 417, 6/21/39. DX 203, p. 419, 11/3/39.
*Wax paper*
DX 200, p. 413, 4/25/39. DX 201, p. 415, 11/20/39.

Miscellaneous
*Glassine*
DX 219, p. 449, 5/8/31. DX 226, p. 458, 12/5/39. Leeds, DX 1011, p. 90.
*Kraft paper*
DX 224, p. 455, 3/30/31. DX 227, p. 459, 10/15/40.
*Parchment*
DX 321, p. 613, 11/4/32.
*Pliofilm*
DX 212, p. 439, 3/27/41. DX 230, p. 463, 12/12/49.

457. Specific cases of competition between cellophane and other flexible packaging materials on the basis of composite physical properties and the degree of each are noted, broken down by end uses, and sub-divided by competing materials:

Baked Goods
*Aluminum foil*
DX 70, p. 158, 10/49.
*Cellulose acetate*
Hopping, DX 1007, p. 19.
*Glassine*
DX 11, p. 14, 5/19/27. DX 12, p. 15, 10/25/27. DX 18, p. 25, 4/28. DX 14, p. 18, 9/28/28. DX 15, p. 19, 9/29/28. DX 306, p. 587, 1/9/30. DX 308, p. 594, 12/7/31. GX 438, p. 5760, 2/9/32. DX 315, p. 601, 5/4/32. DX 316, p. 604, 6/8/32. DX 320, p. 609, 10/32. DX 322, p. 614, 12/8/32. GX 440, p. 5770, 1/27/33. DX 39, p. 63, 9/25/33. DX

164. Throughout the period of duPont sale of cellophane, as result of operation of competitive factors as between duPont cellophane and other flexible packaging materials, duPont cellophane has gained part or all of the packaging

43, pp. 67–73, 3/28/35. DX 47, pp. 84–94, 5/27/38. DX 48, pp. 95–104, 1/11/39. DX 53, pp. 125–26, 10/11/40. DX 49, pp. 105–109, 1/16/41. DX 57A, pp. 135–36, 6/14/45. DX 70, p. 158, 10/49. R. R. Smith, Tr. 5730.
*Pliofilm*
 DX 51, pp. 111–18, 5/3/39. DX 326, p. 628, 10/9/39. DX 52, pp. 119–24, 1/17/40.
*Wax paper*
 DX 12, p. 15, 10/25/27. DX 306, p. 587, 1/9/30. DX 24, p. 43, 10/16/31. DX 46, pp. 80–83, 5/15/36. DX 56, pp. 130–32, 11/24/41. DX 57A, pp. 137–38, 6/14/45. DX 66, p. 149, 6/2/49. DX 70, pp. 155, 159, 161, 10/49. DX 596, p. 1176, 1950. R. R. Smith, Tr. 5677–80, 5791–94.

Candy, Chewing Gum and Nuts
*General*
 DX 74, p. 167, 8/31. DX 79, p. 181, 6/20/35. DX 82, p. 186, 12/15/39. Jakes, DX 1006, p. 11.
*Aluminum foil*
 DX 80, pp. 182–83, 10/7/35. DX 89, p. 207, 2/25/41. DX 101, p. 219, 9/3/48.
*Cellulose acetate*
 R. R. Smith, Tr. 5786–87.
*Glassine*
 DX 78, pp. 175–80, 6/8/34. DX 88, pp. 205–06, 11/11/40. Leeds, DX 1011, p. 89. Jakes, DX 1006, pp. 2–3. Martin, Tr. 6381–82.
*Pliofilm*
 DX 326, pp. 628, 630, 10/9/39. DX 84, pp. 188–98, 1/29/40. DX 87, pp. 203–04, 5/27/40. DX 98, p. 216, 12/23/47. Martin, Tr. 6384.
*Wax paper*
 DX 304, p. 585, 1/13/28. Wilcox, DX 1013, p. 124.

Frozen Foods
*Aluminum foil*
 DX 116, pp. 258–61, 9/48. DX 114, 246–49, 1/49.
*Cry-O-Vac*
 DX 110, pp. 240–42, 11/16/39. Horn, DX 1010, p. 72.
*Glassine*
 DX 106, pp. 225–28, 3/22/49. DX 108, p. 233, 7/21/31. DX 110, pp. 240–42, 11/16/39. DX 116, pp. 258–61, 9/48.
*Parchment*
 DX 105, p. 224, 7/28/27. DX 106, pp. 225–28, 3/22/29. DX 110, pp. 240–42, 11/16/39.
*Pliofilm*
 DX 116, pp. 258–61, 9/48. DX 114, pp. 246–49, 1/49.

*Polyethylene*
 DX 116, pp. 258–61, 9/48.
*Wax paper*
 DX 106, pp. 225–28, 3/22/29. R. R. Smith, Tr. 5991. DX 109, pp. 234–39, 7/34. DX 119, pp. 265–66, 4/21/48. DX 116, pp. 258–61, 9/48. DX 123, p. 271, 1/21/49. DX 124, p. 272, 4/28/49. DX 114, pp. 246–49, 1/49. DX 596, p. 1176, 1950. Croy, DX 1021, pp. 341, 344. Hanson, DX 1018, pp. 251–54. Ramsay, DX 1017, p. 233. Tindal, DX 1012, p. 108. R. R. Smith, Tr. 5809.
Fresh Produce
*Cellulose acetate*
 DX 331, p. 637, 1/6/47. DX 136, p. 291, 4/13/47. DX 135, p. 290, 7/47. DX 132, p. 287, 11/4/47. DX 133, p. 288, 12/4/47. DX 139, p. 298, 8/18/48. DX 137, pp. 291–96, 8/48. DX 140, p. 299, 12/7/48. DX 141, p. 300, 11/1/49. DX 144, pp. 303–05, 11/18/49. Goland, DX 1015, p. 192. Hopping, DX 1007, pp. 19, 22.
*Pliofilm*
 DX 134, p. 289, 4/48. DX 138, p. 297, 7/22/48. DX 137, pp. 291–96, 8/48. Ellies, DX 1014, p. 138. Ramsay, DX 1017, pp. 238–39.
*Polyethylene*
 Ramsay, DX 1017, pp. 238–39.
Snacks
*Aluminum foil*
 DX 145, pp. 306–11, 12/28/36. DX 153, p. 125, 4/47. Martin, Tr. 6391–94. R. R. Smith, Tr. 5815.
*Glassine*
 DX 149, pp. 319–20, 8/3/48. DX 150, p. 321, 9/10/48. DX 151, pp. 322–23, 12/13/48. DX 152, p. 324, 2/49. Martin, Tr. 6391–94.
*Pliofilm*
 DX 326, p. 629, 10/9/39.
Cereal Products
*Cellulose acetate*
 Hopping, DX 1007, p. 19.
*Glassine*
 Horn, DX 1010, p. 71. Southwick, DX 1008, p. 32.
*Pliofilm*
 DX 326, p. 630, 10/9/39.
*Wax paper*
 Horn, DX 1010, pp. 70–71. Southwick, DX 1008, p. 32. R. R. Smith, Tr. 5817.
Meats
*Parchment*
 DX 316, p. 604, 6/8/32.
*Pliofilm*
 DX 175, pp. 356–58, 8/40. DX 176, p. 359, 1/2/48. R. R. Smith, Tr. 5752. Ellies, DX 1014, pp. 138, 153.

business of certain specific accounts from other flexible packaging materials and vice versa. Evidence is shifts of business between duPont cellophane and other flexible packaging materials have been frequent, continuing and contested.[458]

**Other Food Products**
*Aluminum foil*
DX 169, pp. 343–345, 7/28. DX 182, p. 365, 9/19/39. DX 183, pp. 366–71, 4/22/40. DX 171, p. 350, 6/12/45. Elmstrom, DX 1019, pp. 278–79. Leeds, DX 1011, p. 90. Wilcox, DX 1013, pp. 122–24, 130.
*Cellulose acetate*
DX 154, p. 326, 3/31/41. DX 156, p. 329, 7/18/47. DX 167, p. 341, 1/13/48.
*Glassine*
DX 178, p. 361, 8/13/47. DX 179, p. 362, 8/5/48. DX 180, p. 363, 8/11/48.
*Parchment*
Elmstrom, DX 1019, pp. 278–79.
*Pliofilm*
DX 326, p. 629, 10/9/39. DX 165, p. 339, 10/2/47. DX 167, p. 341, 1/13/48. DX 166, p. 340, 1/30/48. DX 169, pp. 343–45, 7/48. DX 173, p. 352, 6/6/49. DX 172, p. 351, 10/27/48. DX 436, pp. 851–52, 6/22/49. Ellies, DX 1014, pp. 141, 153. Leeds, DX 1011, p. 96. Wilcox, DX 1013, pp. 122, 125, 130.
*Saran*
DX 170, pp. 346–49, 12/49. Wilcox, DX 1013, p. 122.
*Wax paper*
DX 169, pp. 343–45, 7/48. DX 188, p. 378, 6/17/48. DX 181, p. 364, 12/23/48.

**Tobacco**
*Aluminum foil*
DX 194, p. 395, 7/16/37. DX 195, p. 398, 8/2/37. DX 196, p. 405, 5/3/38. DXs 205–08, pp. 424–34, 1948.
*Glassine*
DX 339, p. 651, 4/23/26. DX 307, p. 591, 5/14/30. DX 193, p. 385, 7/18/34. Leinbach, Tr. 6742–43. R. R. Smith, Tr. 5997–98.
*Pliofilm*
DX 326, p. 631, 10/9/39. DX 210, p. 436, 2/16/49. DX 209, pp. 434–435, 5/4/49.

**Miscellaneous**
*Cellulose acetate*
GX 441, p. 5781, 7/26/33. DX 225, p. 457, 11/8/39. Ramsay, DX 1017, p. 240. Hanson, DX 1018, p. 249.
*Glassine*
DX 221, p. 452, 1/19/49.
*Pliofilm*
DX 324, pp. 623–24, 9/16/38. DX 326, p. 628, 10/9/39. DX 212, p. 439, 3/27/41. DX 229, p. 462, 8/23/49. Leeds, DX 1011, p. 96. Ramsay, DX 1017, p. 239.

*Polyethylene*
Ramsay, DX 1017, p. 239.

458. Specific cases of shifts of business between duPont cellophane and other flexible packaging materials are noted, broken down by end uses, and subdivided by competing materials:

**Baked Goods**
*Cellulose acetate*
DX 73, p. 166, 1/4/50.
*Glassine*
DX 18, p. 30, 4/28. DX 23, p. 41, 11/28/31. DX 309, p. 594, 12/4/31. GX 438, p. 5760, 2/9/32. DX 26, p. 45, 2/32. DX 27, p. 46, 2/26/32. DX 315, p. 601, 5/4/32. DX 316, pp. 603–04, 6/8/32. GX 439, p. 5767, 7/28/32. DX 318, p. 607, 8/10/32. DX 319, p. 608, 9/1/32. DX 320, p. 610, 10/32. DX 321, pp. 611–12, 11/4/32. GX 440, pp. 5770, 5774, 1/27/33. DX 39, p. 63, 9/25/33. DX 41, p. 65, 11/15/33. DX 55, p. 128, 9/10/41. McCurry, DX 1016, p. 208. Nelson, DX 1020, p. 316. Leeds, DX 1011, p. 89. Leinbach, Tr. 6757–58, 6767–68. R. R. Smith, Tr. 5705, 5715–16, 5730, 5794–95.
*Wax paper*
DX 24, p. 43, 10/16/31. McCurry, DX 1016, p. 205. GX 440, p. 5774, 1/27/33. DX 38, p. 62, 6/8/33. DX 40, p. 64, 10/27/33. R. R. Smith, Tr. 5709–10, 5696. DX 58, p. 137, 1/22/48. R. R. Smith, Tr. 5804. DX 59, p. 138, 6/4/48. DX 62, pp. 141–42, 2/21/49. DX 63, pp. 144–45, 4/11/49. DX 68, p. 151, 9/27/49. DX 73, p. 165, 1/4/50. Croy, DX 1021, p. 343. Leeds, DX 1011, p. 89. McCurry, DX 1016, pp. 209–10. Ramsay, DX 1017, p. 238. R. R. Smith, Tr. 5697–99, 5705, 5708–9, 5715–16, 5794–95, 5800–01. DX 60, p. 140, 5/17/48.

**Candy, Chewing Gum and Nuts**
*Aluminum foil*
DX 81, pp. 184–85, 3/8/37. DX 99, p. 217, 6/10/48. DX 100, p. 218, 6/30/48. R. R. Smith, Tr. 5985, 6011. Jakes, DX 1006, p. 5. DX 101, p. 219, 9/3/48. Jakes, DX 1006, pp. 3–4. R. R. Smith, Tr. 5777–79. Martin, Tr. 6358–59.
*Cellulose acetate*
R. R. Smith, Tr. 5786–87.
*Glassine*
DX 92, p. 210, 2/10/32. DX 321, p. 612, 11/4/32. DX 94, p. 212, 7/25/33. DX 77, p. 174, 9/18/33. DX 93, p. 211, 11/17/47. DX 95, p. 213, 11/18/47. Jakes, DX 1006, pp. 1–2. R. R. Smith,

165. Identical consumer products of a producer are available on the market at the same time in different packaging materials. Illustrations of this situation

Tr. 5771. DX 81, pp. 184–85, 3/8/37. DX 85, pp. 199–200, 2/7/40. DX 86, pp. 201–02, 10/28/40. Goland, DX 1015, p. 195. Jakes, DX 1006, pp. 3–4. Leeds, DX 1011, p. 89. R. R. Smith, Tr. 5772–73.

*Pliofilm*
DX 326, p. 628, 10/9/39. DX 98, p. 216, 12/23/47. DX 103, p. 222, 8/2/49. DX 104, p. 223, 8/23/49.

*Sulphite*
Wilcox, DX 1013, p. 125. Ramsay, DX 1017, p. 241.

*Wax paper*
DX 102, pp. 220–21, 1/7/49. Goland, DX 1015, p. 195. Jakes, DX 1006, p. 4. Wilcox, DX 1013, p. 124. R. R. Smith, Tr. 5781.

Frozen Foods
*Cry-O-Vac*
Horn, DX 1010, p. 72. DX 595, p. 1156, 1949. DX 129, p. 278, 11/14/49.

*Parchment*
Horn, DX 1010, p. 72. R. R. Smith, Tr. 5811–12.

*Polyethylene*
R. R. Smith, Tr. 5813.

*Wax paper*
R. R. Smith, Tr. 5807–11. DX 117, p. 262, 1/26/48. DX 118, pp. 263–64, 1/21/48. DX 119, pp. 265–66, 4/21/48. DX 120, p. 267, 1/26/49. DX 123, p. 271, 1/21/49. DX 124, p. 272, 4/28/49. DX 125–28, pp. 273–77, 1949. DX 436, p. 848, 6/22/49. Croy, DX 1021, pp. 340–42. Elmstrom, DX 1019, pp. 286–87. Hanson, DX 1018, p. 251. Ramsay, DX 1017, p. 233. Tindal, DX 1012, p. 108.

Fresh Produce
*Cellulose acetate*
DX 132, p. 287, 11/4/47. DX 133, p. 288, 12/4/47. DX 140, p. 299, 12/7/48. DX 141, p. 300, 11/1/49. DX 144, pp. 303–05, 11/18/49. Goland, DX 1015, p. 192. Hopping, DX 1007, p. 20. R. R. Smith, Tr. 5820.

*Pliofilm*
DX 593, pp. 1135–37, 1947. Ramsay, DX 1017, p. 238.

*Polyethylene*
Ramsay, DX 1017, p. 238.

Snacks
*Glassine*
DX 149, pp. 319–20, 8/3/48. Hanson, DX 1020, p. 322. McCurry, DX 1016, p. 209. Nelson, DX 1020, p. 316. Leinbach, Tr. 6767–68, 6778–79. R. R. Smith, Tr. 5816.

Cereals
*Cellulose acetate*
DX 158, pp. 331–32, 10/7/48.

*Glassine*
Horn, DX 1010, p. 71. Leinbach, Tr. 6764, 6767–68.

*Wax paper*
Horn, DX 1010, pp. 70–71.

Meats
*Cry-O-Vac*
Elmstrom, DX 1019, p. 273.

*Glassine*
Elmstrom, DX 1019, pp. 271, 273–75. R. R. Smith, Tr. 5734. Hanson, DX 1018, p. 250.

*Greaseproof*
Elmstrom, DX 1019, pp. 271, 275. R. R. Smith, Tr. 5734, 5739–41. Hanson, DX 1018, p. 250.

*Parchment*
DX 316, p. 604, 6/8/32. Elmstrom, DX 1019, pp. 271, 273, 275. R. R. Smith, Tr. 5734, 5739–41. Hanson, DX 1018, p. 250.

*Pliofilm*
DX 175, pp. 356–58, 8/40. DX 593, pp. 1135–37, 1947. DX 176, p. 359, 1/2/48. R. R. Smith, Tr. 5752, 5759, 5761.

Other Foods
*Aluminum foil*
DX 177, p. 360, 3/22/33. DX 182, p. 365, 9/19/39. Elmstrom, DX 1019, pp. 278–9. Leeds, DX 1011, p. 90. Wilcox, DX 1013, pp. 123–24.

*Cellulose acetate*
DX 156, p. 329, 7/18/47.

*Glassine*
DX 339, p. 648, 4/23/26. DX 178, p. 361, 8/18/47. DX 179, p. 362, 8/5/48. DX 180, p. 363, 8/11/48. Horn, DX 1010, p. 73.

*Parchment*
Elmstrom, DX 1019, pp. 278–79.

*Pliofilm*
DX 326, pp. 628–29, 10/9/39. DX 168, p. 342, 7/26/48. DX 172, p. 351, 10/27/48. DX 173, p. 352, 6/6/49. Ellies, DX 1014, p. 138.

*Saran*
DX 170, pp. 346–49, 1/2/49.

*Wax paper*
DX 181, p. 364, 12/23/48.

Tobacco
*Aluminum foil*
DX 194, p. 395, 7/16/37. GX 78, p. 271, 2/8/38. GX 79, p. 284, 2/9/39. DX 199, p. 411, 2/27/39. GX 425, p. 5653, 2/9/40. DX 205, p. 425, 2/4/48. Torrence, DX 1009, p. 43. R. R. Smith, Tr. 5824–86.

*Glassine*
DX 191, p. 381, 5/19/32. R. R. Smith, Tr. 5822, 5997–98. Leinbach, Tr. 6769–70, 6742–43. DX 197, p. 407, 1/13/39.

in the market include products such as bread,[459] candy,[460] Campfire marshmallows,[461] M & M candies,[462] Beechnut gum,[463] Kleenex,[464] Armour's bacon,[465] General Food's coconut,[466] and varieties of National Biscuit Company's cookies.[467]

166. As cellophane sales increased it was useful in packaging operations of smaller companies. In 1950 duPont had 5,000 customers of which only 2% were large companies, such as national bakers, cigarette manufacturers, major meat packers, etc.[468]

167. Glassine[469] and waxed paper[470] are both made in a number of varieties. These types vary in transparency, opacity, moistureproofness, price, gloss, and sealability. Additional varieties are engineered for specific customers on particular orders.[471]

168. Glassine offers a degree of transparency greatest per unit of cost of all packaging materials. Its degree of transparency is all that is needed and its cost is low.[472]

169. Glassine and greaseproof papers compete with other wrapping and packaging materials. Cellophane is the product with which they compete directly.[473]

170. Glassine and greaseproof papers are sold on the ability of the different types to furnish protective packaging for various products. This is the same approach as that of selling moistureproof cellophane.[474]

171. Eye appeal in the flexible packaging business is any appearance that arrests the eye. It is not transparency and luster of the wrap. It is obtained by printing to achieve a colorful wrapper.[475]

DX 204, p. 420, 8/2/46. Nelson, DX 1020, p. 313.
*Pliofilm*
 DX 326, p. 631, 10/9/39. DX 210, p. 436, 2/16/49. DX 209, pp. 434-35, 5/4/49.
*Wax paper*
 Ramsay, DX 1017, p. 247.
Miscellaneous
*Cellulose acetate*
 GX 441, p. 5781, 7/26/33. GX 443, p. 5799, 7/29/35. DX 225, p. 457, 11/8/39. GX 80, pp. 303-04, 2/9/40. Hanson, DX 1018, p. 249. Ramsay, DX 1017, p. 240.
*Glassine*
 DX 222, p. 453, 5/5/49. Leeds, DX 1011, p. 90.
*Kraft paper*
 DX 224, p. 455, 3/30/31.
*Pliofilm*
 DX 324, pp. 623-24, 7/16/38. DX 325, p. 627, 11/1/38. DX 147, p. 317, 2/47. DX 216, p. 445, 2/21/49. DX 217, p. 446, 7/12/49. Ellies, DX 1014, p. 156. Leeds, DX 1011, p. 90. Ramsay, DX 1017, p. 239.
*Polyethylene*
 Leeds, DX 1011, p. 90. Ramsay, DX 1017, p. 239.
*Sulphite*
 Leeds, DX 1011, pp. 89-90.
*Tissue*
 DX 214, p. 443, 1/26/48. DX 215, p. 444, 1/26/48.
459. McCurry, DX 1016, pp. 209-10. Goland, DX 1015, pp. 194-95.

460. Goland, DX 1015, p. 195. Horn, DX 1010, p. 71.

461. Leinbach, Tr. 6756-57.

462. Id., Tr. 6758, 6759.

463. Id., Tr. 6761-62.

464. Nelson, DX 1020, p. 305.

465. Elmstrom, DX 1019, pp. 275-76.

466. Horn, DX 1010, p. 72.

467. McCurry, DX 1016, p. 206.

468. GX 6002, pp. 8125-26, 6/8/51.

469. Leinbach, Tr. 6740. Nelson, DX 1020, pp. 307-08. GX 6004, p. 7926.

470. Ramsay, DX 1017, pp. 225, 243-44. Croy, DX 1021, pp. 340, 344.

471. Ramsay, DX 1017, pp. 225-26. Nelson, DX 1020, p. 308. Leinbach, Tr. 6741.

472. GX 6004, p. 7926.

473. Nelson, DX 1020, p. 304.

474. GX 6004, pp. 7921-28.

475. Leinbach, Tr. 6752. R. R. Smith, Tr. 5935-39. Martin, Tr. 6346, 6348. Torrence, DX 1009, pp. 42, 47. Horn, DX 1010, p. 76. Leeds, DX 1011, p. 94. Wilcox, DX 1013, pp. 129-30. Ellies, DX 1014, p. 153. Goland, DX 1015, p. 193. Ramsay, DX 1017, pp. 232-33. Hanson, DX 1018, pp. 253-54. Nelson, DX 1020, p. 322. Croy, DX 1021, pp. 343-344.

172 From 1924, duPont engaged in developmental selling program for the bakery industry.[476] This work contributed to duPont's volume of sales to that industry, which has become its largest outlet. This creative selling involved:

(1) Invention of moistureproof cellophane, followed by development of a heat sealing type and of special types for different bakery products.[477]

(2) Work with bakeries and machinery manufacturers to modify wrapping machines to handle cellophane and service the use of cellophane on such machines.[478]

(3) Development of standard formulae for sweet dough and promotion of manufacture of sweet dough goods by bakers.[479]

(4) Market research as to distribution of bakery products in retail stores and by house to house trucks.[480]

(5) Engineering work on mechanization of soft cake manufacture and on machines to wrap soft cake in cellophane or other wraps.[481]

(6) Studies of the characteristics of particular bakery products, such as doughnuts, to determine what characteristics cellophane must have to package them satisfactorily.[482]

(7) Comparative studies of the efficiency of cellophane, waxed paper and glassine as a wrap for bakery products.[483]

(8) Energetic customer by customer selling.[484]

### SPECIFIC USES.

#### 1. WHITE BREAD.

#### (Findings 173–189)

173. DuPont undertook promotion of cellophane for white bread in the early 1930's and has been selling cellophane for white bread since 1933.[485] It is used to some extent for that purpose in every section of the country.[486] DuPont's progress has been salesmanship rather than meeting spontaneous demand, since the disadvantage of cellophane's higher initial cost over waxed paper must be overcome by sales arguments that emphasize its ability to increase sales and the hidden savings which result from its use.[487] In 1951 duPont sold between 8,000,000 and 9,000,000 pounds of cellophane for white bread.[488]

174. For packaging of white bread the wrapping material used besides moistureproof cellophane is waxed paper. Some waxed glassine is also used.[489] Waxed paper was being widely used for wrapping white bread when cellophane was first sold for this purpose.[490] Plain cellophane is not a satisfactory wrap for baked goods.[491]

175. Principal obstacle to be overcome by duPont in selling moistureproof cellophane for the packaging of white bread was its price in relation to waxed

476. See, e. g., GX 1483, p. 7049, 4/23/26.

477. DX 47, p. 85, 5/7/38. Mitchell, Tr. 5512–16.

478. R. R. Smith, Tr. 5683. Russell, Tr. 6477–78, 6480.

479. R. R. Smith, Tr. 5711–18. GX 442, p. 5783, 1/23/34.

480. R. R. Smith, Tr. 5688–93, 5718–22. DX 18, p. 24, 4/28.

481. Russell, Tr. 6486–88.

482. DX 7A, p. 9, 5/25/26. DX 11, p. 14, 5/19/27. DX 43, p. 68, 3/28/35. DX 44, p. 74, 3/17/36. DX 52, p. 119, 1/17/40.

483. DX 47, p. 85, 5/27/38. DX 52, p. 119, 1/17/40.

484. R. R. Smith, Tr. 5688–89.

485. GX 6037, p. 8164, 1/28/49. DX 40, 10/27/33. R. R. Smith, Tr. 5677, 5684–85.

486. GX 6307, p. 8165, 1/28/49.

487. GX 6035, pp. 8160–61, 10/20/48.

488. R. R. Smith, Tr. 5700.

489. R. R. Smith, Tr. 5676. Ramsay, DX 1017, pp. 227–28 237–38. McCurry, DX 1016, p. 210. DX 70, pp. 159–60, 10/49. GX 6035, pp. 8160–62, 10/28/40.

490. R. R. Smith, Tr. 5676–77, 5685–86. GX 564, p. 8078, 8/31/49. GX 565, pp. 8088–89, 9/8/49.

491. DX 388A, p. 719, 7/10/24. DX 389A, p. 721, 7/11/24.

paper and glassine. Depending on how the materials were used, cellophane bread wraps cost in the early 1930's between three to five times the cost of waxed paper and from two and one-half to four times the cost of glassine. The low profit margin on white bread and the competition between bakers made the higher cost of cellophane a serious obstacle.[492]

176. A deterrent to use of cellophane by a white bread baker was the lack of wrapping equipment which could mechanically apply cellophane. To use cellophane the baker had to wrap it by hand which increased his costs, or convert existing equipment to handle cellophane, or invest as much as $3,000 in a new wrapping machine designed to handle cellophane as well as the papers.[493]

177. To minimize difficulty of wrapping white bread in cellophane on wrapping machines, duPont salesmen in the thirties made efforts at adapting bakers' installed wrapping machines to handle cellophane, by modifying the behavior of the machine by piano wire.[494] DuPont engineers contributed to the development of machines which would handle cellophane or waxed paper with equal efficiency by adjustment.[495]

178. Another deterrent to use of cellophane by a baker to wrap white bread was the inferior durability of cellophane and its tendency to shrink and break in dry or cold weather.[496]

179. One selling point made by duPont promoting its cellophane for use in the white bread trade was its moisture protection. Many bakers found waxed paper provided adequate protection against moisture during the 48 hour turnover period allotted to white bread and did not believe there was need for moistureproofness in any greater degree.[497]

180. In the thirties, duPont emphasized transparency of cellophane as a selling point. Many bakers believed glassine when wrapped closely about a loaf of bread was sufficiently transparent to enable their product to be inspected through the wrap. Others considered transparency a disadvantage.[498]

181. In the thirties white bread bakers were accustomed to the distinctive appearance of a bread wrap in their advertising. Waxed paper lent itself more readily than cellophane to the advertising practices of that trade.[499]

182. To sell cellophane to white bread bakers in the face of its disadvantages vis-a-vis waxed paper and glassine, duPont had to develop a sales method which minimized high price of cellophane. This method was to analyze distribution, production, selling costs of the baker and to associate suggested reductions in these costs with the use of higher priced cellophane.

DuPont salesmen would discover a baker who was a prospective customer, had an attenuated distribution route, and was making a low return because of high distribution costs per dollar of sale on that route. The salesmen would plan a rerouting for the baker in an effort to gain a greater volume of sale on a shorter distribution route, and tie it to the argument cellophane wraps on his white bread would gain for him a greater volume of sale on a shorter route. DuPont salesmen would find improper production methods in the baker's plant produced a high proportion of badly sealed waxed paper wrappers. These loaves could not be sold either because of the appearance of the unsealed wrap or be-

492. R. R. Smith, Tr. 5677, 5691. DX 40, p. 64, 10/27/33. DX 994 (Graph).

493. R. R. Smith, Tr. 5678. Russell, Tr. 6479–80. DX 30, pp. 49–51, 1/5/33. DX 31, pp. 52–54, 1/27/33.

494. R. R. Smith, Tr. 5683–84.

495. Russell, Tr. 6479–80. DX 31, p. 52, 1/27/33.

496. R. R. Smith, Tr. 5679, 5685.

497. R. R. Smith, Tr. 5680–82. DX 72, pp. 163–64, 10/24/49.

498. R. R. Smith, Tr. 5686. Martin, Tr. 6383.

499. R. R. Smith, Tr. 5678–79.

cause the loaf would get stale. DuPont salesmen would inspect the production methods, suggest methods to improve the sealing of the wraps, and seek to persuade the baker cellophane as the wrap would produce this greater efficiency and lower production cost.[500]

183. DuPont's sales methods for promoting the use of cellophane for white bread met with success and white bread bakers were induced to use cellophane wraps for part or all of their white bread in lieu of the previously used waxed paper or glassine wraps. Many bakers switched to cellophane from waxed paper or glassine and then shifted back, having lost money either because the higher cost cellophane wraps did not increase their volume of sales or because the baker overestimated the amount of increase he could get by using cellophane and lost money on large unsold production.[501]

184. White bread bakers shift from cellophane to waxed paper or glassine because of changes in the level of price of ingredients of bread: flour, sugar, shortening, etc. The profit margin in white bread can be reduced by rises in costs of these materials to a point at which the baker believes his return will increase if he shifts to a cheaper wrapping material. An example of this occurred in the mid-thirties when nearly every baker in northwest Pennsylvania discontinued the use of cellophane and reverted to waxed paper because of a 50–60¢ increase per barrel in the price of flour.[502]

185. A new promotion gains greater volume for one baker but tends to reduce volume of others. In many cases bakers whose business suffered, abandoned cellophane wrappers and reverted to waxed paper in order to prevent the loss of profit. This brought about losses of business for duPont.[503]

186. Shifts of business between waxed paper and glassine and duPont cellophane for wrapping white bread have occurred from the early thirties up to the present. These shifts of packaging business have been caused by the operation of competitive factors stressing advantages and disadvantages of cellophane as against waxed paper and glassine, and by fluctuating emphasis, in the baking industry, upon cost savings.[504]

187. Cellophane is still at a price disadvantage to waxed paper and glassine.[505] Profit margins in the white bread trade are still low and ability of bakers to use cellophane and return a profit remains in a narrow range.[506] Machines have been developed, which will wrap automatically with cellophane at high speeds.[507] Improvement of process printing of waxed paper and in the opacity of waxed paper have made waxed paper a more commercially desirable wrapper.[508] Improvements in the transparency of glassine and wax sulphite have narrowed this advantage cellophane once held over these wraps.[509]

188. DuPont has promoted sales of cellophane for wrapping white bread, except that during the period of cellophane shortage from 1941 through 1948, duPont did not attempt to increase the use of cellophane for this purpose. DuPont could not supply an industry-wide demand for cellophane for wrapping white bread and stated this to the baking trade and to converters who were active in

500. R. R. Smith, Tr. 5687–91.

501. R. R. Smith, Tr. 5692–95.

502. R. R. Smith, Tr. 5696.

503. R. R. Smith, Tr. 5694–97. DX 40, p. 64, 10/27/33.

504. R. R. Smith, Tr. 5676–5702. See, e. g., DX 40, p. 64, 10/27/33.

505. DX 379, p. 709, 6/22/48. DX 994

(Graph). R. R. Smith, Tr. 5686–87. McCurry, DX 1016, p. 210.

506. McCurry, DX 1016, p. 210.

507. R. R. Smith, Tr. 5687. Russell, Tr. 6480.

508. R. R. Smith, Tr. 5687.

509. DX 53, p. 125, 10/11/40. Martin, Tr. 6381–82. R. R. Smith, Tr. 5713. Leinbach, Tr. 6773.

promoting printed cellophane for white bread.[510]

189. Sales methods used by duPont to sell cellophane to various trades for packaging of many different products are the same as those applied to the white bread trade. They are variations upon the central theme of attempting to persuade the individual customer cellophane packaging will increase sales of his product and his profits.[511]

## 2. SPECIALTY BREADS.

### (Findings 190–196)

190. Breads other than white, such as rye, whole wheat, raisin, etc. are known as specialty breads.[512] Flexible packaging materials used to wrap specialty breads are: Waxed paper, glassine, moistureproof cellophane, and some aluminum foil.[513]

191. Prior to 1933–1934 no specialty bread was produced by wholesale bakers. DuPont, in order to provide a market for cellophane, promoted the development of specialty bread. DuPont urged production of specialty loaves by bakers, on the basis specialty loaves would be novel when introduced and could be changed to remain novel; that absence of standardization of specialty breads would permit each baker to set his own price and not have to meet the competition of a standard price and product, and specialty loaves marketed in cellophane would attain substantial volume and profit. The amount of cellophane sold for wrapping specialty bread increased from nil in the early thirties to its present volume, 15,700,000 pounds.[514]

192. As sales of specialty breads increased, much of the volume of these breads was wrapped in waxed paper, glassine and aluminum foil.[515]

193. Advantages or disadvantages of cellophane as against waxed paper and glassine for the wrapping of specialty breads were much the same as in the case of white bread.[516]

194. Operation of advantages and disadvantages of cellophane as a wrap for specialty bread produced shifts of specialty bread bakers between cellophane and waxed paper or glassine, which have continued up to the present.[517] Considerable business duPont once built up for wrapping specialty bread in Oklahoma and Kansas has completely gone, and the bakers have gone back to waxed paper, seeking to increase their profit by cutting their costs.[518]

195. Some business on specialty breads lost by cellophane to wax paper and glassine has been regained, for example in the Minneapolis area. On the other hand, certain important bakers of specialty breads such as Pepperidge Farms have never used cellophane but always waxed paper.[519]

196. A proportion of the duPont cellophane sold for wrapping specialty bread is sold by converters to the bakers in printed form.[520]

510. Hanson, DX 1018, p. 265. GX 5594, p. 7903, 10/25/45. GX 582 (Imp.Doc. No. 18), pp. 3–4, 3/9/48.

511. R. R. Smith, Tr. 5687–89, 5704–05, 5923–24, 5727–29, 5743–49.

512. R. R. Smith, Tr. 5702. Ramsay, DX 1017, p. 237.

513. R. R. Smith, Tr. 5703. DX 70, pp. 159–60, 10/49. McCurry, DX 1016, p. 209. Ramsay, DX 1017, p. 237. DX 1009–B, p. 59, 8/31/51.

514. R. R. Smith, Tr. 5704–05.

515. R. R. Smith, Tr. 5705–07. Ramsay, DX 1017, p. 237. DX 56, p. 130, 11/24/41. DX 996 (Physical Samples). DX 1009–B, p. 57, 8/31/51.

516. R. R. Smith, Tr. 5703. DX 25, p. 44, 8/8/32. DX 35, p. 59, 2/7/33. DX 58, p. 125, 10/11/40. DX 54, p. 127, 4/7/41.

517. R. R. Smith, Tr. 5708–10. DX 54, p. 127, 4/7/41. DX 56, pp. 130–32, 11/24/41. DX 58, p. 137, 2/20/48. DX 73, p. 165, 1/4/50.

518. R. R. Smith, Tr. 5708–10.

519. R. R. Smith, Tr. 5709–10.

520. R. R. Smith, Tr. 5710–11.

### 3. CAKE AND SWEET GOODS.

#### (Findings 197–204)

197. Flexible packaging materials used for wrapping cake are waxed paper, moistureproof cellophane, glassine, and cellulose acetate used as a window in paper board boxes. These materials are also used in the wrapping of "sweet goods" (coffee cakes, sweet rolls, and buns).[521]

198. In the early thirties sweet goods were not baked by wholesale bakers in any quantity. DuPont set about to create such a wholesale business as an outlet for cellophane. DuPont obtained for this purpose formulae for sweet dough and made an analysis of the market for wholesale sweet goods. DuPont sought to interest wholesale bakers in the considerable demand forecast for sweet goods, and made the formulae available to them. Result of this was the creation of a large wholesale sweet goods business and with it the creation of a considerable cellophane business for du-Pont.[522]

199. In spite of duPont's efforts to expand sales for packaging of baked sweet goods, it does not supply more than 50% of the packaging to this trade.[523] Of cellophane sold for sweet goods packaging, much is sold by duPont to converters, and sold to the bakers in converted form.[524] Almost all of the remainder of the flexible packaging in this field is glassine or waxed paper. Many bakers divide their packaging for sweet goods between cellophane and glassine and waxed paper, often using as much as three times as much glassine and waxed paper as cellophane.[525]

200. Principal factors adverse to duPont's sale of cellophane to wrap cake and sweet goods have been the higher cost of cellophane wrap as against wraps of other materials,[526] and improvement in transparency of glassine.[527]

201. Operation of competitive factors in the baking industry enabled cellophane to take packaging business for sweet goods away from waxed paper and glassine, and has enabled the latter to take business from cellophane. These shifts have been frequent and are continuing.[528]

202. A number of large bakers of sweet goods never used cellophane, including the Tasty Baking Company in Philadelphia, the most successful cake baker in the United States.[529]

203. DuPont exerted efforts to develope a demand for cellophane in the house to house bakery business. Among these efforts was an analysis of selling methods used at the door by house to house bakery truck drivers. DuPont made a training motion picture for bakery salesmen, based upon these observations, which it made available to bakers. Many bakers who used the motion picture and accepted duPont's selling suggestions, do not use cellophane, but use waxed paper, glassine and window boxes to package their products.[530]

204. A special doughnut film was developed to avoid the excessive condensation of moisture within the package and the consequent sogginess of the doughnut and dissolution of sugar coating. A

521. R. R. Smith, Tr. 5711. DX 70, p. 158, 10/49.

522. R. R. Smith, Tr. 5728–29.

523. R. R. Smith, Tr. 5729.

524. DX 54, p. 127, 4/7/41. DX 55, p. 128, 9/10/41. McCurry, DX 1016, p. 213.

525. R. R. Smith, Tr. 5729. McCurry, DX 1016, p. 206. DX 53, p. 125, 10/11/40. Leinbach, Tr. 6757.

526. R. R. Smith, Tr. 5712. DX 18, p. 36, April 1928. DX 27, p. 46, 2/26/32. DX 37, p. 61, 5/22/33. DX 38, p. 62, 6/8/33. DX 55, p. 28, 9/10/41.

527. R. R. Smith, Tr. 5713. DX 53, p. 125, 8/30/40.

528. R. R. Smith, Tr. 5711–15. DX 24, p. 43, 10/16/31. DX 26, p. 45, Jan.-Feb. 1932. DX 39, p. 63, 9/25/33. DX 55, p. 128, 9/10/41.

529. R. R. Smith, Tr. 5716–17.

530. R. R. Smith, Tr. 5719–22.

special cake film was developed by du-Pont (MST–52) to eliminate shrinking and puckering of the previously used type of moistureproof cellophane.[531]

### 4. MEAT.

### (Findings 205–220)

205. Since 1924, duPont has sold cellophane to the meat industry.[532] The first use of cellophane in this industry was the wrapping of bacon, and other types of processed meats.[533] Processed meats continued to be the area for the use of cellophane in the meat industry, until after World War II when cellophane packaging of fresh meat for self-service food markets reached substantial proportions.[534]

206. During the 1930's and ever since, other flexible packaging materials used to wrap types of processed meat products for which cellophane was used were: greaseproof paper, vegetable parchment, glassine, waxed paper, foil and Pliofilm. Most packaging of processed meats is done with those materials.[535]

207. When duPont commenced to sell cellophane for packaging of processed meats, glassine, greaseproof paper and vegetable parchment were already being used in quantity and at lower cost. DuPont had to sell in the face of this price disadvantage. Every purchaser at every stage of meat distribution purchased at as low a figure as he could, and competition in the meat industry was that of price.[536]

208. When duPont was first selling an appreciable volume of cellophane to the meat industry, meat packers depended upon achieving a maximum volume of sale in order to keep a profit in the low price framework of the meat industry. Packers and wholesalers of meat had an insufficient profit margin to absorb the added cost of cellophane for processed meats, and had difficulty meeting prices of their competition if they passed the cost of cellophane along. Result was most meat packers and wholesalers could better achieve high volume of meat sales if they sold in unpackaged form or if their products were packaged in cheaper greaseproof paper, glassine, or parchment. Price disadvantage of cellophane in the meat industry was particularly severe.[537]

209. Prior to World War II, between 5 and 10% of baked and smoked meats were wrapped in duPont cellophane, at the peak of duPont's penetration of that business.[538] The pre-war peak was 1933 when duPont sold about two million pounds of cellophane for packaging smoked and processed meats.[539] Thereafter duPont's business in this industry declined and did not again attain the 1933 volume until 1947.[540]

210. DuPont was unable to hold its 1933 peak of cellophane business in the bacon and processed meat trade for these reasons: (1) Sylvania sold a sizeable quantity of second quality cellophane to the meat trade at a substantially reduced second quality price. DuPont did not sell second quality cellophane to this trade, and did not sell first quality material at a reduced price. DuPont also charged a higher price than Sylvania for shipments under 500 pounds. (2) Con-

531. R. R. Smith, Tr. 5730–31. DX 43, p. 68, 3/28/35. DX 44, p. 74, 3/17/36. DX 49, p. 105, 1/16/41. DX 408, p. 797. GX 6002, p. 8110, 6/8/51.

532. R. R. Smith, Tr. 5732. GX 460, pp. 5908–09, 1/14/25.

533. R. R. Smith, Tr. 5734, 5732. Elmstrom, DX 1019, pp. 271, 273, 275.

534. R. R. Smith, Tr. 5743–51. DX 595, pp. 1150–51, 1948.

535. R. R. Smith, Tr. 5734. Elmstrom, DX 1019, pp. 273–78. Torrence, DX 1009–B, p. 57. Ellies, DX 1014, pp. 135–38. Nelson, DX 1020, p. 314.

536. R. R. Smith, Tr. 5737. Elmstrom, DX 1019, pp. 271–76. GX 460, pp. 5908–09, 1/14/25.

537. R. R. Smith, Tr. 5737. Elmstrom, DX 1019, pp. 271–76, 279–80.

538. R. R. Smith, Tr. 5739.

539. R. R. Smith, Tr. 5732–33.

540. R. R. Smith, Tr. 5733–34.

verters could make converted Sylvania film available to the meat trade at a lower price than the prices of converters who purchased from duPont. (3) The use was reduced around 1935 by the introduction of a bacon package of parchment or greaseproof paper. This so-called "Platter Pack" was cheaper than cellophane and was used for a time by nearly every bacon packer in the United States.[541]

211. During the mid-thirties duPont made a market study of the meat industry to discover opportunities for sales of cellophane. The cost emphasis of the meat industry's distribution system, lower prices of other flexible packaging materials and lower prices charged by Sylvania and its converters made duPont conclude there was no opportunity to expand sale of cellophane in that industry.[542]

212. The growth of duPont's cellophane sales to the meat industry from the low point of the mid-thirties to the present rate of 19,000,000 pounds annually is attributable to the rise of self-service retailing of fresh meat.[543]

213. The growth of cellophane sales for wrapping self-service fresh meat did not commence until after World War II. Prior to that, obstacles to development of this outlet for cellophane were: (1) lack of a type of cellophane that would hold the color of red meat for a 72 hour turnover period; (2) design and development of refrigeration cases for the display of packaged meats had received no attention from refrigerator companies; (3) consumers were bound by habit of butcher service, and there was no consumer acceptance of selling fresh meat by display and self-service of package cuts.[544]

214. DuPont experimented with wrapping fresh meat cuts in cellophane in cooperation with retail stores, and collected information from this work, on it to base improvements in the cellophane, refrigeration, and retailing. Self-service retailing of other types of food had increased by 1940, and self-service retailing experiments for fresh meat cuts wrapped in cellophane were successful at that time, though the refrigeration equipment was makeshift. In the early 1940's duPont developed a type of moistureproof cellophane specifically designed to hold the color of fresh meat for 72 hours, and enable it to be wrapped for self-service selling in retail stores. DuPont then induced retailing organizations to install equipment for testing this method of retailing meat, and cooperated with these organizations in training employees, designing installation, revising accounting procedures, achieving uniformity of cut. There are now 42,000 stores in the United States that sell fresh meat only by self-service, in packaged form. Prior to World War II, there were none.[545]

215. Since acceptance of self-service retailing of fresh meat in packaged form, duPont has lost a considerable proportion of such packaging business to Goodyear's Pliofilm. Shifts of meat retailer's packaging business occur between duPont cellophane and Pliofilm continually, and Pliofilm is increasing its proportion of this packaging business. Specific retailing accounts, e. g., the A & P, Safeway, American Stores, have increased their proportionate use of Pliofilm, though they continue to use Pliofilm and duPont cellophane concurrently.[546]

216. Pliofilm's acceptance as a self-service meat wrap is attributable to certain characteristics: (1) It is tougher than cellophane. This reduces the cost to the retail store of rewrapping cuts on

541. R. R. Smith, Tr. 5739–42.

542. R. R. Smith, Tr. 5742.

543. R. R. Smith, Tr. 5734, 5743. GX 6002, pp. 8116–17, 6/8/51. GX 595, pp. 1150–51, 1948. GX. 596, p. 1170, 4/7/50.

544. R. R. Smith, Tr. 5743–44.

545. R. R. Smith, Tr. 5743–53. DX 172, p. 351, 10/27/48. DX 173, p. 352, 6/6/49.

546. R. R. Smith, Tr. 5751–60. Ellies, DX 1014, pp. 137–38.

which the wrap has broken. (2) A single type of Pliofilm can be used for red meat, luncheon meat, cheese, etc., as against three different types of cellophane. This makes the job simpler for the wrapping crew, and eliminates wrapping cheese or meat in the wrong type of film. (3) Cellophane used for wrapping fresh meat is coated on only one side. The coated side of cellophane must be kept away from the meat, or else the film will lose its protective properties and the meat will discolor. In the case of Pliofilm, either side may be wrapped next to the meat. This again makes for a simpler wrapping job and eliminates the cost of spoilage and rejects. The somewhat higher price of Pliofilm is offset by economies resulting from these physical characteristics.[547]

217. During the year 1951, the amount of Pliofilm used for self-service meat wraps was approximately 30 to 40% of the quantity of duPont cellophane used for the same purpose.[548]

218. Materials used today to package processed meats and bacon are: Saran, Cry-O-Rap, Pliofilm, cellulose acetate, polyethylene, greaseproof paper, cellophane, parchment, glassine, and waxed paper.[549] Most of the meat sold in the United States is sold through stores where meat is not on a self-service basis.[550] The use of greaseproof paper, waxed paper, and glassine for processed meats is heavy in these non-self-service stores.[551] There is acceptance in self-service stores of bacon packages made of paperboard and glassine, completely opaque.[552]

219. DuPont developed different types of moistureproof film in the early 1940's which had the correct degree of moistureproofness to enable luncheon meats and frankfurters to be packaged.[553] These items had never before been packaged because packaging materials then available had too much moistureproofness and turned the meat slimy, or else had too little moistureproofness and permitted it to become dried out.[554]

220. There is competition between converters for the business of converted wraps for meat and meat products. Armour and Company have purchased cellophane meat wraps from Daniels, Shellmar, Cellu-craft, Milprint, Inc., Traver Corporation, Standard Cap and Seal, Marathon Corporation, and Wraps, Inc. There is no uniform pattern of prices as between converters of any given type of wrap.[555]

### 5. CANDY.

#### (Findings 221–233)

221. Flexible packaging materials used for packaging by the candy industry are: Glassine, waxed paper, cellophane, greaseproof, aluminum foil, Pliofilm, cellulose acetate and polyethylene.[556]

222. 40% or more of the production of the candy industry is accounted for by chocolate or chocolate coated candy bars.[557]

223. In the early thirties duPont was able to obtain a volume of business in cellophane candy bar wrappers. This business was in the form of printed wrappers. Most important brands of

547. R. R. Smith, Tr. 5752–58. Southwick, DX 1008–A, p. 35. Ellies, DX 1014, pp. 137–38, 153.

548. R. R. Smith, Tr. 5759–60.

549. Martin, Tr. 6353. R. R. Smith, Tr. 5761–62. Nelson, DX 1020, p. 314. Ellies, DX 1014, pp. 135–38. Elmstrom, DX 1019, pp. 275–77.

550. R. R. Smith, Tr. 5762.

551. R. R. Smith, Tr. 5762.

552. R. R. Smith, Tr. 5763.

553. R. R. Smith, Tr. 5763–64. Elmstrom, DX 1019, pp. 288–89.

554. R. R. Smith, Tr. 5751, 5763–64. Elmstrom, DX 1019, pp. 288–89.

555. Elmstrom, DX 1019, pp. 283–84. Leeds, DX 1011, pp. 87–88. Hanson, DX 1818, p. 250. GX 5047, p. 1430, 4/28/41.

556. R. R. Smith, Tr. 5767. Martin, Tr. 6351. Horn, DX 1010, p. 71. Jakes, DX 1006, p. 8. DX 996 (Physical Samples).

557. R. R. Smith, Tr. 5768. Jakes, DX 1006, p. 1.

candy bars, in volume of business, were wrapped in duPont cellophane. These candy bars had previously been wrapped in glassine and duPont obtained this business by displacing the glassine wrap in favor of printed wraps of its own cellophane.[558]

224. Obstacles to sale of cellophane by duPont for use as candy bar wrappers have been: (1) higher price of cellophane as against glassine; (2) desirability in the candy bar trade of a highly printed "billboard" type of wrap; (3) transmission of light through a cellophane wrap tends to turn chocolate gray; (4) in the early days of duPont's candy bar wrap business, wrapping machines were not available to handle cellophane, and cellophane wraps had to be applied by hand, adding greatly to the cost of production.[559]

225. DuPont was unable to maintain its early volume of candy bar wrap business, and the major brands of candy bars in the United States returned to printed glassine wrappers.[560] None of the major sellers in the candy bar field are wrapped in cellophane today although certain brands of candy bars are still wrapped in duPont cellophane, e. g., those made by the Elmer Candy Company of New Orleans, Donaldson Chocolate Company of Kansas City and General Foods Corporation of New York.[561] Gains and losses of candy bar business between du-Pont cellophane and glassine continue.[562]

226. In recent years duPont developed some cellophane business in the overwrap of cardboard trays containing a number of chocolate bars. These are sold in food stores as "take-home packages."[563]

227. Shifts of business occurred and still do between duPont cellophane and aluminum foil in segments of the candy industry. These include: (1) candy bars,[564] (2) seasonal specialties such as Easter candies and chocolate Easter eggs,[565] (3) mints,[566] (4) Lifesavers and other 5¢ packages.[567]

228. Moistureproof cellophane has displaced some waxed paper and vice versa in the wrapping of plastic types of candy such as kisses and caramels, and certain children's penny goods such as lollipops. Shifts of business are frequent.[568]

229. Manufacturers of this type of candy goods have frequently discontinued cellophane for a period because profits could not stand the higher price of the cellophane wrap.[569]

230. In the early years of duPont's efforts to sell cellophane for the low priced line of candy goods, kisses and caramels were individually wrapped by machine in waxed paper. Volume of this class of goods prohibited hand wrapping in cellophane, and this business was obtained by duPont only after development of wrapping machines that would handle cellophane.[570]

558. R. R. Smith, Tr. 5770. DX 92, p. 210, 2/10/32. DX 94, p. 212, 2/25/33. Jakes, DX 1006, p. 1.

559. R. R. Smith, Tr. 5769–70. DX 76, p. 173, 6/12/32. DX 81, p. 184, 3/8/37. DX 86, p. 201, 10/28/40. DX 89, p. 207, 2/25/41. DX 91, p. 209, 11/5/47. DX 93, p. 211, 11/7/47. DX 95, p. 213, 11/18/47. DX 96, p. 214, 10/24/47.

560. R. R. Smith, Tr. 5771, 5773. Jakes, DX 1006, pp. 1–2. DX 77, p. 174, 9/18/33. DX 86, p. 201, 10/28/40.

561. R. R. Smith, Tr. 5771–73. Horn, DX 1010, p. 71. Jakes, DX 1006, p. 2.

562. R. R. Smith, Tr. 5772–73.

563. R. R. Smith, Tr. 5772. Jakes, DX 1006, p. 3. DX 103, p. 222, 8/2/49.

564. R. R. Smith, Tr. 5775–80.

565. R. R. Smith, Tr. 5777–79.

566. R. R. Smith, Tr. 5779.

567. DX 99, p. 217, 6/10/48. DX 100, p. 218, 8/20/48.

568. R. R. Smith, Tr. 5780–81. DX 79, p. 181, 6/20/35. DX 90, p. 208, 11/15/46. Jakes, DX 1006, p. 4.

569. R. R. Smith, Tr. 5780–81. Jakes, DX 1006, pp. 4–5.

570. R. R. Smith, Tr. 5780–81. DX 75, p. 171, 7/7/31. DX 79, p. 181, 6/20/35.

231. In 1938, duPont believed maximum volume of cellophane possible was being sold to the candy industry as it was then conducted, with no prospect of new uses for cellophane. It decided to attempt to increase the volume of cellophane sales to the candy industry. It found food stores provided the greatest human traffic of any type of retailing outlet, and held the greatest promise as a new candy market. Since most food stores did not then carry candy, duPont made a market study of the kind of candy that would sell, the size of package that would sell, and the price at which it would sell in greatest volume. The price range of 19 to 29¢ per package was found to be promising. This range eliminated high priced box candy and indicated packages of cheaper types of candy were best prospects for home consumption. DuPont presented the results of this market study to candy manufacturers and to food stores, and recommended cellophane packaging for this type of unit. Sales of candy expanded as a result. This market development was largely responsible for the growth of duPont cellophane sales to the candy industry to the present figure of 20 million pounds annually.[571]

232. DuPont did not gain all of the food store business for candy packages. Glassine, aluminum foil, and cellulose acetate window boxes are all used to wrap types of candy sold in food stores.[572]

233. Moistureproof cellophane, Pliofilm, polyethylene, aluminum foil, and glassine are all used for packaging hard candies,[573] and business for this type of wrapping is lost and gained between each of these materials and cellophane.[574]

### 6. CRACKERS AND BISCUITS.

#### (Findings 234–243)

234. The cracker and biscuit industry is divided into the sponge cracker trade and the sweet cracker trade. The former includes soda crackers such as Saltines and Ritz, and the latter includes sweet biscuits and crackers such as vanilla wafers, cookie sandwiches, ginger snaps.[575]

235. Since early 1930's some sweet crackers and biscuits have been packaged in moistureproof cellophane bags, and the majority in cartons lined with glassine or waxed paper and overwrapped with printed sulphite paper. Some cartons have been overwrapped in cellophane. DuPont has taken packaging business from other materials for certain cracker and biscuit accounts and has lost business back to these materials. Customers package part of their production of specific sweet goods in cellophane packages and the remainder of their production of the identical goods in other flexible packaging materials.[576]

236. In duPont's effort to sell cellophane for wrapping sweet crackers it encountered obstacles: (1) Cellophane cost the cracker and biscuit manufacturer more than glassine liners or sulphite carton overwraps. (2) Machines were in use for packaging with glassine, sulphite and cartons, but not with cellophane.[577] In this period (early 1930's) these factors limited duPont's sales for wrapping sweet crackers and biscuits to relatively high priced lines of goods.[578] Durability of cellophane was poor and frequency of breakage of cellophane bags and overwraps of sweet cracker packages was high.[579]

571. R. R. Smith, Tr. 5782–87.

572. R. R. Smith, Tr. 5786–87. Leinbach, Tr. 6758–59.

573. R. R. Smith, Tr. 5781, 5775. Jakes, DX 1006, p. 4.

574. DX 101, p. 219; 9/3/48. Jakes, DX 1006, p. 4.

575. R. R. Smith, Tr. 5788–91.

576. R. R. Smith, Tr. 5789, 5791–95. McCurry, DX 1016, p. 206.

577. R. R. Smith, Tr. 5791–92. McCurry, DX 1016, pp. 13–14. DX 32, p. 56, 1/9/33. DX 33, p. 57, 3/20/33. DX 34, p. 58, 10/30/33.

578. R. R. Smith, Tr. 5792.

579. R. R. Smith, Tr. 5792–93.

237. Factors described caused loss of cellophane business for duPont to other flexible packaging materials. Some of this business has been regained. Cellophane is still at a price disadvantage; cellophane bags still must be filled by hand; the introduction of lithographing and process printing on sulphite and waxed paper has increased acceptance of those materials in the trade. All factors continue to cause losses of business for duPont in the cracker and biscuit industry, although some of it has been regained.[580]

238. To displace glassine, waxed papers and sulphite wrappers and liners on sweet goods, duPont made an effort to sell cellophane for the packaging of sweet crackers which were then sold in bulk, and displayed in large cartons known as caddies. These accounted for 65% of the sweet cracker business in 1931.[581] This type of selling was prevalent until 1938, at which time duPont had about two million pounds of business annually in cellophane overwraps and liners for sweet crackers and biscuits.[582] DuPont persuaded a substantial part of the cracker and biscuit industry and its retailing outlets to adopt display fixtures for sweet crackers and cookies to afford permanent display of these products and recommended cellophane packaging to promote display. Much of the sweet crackers previously sold in bulk were sold from these display fixtures.[583] When self-service food merchandise became general a few years later these display factors for crackers and biscuits remained as part of the self-service arrangement.[584] Today bulk selling of sweet crackers and biscuits has been eliminated, and cellophane bags, cellophane-wrapped trays, glassine lined trays overwrapped in Saran, printed and unprinted waxed paper, sulphite, glassine, foil and Pliofilm are used to package consumer size units.[585]

239. Until 1947 duPont's sales of cellophane for the packaging of sponge crackers, i. e., soda crackers, saltines, etc., were limited to cracker carton overwraps. This business depended upon the displacement of waxed paper overwraps.[586] Shifts of business have occurred back and forth for specific accounts such as Keebler-Weil Biscuit Company and Union Biscuit Company between duPont cellophane and waxed paper carton overwraps.[587]

240. In recent years development of process printing on waxed paper and improvements in waxed paper coatings have become factors in the overwrapping of cartons of sponge crackers and sweet biscuits.[588] DuPont has lost cellophane business in this trade to waxed paper for this reason.[589]

241. In 1947, duPont sold its first account for the use of cellophane for "fractional packaging" of sponge crackers.[590] Fractional packaging is the division of the contents of a carton into halves or quarters, each of which is separately wrapped, so that the opening of the carton exposes only a fraction of the contents.[591] DuPont tried unsuccessfully to get this method of packaging adopted for nearly twenty years prior to 1947.[592] At the present time about 26 cracker and biscuit bakers have a

580. R. R. Smith, Tr. 5794, 5798–99. Mc-Curry, DX 1016, p. 206.

581. R. R. Smith, Tr. 5791–92. DX 34, p. 58, 10/30/33.

582. R. R. Smith, Tr. 5795.

583. R. R. Smith, Tr. 5796–97.

584. R. R. Smith, Tr. 5797–98.

585. McCurry, DX 1016, pp. 206, 218–19, 221.

586. R. R. Smith, Tr. 5799–5802.

587. R. R. Smith, Tr. 5801. DX 62, p. 141, 2/21/49. DX 63, pp. 144–45, 5/23/49. DX 64, pp. 146–47, 6/2/49.

588. R. R. Smith, Tr. 5794, 5801.

589. R. R. Smith, Tr. 5794–95, 5801. DX 62, pp. 141–42, 2/21/49. DX 63, pp. 143–44, 4/11/49. DX 64, pp. 145–46, 5/23/49.

590. R. R. Smith, Tr. 5802.

591. R. R. Smith, Tr. 5801–02. McCurry, DX 1016, p. 207.

592. R. R. Smith, Tr. 5802.

fractional packaged soda cracker on the market.[593] Other items such as graham crackers have been similarly packaged.[594] DuPont estimates about two million pounds annually of its cellophane goes into fractional packaging of crackers.[595]

The principal flexible packaging materials used for fractional packaging of crackers and biscuits are waxed glassine and waxed paper.[596] A small percentage of fractional packaging crackers and biscuits are wrapped in duPont cellophane. Certain individual cracker manufacturers use more waxed glassine for fractional packaging than duPont's total sales for that purpose.[597]

242. Profit margins are narrow and price competition intense in the sponge cracker business.[598] As any cracker manufacturer reduces price others follow to remain competitive and give up cellophane for fractional packaging in favor of a cheaper material, e. g., a recent price reduction of National Biscuit Company forced a general reduction of saltine prices and duPont received cellophane order cancellations from several accounts.[599]

243. Certain cracker manufacturers began using glassine for fractional packaging during the postwar cellophane shortage because of the unavailability of cellophane. By April of 1952, when cellophane was in ample supply, those accounts had not been won over to cellophane.[600]

## 7. FROZEN FOODS.

### (Findings 244–250)

244. The frozen food and vegetable industry is of recent origin. In the early thirties when cellophane was first used on frozen food packages, Birdseye was the packer. A few additional concerns entered this business prior to World War II, but the industry grew slowly. During World War II the frozen food and vegetable packing business grew with emergence of dozens of major concerns, to a point at which it became one of the largest process food industries in the United States. Its growth is continuing.[601]

245. Cellophane is used in the frozen food industry for direct wraps or liners inside a carton, for carton overwraps and for direct wraps used alone. As a liner or direct wrap inside a carton it is used for frozen fish filets [602] and small consumer units of frozen fruits and vegetables.[603] It is used as an overwrap for cartons of frozen fruits and vegetables.[604] Cellophane is used as a direct wrap for frozen poultry.[605]

246. Cellophane has displaced some vegetable parchment as a direct wrap for frozen fish, and vice versa. Shifts of business continue between cellophane and parchment for this use.[606]

247. Waxed paper has displaced cellophane in some instances as a carton overwrap for frozen fish filets, and vice versa. Displacement continues back and forth in important fish packing accounts.[607]

593. R. R. Smith, Tr. 5802–03.

594. R. R. Smith, Tr. 5803.

595. R. R. Smith, Tr. 5803.

596. R. R. Smith, Tr. 5803. Leinbach, Tr. 6792. McCurry, DX 1016, p. 207.

597. R. R. Smith, Tr. 5803–04.

598. McCurry, DX 1016, pp. 207–08. Nelson, DX 1020, pp. 304–05, 321.

599. R. R. Smith, Tr. 5805.

600. R. R. Smith, Tr. 5804. McCurry, DX 1016, p. 208.

601. R. R. Smith, Tr. 5806–07.

602. R. R. Smith, Tr. 5811. Horn, DX 1010, p. 72.

603. Horn, DX 1010, p. 72.

604. R. R. Smith, Tr. 5808–10.

605. R. R. Smith, Tr. 5812.

606. R. R. Smith, Tr. 5811. Martin, Tr. 6353. DX 111, p. 243, 3/9/39. DX 112, p. 244, 11/6/39. DX 122, pp. 269–70, 12/23/48. DX 174, p. 355, 12/13/40.

607. R. R. Smith, Tr. 5811–12. DX 116, pp. 259–61, 9/48. DX 122, p. 270, 12/23/48. DX 119, p. 265, 1/21/48. DX 120, p. 267, 1/26/49.

248. Birdseye (now a division of the General Foods Corporation) adopted cellophane on its frozen foods packages in the early thirties. For a period after that time duPont cellophane was used in 100% of the frozen food packages sold in the United States. To get this business duPont cellophane displaced waxed paper which Birdseye had previously used.[608] With growth of the frozen food industry during World War II converters of cellophane developed a highly attractive multi-colored process printed opaque cellophane carton overwrap which became widely accepted in the industry by such leaders as Libby McNeill and Libby, Dulany, Pictsweet and others,[609] displacing cellophane.

249. DuPont cellophane was once used to wrap 100% of frozen poultry. Displacement of much of this business has been effected by polyethylene, Pliofilm, and Cry-O-Rap. Among accounts who shifted to one of these films from cellophane for the wrapping of frozen poultry are the "Big 4" meat packers: Swift, Armour, Cudahy and Wilson.[610]

250. In the late 1940's, waxed paper manufacturers and converters developed waxed paper with a "hard wax" coating containing a polyethylene resin. This wrap is glossy, durable and resistant to moisture and liquids. It is a great deal cheaper than cellophane. Simultaneously converters developed process printing methods on this type of paper, which made a wrap of this material indistinguishable from printed cellophane. This wrap was widely accepted in the frozen food industry as a carton overwrap for fruits and vegetables, because of its low cost,[611] its ability to be handled at higher machine speeds than cellophane,[612] and for its great decorative [613] and protective qualities.[614] The polyethylene wax wrap has largely displaced cellophane in five of duPont's largest frozen food accounts.[615] DuPont is attempting to regain this business and still holds the business of certain other accounts of this type of wrap.[616]

## 8. POTATO CHIPS, POP CORN AND SNACKS.

### (Findings 251–253)

251. Flexible packaging materials used as wraps for potato chips, popcorn and cocktail snacks of various types are: waxed paper, glassine, aluminum foil, moistureproof cellophane, and Pliofilm.[617]

252. Cellophane has displaced other flexible packaging materials with certain accounts for packaging snacks and has been displaced by them in other cases. This displacement back and forth continues.[618]

253. Obstacles to sale of cellophane as wraps of bags for potato chips and other types of "snacks" have been: (1) higher price of cellophane over waxed paper and glassine; (2) passage of ultraviolet rays through cellophane which produces rancidity in the oils used in the packaged product. This latter obstacle has been particularly severe in the case

608. R. R. Smith, Tr. 5807.

609. R. R. Smith, Tr. 5809. DX 115, p. 250, 11/46. DX 130, p. 285, 6/49. DX 996 (Physical Samples). DX 1003 (Shellmar Samples).

610. R. R. Smith, Tr. 5812–13. DX 116, pp. 259–60, 9/48. DX 129, p. 278, 11/14/49.

611. R. R. Smith, Tr. 5810–11. DXs 125–28, pp. 273–77. DXs 123–24, pp. 271–72.

612. R. R. Smith, Tr. 5809. DX 118, p. 263, 1/21/48.

613. R. R. Smith, Tr. 5810. DX 119, p. 265, 4/21/48.

614. R. R. Smith, Tr. 5809. Ramsay, DX 1017, p. 233. DX 596, p. 1176, 4/7/50.

615. R. R. Smith, Tr. 5810–11. Horn, DX 1010, p. 72. Croy, DX 1021, pp. 340–41. Hanson, DX 1018, p. 251. DX 120, p. 267, 1/26/49.

616. R. R. Smith, Tr. 5811.

617. R. R. Smith, Tr. 5814. Martin, Tr. 6354–55. McCurry, DX 1016, p. 209. Ramsay, DX 1017, p. 228. Hanson, DX 1018, p. 248. Nelson, DX 1020, p. 305. DX 147, p. 315. DX 148, p. 318, 2/18/48. DX 996 (Physical Samples).

618. R. R. Smith, Tr. 5816. McCurry, DX 1016, p. 209. Nelson, DX 1020, pp. 322–323. DX 150, p. 321, 9/10/48.

of potato chips.[619] Aluminum foil does not permit the passage of any light, and waxed paper and waxed glassine can be made opaque to prohibit rancidity effect of ultraviolet rays.[620]

### 9. CEREALS.

#### (Findings 254–255)

254. Flexible packaging materials used as cereal wraps are glassine, waxed paper, and cellophane both as liners and overwraps.[621] Aluminum foil is also used for packaging a small quantity of cereal.[622]

255. DuPont had little success in selling cellophane for use as a cereal package. Obstacles to the sale of cellophane as a cereal wrap have been: (1) higher price than waxed paper or waxed glassine; (2) major cereal producers found cellophane gave less satisfactory protection against either moisture or rancidity than did wax paper; (3) cellophane bags required more cumbersome filling methods; and they stacked poorly on display shelves.[623]

### 10. FRESH PRODUCE.

#### (Findings 256–258)

256. Flexible packaging materials used for packaging of fresh fruits and vegetables are cellophane, cellulose acetate, polyethylene, Pliofilm, glassine and parchment.[624] Acetate is used for the wrapping of spinach, tomatoes, and certain other green vegetables.[625] Poly-ethylene and Pliofilm are used for packaging vegetables and fruits in package sizes up to five or ten pounds.[626]

257. Cellophane has displaced cellulose acetate for the packaging of fresh produce such as spinach and tomatoes in some instances and cellulose acetate has displaced cellophane in others.[627] On the West Coast, cellulose acetate is used to package 100% of packaged spinach. On the East Coast it is not used in any quantity to package spinach.[628]

258. Certain types of fruits and vegetables are packed in consumer-size units by the grower in quantities in lieu of shipment in bulk and packaging by the retailer. In these cases cellophane has been displaced by polyethylene and Pliofilm. These durable materials are superior to cellophane for shipment at low temperatures for long distances, and for handling without breakage during long shipments. A shift from retail packaging by retailer or wholesaler to packaging by the grower frequently involves displacement of cellophane by polyethylene and Pliofilm. This development is taking place in the case of carrots and apples.[629]

### 11. PAPER GOODS AND TEXTILES.

#### (Findings 259–260)

259. Flexible packaging materials used for wrapping paper goods (tissues, paper napkins, paper tablecloths, cups, etc.) are waxed paper, glassine, cellophane, sulphite, and cellulose acetate.[630]

619. R. R. Smith, Tr. 5815. DX 149, p. 319, 8/3/48.

620. DX 145, p. 308, 2/28/36. Martin, Tr. 6391–94.

621. R. R. Smith, Tr. 5816–17. Martin, Tr. 6351. Horn, DX 1010, pp. 70–71. Nelson, DX 1020, p. 310. DX 984. DX 985.

622. Horn, DX 1010, pp. 70–71.

623. R. R. Smith, Tr. 5816, 5817. Horn, DX 1010, pp. 70–71. DX 163, p. 337, 10/24/33.

624. R. R. Smith, Tr. 5818. Martin, Tr. 6353. Ramsay, DX 1017, pp. 228–238. Hopping, DX 1007, p. 19. Ellies, DX 1014, pp. 136–37.

625. R. R. Smith, Tr. 5820. DX 132, p. 287, 11/4/47. DX 133, p. 288, 12/4/47.

626. R. R. Smith, Tr. 5820. Ramsay, DX 1017, p. 238.

627. R. R. Smith, Tr. 5820. Hopping, DX 1007, p. 19, DX 563, p. 1093, 2/47. DX 132, p. 287, 11/4/47. DX 133, p. 288, 12/4/47. DX 140, p. 299, 12/7/48. DX 139, p. 298, 8/18/48. DX 141, p. 300, 11/1/49.

628. R. R. Smith, Tr. 5820.

629. R. R. Smith, Tr. 5820–21. Ramsay, DX 1017, p. 238. DX 562, pp. 1083–87, 10/46.

630. R. R. Smith, Tr. 5821. Hopping, DX 1007, p. 19. DX 219, p. 449, 5/8/31. DX 221, p. 452, 1/19/49. DX 222, p. 453, 5/5/49. DX 984.

260. Principal flexible packaging ma terials used to wrap textiles are cellophane, Pliofilm, polyethylene and glassine.[631] Obstacle to the sale of cellophane for wrapping of heavy textiles such as sheets, blankets and pillow cases is absorption of moisture by the hydroscopic textile in the package and consequent shrinkage and breakage of the cellophane wrap as it dries out. Polyethylene and Pliofilm combine a higher degree of toughness with less tendency to shrink, and have found increasing acceptance for the wrapping of heavy textiles, displacing much cellophane.[632]

## 12. CIGARETTES.

### (Finding 261)

261. Cellophane was first accepted as an overwrap for cigarette paper-foil package for novel appearance, lending itself to a large advertising campaign.[633] Glassine had been used.[634] Since general acceptance of cellophane as a cigarette package overwrap, there have been periods of its displacement: a period of cellophane shortage in the mid-forties, and merchandising experiments of the Brown and Williamson Tobacco Company who, for a period, sold Kools and Raleigh cigarettes in a one-piece foil package.[635] Manufacturers of Pliofilm, glassine and aluminum foil have made and continue to make determined efforts to displace cellophane as a wrap for cigarettes.[636]

## 13. BUTTER.

### (Finding 262)

262. DuPont in the mid-thirties made a selling effort in the butter industry. This met with no success, since butter in contact with cellophane tended to separate the coating and because the butter industry could not pass the higher cost of the cellophane wrap on to dealer. DuPont is attempting to sell cellophane as a butter wrap. Vegetable parchment and aluminum foil have been and are the materials used as a direct wrap for butter.[637]

## 14. CHEWING GUM.

### (Findings 263–264)

263. Flexible packaging materials used for the packaging of chewing gum are: aluminum foil, waxed paper, cellophane, laminations of aluminum foil and waxed paper, and laminations of aluminum foil to cellophane or to waxed paper. These materials carry a variety of printed effects and coatings.[638]

264. Chewing gum packages are shifting to an opaque outer wrapper.[639] This opacity is achieved by a solid overprinting of cellophane film, and in other instances by using opaque foil or paper. Producers of foil, waxed paper and cellophane have attempted to promote package designs upon converters and chewing gum manufacturers which utilize a maximum of their material.[640] Increase of one material is at the expense of another.[641]

631. R. R. Smith, Tr. 5821–22. Ramsay, DX 1017, p. 228. DX 996.

632. Ramsay, DX 1017, p. 239. Hanson, DX 1018, p. 249. DX 212, p. 439, 3/27/41. DX 216, 217, pp. 445–46, 2/21/49, 7/12/49.

633. R. R. Smith, Tr. 5997.

634. R. R. Smith, Tr. 5822. Leinbach, Tr. 6769.

635. R. R. Smith, Tr. 5824–25. DX 205, p. 424, 12/2/46. DX 206, p. 425, 2/4/48.

636. Leinbach, Tr. 6769–70. Ellies, DX 1014, pp. 139–41. DX 593, pp. 1136–37, 1946.

637. R. R. Smith, Tr. 5828. Martin, Tr. 6380. Elmstrom, DX 1019, pp. 278–79. DX 996 (Physical Samples).

638. Martin, Tr. 6352, 6358–59. Leinbach, Tr. 6761–62. Jakes, DX 1006, pp. 3–4. Ramsay, DX 1017, pp. 228, 240–41. Nelson, DX 1020, p. 311.

639. Leinbach, Tr. 6744. Ramsay, DX 1017, pp. 240–41.

640. Leinbach, Tr. 6761–62.

641. Martin, Tr. 6385. Leinbach, Tr. 6743–44. Ramsay, DX 1017, pp. 16–17.

### 15. OTHER FOOD PRODUCTS.

#### (Findings 265–273)

265. Other food products on which cellophane is used as a packaging material are: powdered drink mixes, macaroni, noodles, rice, dried fruits, dried vegetables, cheese, cake mixes, sandwiches. For each of these products other flexible packaging materials are used. In each case duPont must sell against a physical property of another packaging material, against lower cost of another material, or against both.[642]

266. Noodles and macaroni have been sold in cellophane bags, Pliofilm, paper wraps and window boxes.[643] Cellophane bags have been displaced by specific accounts wholly or in part by window boxes.[644] Many accounts prefer window boxes because of lower breakage, and because of their more regular shape and facility of use on display counters.[645]

267. Dried fruits are packaged in blocks wrapped in Saran film, moisture-proof cellophane or Pliofilm, and in cartons overwrapped with waxed paper,[646] and sometimes lined with glassine or greaseproof paper.[647]

268. Shifts of specific accounts between cellophane and other flexible packaging materials have occurred and now occur for the packaging of dried fruits.[648] DuPont's business in this end use was gained from glassine.[649]

269. Saran film is preferred by dried fruit packers to cellophane for its superior moistureproofness, although Saran is more costly.[650] Pliofilm is preferred by many for the soft appearance it imparts to the contents of the package.[651] Cellophane costs less than either Pliofilm or Saran film and is preferred by many packers for that reason.[652]

270. DuPont developed a Saran coated cellophane film "K–202" in order to provide the dried fruit trade with a film that can compete with Saran and Pliofilm in moisture resistance.[653] K–202 is also used for wrapping certain types of cookies and other products that absorb moisture readily.[654]

271. Rice is packaged in cartons, paper bags, cellophane bags and window boxes. Shifts of business for packaging of rice have occurred between duPont cellophane and various forms of rice packaging.[655]

272. Dried vegetables are packaged in laminated foil, Pliofilm, Pliofilm and paper laminations, cellophane, cellophane and paper laminations, depending upon degree of transparency desired, degree of protection against moisture required, display conditions, and other factors of choice.[656]

273. Powdered mixes including cake mixes, dessert mixes, and beverage mixes have been packaged in foil, foil and

642. Martin, Tr. 6352–55. DX 155, p. 328, 11/6/47. DX 180, p. 363, 8/11/48. DX 188, p. 378, 6/17/48. DX 183, p. 366, 5/40. DX 984. GX 6004, pp. 7926–28.

643. Martin, Tr. 6354, DX 155, p. 328, 11/6/47. DX 155 (ibid). DX 156, p. 329, 7/18/47.

644. DX 155 (ibid). DX 156 (ibid).

645. DX 156 (ibid). Martin, Tr. 6354.

646. Ellies, DX 1014, p. 138. DX 165, p. 339, 10/2/47. DX 166, p. 340, 1/30/48. DX 169, pp. 343–45, July 1948. DX 170, pp. 346–49, Dec. 1949.

647. Martin, Tr. 6354.

648. DX 167, p. 341, 1/13/48. DX 168, p. 342, 7/26/48. DX 165, p. 339, 10/2/47. Ellies, DX 1014, pp. 137, 138–39.

649. DX 339, p. 648, 4/23/26.

650. DX 170, p. 346. McCurry, DX 1016, p. 211. Ellies, DX 1014, p. 138.

651. Ellies, DX 1014, pp. 138–39, 153–54. DX 168, p. 342, 7/26/48.

652. Leeds, DX 1011, pp. 92, 96. Elmstrom, DX 1019, p. 288. McCurry, DX 1016, p. 211. DX 168, p. 342, 7/26/48.

653. Mitchell, Tr. 5519–20. GX 396, p. 5492, 5/15/50. GX 6002, p. 8110, 6/8/51.

654. Mitchell, Tr. 5519.

655. Martin, Tr. 6355. DX 157, p. 330, 3/16/49. DX 158, p. 331, 10/7/48. DX 159, p. 333, 12/6/48. DX 160, p. 334, 12/9/49. DX 161, p. 335, 8/31/48. DX 162, p. 336, 8/19/49.

656. Martin, Tr. 6352. DX 984. DX 985.

paper laminations, cellophane pouches, glassine pouches, cartons lined with a glassine bag and glassine laminations.[657] Some accounts have displaced cellophane for powdered mixes because of the moisture resistance of foil or a glassine,[658] others because of the breakage of cellophane.[659] These are factors against which duPont must sell for that use.

### 16. OTHER TOBACCO PRODUCTS.

#### (Findings 274–275)

274. Aluminum foil and moisture-proof cellophane are both used for the wrapping of individual cigars. Both afford protection against moisture loss of the cigar, and accounts have been gained and lost by duPont cellophane from and to aluminum foil.[660]

275. Glassine, waxed paper, sulphite and cellophane have been used for packaging of smoking and chewing tobacco.[661] Major obstacles to sale of cellophane for this use is its high cost in relation to cost of waxed paper and glassine, and the superior production facility of glassine and waxed paper on wrapping machines. Accounts have been regained and lost by cellophane from and to these materials. Recently Pliofilm has been adopted on some tobacco packages for its lack of shrinkage and consequently the superior appearance of the package.[662]

### 17. CHEESE.

#### (Findings 276–277)

276. Flexible packaging materials used for the packaging of cheese include: cellophane, a converted cellophane coated with a rubber wax compound, Pliofilm, glassine, aluminum foil, lead foil and Saran.[663]

277. Processed cheese was once wrapped in tin foil or in aluminum foil but this wrap has been displaced by a rubber coated opaque cellophane cheese wrap.[664] American cheese is wrapped in Pliofilm, Saran or cellophane.[665] Swiss cheese is generally wrapped in transparent cellophane.[666] Cream cheese and Camembert cheese are generally wrapped in aluminum foil. Cellophane has been tried for the wrapping of cream cheese and Camembert but has been displaced by aluminum foil.[667]

### 18. OLEOMARGARINE.

#### (Finding 278)

278. Oleomargarine is wrapped in aluminum foil, greaseproof, and vegetable parchment applied directly about the quarter pound bars. Aluminum foil dominates[668] recently printed cello-

657. DX 180, p. 363, 8/11/48. DX 182, p. 365, 9/19/39. DX 1009–B, p. 57, 8/31/51. DX 984.

658. DX 180, p. 363. DX 182, p. 365, 9/19/39.

659. DX 184, pp. 372–73, 7/1/42. DX 185, p. 374, 8/18/42. DX 186, p. 375, 4/23/42.

660. DX 194, p. 395, 7/16/37. DX 199, p. 411, 2/27/39. DX 1009–B, p. 59, 8/31/51. DX 596, p. 1181, 4/7/50.

661. DX 198, pp. 408–09, 4/12/39. DX 202, p. 417, 6/21/39. DX 203, p. 419, 11/3/39. DX 200, p. 413, 4/25/39. Ramsay, DX 1017, p. 241.

662. Ellies, DX 1014, p. 136. DX 210, p. 436, 1/12/49.

663. Martin, Tr. 6532. Wilcox, DX 1013, p. 121. Hanson, DX 1018, p. 251. Elmstrom, DX 1019, p. 275. Croy, DX 1021, p. 334. DX 984 (physical samples). DX 171, p. 350, 6/12/45. DX 172, p. 351, 10/27/48. DX 173, pp. 352–53, 6/6/49.

664. Wilcox, DX 1013, p. 123. Elmstrom, DX 1019, p. 275. Croy, DX 1021, p. 334.

665. Wilcox, DX 1013, p. 122.

666. Wilcox, DX 1013, p. 122.

667. Wilcox, DX 1013, p. 123. Torrence, DX 1009, p. 43.

668. Martin, Tr. 6353–54. Torrence, DX 1009, 43–44. Wilcox, DX 1013, p. 125. Hanson, DX 1018, pp. 248–49. DX 996 (Physical Samples).

phane has been adopted on certain brands for a full pound overwrap. DuPont had attempted to gain acceptance of this wrap for years and has succeeded only in 1952.[669]

### VIII. Results of duPont's Competition With Other Materials

#### (Findings 279–292)

279. During the period duPont entered the flexible packaging business, and since its introduction of moisture-proof cellophane, sales of cellophane have increased.[670] Total volume of flexible packaging materials used in the United States has also increased.[671] DuPont's relative percentage of the packaging business has grown[672] as a result of its research, price, sales and capacity policies,[673] but duPont cellophane even in uses where it has competed has not attained the bulk of the business, due to competition of other flexible packaging materials.[674]

280. Of the production and imports of flexible packaging materials in 1949 measured in wrapping surface, duPont cellophane accounted for less than 20% of flexible packaging materials consumed in the United States in that year. The figures on this are:[675]

| | Thousands of Square Yards |
|---|---|
| Glassine, Greaseproof and Vegetable Parchment Papers..... | 3,125,826 |
| Waxing Papers (18 Pounds and over) ...................... | 4,614,685 |
| Sulphite Bag and Wrapping Papers ...................... | 1,788,615 |
| Aluminum Foil ............... | 1,317,807 |
| Cellophane ................... | 3,366,068 |
| Cellulose Acetate ............ | 133,982 |
| Pliofilm, Polyethylene, Saran and Cry-O-Rap ........... | 373,871 |
| Total ............... | 14,720,854 |
| Total duPont Cellophane Production .................... | 2,629,747 |
| DuPont Cellophane Per Cent of of Total United States Production and Imports of These Flexible Packaging Materials | 17.9% |

281. 80% of cellophane made by duPont is sold for packaging in the food industry. Of this quantity, 80% is sold for packaging baked goods, meat, candy, crackers and biscuits, frozen foods, fresh vegetables and produce, potato chips, and "snacks", such as peanut butter sandwiches, popcorn, etc. A small amount is sold for wrapping of textiles and paper products, etc. Largest non-food use of cellophane is the overwrapping of cigarette packages.

669. R. R. Smith, Tr. 6002.

670. DX 536, p. 992. DX 537, p. 993.

671. DX 981.

672. DX 981.

673. Yerkes, Tr. 6940–43. DX 367, p. 686, 11/27/40. DX 369, p. 689, 1944.

674. DX 984. DX 989. DX 990. DX 991. DX 992. DX 993.

675. DX 982. Bricker, Tr. 4433–43.

The breakdown of duPont cellophane sales for the year 1949 was:[676]

| Use | Sales (M pounds) | % of Total Sales |
|---|---|---|
| TOBACCO | | |
| Cigarettes | 20,584 | 11.6 |
| Cigars | 3,195 | 1.8 |
| Other Tobacco | 1,657 | 0.9 |
| Total | 25,436 | 14.3 |
| FOOD PRODUCTS | | |
| Candy & Gum | 17,054 | 9.6 |
| Bread & Cake | 40,081 | 22.5 |
| Crackers & Biscuits | 12,614 | 7.1 |
| Meat | 11,596 | 6.5 |
| Noodles & Macaroni | 2,602 | 1.5 |
| Tea & Coffee | 1,380 | 0.8 |
| Cereals | 2,487 | 1.4 |
| Frozen Foods | 5,234 | 2.9 |
| Dried Fruit | 333 | 0.2 |
| Nuts | 2,946 | 1.7 |
| Popcorn & Potato Chips | 6,929 | 3.9 |
| Dairy Products | 3,808 | 2.1 |
| Fresh Produce | 4,564 | .2.6 |
| Unclassified Foods | 8,750 | 4.9 |
| Total | 120,478 | 67.7 |
| MISCELLANEOUS | | |
| Hosiery | 1,370 | 0.7 |
| Textiles | 3,141 | 1.8 |
| Drugs | 1,031 | 0.6 |
| Rubber | 317 | 0.2 |
| Paper | 2,736 | 1.5 |
| Unclassified | 18,602 | 10.5 |
| Total | 27,197 | 15.3 |
| DOMESTIC TOTAL | 173,011 | 97.3 |
| EXPORT | 4,820 | 2.7 |
| GRAND TOTAL | 177,831 | 100.00 |

676. DX 409, p. 809, 2/9/50. R. R. Smith, Tr. 5671. See also DX 595, p. 1158, 1949.

282. Sales of cellophane by duPont in 1951, by principal uses, were approximately as follows:

White bread.............................between 8 and 9,000,000 lbs.[677]
Specialty breads ......................................15,700,000 " [678]
Cake and other baked sweet goods.....................22,000,000 " [679]
Meat .................................................19,000,000 " [680]
Candy (including chewing gum) .......................20,000,000 " [681]
Crackers and biscuits................................17,000,000 " [682]
Frozen foods ........................................ 5,800,000 " [683]
Cigarettes ..........................................23,000,000 " [684]

283. 1949 sales of 19 major representative converters whose business covered a substantial segment of the total converting of flexible packaging materials for that year showed the following as to their sales of flexible packaging materials, classified by end use.[685]

| End Use | Quantity (Millions sq. in.) | Per Cent of Total End Use | End Use (Cont'd) | Quantity (Millions sq. in.) | Per Cent of Total End Use |
|---|---|---|---|---|---|
| *Bakery Products* | | | *Meat and Poultry* (Cont'd) | | |
| Cellophane [686] .... | 109,670 | 6.8 | Papers .......... | 97,255 | 57.5 |
| Foil ............. | 2,652 | .2 | Films .......... | 8,173 | 4.8 |
| Glassine ........ | 72,216 | 4.4 | | | |
| Papers .......... | 1,440,413 | 88.6 | | 169,056 | 100.0 |
| Films ........... | 215 | .0 | | | |
| | | | *Crackers and Biscuits* | | |
| | 1,625,166 | 100.0 | Cellophane ....... | 29,960 | 26.6 |
| | | | Foil ............. | 192 | .2 |
| *Candy* | | | Glassine ........ | 11,253 | 10.0 |
| Cellophane ....... | 134,280 | 24.4 | Papers .......... | 71,147 | 63.2 |
| Foil ............. | 178,967 | 32.5 | Films ........... | 8 | .0 |
| Glassine ........ | 117,634 | 21.4 | | | |
| Papers .......... | 119,102 | 21.6 | | 112,560 | 100.0 |
| Films ........... | 484 | .1 | | | |
| | | | *Fresh Produce* | | |
| | 550,467 | 100.0 | Cellophane ....... | 52,828 | 47.2 |
| | | | Foil ............. | 43 | .1 |
| *Snacks* | | | Glassine ........ | 96 | .1 |
| Cellophane ....... | 61,250 | 31.9 | Papers .......... | 51,035 | 45.6 |
| Foil ............. | 1,571 | .8 | Films ........... | 7,867 | 7.0 |
| Glassine ........ | 120,556 | 62.8 | | | |
| Papers .......... | 8,439 | 4.4 | | 111,869 | 100.0 |
| Films ........... | 79 | .1 | | | |
| | | | *Frozen Food Excluding Dairy Products* | | |
| | 191,895 | 100.0 | Cellophane ....... | 31,684 | 33.6 |
| | | | Foil ............. | 629 | .7 |
| *Meat and Poultry* | | | Glassine ........ | 1,943 | 2.1 |
| Cellophane ....... | 59,016 | 34.9 | Papers .......... | 56,925 | 60.3 |
| Foil ............. | 88 | .1 | Films ........... | 3,154 | 3.3 |
| Glassine ........ | 4,524 | 2.7 | | | |
| | | | | 94,335 | 100.0 |

677. R. R. Smith, Tr. 5700.
678. Id. 5710.
679. Id. 5718.
680. Id. 5731.
681. Id. 5765.
682. Id. 5787.

683. Id. 5805.
684. Id. 5822.
685. DX 984. Bricker, Tr. 4470–88, 4530–31, 4536–37. Croy, DX 1021, p. 347.
686. This includes all cellophane, not merely duPont cellophane.

284. About 96% of packaged white bread produced in the United States is wrapped in waxed paper or glassine, and about 6% in cellophane. The cellophane figure includes sales by all U. S. producers.[687]

285. 48% of specialty breads are wrapped in duPont cellophane, the remainder in other cellophane or other materials.[688] Most of this balance is wrapped in waxed paper and glassine.[689]

286. Approximately 45% of cake and baked sweet goods packaged by wholesale bakers is wrapped in duPont cellophane. The balance is wrapped in other cellophane or in waxed paper or glassine.[690]

287. Between 25 and 35% of packaged candy units sold in the United States are wrapped in duPont cellophane.[691]

288. Of sponge and sweet crackers and biscuits combined approximately 25% to 30% of the packaged units produced in 1951 were wrapped in duPont cellophane.[692]

289. DuPont cellophane at the present time is used on approximately 20 to 30% of packaged retail units of frozen foods.[693] The remainder use waxed paper, waxed glassine, polyethylene, Pliofilm, Cry-O-Vac, or vegetable parchment.[694]

290. Approximately 20 to 30% of packages of potato chips and other snacks are wrapped in duPont cellophane. Most of the remainder are packaged in glassine and other flexible wraps.[695]

291. Approximately 4 to 6% of the packaged units of cereal are wrapped in duPont cellophane.[696] The principal flexible packaging materials used are waxed paper and glassine.[697]

292. DuPont cellophane is used as an outer wrap on the paper-foil packages for approximately 75 to 80% of cigarettes sold in the United States.[698] Sales for this use represent about 11.6% of duPont's total sales of cellophane.[699]

## IX. DuPont Competed With Sylvania (Findings 293–330).

293. Competition existed between duPont and Sylvania, and later Olin, for the sale of cellophane. Many customers have shifted back and forth between the producers, or divided their purchases between producers in changing proportions. Illustrative examples of such shifts in business are:

| 1930 | GX 435, p. 5729, 7/21/30. |
|------|---------------------------|
| | GX 436, pp. 5741–42, 1/27/31. |
| 1931 | GX 437, p. 5751, 7/28/31. |
| | GX 438, p. 5761, 2/9/32. |
| 1932 | GX 439, p. 5766, 7/28/32. |
| | DX 29, p. 48, 1/1/32. |
| | DX 539, pp. 995–98, 8/25/32. |
| | GX 440, p. 5774, 1/27/33. |
| 1933 | DX 77, p. 174, 9/18/33. |
| | DX 584, p. 1118, 5/22/33. |
| | GX 442, p. 5784, 1/23/34. |
| 1934 | GX 443, pp. 5794–5801, 1/29/35. |
| | DX 543, pp. 1004–35, 1935. |
| 1935 | GX 76, pp. 237–40, 243, 2/11/36. |
| | GX 77, p. 261, 2/10/36. |
| | GX 78, p. 270, 1938. |
| 1936 | GX 78, pp. 272–73, 1938. |
| | GX 444, pp. 5809–18, 2/9/37. |
| 1937 | GX 78, pp. 270–75, 1938. |
| 1938 | GX 79, p. 280, 2/9/39. |
| | GX 80, p. 295, 2/9/40. |
| | GX 493, pp. 6577, 6582, 1/20/39. |
| | GX 5517, pp. 629–95, 9/19/38. |
| 1939 | GX 80, pp. 295–300, 2/9/40. |

687. R. R. Smith, Tr. 5701–2.

688. R. R. Smith, Tr. 5710.

689. R. R. Smith, Tr. 5702–03.

690. R. R. Smith, Tr. 5718.

691. R. R. Smith, Tr. 5782.

692. R. R. Smith, Tr. 5805.

693. R. R. Smith, Tr. 5813–14.

694. Id. 5806.

695. R. R. Smith, Tr. 5814–15.

696. R. R. Smith, Tr. 5816–17.

697. Martin, Tr. 6351. DX 984.

698. R. R. Smith, Tr. 5823.

699. DX 409, p. 809, 2/9/50.

| 1940 | GX 81, pp. 305–08, 1941. |
|---|---|
| | GX 5040, p. 4526, 7/19/40. |
| | DX 85, pp. 199–200, 2/7/40. |
| | DX 582, p. 1115, 6/20/40. |
| | DX 86, pp. 201–02, 10/28/40. |
| | GX 82, pp. 312–13, 1942. |
| 1941 | GX 82, pp. 312–13, 1942. |
| | GX 495, p. 6657. |
| 1946 | DX 562, pp. 1083–87, 10/46. |
| 1947 | DX 132, p. 287, 9/8/47. |
| | DX 155, p. 328, 11/6/47. |
| | DX 156, p. 329, 7/18/47. |
| | DX 563, pp. 1088–92, 2/47. |
| 1948 | DX 122, pp. 269–70, 12/33/48. |
| | DX 208, p. 433, 6/25/48. |
| | DX 435, p. 845, 5/17/48. |
| 1949 | DX 102, p. 220, 1/7/49. |
| | DX 141, p. 300, 5/19/49. |
| | DX 209, p. 435, 5/4/49. |

General: R. R. Smith, Tr. 5835-37.

294. Comparative dollar volume of sales of plain cellophane by duPont and Sylvania in illustrative years is as follows:[700]

| Year | DuPont | Sylvania |
|---|---|---|
| 1932 | $5,052,442 | $1,916,449 |
| 1935 | 5,126,685 | 2,131,884 |
| 1938 | 5,907,989 | 2,547,850 |
| 1941 | 8,960,865 | 4,029,240 |
| 1947 | 7,741,573 | 2,093,250 |
| 1950 | 9,330,776 | 2,674,961 |

295. Comparative dollar volume of sales of moistureproof cellophane by duPont and Sylvania in illustrative years is as follows:[701]

| Year | DuPont | Sylvania |
|---|---|---|
| 1932 | $10,325,539 | $ 1,091,158 |
| 1935 | 13,581,480 | 3,906,913 |
| 1938 | 19,667,671 | 6,284,401 |

| Year | DuPont | Sylvania |
|---|---|---|
| 1941 | 31,013,706 | 8,799,764 |
| 1944 | 34,350,852 | 10,671,004 |
| 1947 | 47,598,053 | 14,388,668 |
| 1950 | 89,850,416 | 26,809,793 |

296. DuPont sales of cellophane increased or decreased from year to year at rates different from those at which Sylvania sales increased or decreased. The rate of increase (or decrease) of sales for each company for illustrative years over the respective preceding year is as follows:[702]

| Year | DuPont | Sylvania |
|---|---|---|
| 1933 | 19.6 | 36.8 |
| 1935 | 11.0 | 26.7 |
| 1938 | 1.8 | 14.0 |
| 1941 | 28.3 | 23.9 |
| 1943 | 11.0 | ( 9.0) |
| 1946 | 11.3 | 19.0 |
| 1947 | 24.1 | 10.6 |
| 1949 | 10.8 | 8.1 |
| 1950 | 13.8 | 29.7 |

297. DuPont and Sylvania acting independently of each other have increased production during the history of their operations. In 1931, duPont produced 24,619,988 pounds of cellophane while in 1950 it produced 202,826,066 pounds. Sylvania increased its production from 3,751,151 pounds in 1931 to 59,845,816 pounds in 1950. Following tables indicate production of each company during the period 1924–1950, together with relative and changing rates of growth of production.[703]

700. DX 536, p. 992.

701. DX 536, p. 933.

702. DX 537, p. 993.

703. DX 600, p. 1216.

| | DuPont | | Sylvania | |
| --- | --- | --- | --- | --- |
| | Pounds | % Increase Or (Decrease) From Previous Year | Pounds | % Increase Or (Decrease) From Previous Year |
| 1924 | 361,249 | | | |
| 1925 | 944,441 | 161.4 | | |
| 1926 | 1,910,286 | 102.3 | Sylvania began production in 1930 | |
| 1927 | 1,889,599 | (1.1) | | |
| 1928 | 3,181,069 | 68.3 | | |
| 1929 | 6,056,128 | 90.4 | | |
| 1930 | 14,804,941 | 144.5 | Not available | |
| 1931 | 24,619,988 | 66.3 | 3,751,151 | |
| 1932 | 27,008,687 | 9.7 | 7,032,089 | 87.5 |
| 1933 | 33,962,048 | 25.7 | 8,366,602 | 19.0 |
| 1934 | 39,357,997 | 15.9 | 11,212,407 | 34.0 |
| 1935 | 43,807,451 | 11.3 | 13,788,529 | 23.0 |
| 1936 | 55,593,780 | 26.9 | 19,999,655 | 45.0 |
| 1937 | 61,021,870 | 9.8 | 20,690,482 | 3.5 |
| 1938 | 61,386,582 | 0.6 | 21,291,072 | 2.9 |
| 1939 | 74,147,443 | 20.8 | 25,860,639 | 21.5 |
| 1940 | 81,676,848 | 10.2 | 29,142,503 | 12.7 |
| 1941 | 106,349,907 | 30.2 | 34,351,301 | 17.9 |
| 1942 | 87,099,471 | (18.1) | 30,498,388 | (11.2) |
| 1943 | 97,651,419 | 12.1 | 30,079,593 | ( 1.4) |
| 1944 | 94,350,906 | ( 3.4) | 29,238,796 | ( 2.8) |
| 1945 | 96,401,673 | 2.2 | 30,612,355 | 4.7 |
| 1946 | 107,185,838 | 11.2 | 35,516,404 | 16.0 |
| 1947 | 133,502,858 | 24.6 | 41,046,308 | 15.6 |
| 1948 | 160,616,693 | 20.3 | 46,679,266 | 13.7 |
| 1949 | 178,666,169 | 11.2 | 50,171,066 | 7.5 |
| 1950 | 202,826,066 | 13.5 | 59,845,816 | 19.3 |

298. Sylvania's competition has been strong. It took business from duPont in some of the largest accounts. Without exception, Sylvania attempted to sell duPont's customers and *vice versa*.[704]

299. DuPont competed with Sylvania but never sought to suppress it. Yet it never held back from developing new business in order to leave it for Sylvania.[705]

300. Sylvania's customers included large and small organizations. Among its important customers were Reynolds Tobacco Company, American Tobacco Company, P. Lorillard, Ward Baking Company, Great Atlantic & Pacific Tea Company, and Quality Bakers of America.[706]

301. No proof was presented duPont excluded Sylvania from the cigarette industry.

302. Sylvania prospered during 1930–40 when duPont was making price reductions.[707]

303. Sylvania and duPont competed for the business of converters. Sylvania since 1930 had adequate converters.[708] Plaintiff conceded the number of convert-

704. R. R. Smith, Tr. 5835–37. GX 6020, p. 8094, 4/10/50.

705. R. R. Smith, Tr. 5835–38. Yerkes, Tr. 6957. Reichel, Tr. 6047–48.

706. GX 414, pp. 5616–17. GX 79, pp. 283–84, 1938.

707. GX 414, p. 5615. Reichel, Tr. 6040–42.

708. Reichel, Tr. 6048.

ers sold by Sylvania kept pace with the number sold by duPont.[709] Converter sales have been an important proportion of Sylvania's business, in 1947 and 1948 approximating 40% of total sales.[710] Instances of the competition for business of converters are:

(1) American Paper Goods, duPont's first converter, began using Sylvania cellophane in 1930,[711] and in 1935 began purchasing Sylvania cellophane exclusively.[712]

(2) U. S. Envelope Co. shifted from duPont to Sylvania in 1934.[713]

(3) In 1940 duPont's first two converters, American Paper Goods Co. (1925) and Alexander Hurtz (1926) purchased ten times as much cellophane from Sylvania as from duPont.[714]

(4) From 1942 to 1947 Shellmar and Dobeckmun were among Sylvania's ten most important converter customers.[715]

(5) Sylvania sold to 45 converters in 1935, 53 in 1940, 63 in 1945 and 93 in 1948.[716]

304. In its existence, Sylvania has expanded its productive capacity to the extent of its financial resources.[717] Its growth has been substantial.[718]

305. Sylvania has conducted its cellophane operations at a profit.[719] Its Board of Directors approved plans to expand its capacity to 100,000,000 pounds and these plans are advanced.[720]

306. Sylvania was able to sell its cellophane output and expanded its productive capacity as fast as it could afford. It was not easy to borrow money during the 1930's. Sylvania borrowed a million dollars in 1938.[721]

307. During the 1930's Sylvania used part of its earnings to enter manufacture of viscose caps, artificial horse hair, viscose staple fiber, sausage casings, rubber thread, and textile finishes. Of these only the sausage casing venture was successful. Use of its funds for these projects limited Sylvania's funds available for expansion of its cellophane capacity.[722]

308. During the period 1931–1950, inclusive, duPont produced and sold 75% of the total amount of cellophane manufactured in the United States in the twenty years and Sylvania about 25%. In the individual years this ratio rarely varied more than 1% or 2%. During this period annual production in the United States expanded from 28,000,000 lbs. to 263,000,000 lbs. Each company's expansion of sales was achieved by its own efforts, and similarity of proportions of the total business sold by the two companies during this expansion was not the result of any agreement or understanding.[723] Business of each company increased and decreased with particular customers, and for particular products; and the rate of growth of the two companies varied from year to year.[724]

309. DuPont was able to gain the greater share of the cellophane business because of efficiency as a manufacturer, the superior quality of duPont cellophane, and value to its customers of its creative merchandising and technical service.[725]

709. Minicus, Tr. 1729.

710. GX 414, p. 5615.

711. GX 436, p. 5745, 1/27/31.

712. GX 77, p. 261, 2/11/36.

713. GX 5001, pp. 4419–20, 1934.

714. GX 5046, p. 4555, 11/5/40.

715. GX 414, pp. 5619–20.

716. GX 414, p. 5618.

717. Reichel, Tr. 6040–41.

718. DX 536, p. 992. DX 537, p. 993. DX 538, p. 994.

719. Reichel, Tr. 6049. DX 538, p. 994.

720. Reichel, Tr. 6049. GX 410, p. 5602.

721. Reichel, Tr. 6040–41.

722. Reichel, Tr. 6041–42.

723. GX 531A, p. 7326.

724. DX 537, p. 999.

725. GX 79, p. 281, 1938. Martin, Tr. 6361–62, 6399. Jakes, DX 1006, pp. 6–7. Wilcox, DX 1013, pp. 127–28, 130–31. McCurry, DX 1016, pp. 216, 217. Hanson, DX 1018, pp. 264, et seq.

310. Vigorous competition existed between duPont and Sylvania on the basis of quality. This competition included the development of types of moistureproof film [726] with characteristics adapting to particular products, as well as the quality of each type.[727] Shifts of business continually took place as result of such competition.[728]

311. DuPont manufactures a wider variety of specialized types of moistureproof cellophane than does Sylvania. This is an advantage to a converter, since the variety gives a complete line of wraps adapted for particular applications.[729]

312. Quality of duPont cellophane has improved over the years. Quality improvements have been a factor in the purchase of duPont cellophane by customers as opposed to Sylvania cellophane and other packaging materials.[730]

313. DuPont and Sylvania engaged in competition on the basis of quality for business in the cigar trade. Shifts of business of particular customers resulted from this competition.[731] Soon after duPont's introduction of moistureproof cellophane in 1930, most cigars shifted to a moistureproof cellophane wrap. Commencing in 1932, Sylvania made increasing gains in sales to the cigar industry because of the preference of customers for the characteristics of its cigar film.[732] By 1935 Sylvania's sales to the cigar industry were over 40% of all cellophane sold to that industry.[733] To compete, duPont engaged in research to improve its cellophane in the qualities desired by customers.[734] A new type was sold commencing by 1935, but was not able to recapture much business from Sylvania.[735] Further research which resulted in a further improved type sold commercially in 1938 enabled duPont in 1939 and 1940 to regain substantial cigar business from Sylvania.[736]

314. Prior to 1930 cigarette packages were overwrapped with glassine.[737] With availability of moistureproof cellophane the cigarette companies adopted it as the overwrap for their packages.[738] Cigarettes were a negligible factor in duPont sales in 1930,[739] but accounted for 20% of its total volume in 1931,[740] and contributed to the doubling of moistureproof sales in 1931 as compared with 1930.[741] Up to 1933 the cigarette industry used duPont film exclusively.[742] Commencing about 1934, Sylvania began to sell quantities of moistureproof cellophane to the cigarette industry.[743] By 1938 its customers in that industry included Reynolds, American Tobacco Co., Brown & Williamson, and Stephano Co.[744] Thereafter Sylvania obtained additional business from P. Lorillard.[745]

315. DuPont rolls have been of better quality than those produced by Sylvania,

726. DX 342, p. 657, 5/15/28. DX 346, p. 661, 8/1/29. DX 398, p. 740.

727. DX 543, pp. 1008–09, 1010–11, 1934. DX 548, p. 1047, 6/23/38.

728. DX 539, p. 995, 7/25/32. GX 77, p. 250, 2/10/36. GX 78, p. 266, 2/2/38. GX 79, p. 288, 2/9/39.

729. Leeds, DX 1011, p. 82.

730. Martin, Tr. 6452–53. Jakes, DX 1006, pp. 9–11. Leeds, DX 1011, pp. 87–88, 93. Wilcox, DX 1013, p. 127. Ellies, DX 1014, p. 138. Hanson, DX 1018, p. 254. Elmstrom, DX 1019, pp. 288–89. Nelson, DX 1020, pp. 316–17.

731. GX 435, p. 5728, 1930. DX 194, p. 395, 7/16/37.

732. GX 438, p. 5759, 1931. GX 439, p. 5766, 7/28/32. GX 546, p. 1038, 4/20/36.

733. GX 76, pp. 238–39, 2/10/36.

734. DX 544, p. 1036, 9/13/35. DX 548, pp. 1047, 1050, 6/23/38.

735. GX 77, pp. 254–56, 2/11/33. DX 544, p. 1036, 9/13/35.

736. GX 79, pp. 284–85, 2/9/39. GX 80, p. 297, 2/9/40, 1939. GX 81, p. 305, 2/9/41, 1940. DX 548, p. 1050, 6/23/38.

737. Leinbach, Tr. 6769–70. Nelson, DX 1020, p. 313.

738. GX 438, p. 5755, 2/9/32.

739. Ibid.

740. Ibid.

741. GX 395, p. 5488, 5/15/50.

742. GX 442, p. 5784, 1/23/34.

743. GX 76, p. 239, 2/10/36. GX 444, pp. 5811–12, 2/9/37.

744. GX 79, pp. 283–84.

745. GX 414, p. 5617.

and this superiority has contributed to the greater sales of duPont.[746]

316. The quality of duPont cellophane has been generally superior to that produced by Sylvania.[747] This superiority has lessened since the acquisition in 1946 of Sylvania by American Viscose Company.[748] The superiority of duPont quality in large part is due to its research.[749]

317. Superior quality of duPont's cellophane as compared with that of Sylvania has been the determining factor in the purchase by customers of all or almost all of their cellophane from duPont. Such customers include Curtiss Candy Company, [750] General Foods,[751] Kraft Foods,[752] and National Biscuit Company,[753] among users, and Shellmar,[754] Milprint,[755] Cellu-Craft[756] and Marathon,[757] among converters.

318. Quality of cellophane, particularly the uniformity of thickness, is of importance to converters. The high speed printing and bag making they perform requires cellophane with almost no variation in thickness.[758]

319. DuPont's manufacturing efficiency as to cellophane is greater than Sylvania's, [759] due to duPont's research program.[760]

Sylvania casts film at slower speeds, has greater waste, less efficient solvent recovery, requires more employees per casting machine, and produces less poundage per casting machine.[761]

320. DuPont invested more money per casting machine than Sylvania. Due to duPont's productivity and manufacturing efficiency, duPont's investment per pound of sales was smaller than that of Sylvania.[762]

321. A casting machine is the basic unit for manufacture of cellophane.[763] The following table indicates number of casting machines in operation by duPont and Sylvania during the period 1924–47.[764] Neither duPont nor Sylvania has put additional casting machines into operation since 1947.[765] Olin in 1951 put an eight casting machine plant into operation and thereafter put a ninth casting machine into operation.[766]

| Year | DuPont | Sylvania |
| --- | --- | --- |
| 1924 | 2 | — |
| 1926 | 4 | — |
| 1928 | 6 | — |
| 1930 | 29 | 3 |
| 1932 | 36 | 8 |
| 1934 | 40 | 12 |
| 1936 | 40 | 17 |
| 1938 | 48 | 19 |
| 1940 | 48 | 19 |
| 1942 | 56 | 21 |
| 1944 | 48 | 21 |
| 1946 | 48 | 21 |
| 1947 | 56 | 21 |

746. Leeds, DX 1011, p. 82. Goland, DX 1015, p. 185. Martin, Tr. 6365–67.

747. Reichel, Tr. 6097, 6103. McCune, Tr. 5583–84. Mitchell, Tr. 5535. Goland, DX 1015, pp. 184–85. Jakes, DX 1006, pp. 6–7. Horn, DX 1010, pp. 67–68. McCurry, DX 1016, p. 216. Leeds, DX 1011, pp. 81–82. Wilcox, DX 1013, pp. 127–29.

748. Reichel, Tr. 6097, 6102–03. McCune, Tr. 5584, 5627–28. McCurry, DX 1016, p. 216. Leeds, DX 1011, p. 81.

749. Mitchell, Tr. 5532. McCune, Tr. 5584. Wilcox, DX 1013, p. 127.

750. Jakes, DX 1006, pp. 6–8.

751. Horn, DX 1010, pp. 67–68, 78.

752. Wilcox, DX 1013, pp. 127–29.

753. McCurry, DX 1016, p. 216.

754. Martin, Tr. 6363–66, 6452–53.

755. Hanson, DX 1018, p. 255.

756. Leeds, DX 1011, pp. 81–82.

757. Croy, DX 1021, pp. 345–46.

758. Martin, Tr. 6364, 6378, 6399–6400. Leeds, DX 1011, p. 82. Goland, DX 1015, pp. 184–85.

759. GX 561. McCune, Tr. 5539–49. Reichel, Tr. 6099–6100.

760. McCune, Tr. 5577–78.

761. McCune, Tr. 5539–49. Reichel, Tr. 6099–6100.

762. DX 612, p. 1248, 3/22/44.

763. GX 25, p. 131, 7/2/43.

764. GX 538.

765. GX 304, p. 5482. GX 410, p. 5597.

766. Olsen, Tr. 6830, 6/11/51. DX 978, p. 2008.

322. United States cellophane producers competed on the basis of packaging service.[767] DuPont established a packaging development department in 1929 which has assisted customers to create packages employing cellophane.[768] Purpose of the project was to promote the sale of cellophane, particularly that of duPont.[769] Up to 1946, Sylvania had not established any organized packaging development section.[770]

323. DuPont's cooperation in constructive work with packaging machinery manufacturers has been greater than that of Sylvania. Sylvania began cooperation after most of the developments were worked out and has made no substantial technical suggestions to machinery manufacturers.[771] DuPont's efforts to widen the use of packaging machinery for cellophane were much greater than those of Sylvania.[772] DuPont's work in the development and promotion of packaging machinery improved the sales of Sylvania and other packaging material manufacturers, whose products can be used on the same machines as well as duPont sales.[773]

324. Since January 1, 1947, duPont list prices for its cellophane and Sylvania prices for its cellophane have differed in the following respects:

(a) Different list prices per pound on orders of 500 pounds or more of roll cellophane of comparable types.[774]

(b) Sylvania at all times allowed direct customers 1% cash discount whereas duPont allowed none until August 1949, when it adopted a 1% discount to compete with Sylvania.[775]

(c) Differences in area per pound until November, 1947.[776]

(d) DuPont's only price was for orders of 500 pounds or greater until Sylvania had different and higher prices for quantities under 500 pounds.[777]

325. Despite existence of similar list prices for cellophane during the period 1930 to 1946, on numerous occasions there was competition between Sylvania and duPont on the basis of price. Sylvania departed from its list prices by supplying first quality film at second quality prices,[778] by quantity discounts on small volume orders,[779] by combining printed and unprinted cellophane in the determination of the rate of quantity discount,[780] by allowing quantity discounts at a rate based on aggregate purchases of bakers purchasing through a cooperative group,[781] by billing less than case orders at the lower case price,[782] and by granting a converter discount to an important customer that was not manufacturing converted cellophane for resale.[783]

326. From 1941 to 1949 the cash discount allowed by Sylvania was 1% to customers and 2% to agents.[784] During

767. Russell, Tr. 6478–79. DX 338, p. 645, 2/2/25.

768. GX 431, p. 5678, 4/26/29. DX 91, p. 209, 11/19/47.

769. R. R. Smith, Tr. 5743–49. DX 338, p. 645, 2/2/25. DX 348, p. 663, 2/1/30. GX 80, p. 294, 2/9/40.

770. DX 561, p. 1082, 7/2/46. Martin, Tr. 6367–68.

771. Tindal, DX 1012, pp. 109–11.

772. Tindal, DX 1012, p. 111. Russell, Tr. 6478.

773. GX 80, pp. 294–95, 2/9/40.

774. DX 591, p. 1128, 1951.

775. DX 569, p. 1099, 6/3/49. DX 591, p. 1128, 1951. DX 383, p. 713, 9/12/49. DX 570, p. 1100, 8/9/49. DX 596, p. 1169, 4/7/50.

776. DX 591, p. 1128, 1951.

777. Ibid.

778. GX 438, p. 5759, 2/9/32. GX 437, p. 5751, 7/28/31. GX 442, p. 5784, 1/23/34. DX 574, p. 1105, 3/30/33. DX 581, p. 1114, 4/14/33.

779. GX 438, p. 5760, 2/9/32. GX 439, p. 5766, 7/28/32.

780. GX 441, p. 5780, 7/26/35.

781. GX 77, pp. 257–59, 2/11/36. GX 78, pp. 272–73, 2/8/38.

782. DX 567, p. 1096, 5/1/44. DX 573, p. 1104, 6/19/32.

783. Horn, DX 1010, p. 67.

784. DX 563, p. 1091, 1947. Replogle, Tr. 1902. DX 294, p. 759, 11/1/44.

the same period duPont allowed no cash discounts to either customers or agents.[785]

327. Sylvania's actual sales at less than list prices resulted in numerous shifts of customer's business from duPont to Sylvania.[786]

328. Sylvania did not engage in developmental selling to the same extent as duPont.[787] Its sales and technical service to customers could not compare with that rendered by duPont.[788] It had no organized package development service, did no consumer advertising, and did not undertake market research essential to the initial development of new uses.[789]

329. DuPont cellophane has had uniformity of gauge. This quality makes for uniform tension on the film, diminishes breakage in packaging and converting machines, and enables printing to be precisely in register.[790]

330. DuPont has furnished customers, both users and converters, with technical assistance. DuPont's service was superior in this respect to Sylvania's.[791]

## X. The Basic Moistureproof Patents.

### (Findings 331–339)

331. Moistureproof cellophane was a duPont invention. No other party made any contribution to its development.[792]

332. DuPont got five basic patents upon its inventions of the product moistureproof cellophane and methods for its manufacture. Basic product patent, U. S. Patent No. 1,737,187, which issued November 26, 1929, claimed as a new product a sheet or film of regenerated cellulose combined with a moistureproofing composition and having a resistance to the transmission of water vapor at least seven times as great as plain cellophane. It claimed specific embodiments of that invention.[793] The remaining four patents, issued October 6, 1931, covered duPont's method of operation and coating compositions discovered by duPont inventors. No. 1,826,696 claimed coating compositions for moistureproof cellophane consisting of four named ingredients in modifications and combinations. No. 1,826,697 was an apparatus patent on machinery used by duPont for applying the coating to regenerated cellulose film. No. 1,826,698 was concerned with the method of coating, particularly the humidifying of the base sheet. No. 1,-826,699 was concerned with the method of moistureproofing regenerated cellulose film in a process in which the coating compositions were heated above a stated melting point.[794] Validity of these patents is not challenged, and is conceded by plaintiff for purposes of this suit.[795]

785. DX 555, p. 1065, 10/10/41. GX 5490, p. 5391, 8/19/42. GX 5478, p. 5370, 10/7/41.

786. DX 563, p. 1091, Feb. 1947. DX 559, p. 1077, 5/15/44. DX 582, p. 1115, 10/17/40. DX 543, pp. 1003–15, 1018, 1934. DX 576, p. 1107, 9/30/32.

787. Jakes, DX 1006, p. 8. GX 440, p. 5774, 1/27/33. Reichel, Tr. 6065.

788. Jakes, DX 1006, p. 9. McCurry, DX 1016, p. 217. Wilcox, DX 1013, p. 130. Goland, DX 1015, p. 188. Martin, Tr. 6367–68.

789. DX 561, p. 1082, 7/2/46. Reichel, Tr. 6065. Jakes, DX 1006, pp. 8–9. Wilcox, DX 1013, pp. 130–31. McCurry, DX 1016, p. 217.

790. Martin, Tr. 6363–67. Jakes, DX 1006, pp. 6–8. Horn, DX 1010, pp. 67–68. Leeds, DX 1011, pp. 82–83. Wilcox, DX 1013, pp. 127–28. Goland, DX 1015, pp. 184–86. McCurry, DX 1016, p. 216. Hanson, DX 1018, p. 255.

791. Jakes, DX 1006, pp. 6, 8–9. Leeds, DX 1011, pp. 83–86. Wilcox, DX 1013, pp. 130–31. Goland, DX 1015, pp. 187–89. McCurry, DX 1016, p. 217. Ramsay, DX 1017, p. 245. Elmstrom, DX 1019, p. 285.

792. Benger, Tr. 5437–38.

793. W. W. Smith, Tr. 6515. GX 2001A, p. 1981, No. 3 (Schedule of Patents).

794. W. W. Smith, Tr. 6515–16. GX 2001A, p. 1982, Nos. 9, 10, 11, 12.

795. Minicus, Tr. 6960–62.

333. DuPont employed the processes covered by its U. S. Patents Nos. 1,826,-698 and 1,826,699, which were among the four basic process patents issued in 1931.[796] It was not operating under apparatus patent No. 1,826,697 when it expired in 1948, since that apparatus had since been displaced by better technology.[797]

334. Throughout the life of the basic moistureproof cellophane product patent, No. 1,737,187, no transparent regenerated cellulose film that resisted transmission of water vapor at least 7 times as well as plain cellophane could be made or sold in the United States without infringement of the claims of that patent.[798]

335. Principal growth in the cellophane industry occurred after duPont's invention of moistureproof cellophane,[799] which by 1940 accounted for over 80%

of all cellophane sales in the United States.[800]

336. Relative proportions of U. S. production of plain cellophane and moistureproof cellophane reversed from 3.9% moistureproof and 96.1% plain in 1927 to over 85% moistureproof and less than 15% plain by 1943. For the period 1943–47, inclusive, national production was 86.4% of moistureproof types and 13.6% of plain cellophane.[801] For the year 1950, on a dollar basis over 90% of all domestic sales were moistureproof cellophane, whereas plain cellophane accounted for less than 10% of dollar sales.[802]

337. Principal growth in cellophane sales has been in moistureproof cellophane.[803] This is shown by the following table of dollar sales, duPont and Sylvania, broken down by plain and moistureproof, for the period 1924–1950.[804]

796. W. W. Smith, Tr. 6582–84.

797. W. W. Smith, Tr. 6606.

798. U. S. Pat.No.1,737,187. W. W. Smith, Tr. 6514, 6539–40. DX 306, p. 588, 1/9/30.

799. DX 335, p. 641.

800. DX 367, p. 685, 11/27/40.

801. GX 532.

802. DX 536, p. 992.

803. GX 540, p. 2116.

804. DX 536, p. 992.

| | DuPont | | | Sylvania | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Plain | Moisture-proof | Total | Plain | Moisture-proof | Total |
| 1924 | $1,306,662 | $ —— | $ 1,306,662 | $ | $ | $ |
| 1925 | 1,942,373 | —— | 1,942,373 | | | |
| 1926 | 2,982,542 | —— | 2,982,542 | Sylvania began production | | |
| 1927 | *2,869,014 | —— | 2,869,014 | in 1930 | | |
| 1928 | 3,131,608 | 603,222 | 3,734,830 | | | |
| 1929 | 4,228,777 | 1,990,843 | 6,219,620 | | | |
| 1930 | 4,306,440 | 6,588,489 | 10,894,929 | N.A. | N.A. | N.A. |
| 1931 | 4,918,294 | 11,149,513 | 16,067,807 | N.A. | N.A. | N.A. |
| 1932 | 5,052,422 | 10,325,539 | 15,377,961 | 1,916,449 | 1,091,158 | 3,007,607 |
| 1933 | 4,981,306 | 11,686,804 | 16,668,110 | 2,114,506 | 1,759,572 | 3,874,078 |
| 1934 | 5,359,327 | 13,459,023 | 18,818,350 | 2,120,127 | 3,095,148 | 5,215,275 |
| 1935 | 5,126,685 | 13,581,480 | 18,708,165 | 2,131,884 | 3,906,913 | 6,038,797 |
| 1936 | 6,012,868 | 16,674,063 | 22,686,931 | 2,371,318 | 4,987,109 | 7,358,427 |
| 1937 | 6,204,768 | 18,850,063 | 25,054,831 | 2,241,066 | 5,438,522 | 7,679,588 |
| 1938 | 5,907,989 | 19,667,671 | 25,575,660 | 2,547,850 | 6,284,401 | 8,832,251 |
| 1939 | 6,561,206 | 22,778,550 | 29,339,756 | 3,283,310 | 6,650,291 | 9,933,601 |
| 1940 | 6,721,422 | 24,327,492 | 31,048,914 | 3,365,902 | 6,866,069 | 10,231,971 |
| 1941 | 8,960,865 | 31,013,706 | 39,974,571 | 4,029,240 | 8,799,764 | 12,829,004 |
| 1942 | 4,535,340 | 30,115,596 | 34,650,936 | 2,163,165 | 11,204,888 | 13,368,053 |
| 1943 | 4,297,047 | 34,937,420 | 39,234,467 | 1,664,011 | 10,677,563 | 12,341,574 |
| 1944 | 5,006,154 | 34,350,852 | 39,357,006 | 1,432,947 | 10,671,004 | 12,103,951 |
| 1945 | 4,453,135 | 35,361,199 | 39,814,334 | 1,785,954 | 10,524,162 | 12,310,116 |
| 1946 | 4,984,310 | 37,665,221 | 42,649,531 | 2,037,739 | 12,202,521 | 14,240,260 |
| 1947 | 7,741,573 | 47,598,053 | 55,339,626 | 2,093,250 | 14,388,668 | 16,481,918 |
| 1948 | 9,483,247 | 64,255,320 | 73,738,567 | 2,885,008 | 17,399,474 | 20,284,482 |
| 1949 | 8,234,870 | 77,701,608 | 85,936,478 | 2,711,094 | 19,074,254 | 21,785,348 |
| 1950 | 9,330,776 | 89,850,416 | 99,181,192 | 2,674,961 | 26,809,793 | 29,484,754 |

*Includes 58,279 pounds of Moistureproof not reported separately in 1927.

338. The important protective quality of cellophane, resistance to transmission of moisture vapor,[805] was confined in the years 1929–1946 to products falling within the claims of duPont's United States product patent No. 1,737,187,[806] validity of which is conceded.[807]

339. Moistureproof cellophane in the period subsequent to its commercial introduction in 1927 made the buying public package conscious and its growth stimulated use of light weight papers. Cellophane sales increased from about 28,000,000 pounds in 1931 to approximately 204,000,000 pounds in 1948, while during the same period the total sales of packaging papers, cellophane and other films together, rose from 300,000,000 pounds to approximately 1,500,000,000 pounds.[808]

XI. DuPont Did Not Engage in Predatory Practices as Alleged.

A. DuPont's decisions as to changes in its capacity were made on the basis of business considerations, and not to suppress competition or to create artificial shortages.

(Findings 340–353)

340. DuPont expanded cellophane capacity to meet reasonably foreseeable demand.[809] In most cases sales achieved

805. Leinbach, Tr. 6784.

806. DX 306, p. 588, 1/9/30. W. W. Smith, Tr. 6514–15.

807. Minicus, Tr. 6960–62.

808. GX 583 (Imp.Doc.No.39), p. 1, 5/16/49.

809. GX 419, pp. 5633–35, 2/13/29. GX 424, pp. 5646–47, 5/8/39. GX 125, pp.

were in excess of the amount forecast at the time of plant expansion.[310]

Capacity was not expanded with the purpose of stifling competition, creating excess capacity to overhang the market, or forestalling potential competitors.[311]

341. DuPont's plant expansions have been based on range estimates of possible sales. Projects for expansion are prepared and submitted to management stating reasons in support. These reasons have not included forestalling competitors.[312]

342. DuPont expanded its capacity for cellophane when it had more business than it could supply and forecasted additional business in the future. Expansion was not undertaken with idea of obtaining any predetermined percentage of domestic cellophane production or of the flexible packaging market.[313]

343. Most of the increase in duPont's capacity to produce cellophane has resulted from improved efficiency of manufacturing with existing equipment rather than installation of new plant.[314] Better efficiency resulted in increased output per unit of existing plant.[315]

344. In determining whether to expand duPont followed business methods. It considered estimates of sales in the next few years, and the relation between the estimated cost of expanding production and the revenue from the projected increased output.[316] The effect of the expansion on the entry of other manufacturers of cellophane was not a principal factor in duPont's decision to expand.[317]

345. Plaintiff conceded duPont's expansion of productive capacity was not illegal.[318]

346. DuPont has never sought to create a shortage of cellophane and has not closed down plant nor taken any other action with the intention of creating a shortage.[319]

For ten years before 1941, duPont production increased at the compound rate of 15% [320] and in March 1941 its eight machine Clinton #1 plant came into production.[321]

Production of both duPont and Sylvania was curtailed during World War II as the result of Government action to preserve manpower and raw materials. Supply available for civilian consumption was further curtailed by use of cellophane for war purposes, and by Governmental limitations on the use of cellophane.[322]

Cellophane plants could not be built during the war. Work on duPont's Clin-

426–28, 9/1/43. GX 132, p. 435, 4/25/45. GX 109, pp. 403–05, 11/15/45. GX 114, pp. 412–14, 1/11/46. DX 372, p. 695, 6/27/47. Yerkes, Tr. 6948. McCune, Tr. 5585, 5589. See also DX's 602–620.

810. Compare GX 395, p. 5488, 5/15/50 with exhibits, note 1, supra.

811. DX 598, p. 1214, 1951. DX 610, p. 1243, 4/19/38. Yerkes, Tr. 6949–50. Carpenter, Tr. 6282–83. McCune, Tr. 5589–90, 5592–96.

812. McCune, Tr. 5585, 5589–90, 5594–96.

813. Yerkes, Tr. 6948.

814. McCune, Tr. 5548, 5586. DX 386. Compare GX 393, p. 5476 and GX 394, p. 5482.

815. McCune, Tr. 5539–48, 5578. DX 386.

816. GX 417, p. 5628, 2/29/28. GX 415, pp. 5623–26, 5/4/28. GX 418, pp. 5629–32, 5/12/28. GX 419, pp. 5633–35,

2/13/29. GX 420, pp. 5636–37, 3/21/29. GX 421, pp. 5638–40, 6/29. GX 455, pp. 5885–89, 4/21/30. GX 125, pp. 426–28, 9/3/43. GX 150, pp. 463–65, 2/2/45. GX 98, pp. 386–87, 3/29/45. GX 132, p. 435, 4/25/45. GX 109, pp. 403–04, 11/15/45. GX 114, pp. 412–14, 1/11/46.

817. GX 424, p. 5647, 5/8/39. GX 425, pp. 5648–54, 5/8/39. GX 96, pp. 383–84, 2/29/45. GX 99, p. 388, 5/10/46. McCune, Tr. 5589–90, 5592–96. Yerkes, Tr. 6943, 6949–50.

818. Minicus, Tr. 1493.

819. McCune, Tr. 5596–97. Yerkes, Tr. 6949.

820. GX 125, p. 426, 9/1/43.

821. Answer, Para. 17. GX 32, p. 154, 8/23/44.

822. GX 88, p. 339, 3/10/47. GX 84, pp. 320–21, 3/1/43. GX 393, p. 5476, 5/15/50 GX 410, 5592. GX 32, p. 153, 8/23/44.

ton #2 plant commenced almost immediately after V-J Day, and it began production in February 1947.[823]

347. In May, 1942, the Governmental restrictions on the use of cellophane had caused demand to drop to the extent duPont had twenty casting machines idle.[824] It decided to close down Buffalo #1 plant, consisting of eight casting machines.[825] Thereafter at plaintiff's request and pursuant to a contract with plaintiff, the plant was converted to production of rayon tire yarn.[826] It has never been reconverted to cellophane manufacture.

348. During World War II, war uses took an increasing percentage of duPont's cellophane output. This percentage rose steadily from 1941 to a high of about 75% of all duPont cellophane by 1945.[827]

349. Since World War II, there has been expansion in packaging, particularly in consumer size units, and hence increase in demand for flexible packaging materials.[828] Producers of such materials, including cellophane producers, have increased their capacity, but have been unable to satisfy the demand except for a period during 1949 and a period commencing January 1, 1952.[829] Demand for cellophane has exceeded supply not only in the United States, but also in Europe and South America.[830]

350. Waxed paper, glassine and flexible packaging materials were, like cellophane, in short supply during World War II, and in postwar years. Occurrence of periods of relatively free supply of cellophane in 1949 and 1952 coincided with similar periods of relatively free supply of other flexible packaging materials.[831]

351. In 1952 all flexible packaging materials except polyethylene were in free supply, and waxed paper, glassine and cellophane were considerably undersold.[832] At that time, duPont was operating its cellophane productive facilities at approximately 72% of capacity.[833]

352. During periods when demand for cellophane was greater than ability of producers to supply, duPont has lost business and has been hampered in its competition with other flexible packaging materials.[834] When cellophane has

823. DX 615, pp. 1255–56, 11/4/44. DX 617, p. 1258, 9/21/45. Answer, Para. 17.

824. GX 32, p. 154, 8/23/44.

825. GX 32, p. 155, 8/23/44. GX 394, p. 5482, 5/15/50.

826. GX 32, pp. 153–61, 8/23/44. GX 394, p. 5482, 5/15/50. Yerkes, Tr. 6950.

827. GX 87, p. 336, 1/46. GX 6002, pp. 8130, 8132, 6/8/51.

828. Leeds, DX 1011, pp. 93–94. Tindal, DX 1012, p. 119. Ellies, DX 1014, p. 134. McCurry, DX 1016, pp. 214, 218–22. Ramsay, DX 1017, pp. 233–34. Elmstrom, DX 1019, p. 290. Nelson, DX 1020, p. 326. Croy, DX 1021, pp. 343–44. GX 6002, Book 45, pp. 8116–21, 6/8/51.

829. GX 581, p. 7338, 9/50. GX 573 (Imp. Doc.No.13), 1/26/51. DX 596, p. 1167, 4/7/50. Leeds, DX 1011, p. 100. Ellies, DX 1014, p. 144. Goland, DX 1015, pp. 181, 190. Ramsay, DX 1017, p. 246. Hanson, DX 1018, p. 256. Nelson, DX 1020, p. 326. R. R. Smith, Tr. 6003. Leinbach, Tr. 6775, 6777–78.

830. GX 88, p. 343, 3/10/47. GX 445, p. 5823, 1/48. DX 592, p. 1130, 1946. DX 371, p. 693, 2/7/47. DX 595, pp. 1151–52, 1/49.

831. *Cellophane:*
R. R. Smith, Tr. 6003. Hanson, DX 1018, p. 256.
*Glassine & greaseproof:*
Leinbach, Tr. 6775, 6777–78.
*Glassine:*
Leeds, DX 1011, p. 100. Goland, DX 1015, pp. 181, 190.
*Wax paper and glassine:*
Ramsay, DX 1017, p. 246. Nelson, DX 1020, p. 326.
*Pliofilm:*
Ellies, DX 1014, p. 144.
*Cellophane, glassine, wax paper, foil, etc.:*
GX 581, p. 7338, 9/50. GX 573 (Imp. Doc.No.13), 1/26/51. DX 596, p. 1167, 4/7/50.

832. Leeds, DX 1011, p. 100. Ramsay, DX 1017, p. 246. Nelson, DX 1020, p. 326. Goland, DX 1015, pp. 181, 190–91. Leinbach, Tr. 6777. Martin, Tr. 6459. R. R. Smith, Tr. 5761, 5980, 6003.

833. R. R. Smith, Tr. 5845.

834. R. R. Smith, Tr. 5759, 5880–81. Leinbach, Tr. 6783–84.

been in free supply as it was during 1949 and is now,[835] duPont has been unable to regain some of the business it lost during the shortage periods.[836]

353. During the postwar period the demand for cellophane was greater than at any previous time, owing to the increase in packaging for self-service supermarkets, then in their greatest period of growth.[837] During this period cellophane prices have more closely approached those of waxed paper and glassine than at any previous time.[838]

**B. Potential competitors were not excluded.**

**(Findings 354–388)**

354. No proof was presented any person failed to manufacture cellophane as the result of any act done by duPont.

355. There is no proof there has been any potential competitor who desired to manufacture cellophane and did not do so.

356. There is no proof duPont possesses power to exclude potential competitors who may desire to manufacture cellophane.

357. DuPont employed lawful business methods in attempting to keep apprised of competitive developments [839] and did not attempt to stifle competitors.[840]

358. No evidence was offered any potential competitor was excluded from manufacture of cellophane as a result of duPont's size or prestige in the chemical industry. Sylvania is the largest producer of viscose rayon in the United States with assets of at least $165,000,-000.[841] Olin Industries, another cellophane manufacturer, has assets of approximately $180,000,000.[842] Other concerns with substantial assets have been engaged in the manufacture of competing flexible packaging materials, such as Pliofilm, foil and papers.[843]

359. DuPont did not suppress potential competition by Rayonier in the manufacture of cellophane.[844]

360. Rayonier is a wood pulp manufacturer and supplies wood pulp to duPont, among others.[845] The wood pulp it manufactured before 1930 was unsatisfactory for the manufacture of cellophane or rayon.[846] An agreement was entered into between duPont and Rayonier on September 27, 1930 under which Rayonier for a fee received substantial secret information and technical assistance from duPont, which enabled Rayonier to produce a satisfactory dissolving pulp for rayon and cellophane manufacture.[847] The fee was modest in comparison to the essential assistance given under this agreement.[848] Improvements in Rayonier's pulp resulting from the technical assistance by duPont were made available to many other rayon or cellophane manufacturers, including Sylvania.[849]

361. DuPont has bought wood pulp for cellophane manufacture in substantial quantities from many suppliers other than Rayonier,[850] and there is wood pulp

835. R. R. Smith, Tr. 5761. Martin, Tr. 6759.

836. R. R. Smith, Tr. 5761, 5998–99.

837. GX 6002, pp. 8116–21, 6/28/51. DX 595, pp. 1149–51, 1949. DX 596, p. 1170, 4/7/50. Horn, DX 1010, pp. 66, 76.

838. DX 994.

839. Yerkes, Tr. 6951.

840. Yerkes, Tr. 6956–57.

841. DX 538, p. 994, 1951. DX 983 (Moody's Industrials, 1950).

842. Olsen, Tr. 6909–10. DX 983, supra.

843. DX 983, supra.

844. Pickens, Tr. 6128, 6152–53.

845. DX 622, p. 1266, 1951. Pickens, Tr. 6129–30, 6107.

846. Pickens, Tr. 6111. GX 4008, p. 3714, 9/27/30.

847. GX 4448, p. 6211, 1/10/40. DX 633, p. 1289, 11/2/38. Pickens, Tr. 6114–17.

848. Pickens, Tr. 6132, 6138.

849. DX 633, p. 1289, 11/2/38. Pickens, Tr. 6130, 6149.

850. DX 622, p. 1266, 1951. Haley, Tr. 4789. Pickens, Tr. 6107.

available for all cellophane manufacturers.[851]

362. Rayonier did not desire to enter into the business of manufacturing cellophane.[852]

363. The 1930 contract between du-Pont and Rayonier expired in September 1945.[853] There is no proof either party has any intention to extend it, or there were any understandings extended beyond the expiration of the contract.

364. The 1930 contract between du-Pont and Rayonier did not exclude Rayonier from the manufacture of cellophane.[854]

365. DuPont did not suppress competition by Visking Corporation in the manufacture of cellophane. DuPont has never had a contract, arrangement or understanding with Visking which would have prevented Visking from manufacturing and selling cellophane,[855] provided duPont patents were not infringed.

366. Visking never desired to enter cellophane business. It was interested in the manufacture of cellulose sausage casings.[856]

367. DuPont acquired certain Cohoe patents in 1923 which covered the use of glycerine as a softening agent in the manufacture of cellulose sausage casings, and were of interest to duPont because of their possible relevance to the use of glycerine in the manufacture of cellophane.[857]

368. In connection with experimental work on cellulose sausage casings one Freund discovered he could not manufacture these casings without infringing the Cohoe patents acquired by duPont. He asked duPont for a license under these patents. DuPont agreed in 1925 to license the patents and its technical information pertinent to cellulose casing manufacture to a company to be formed by Freund. As payment it received 40% of the common stock in the company, Visking Corporation.[858]

369. Under the agreements of October 20 and December 31, 1925 between duPont and Visking, duPont licensed to Visking patents and technical information for the manufacture of cellulose sausage casings and in return became entitled to Visking's technical information and patents as to cellophane sheeting.[859] No limitations prevented Visking from making cellophane if it used its own patents and information, but it was barred from using duPont patents and information for that purpose.[860] There were no understandings between the parties outside the contract.[861]

370. By rendering financial, managerial and technical assistance to Visking, duPont helped to organize that Company and to develop it into a growing and profitable business.[862] Visking regarded duPont's technical and managerial assistance as very valuable.[863]

371. The agreements of October 20 and December 31, 1925 between Visking and duPont were cancelled as of January 25, 1945. There is no proof this cancellation was anything other than bona fide or there were any understandings which extended beyond termination of the contracts.[864]

851. Olsen, Tr. 6831. GX 594, p. 7553, 9/28/48.

852. Pickens, Tr. 6153.

853. GX 4008.

854. Pickens, Tr. 6153.

855. Yerkes, Tr. 6954. DX 644, p. 1305, 1/26/31.

856. Yerkes, Tr. 6953–54. GX 594, p. 7546, 12/14/49.

857. GX 4442, p. 6199, 10/29/23. DX 643, p. 1302, 9/23/24. Yerkes, Tr. 6952.

858. DX 645A, p. 1327, 5/25/42. Yerkes, Tr. 6952. GX 4089, p. 3827.

859. GX 4089, pp. 3827–34, 10/20/25. GX 4090, pp. 3835–37, 12/31/25. GX 4091, pp. 3838–40, 12/31/25. DX 645A, pp. 1323–38, 5/25/42.

860. DX 644, p. 1305, 1/26/31.

861. Yerkes, Tr. 6954.

862. DX 645, pp. 1327, 1328, 5/25/42. DX 656, p. 1353, 6/12/47.

863. DX 645, pp. 1327, 1328, 5/25/42.

864. GX 4129, p. 3898, 1/25/45. DX 657, p. 1354, 4/30/46.

372. DuPont sold all its stock in Visking prior to the filing of the complaint in this action.[865]

373. Representatives of Visking Corporation in June 1948 conferred with duPont with respect to its offer to license its cellophane patents and technology, and arrangements were made for the Visking people to visit a duPont plant to obtain a visual concept of cellophane manufacture.[866] Visking made no proposal to accept duPont's offer.[867]

374. DuPont never entered into any agreement that had the intent of suppressing potential competition from American Viscose, which is now duPont's principal cellophane competitor in the United States.[868]

375. DuPont entered into a contract with British Cellophane, Ltd. in 1935 regarding the exchange of secret technical information.[869] In this agreement it took normal precautions against disclosure of such information to parties not authorized to receive it under the agreement, including shareholders of BCL.[870] One effect of this provision against disclosure of secret data to unauthorized parties was such information could not be passed on to American Viscose by British Cellophane, Ltd. through their common shareholder, Courtaulds, Ltd.[871]

376. The 1935 agreement regarding the exchange of secret technical information between duPont and British Cellophane, Ltd. did not exclude American Viscose from entering the cellophane business in the United States.[872]

377. DuPont and Union Carbide & Carbon Co. never had an agreement they would not compete with each other as to cellophane, glycol cellulose film, or any other kind of flexible packaging material. Likewise, Carbide was not influenced by duPont not to compete with duPont in the manufacture and sale of cellophane. On the contrary, anyone in the Carbide organization suggesting such an understanding would have been discharged.[873]

378. Union Carbide & Carbon Company today manufactures flexible packaging materials which compete with cellophane, including vinylite sheeting and polyethylene.[874]

379. Union Carbide & Carbon Co. never considered engaging in the manufacture and sale of cellophane.[875]

380. A process for manufacturing glycol cellulose film was acquired by Union Carbide & Carbon Co. from another company which had developed it. Carbide engaged in research and experimental work using glycol cellulose film as a packaging material, but never manufactured it on a commercial scale.[876]

381. Because of its desire to sell raw materials important to the manufacture of glycol cellulose film, Union Carbide & Carbon Company sought to interest duPont, Sylvania, Goodyear Tire & Rubber Co., Marathon Corp., Olin Industries and Industrial Rayon Co. in the manufacture of glycol cellulose film.[877] Both duPont and Sylvania conducted experiments in cooperation with Carbide with respect to manufacture of glycol cellulose film.[878] DuPont concluded it was not interested in manufacture of that product and so informed Carbide.[879]

865. DX 656, p. 1353, 6/12/47.

866. DX 596, pp. 7564-65, 6/4/48.

867. GX 594, p. 7546, 12/14/49.

868. Reichel, Tr. 6046-47. Yerkes, Tr. 6956.

869. GX 1109, pp. 1230-35, 5/17/35.

870. GX 1109, p. 1232, 5/17/35. GX 4454, p. 6225, 5/25/34.

871. GX 1109, p. 1232, 5/17/35.

872. GX 1109, pp. 1230-35, 5/17/35.

873. Davidson, Tr. 5866-68.

874. Davidson, Tr. 5868-69.

875. Davidson, Tr. 5872.

876. Davidson, Tr. 5850-53, 5876.

877. DX 639, p. 1298. Davidson, Tr. 5859-60.

878. Davidson, Tr. 5856-58.

879. DX 638, p. 1297, 1/6/34. DX 641, p. 1300, 11/22/34.

Other concerns approached by Carbide took the same position, and none ever made the film.[880]

382. When unable to interest other companies in manufacturing glycol cellulose film, Carbide decided not to make that film for reasons, including the high manufacturing cost, and the Dreyfus patent, which was controlled by one of the Celanese companies and did not expire until 1941. Controlling factor was Carbide then was the only manufacturer of ethylene oxide in the world and the market for it was expanding. It decided to continue to concentrate on the profitable manufacture of this chemical rather than to invest millions in a field involving mechanical operations with which Carbide was not familiar. The only raw material manufactured by Carbide used in making glycol cellulose was ethylene oxide, which comprised only about 6% to 8% of the raw material required for glycol cellulose film manufacture. Carbide is not interested in operating manufacturing processes unless it makes 75% to 90% of the raw materials required for manufacture of the final product.[881]

383. DuPont made no attempt to prevent Union Carbide & Carbon Company from manufacturing either cellophane or glycol cellulose film,[882] and no action of duPont had the effect of excluding Union Carbide & Carbon Company from such manufacture.[883]

384. DuPont had no patents that would have prevented Union Carbide & Carbon Company from manufacturing glycol cellulose film.[884] DuPont had opportunity to buy certain Lilienfeld patents relating to glycol cellulose, but declined to do so despite a belief Carbide was interested in the patents for their relation to glycol cellulose film.[885]

385. Goodyear Tire & Rubber Company did not consider the manufacture of cellophane before late 1948. At duPont's invitation, it investigated the advisability of entering cellophane manufacture, obtained information from duPont and decided not to engage in cellophane manufacture, but to use its funds available for expansion in fields with which it was familiar.[886]

386. There is no proof any of the following companies ever attempted or desired to engage in the manufacture in the United States of plain cellophane or of moistureproof cellophane.

Rayonier, Inc.
Skenandoa Rayon Co.
Industrial Rayon Co.
Union Carbide & Carbon Corp.
Marathon Corp.
Goodyear Tire & Rubber Co.
Eastman Kodak Company
Monsanto Chemical Company
Transparent Package Company

387. DuPont is a corporation engaged in the chemical industry,[887] and manufactures a variety of products. There is no proof the size of duPont or its manufacture of numerous products has had any influence whatever in the decision of third parties not to engage in cellophane manufacture.

388. There is no proof of the extent of duPont's diversification of chemical products, no proof such diversification as exists has had any effect upon the volume of duPont's sales of cellophane or upon the entry of any concern into the manufacture of cellophane, and no proof such diversification as exists has developed domestic or international affiliations that were not obtainable by other corporations.[888]

880. Davidson, Tr. 5859–60.

881. Davidson, Tr. 5860–63.

882. Davidson, Tr. 5866–67, 5878. DXs 635–41, pp. 1292–1300.

883. Davidson, Tr. 5867–68.

884. Davidson, Tr. 5863.

885. DX 636, p. 1294, 7/7/33. DX 637, pp. 1295–96, 7/10/33.

886. Ellies, DX 1014, pp. 146–47. GX 594, p. 7546, 12/14/49.

887. Answer, Par. 31.

888. Complaint and Answer, Par. 31.

### C. Distribution outlets were not controlled.

### (Findings 389–455)

389. There is no proof as to the number of companies in the United States that engage in the conversion of cellophane.

390. There is no proof of the number of marketing outlets to which cellophane is sold.

391. Sylvania[889] and later Olin[890] had no difficulty in obtaining adequate numbers of converters. Some of Sylvania's converters sold only Sylvania cellophane and others sold both duPont and Sylvania.[891] Sylvania preferred to sell to direct users rather than to converters because of the functional discounts always given converters.[892] Sylvania refused to sell to numerous converters who sought to purchase cellophane from it.[893]

392. Sylvania's dollar sales to converters increased about five-fold from 1935 to 1948. In 1935 there were only ten or twelve recognized cellophane converters. By the end of 1939, Sylvania was selling to 26 converters and by 1948 it was selling to 93 converters. Converters were the second largest sales outlet of Sylvania in the 1935–39 period, constituting less than 20% of Sylvania's sales. This figure rose to 28.8% in 1941 and 32.5% in 1948. Dollar sales to converters increased from $1,150,000 in 1935 to $2,200,000 in 1939, $3,800,000 in 1941, and $6,800,000 in 1948.[894]

393. DuPont has never engaged in the conversion of cellophane.[895] It promoted conversion by independent companies by furnishing encouragement, sales assistance and technical assistance.[896]

394. DuPont prior to World War II had a program of selecting converters to which it would sell. Policy was adopted to enable cellophane, which was a high priced patented product, to fight paper for the business of flexible packaging purchasers.[897]

395. Sylvania, as well as duPont, had a selective converter policy.[898]

396. DuPont's selective program in selling converters was to get the special type of selling that was needed to foster cellophane sales.[899] The number of converters was increased as requirements changed.[900] Each application to purchase duPont cellophane for conversion was considered on its merits[901] and duPont's converter distribution was expanded with the growth of the markets to which cellophane could be sold.[902]

397. When duPont commenced the manufacture of cellophane in the United States no one in the United States was engaged in the conversion of cellophane.[903] The first domestic bag manufacture began as a hand operation in a single size in 1925,[904] and printing of cellophane began in 1927.[905]

398. Conversion of cellophane is a highly specialized operation. The successful converters of cellophane are those

889. Reichel, Tr. 6048. DX 550, p. 1055, 10/15/40. DX 551, p. 1060, 4/29/42. GX 414, pp. 5618–20.

890. Olsen, Tr. 6830–31.

891. Reichel, Tr. 6048. GX 5038, pp. 4517–20, 1942.

892. Reichel, Tr. 6049.

893. See, e.g., Goland, DX 1015, pp. 185–86. Leeds, DX 1011, p. 80.

894. GX 564, p. 8079, 8/31/49. GX 414, pp. 5615, 5618–22.

895. DX 483, p. 918, 10/15/40.

896. Martin, Tr. 6328, 6360–63. Leeds, DX 1011, pp. 80–85.

897. GX 5047, p. 4559, 4/28/41.

898. GX 5047, p. 4561, 4/28/41.

899. GX 5047, p. 4559, 4/28/41.

900. GX 5047, supra, p. 4570.

901. GX 5047, supra, pp. 4566, 4571.

902. GX 5047, supra, p. 4560.

903. GX 5046, p. 4555, 11/5/40. DX 444, p. 871, 11/20/24. Hanson, DX 1018, p. 251.

904. DX 446, p. 874, 7/23/25.

905. DX 449, p. 878, 6/20/27.

who over a long period of growth developed improvements, efficiency and technical competence. There are ample converting facilities to meet requirements for converted cellophane.[906]

399. Companies which have grown to be important converters of cellophane, such as Shellmar Products Corp., Dobeckmun Company and Milprint, Inc., were small organizations when duPont persuaded them to undertake conversion of cellophane. Shellmar and Dobeckmun were not even in business when duPont began seeking converters, and Milprint was a small glassine converter.[907] There were many large and strong companies engaged in the conversion of waxed paper and glassine.[908] Most successful converters of cellophane achieved their position by hard work and creative selling, growing from quite insignificant companies to important factors in all types of flexible packaging.[909]

400. The number of converters purchasing from duPont has increased. From 1940 through 1944 the number of converters purchasing from duPont increased from 35 to 80.[910] Similarly, the number of concerns engaging in the conversion of duPont cellophane has increased since 1945.[911]

401. Due to shortage of cellophane duPont did not sell to new customers for conversion immediately following World War II. It had a broad policy of aiding veterans and set up allotments of cellophane for them if they desired to enter converting. Since duPont believed the excess of demand for converted cellophane over supply was due to shortage of cellophane production rather than any inadequacy of installed converting equipment, it also advised veterans of these facts and some other business would probably give better chance of success.[912]

402. Converters of cellophane seek business on the basis of quality, price and service.[913] Between cellophane converters there has been no uniformity of price as to cellophane wraps or as to other wraps. Ordinarily a customer can buy any particular bag or wrap from more than one converter, and often purchases both cellophane and other wrapping materials from the same converter.[914]

403. DuPont has not attempted to control the territory in which a converter sells products made of duPont cellophane,[915] the prices at which the converters sells such products,[916] or the converted products it will make.[917]

404. During the period December 1938—January 1, 1947 duPont classified converters purchasing from it as "promotional" and "regular".[918] DuPont's prices were identical to both classes and both sales and technical service were rendered by duPont to both classes.[919] Promotional converter contract in effect during this period provided for exclusive purchases from duPont of the converter's requirements of cellophane, while the

906. GX 5357, p. 5161, 3/46. GX 5368, p. 5174, 6/20/46. Hanson, DX 1018, pp. 248, 251. Martin, Tr. 6371–72.

907. Martin, Tr. 6328–34. Hanson, DX 1018, pp. 247–48, 251.

908. Nelson, DX 1020, p. 301. Croy, DX 1021, p. 333. Martin, Tr. 6397.

909. Martin, Tr. 6325–34, 6397–98. Hanson, DX 1018, pp. 247–255.

910. GX 5046, p. 4555, 11/5/40. GX 5531, p. 6328, 12/31/44.

911. DX 437, pp. 853–54, 1948. Goland, DX 1015, p. 190. Martin, Tr. 6371.

912. GX 5357, pp. 5161–62, 3/8/46. GX 5370, p. 5177, 6/28/46. GX 5368, pp. 5174–75, 6/20/46.

913. Goland, DX 1015, p. 189. Leeds, DX 1011, p. 87. Elmstrom, DX 1019, pp. 283–84.

914. Elmstrom, DX 1019, pp. 283–84.

915. Hanson, DX 1018, p. 260. Ramsay, DX 1017, p. 244. Leeds, DX 1011, p. 88. Goland, DX 1015, p. 189.

916. Hanson, DX 1018, p. 260, 265. Ramsay, DX 1017, p. 244. Leeds, DX 1011, p. 88.

917. Hanson, DX 1018, p. 265. Ramsay, DX 1017, p. 244.

918. GX 5041, p. 4530, 5/26/42. DX 437, p. 853, 1948.

919. DX 455–490, pp. 887–925. GX 5041, p. 4530, 5/26/42.

contract with a regular converter contained no such provision.[920]

405. DuPont's exclusive contracts with certain so-called "promotional converters" which were in effect during the period 1938–1947 were subject to termination on 30 days' notice by either party.[921]

406. Despite existence of requirements contracts between "promotional converters" and duPont, during the period 1938–1947, converters considered themselves free to purchase cellophane from Sylvania. Milprint purchased from Sylvania in 1944 and at other times.[922] Shellmar purchased from Sylvania at various times prior to 1945, and in 1945 commenced purchasing a considerable percentage of its requirements from Sylvania. [923]

407. DuPont's salesmen called upon end users of converted cellophane. DuPont's purpose in developing converters was to promote usage of cellophane. DuPont encouraged converters to specialized promotion of cellophane and sought to develop business for converters. The intent of these efforts was not to control outlets for cellophane, but to get better distribution of the product.[924]

408. DuPont's policy was a user of cellophane would receive support regardless of whether it purchased direct from duPont or purchased converted film from converters.[925] DuPont salesmen carried samples of converted cellophane and used them in their sales efforts.[926] When a customer preferred printed cellophane or bags, he was referred to converters who could fulfill his desires.[927] DuPont preferred the cellophane used to manufacture the converted items to fill such referred orders be duPont cellophane.[928]

409. Milprint, earliest and now one of the important converters of cellophane, has been treated no better than duPont's other customers. It was treated fairly in its allocation during shortage periods but was not favored, and has not been favored in price, or in quality or volume of service rendered.[929]

410. DuPont has not protected its original converters or more important converter customers from competition by other converters. New converters of duPont cellophane have constantly come into being.[930]

411. DuPont promoted use of package machinery and bag making machines by cellophane customers. DuPont did not centralize all business for bags or other processed cellophane in the hands of converters.[931]

412. Converters such as Shellmar and Milprint broadened the sales of cellophane by promotional selling. Such selling involves persuading a customer to adopt a new type of package that will increase sales and give his product the protection it requires.[932]

413. DuPont continued to encourage small organizations that began converting operations. Technical and sales assistance furnished by duPont to these converters was essential to their growth. DuPont's assistance to them included reference of customers, joint calls of duPont salesmen with converter salesmen,

920. GX 5047, p. 4569, 4/28/41.

921. GX 5204, Para. 8, p. 4903, 12/1/38. GX 5378, Para. 6, p. 5188, 5/13/42. GX 5379, p. 5193, 2/19/46. GX 5380, p. 5194, 3/4/46.

922. Hanson, DX 1018, pp. 255, 259–60.

923. Martin, Tr. 6364, 6397.

924. DX 440, p. 858, 5/8/36. DX 441, p. 860, 4/30/41. DX 442, p. 865, 2/22/43. GX 5047, p. 4564, 4/28/41.

925. DX 438, p. 855, 11/16/28. DX 485, p. 920, 6/23/41.

926. DX 439, pp. 956–57, 1/8/31.

927. DX 438, p. 855, 11/16/28. DX 439, pp. 956–57, 1/8/31. DX 440, pp. 858–59, 5/8/36.

928. DX 438, p. 855, 11/16/28.

929. Hanson, DX 1018, pp. 260, 267.

930. Martin, Tr. 6371–74. DX 437, pp. 853–54, 1948. Goland, DX 1015, p. 190.

931. DXs 410–435, pp. 810–45.

932. Martin, Tr. 6340–41. Hanson, DX 1018, p. 255.

market surveys, training salesmen and solution of technical problems.[933]

414. DuPont furnished assistance to regular converters, as well as to promotional converters. Examples of such service to regular converters are advice as to packaging machinery,[934] chemical tests on materials,[935] results of market research,[936] sales literature,[937] manuals as to packaging, and consumer advertising.[938]

415. The one year contracts in effect between duPont and fabricators who purchased some cellophane from it were not requirements contracts.[939] There is no proof any fabricator who was a party to such a contract in fact bought cellophane only from duPont.[940]

416. As of January 1, 1947 duPont terminated all purchase contracts with converters and fabricators, and the only contractual relations since that time have consisted of routine individual orders.[941]

417. Plaintiff conceded duPont did not fix or control prices charged by converters,[942] and duPont did not attempt to fix such prices.[943]

418. Competition for the business of cellophane users has been active between converters of duPont film and converters of Sylvania film.[944] Shifts of business were frequent.[945] Daniels Manufacturing Co., an important Sylvania converter, dominated sale of converted cellophane

to the meat industry for years,[946] although converters of duPont cellophane were also selling that industry.[947] Recently, converters of duPont cellophane have been able to capture from Daniels amounts of the meat industry business for converted cellophane.[948]

419. Prior to January 1, 1947, duPont had cumulative annual quantity discounts for different classes of customers.[949] There is no proof these discounts tended to lessen competition at either buyer's level or seller's level.

420. Plaintiff conceded it could offer no evidence any duPont quantity discounts caused any restriction on Sylvania's production or sales.[950]

421. There is no proof duPont's quantity discount was ever the factor in an order by a purchaser or the decision to purchase from duPont was not determined by duPont's quality of cellophane.

422. Sylvania had no understanding with duPont as to quantity discount schedules.[951]

423. Prior to 1936, duPont had quantity discounts to converters.[952] When the Robinson-Patman Act, 15 U.S.C.A. § 13 et seq., was passed these discounts were reviewed by duPont's Legal Department.[953] Quantity discounts to converters were continued until 1938, when they were terminated on the advice of the

933. Leeds, DX 1011, pp. 83–85. Goland, DX 1015, pp. 187–89.

934. DX 466, p. 901, 12/26/45.

935. DX 468, p. 903, 10/20/47.

936. DX 470, p. 905, 1/24/40. DX 472, p. 907, 4/26/40. DX 477, p. 912, 5/26/41.

937. DX 474, p. 909, 4/18/41.

938. DX 471, p. 906, 1/24/40. DX 473, p. 908, 10/4/40. DX 479, p. 914, 6/20/44.

939. GX 5404, p. 5249, 1/31/40. GX 5417, p. 5273, 10/1/41.

940. Compare GX 5417, supra, and GX 414, p. 5619. (Dobeckmun purchases in 1942.)

941. GX 5034, p. 4506, 12/4/46. DX 437, p. 853, 1948.

942. Minicus, Tr. 1970.

943. DX 443, p. 869, 6/7/40. Hanson, DX 1018, p. 260. Leeds, DX 1011, p. 88. Ramsay, DX 1017, p. 244. Martin, Tr. 6374.

944. DX 545, p. 1037, 2/25/36.

945. GX 80, pp. 295–96, 2/9/40. GX 81, p. 307, 1941. Leeds, DX 1011, p. 80.

946. GX 82, p. 312, 1942.

947. GX 443, p. 5798, 1/29/35.

948. Leeds, DX 101, p. 87.

949. Answer, Para. 36. GX 5034, p. 4503, 11/6/45.

950. Renninger, Tr. 3557.

951. Reichel, Tr. 6098.

952. GX 5520, p. 6298, 10/27/36.

953. GX 470, p. 5946, 9/17/36. GX 5520, p. 6298, 10/27/36.

Legal Department.[954] In that year, duPont classified processors of cellophane for resale as converters and fabricators.[955] A 3% functional discount was established for fabricators[956] and continued until January 1, 1947, when discount to fabricators was terminated.[957] Converters were classified in 1938 as "promotional" or "regular", with the same functional discounts applicable to purchases by both.[958] In 1938 functional discount to converters was established at 7½% off list, plus an allowance of one-half the cost of approved advertising up to 2½% of purchases.[959] In November 1941, functional discount to all converters was changed to 10% off list, and the advertising allowance eliminated. It continued until January 1, 1947 when it was lowered to 7½%.[960] DuPont's converter discount was lowered to 5% on August 1, 1948, and raised to 7% on October 1, 1950, where it remained.[961]

424. Plaintiff does not contend quantity discounts paid by duPont to converters, which were terminated in 1938, violated the Robinson-Patman Act.[962]

425. DuPont classifies as a converter one who processes cellophane for resale. Converting activities include printing, bag making, laminating, etc. DuPont classifies as a fabricator one who processes cellophane for resale to produce a product not used as primary packaging material, such as drinking straws, ornaments, pressure sensitive cellulose tape, ribbon, bonbon cups, etc.[963]

426. DuPont's classification of processors of cellophane for resale as converters and fabricators was made with advice of counsel, and different functional discounts to the two classes were approved on the basis of absence of competition between the two classes.[964]

427. There is no proof duPont's classification of its customers as direct and indirect, or its sub-classification of indirect customers as converters, fabricators, industrial users, jobbers and agents was made with any intent to obtain control over its customers.

428. There is no proof any converter, fabricator, industrial user or distributor of cellophane ever purchased cellophane from duPont rather than from Sylvania as the result of any functional discount allowed by duPont to any class of purchaser.

429. Purchasers from duPont who bought cellophane for converter purposes and for fabricator purposes were allowed the discount granted other converters only on that portion of film purchased for conversion, and the discount allowed other fabricators on the portion purchased for fabrication.[965]

430. There is no proof products manufactured by converters compete with products manufactured by fabricators, which are not used as primary parts of a package and as to which during the period 1938–1946 duPont allowed a functional discount at a different rate, and thereafter no such discount.

431. Prior to January 1, 1947, duPont classified one group of customers as industrial users. There is no proof customers purchasing cellophane from duPont as industrial users competed with customers purchasing from duPont as converters or fabricators.

954. GX 355, p. 885, 8/30/38. GX 5516, p. 6289, 3/3/38. GX 5540, p. 6341, 11/1/38.

955. GX 5540, p. 6341, 11/1/38.

956. GX 5540, p. 6341, 11/1/38.

957. GX 5034, p. 4509, 12/13/46.

958. GX 5541, p. 6345, 12/20/38.

959. GX 5540, p. 6341, 11/1/38.

960. GX 5034, p. 4510. DX 591, p. 1128, 1951.

961. DX 591, p. 1128, 1951.

962. Renninger, Tr. 3558.

963. GX 5034, p. 4510. R. R. Smith, Tr. 5884–85, 5889.

964. GX 5010, p. 4442, 2/26/42. GX 5011, p. 4443, 2/24/42. GX 5388, p. 5206, 1/10/44. GX 5540, p. 6341, 11/1/38.

965. GX 5041, p. 4530, 5/26/42. GX 5415, p. 5271, 10/7/41.

432. As early as 1928, duPont paid annual cumulative quantity discounts to customers purchasing cellophane for their own use,[966] it being then the U. S. manufacturer of cellophane.[967] Rates of these discounts and quantity of purchases necessary to earn specific rates were reviewed and revised from time to time.[968] A discount schedule ranging from 2½% on annual purchases over $10,000 to 10% on annual purchases of over $1,500,000 was adopted in November, 1935,[969] and remained until all quantity discounts on cellophane were terminated on January 1, 1947.[970]

433. When the Robinson-Patman Act was passed in 1936, duPont reviewed its quantity discounts to direct users of cellophane,[971] which had been in effect since at least 1928.[972] Under duPont's quantity discounts the maximum price difference to purchasers had been approximately 3¢ a pound. One pound of moistureproof cellophane contains about 21,000 square inches, and will wrap a large number of articles such as cigarette packages. On this basis duPont Legal Department in 1936 advised discounts on cellophane did not have any effect on competition that was forbidden by the Robinson-Patman Act.[973] According to the Legal Department, quantity discounts to direct users were lawful, since they did not injure buyer or create a monopoly, so discounts were continued.[974] This advice was repeated in 1938 with respect to quantity discounts to direct users for discount was an infinitesimal part of customer's cost and could have no effect on competition.[975] In 1943 during the period of maximum price control by plaintiff, duPont's Legal Department advised that the Federal Trade Commission had indicated disapproval of cumulative quantity discounts such as allowed by duPont to direct users. The Legal Department did not urge immediate abolition of all quantity discounts and advised this would not be necessary unless later Federal Trade Commission rulings were more decisive. DuPont, however, undertook studies of its quantity discount arrangements with direct users,[976] and on its next price change eliminated the quantity discount, effective January 1, 1947.[977]

434. Sylvania gave quantity discounts equal to those granted by du-Pont.[978] On occasion Sylvania allowed such discounts on annual sales of less than $10,000 to a customer,[979] which was the minimum quantity on which duPont allowed discount,[980] and in cases allowed direct users to include their purchases from converters in computing the rate at which Sylvania would allow a quantity discount.[981]

435. Sylvania allowed quantity discounts to cooperative organizations acting as purchasing agents for numerous bakers, determining rate on basis of the total orders routed to Sylvania through the organization. DuPont did not allow a discount to such agents, but only to the individual baker ordering from du-Pont.[982]

---

966. GX 483, p. 6407, 1/21/29.

967. Answer, Pars. 16, 18.

968. GX 347, p. 869, 12/31/29. GX 484, p. 6430, 1/21/30.

969. GX 5522, p. 6313, 10/28/35. GX 5551–5560, 1936–46. GX 5033, p. 4500, 2/28/46.

970. GX 5034, p. 4508, 12/10/46.

971. GX 470, p. 5946, 9/17/36. GX 5520, p. 6298, 10/27/36.

972. GX 483, p. 6406, 6707, 1/21/29.

973. GX 5520, p. 6298, 10/27/36.

974. GX 5521, p. 6310, 11/2/36.

975. GX 5516, p. 6289, 3/3/38. GX 355, pp. 885, 886, 8/30/38.

976. GX 5023, p. 4462, 1944. GX 5395, p. 5215, 8/6/45.

977. GX 5034, pp. 4503, 4506, 12/4/46. GX 500, pp. 6864, 6890, 1/4/47.

978. Reichel, Tr. 6083–98. Horn, DX 1010, p. 78.

979. DX 576, p. 1107, 9/30/38.

980. GX 5522, pp. 6312, 6313, 10/28/35.

981. DX 589, p. 1126, 4/3/33. DX 543, pp. 1013–14, 1934.

982. DX 543, pp. 1003, 1012–13, 1018, 1934.

436. When a direct user was purchasing quantities of cellophane from duPont to entitle it to a discount, Sylvania sold the same customer on its own regular quantity discount schedule. There is no proof of the number of occasions on which Sylvania decided to pay more discount than the customer's purchases directly from it would have earned, and no proof of the annual or total amount expended by Sylvania in such extra discounts.[983]

437. Availability of a quantity discount from duPont until 1938 and a functional discount thereafter did not influence Shellmar, one of the most important cellophane converters, to purchase from duPont rather than Sylvania. Sylvania offered as large a discount as duPont, and Shellmar would have preferred two sources of supply. However, it could not use Sylvania cellophane because the quality was not adequate. Quality rather than discount was the reason its purchases were from duPont.[984]

438. DuPont's quantity discounts, which were eliminated January 1, 1947,[985] were paid to small customers as well as large ones. Of 306 quantity discounts paid in 1941, 253 went to customers who purchased less than $50,000 of cellophane in that year.[986]

439. There is no proof of extent, if any, to which duPont's former agents for the sale of unconverted cellophane (H. D. Catty Co., Brooks Paper Co., Zellerbach Paper Co.) competed with job-bers who also handled such cellophane. Principal business of these agents consisted of resale of unconverted cellophane in quantities of 500 lbs. and over.[987] Principal sales by jobbers were of quantities less than 500 lbs.[988] In any event, Catty withdrew from the sale of unconverted cellophane in 1945, Brooks in 1947 and Zellerbach in 1948.[989]

440. Prior to 1948, duPont did not have jobbers in the West Coast area served by its agent Zellerbach.[990] However, duPont had a representative in that area[991] and converters sold into that area.[992] After discontinuance of Zellerbach's agency in 1948,[993] duPont commenced selling direct to jobbers on the West Coast.[994]

441. DuPont did not control resale prices of any of its three agents, or the contractual relations between them and their customers.[995] It did advise an agent as to the desirability of certain clauses in customer contracts.[996]

442. During the period December 1938–November 1941, part of duPont's functional discount to converters consisted of allowing 50% of the converter's approved advertising expense on cellophane, provided the allowance did not exceed 2½% of total purchases. DuPont's advertising allowance was available to regular converters as well as to promotional converters, and allowance was paid to a regular converter.[997]

443. DuPont's advertising allowance to converters did not tend to channel

983. Reichel, Tr. 6083–88, 6098.

984. Martin, Tr. 6368–69; 6399–6400; 6414.

985. GX 5034, p. 4505, 11/29/46. GX 500, p. 6890, 1/14/47.

986. GX 5023, p. 4462, 6/21/44.

987. DX 406, p. 787, 2/2/48. GX 5544, pp. 6356–57, 6/26/43.

988. GX 5539, p. 6340, 12/9/42. GX 5174, p. 4838, 4/14/43. DX 496, pp. 933–34, 12/28/43.

989. R. R. Smith, Tr. 5890–93. DX 407, pp. 787–88, 2/2/48.

990. GX 5503, p. 5411, 2/2/44.

991. GX 5120, p. 4700, 8/30/43.

992. GX 5509, p. 5420, 3/2/44. GX 5504, p. 5413, 6/15/44.

993. DX 407, pp. 791–92, 4/1/49.

994. DX 501, p. 939, 6/30/49.

995. DX 493A, p. 929, 1/5/45. DX 495, p. 931, 4/2/42.

996. DX 494, p. 930, 3/24/42. DX 495, pp. 931–32, 4/2/42.

997. GX 5545, p. 6364, 10/29/41. GX 5106, p. 4670, 11/41. GX 5204, p. 4902, 10/4/39. GX 5542, p. 6346, 2/5/41. GX 5096, p. 4646, 7/29/41. GX 5541, pp. 6344–45, 12/20/38. DX 474, p. 909, 4/18/41. DX 555, pp. 1065–66, 10/10/41.

business to duPont, but was a source of friction with important customers.[998]

444. Sylvania made deals with direct customers who were not converters under which it paid part of their advertising costs. This caused purchases from Sylvania by important accounts.[999] DuPont did not grant any advertising allowance except to converters, and to them only in the period 1938–1941.[1000]

445. DuPont did not attempt to fix prices charged by jobbers of duPont cellophane.[1001]

446. There is no proof duPont fixed the resale prices for cellophane charged by its agent, Brooks Paper Company.

447. DuPont sold cellophane to the West Coast area, also served by Zellerbach Paper Company, its agent. Cellophane customers in the area were aware of duPont's own prices as well as Zellerbach's[1002] While prices were comparable, there is no proof duPont fixed, by agreement, prices charged by Zellerbach for duPont cellophane.

448. DuPont's price lists carry prices for both cellophane in rolls and cellophane in sheets. On area basis, duPont's sheet prices were higher than roll prices.[1003] DuPont's agent, H. D. Catty Co., at times purchased roll cellophane from duPont, cut it into sheets and sold the sheets. In 1945, H. D. Catty Co. inquired of duPont what spread duPont intended to have in duPont's prices for rolls and sheets.[1004] DuPont refused to interfere on a complaint by its agent, Zellerbach, Catty was reselling cellophane at a price lower than charged by Zellerbach.[1005]

449. In 1939 a duPont salesman had a discussion with Houston Paper Company, a jobber which had been reselling both duPont and Sylvania cellophane. The salesman sought to persuade Houston to buy duPont cellophane and, being unsuccessful, informed his superior Houston should be removed from a list of preferred jobbers. This was done.[1006] Thereafter, Houston's name erroneously appeared on a preferred jobber list.[1007] In calling attention to this, another duPont employee stated Houston should not be included, since it was handling competitive Sylvania cellophane, was a price cutter and was aggressively pushing Sylvania cellophane.[1008] There is no other evidence duPont attempted to control resale prices of any jobber of duPont cellophane.

450. DuPont employed a red and blue standard label bearing the legend "DuPont Cellophane".[1009] During the period 1938–1947 when converters were classified as "promotional" or "regular", both classes were permitted to use the standard label with the sale of their converted products, provided such use was in accordance with regulations established by duPont protecting its right to the standard label by insuring it would not be used on products made of cellophane not made by duPont.[1010]

451. There is no proof fabricators were not permitted to use the duPont standard label. Fabricator contracts when duPont's registered trademark "Cellophane" was in wide use granted to fabricators the right to use duPont's

998. GX 5542, p. 6346, 2/5/41. Martin, Tr. 6406–7, 6420.

999. DX 543, pp. 1011–12, 1934.

1000. GX 5106, p. 4670, 11/41. GX 5204, p. 4902, 10/4/39. GX 5542, p. 6346, 2/5/41. GX 5096, p. 4646, 7/29/41. GX 5545, p. 6364, 10/29/41.

1001. DX 407, p. 792, 4/1/49. DX 493, p. 928, 1/5/45.

1002. GX 5480, p. 5375, 10/17/41.

1003. GX 398, pp. 5504–43.

1004. GX 5266, p. 5002, 2/13/45. GX 5267, p. 5003, 2/21/45.

1005. GX 5508, p. 5417, 2/2/42. GX 5509, p. 5420, 3/2/44.

1006. DX 491, p. 926, 11/20/39.

1007. DX 492, p. 927, 1/30/40. GX 5319, p. 5106, 2/5/40.

1008. GX 5318, p. 5105, 1/31/40.

1009. GX 5378, p. 5188, 5/1/42.

1010. GX 5378, p. 5188, 5/1/42. GX 5420, p. 5281, 3/25/43. GX 5373, p. 5182. DX 407, pp. 789, 792, 4/1/49. Leeds, DX 1011, p. 85. Goland, DX 1015, pp. 177, 198.

trademark to identify fabricated products made from duPont cellophane.[1011]

452. DuPont issued a form of agreement covering use by customers of duPont's standard label in 1947.[1012] This agreement was offered to all customers, including those purchasing both Sylvania and duPont cellophane.[1013] As before, the label was to be used on products made of duPont cellophane.[1014]

453. Value of the duPont standard label was small. A converter was interested in promoting its own name rather than that of the producer of one of the flexible packaging materials it converted.[1015]

454. To broaden use of cellophane, duPont furnished sales and technical help to its customers. This help included work in the field, advice as to problems encountered in conversion and in use of converted products, chemical tests, merchandising literature, market surveys, reprints of consumer advertising, etc. DuPont provided such service both to customers buying exclusively from it and to customers purchasing from Sylvania as well as duPont. There is no proof the services furnished by duPont of this character to two-source converters differed in quality or amount from that furnished to converters purchasing only from duPont.[1016]

455. As of April 1, 1949, duPont's distribution practices are summarized:

1. Prices were based on a minimum of 500 pounds of rolls or a case of sheets. Smaller orders were referred to jobbers or converters.

2. Discount from list price on domestic sales was a functional discount to any customer that purchased materials for processing (printing, bag making, etc.) and subsequent resale for packaging uses.

3. No sales agreements between duPont and any customer existed for domestic sales.

4. Remaining wholesale distributors were two companies acting as exclusive distributors of roll cellophane to the dairy industry for use as hoods for milk bottles. Material ordered by these companies was prepared at a special price, without discount. Other resellers of non-processed duPont cellophane were jobbers who purchased at net prices and had neither exclusive territories nor any territorial limitations. Jobbers set their own resale price schedules and there was no suggested resale price schedule by duPont.

5. Use of the standard label, a red, white and blue insignia with the words, "DuPont Cellophane", was available to all customers.

6. Business outside of the continental United States and Canada was handled by the Export Section, covering every country in the world where import licenses and exchange conditions permitted sales. Export business was normally handled through distributors who were given exclusive resale franchises in designated territories, cancellable on 60 days' notice. Foreign distributors were given discounts and commissions of 5% on rolls and 10% on sheets.

7. DuPont's policy was export business on rolls should return a net profit equal to domestic sales and export roll prices were higher than United States roll prices. On sheets export was regarded as an outlet for production in excess of domestic requirements and export prices for sheets were the same as the United States prices.[1017]

1011. GX 5504, p. 5249, 1/31/40. GX 5417, p. 5273, 10/1/41.

1012. DX 502, p. 940, 1/47. DX 407, pp. 789, 792, 4/1/49. DX 371, p. 693, 2/7/47.

1013. DX 371, p. 693, 2/7/47. DX 503, p. 941, 10/10/47.

1014. DX 502, p. 940, 1/47.

1015. Martin, Tr. 6420–21.

1016. Goland, DX 1015, pp. 177, 187–88. Hanson, DX 1018, pp. 247, 259. Leeds, DX 1011, pp. 79, 83–85. DX 455–90, pp. 887–925.

1017. DX 407, pp. 789–793, 4/1/49.

**D. Patents were not abused.**

(Findings 456–532)

456. Plaintiff conceded for purposes of this case claims of all patents involved are valid. It conceded validity of du-Pont's trademarks.[1018] No evidence was offered as to abuse of trademarks.[1019]

457. DuPont never applied for a cellophane patent not based on research done by it.[1020] Only half of proposals by research personnel for patent applications were submitted as applications, the remainder were rejected by duPont's patent personnel because the discovery was not patentable.[1021]

458. DuPont's reason for filing applications on its inventions was to prevent others from filing an application, securing a patent, and preventing du-Pont from enjoying the benefits of its own research either in production or as basis for further research. DuPont desired to obtain patents on results of its research so to feel secure in employing its own discoveries.[1022]

459. Criteria by which duPont decided whether to file a patent application were technical merit of discovery and its possible utility in the operations of duPont.[1023]

460. When a duPont research worker made discovery pertinent to cellophane, he forwarded a patent proposal to the Patent Service Section of the Rayon Department. Patent Service made a preliminary study. The Patent Steering Committee then considered advisability of applying for a patent. This decision turned upon the technical merit of discovery and its possible utility in company operations. If decision of the Patent Steering Committee was favorable, Patent Service would search prior art, develop the facts, to serve as basis for patent application. Upon filing of the application, the Patent Board of the Company was advised. This Patent Board consisted of representatives from each operating department, the Legal Department, Chemical Department, Engineering Department and Foreign Relations Department.[1024]

461. DuPont's Executive Committee exercised control over patent license agreements. It issued policy statements for the guidance of Company management and personnel as to the Company's policies with respect to patents and procedures to be followed.[1025]

462. DuPont's patent policy was to apply for U. S. patents to protect its expenditures for research and development. Policy was to seek patents on inventions which might have commercial value:

(1) Inventions duPont intended to practice in its manufacture.

(2) Auxiliary inventions covering modifications which may be found practical to introduce in duPont's manufacture.

(3) Inventions covering uses of du-Pont's products.

(4) Inventions which may be a source of income.[1026]
DuPont preferred to utilize its inventions in its own manufacture, rather than to exploit them by licenses. It was prepared to consider licensing of inventions it might not be able to use itself or where demand for products embodying invention could not be met by duPont alone.[1027]

463. Since 1938 duPont had a specific policy no license of a duPont patent should be conditioned upon use of du-Pont products.[1028]

1018. Minicus, Tr. 6960–64.

1019. See Findings 450 and 452 as to the standard label.

1020. W. W. Smith, Tr. 6509.

1021. W. W. Smith, Tr. 6506.

1022. GX 2821, p. 6081, 5/5/31. W. W. Smith, Tr. 6507–08.

1023. W. W. Smith, Tr. 6528.

1024. W. W. Smith, Tr. 6492–6500.

1025. DX 661, p. 1365, 11/2/38. DX 662, p. 1375, 4/2/47.

1026. DX 661, p. 1365, 11/2/38. DX 662, p. 1375, 4/2/47.

1027. DX 661, p. 1366, 11/2/38. DX 662, p. 1376, 4/2/47.

1028. DX 661, p. 1367, 11/2/38. DX 674, p. 1408, 11/27/42. DX 662, p. 1377, 4/2/47.

464. DuPont never acquired any patent for purpose of suppressing the patent and not using it.[1029]

465. DuPont never applied for a patent to cellophane for the purpose of blocking third parties from developing their inventions or for fencing off others from patenting inventions relating to an area in which duPont held patents.[1030] DuPont did not undertake research work for purpose of getting patents. Patents were considered only a by-product of that work.[1031]

466. When duPont did not apply for a patent on results of its research, it found itself blocked from using results when others later obtained patents on the same development.[1032]

467. DuPont acquired rights under patents relating to cellophane owned by others. In each case, the patent was studied and decision made as to whether rights would be acquired. DuPont did not acquire any patent right it did not believe had possible utility in its manufacture or sales.[1033]

468. DuPont on some occasions obtained patent rights on customer use inventions, for the purpose of being free to promote use of duPont cellophane by customers without exposing them to possible infringement proceedings.[1034]

469. DuPont acquired patents relating to use of cellophane. Examples of this are:

(a) Wertheimer patent relating to ribbons.[1035]

(b) Patents relating to the closure of cellophane bags.[1036]

(c) Patents relating to adhesives.[1037]

(d) Patents relating to sealing.[1038]

470. There are 7000 United States patents relating to the cellophane art.[1039] During the period 1924–1947, duPont had rights under 368 patents relating to cellophane and 49 relating to caps and bands.[1040] Plaintiff conceded for purposes of this action validity of all claims of all patents.[1041] Of the 368 relating to cellophane, as of January 1, 1952, 102 had expired and 266 were in force.[1042]

471. DuPont had neither intent nor power to subvert the use of trademarks, trade secrets or know-how relating to cellophane.

472. Of the 368 patents relating to cellophane which were issued to duPont, 68 were customer use patents which duPont as a manufacturer would not use. Of the remaining 300, duPont had used 93 in its commercial operations, or 31%.[1043]

473. Patents under which duPont had rights were not put into use by duPont due to difficulties not foreseen when it filed the patent application. Such included:

1029. W. W. Smith, Tr. 6535.

1030. W. W. Smith, Tr. 6508–09. Mitchell, Tr. 5502–03.

1031. Mitchell, Tr. 5503.

1032. W. W. Smith, Tr. 6508. DX, p. 1386, 5/25/31. DX 664, p. 1391, 1/10/36. DX 665, p. 1392, 6/29/39. DX 666, p. 1395, 7/3/39. DX 667, p. 1396, 10/6/39. DX 668, p. 1397, 10/9/39.

1033. W. W. Smith, Tr. 6528, 6535, 6599. GX 2017, p. 2075, 10/22/41. GX 2018, p. 2077, 12/3/41. GX 2019, p. 2078, 3/19/42. GX 2814, p. 6080, 6/6/34. GX 2815, p. 6081, 2/7/35. GX 2816, p. 6082, 2/19/37. GX 2817, p. 6083, 12/15/38. GX 2818, p. 6084, 4/10/39. GX 2819, p. 6085, 12/9/31. GX 2826, p. 6094, 12/19/34. DX 675–683. DX 689–710.

1034. DX 663, p. 1386, 5/25/31. DX 670, p. 1402, 11/22/32. DX 671, p. 1403, 5/23/44. GX 2026, p. 2087, 2/27/45. GX 2105, p. 2220, 12/30/31. GX 2814, p. 6080, 7/6/34.

1035. DX 726, p. 1522, 1/10/33. DX 670, p. 1402, 11/22/32. DX 487, p. 6460, 1/23/33.

1036. DX 671, p. 1403, 5/23/44.

1037. DX 709, p. 1461, 12/27/37.

1038. DX 663, p. 1386, 5/25/31.

1039. W. W. Smith, Tr. 6627.

1040. W. W. Smith, Tr. 6517.

1041. Minicus, Tr. 6960–64.

1042. W. W. Smith, Tr. 6517.

1043. W. W. Smith, Tr. 6517–18.

(a) Critical material required for the practice of the invention was not available in commercial quantities.[1044]

(b) Critical material required for the practice of the invention, although available in commercial quantities, had such a high cost the process was less desirable than other processes.[1045]

(c) During the period between filing the patent application and issue of the patent, new technology developed that gave better results than the patented discovery.[1046]

(d) Invention that operated under laboratory conditions could not be applied to commercial operation under plant conditions.[1047]

474. A patent application is filed soon after invention so as to have an early filing date. At time of making application the question of whether the invention will have commercial utility is a matter of judgment rather than certainty.[1048]

475. There is no proof the chemical industry puts to commercial use as much as 30% of patent rights available.

476. Average percentage of commercial use of patents in the duPont Company is from 30% to 32% of patent rights available, as compared to 31% of its rights under cellophane patents.[1049]

477. As of January 1, 1952, duPont owned or had rights under 266 existing patents relating to cellophane.[1050] Of these 113 related to moistureproof cellophane, and the balance of 153 to plain cellophane or to customer use.[1051] Of those relating to moistureproof cellophane, 30 had been licensed to duPont non-exclusively by the American Solvent Recovery Company, and 11 more had been licensed to duPont non-exclusively by Marbo Patents, Inc.[1052]

478. During period 1929–1952, du-Pont had rights under 158 U. S. patents relating to the manufacture of moistureproof cellophane.[1053] Of these, 104 had been issued to duPont. Of these, 47 related to moistureproofing compositions, 5 related to slip agents, 1 related to mold inhibitors, 19 related to heat sealing, 22 related to anchorage of coatings, 8 related to process and apparatus, and 2 related to solvent recovery.[1054] Of the 54 patents relating to moistureproof cellophane that had been licensed to duPont, 30 related to solvent recovery and 11 related to rubber derivative coatings and materials.[1055] Of these 54, 41 were licensed to duPont on a non-exclusive basis.

479. Of the total 158 patents relating to moistureproof cellophane, under which duPont had rights sometime during the period 1924–1952,[1056] duPont's rights under 54 had been acquired from others.[1057] None of these 54 could have been employed to prevent the manufacture of moistureproof cellophane and none would have enabled a manufacture of moistureproof cellophane absent a license from duPont under the basic product patent during the period it was in force.[1058]

480. During the period 1929–1946 it was not possible to manufacture moistureproof cellophane in the United States without infringing duPont's basic product patent, No. 1,737,187.[1059] During the period 1931–1948 a moistureproof cellophane could have been physically manufactured without infringing duPont's four basic process patents, but there is no proof such a non-infringing

1044. W. W. Smith, Tr. 6519–20.

1045. W. W. Smith, Tr. 6519–20.

1046. W. W. Smith, Tr. 6521.

1047. W. W. Smith, Tr. 6522.

1048. W. W. Smith, Tr. 6519–20.

1049. W. W. Smith, Tr. pp. 6518–19.

1050. W. W. Smith, Tr. 6517.

1051. W. W. Smith, Tr. 6514, 6526.

1052. W. W. Smith, Tr. 6524, 6533.

1053. W. W. Smith, Tr. 6513–14.

1054. W. W. Smith, Tr. 6526.

1055. W. W. Smith, Tr. 6524–6533.

1056. W. W. Smith, Tr. 6514.

1057. W. W. Smith, Tr. 6535.

1058. W. W. Smith, Tr. 6514, 6530.

1059. W. W. Smith, Tr. 6539.

method of manufacture would have been practical on a commercial basis.[1060]

481. There is no proof existence of any U. S. patent relating to cellophane licensed to duPont from third parties contributed in any degree to volume of duPont's sales of cellophane.

482. There is no proof existence of any U. S. patent relating to cellophane licensed to duPont from third parties broadened duPont's right under its own patented inventions to exclude others from manufacture and sale of moisture-proof cellophane.

483. Satisfactory plain and moisture-proof cellophane can be manufactured in the U. S. today without infringing any existing patents issued, licensed or assigned to duPont.[1061]

484. DuPont did not use any patent relating to cellophane to threaten others. On three occasions it brought actions for infringement. One such suit was brought against Sylvania and was based on the five original patents relating to moistureproof cellophane. This suit was settled by stipulation.[1062] The second action was against two manufacturers of ribbons of cellophane and was based on certain patents covering specific types of ribbons. This was settled by consent decree.[1063] The third action was on a customer use patent, which related to the sealing of cellophane. DuPont by contract was obligated to sue infringers and did so.[1064] A number of claims were held invalid by the trial court, and duPont did not appeal.[1065]

485. DuPont in 1939 granted Marathon Paper Mills Company a non-exclusive, non-assignable license under its moistureproof product patent 1,737,187 to coat plain cellophane with a defined rubber wax moistureproofing composition and to sell the coated film for the packaging of cheese.[1066] The royalty payable was 2¢ per pound of the coated film.[1067] Marathon acknowledged validity of the patent licensed,[1068] and the agreement was limited to the period of that patent.[1069] Marathon did not desire a license to manufacture moistureproof cellophane itself.[1070] The product it made under the duPont license was used to package cheese.[1071]

486. Sylvania, which was duPont's exclusive licensee under the 1933 Agreement as amended in 1938, consented to duPont's license to Marathon in 1939 under the product patent and the 1933 Agreement was modified to the extent duPont was free to license Marathon.[1072] Royalties from Marathon under its license of the moistureproof product patent were divided ⅓ to Sylvania and ⅔ to duPont.[1073] Upon termination of the 1933 Agreement and grant of a non-exclusive license to Sylvania under the moistureproof product patent on January 1, 1945,[1074] all Marathon royalties were payable to duPont alone until expiration of the product patent in 1946.[1075]

1060. W. W. Smith, Tr. 6582.

1061. Mitchell, Tr. 5529–31.

1062. Yerkes, Tr. 6928–36. GX 2001, pp. 2027–29, Schedule B.

1063. GX 2128, p. 2268, 1/8/37. GX 2001B, supra.

1064. GX 2173, p. 2399, 11/30/31. GX 2001B, supra.

1065. GX 2188, p. 2442, 9/23/36.

1066. GX 2515, p. 3291, Para. 1, 3, p. 3292, 9/19/39.

1067. GX 2515, p. 3291, Para. 4, p. 3294, 9/19/39.

1068. GX 2515, p. 3291, Para. 3, p. 3293, 9/19/39.

1069. GX 2515, p. 3291, Para. 2, p. 3292, 9/19/39.

1070. Croy, DX 1021, pp. 346–47.

1071. DX 408, p. 794, 10/1/48. GX 11, pp. 87–90, 3/27/45. GX 2524, p. 3309, 11/30/39. Croy, DX 1021, p. 334. Wilcox, DX 1013, pp. 123–24.

1072. GX 2515, p. 3287, Para. 1, p. 3288, 9/19/39.

1073. GX 2515, p. 3287, Para. 2, p. 3288, 9/19/39.

1074. GX 2755, p. 3642, 1/1/45.

1075. DX 717, p. 1484, 2/6/45. DX 718, p. 1485, 2/6/45. DX 719A, p. 1487, 6/29/45.

487. During the term of its license, Marathon could purchase non-moistureproof film from either duPont or Sylvania for coating.[1076]

488. The license to Marathon by du-Pont expired on November 26, 1946, with the expiration of duPont's product patent 1,737,187.[1077]

489. When Marathon decided to make cheese wraps by applying its rubber-wax coating to non-moistureproof cellophane, it obtained from duPont a license under duPont's product patent 1,737,187 which enabled Marathon to make the wrap it was interested in producing. Despite its right under the license to apply its coating to plain cellophane, Marathon did not operate under the license long. It determined use of moistureproof cellophane as a base for its coating made a better wrap, and used moistureproof film. Application of Marathon's coating to this film did not require a license or payment of royalties.[1078] Marathon's royalties to duPont were $1.77 in 1944 and zero in 1945.[1079] Despite expiration of the product patent in 1946, Marathon was continued to make its cheese wrap from moistureproof cellophane.[1080]

490. Late in 1940, Marathon inquired whether duPont would be willing to broaden Marathon's license under duPont's moistureproof patent to include the coating of plain cellophane with Marathon's rubber wax composition for use as wrappers for ground and processed meats.[1081] DuPont declined and suggested Marathon coat moistureproof film. DuPont offered technical assistance for problems encountered in such coating.[1082] Marathon was not deeply interested in coating plain cellophane for meat wrappers and did not press for extension of its license to enable that use.[1083]

491. Marathon has not been interested in manufacture of cellophane, even when duPont offered to license its patents and technology. Cellophane manufacture would have been a departure from Marathon's business. Marathon preferred to invest its financial resources in other directions.[1084]

492. In 1930, duPont and Dobeckmun Company entered into agreement where Dobeckmun could receive within the United States technical information from Kalle with respect to lamination of moistureproof cellophane, and was granted non-exclusive license with respect to patents duPont might obtain for the process and apparatus used in such lamination. The agreement provided Dobeckmun would use only cellulose sheets made by duPont. At the time of agreement, duPont was the only manufacturer of moistureproof cellophane in the United States and it had the right to make moistureproof cellophane in the United States, its moistureproof cellophane product patent having then issued and having not been licensed in any way.[1085] In 1938, duPont waived the provision in the Dobeckmun agreement by which Dobeckmun agreed to use only duPont cellophane in operations under the agreement.[1086]

493. In 1931, duPont was the only manufacturer of moistureproof cellophane. Dobeckmun Company obtained a patent on the heat sealing of moistureproof cellophane, and Humitube Company obtained a patent on the sealing of moistureproof cellophane.[1087] These

1076. GX 2523, p. 3308, 11/30/39. GX 2526, p. 3313, 2/22/40.

1077. GX 2914, 6/29/45. GX 2515, p. 3291, 3293, 9/19/39. DX 719, p. 1486, 6/29/45.

1078. Croy, DX 1021, pp. 335–36.

1079. GX 499, p. 6835, 1/25/46.

1080. DX 719, p. 1486, 7/29/45. Croy, DX 1021, p. 336.

1081. Croy, DX 1021, pp. 337–39. GX

2909, 12/31/40. GX 2910, 1/15/42. GX 2911, 1/29/42.

1082. GX 2912, 2/10/41.

1083. Croy, DX 1021, pp. 337–39.

1084. Croy, DX 1021, pp. 346–47.

1085. GX 2921, p. 7855, 9/19/30. W. W. Smith, 6539. GX 403.

1086. GX 2922, 12/19/38.

1087. GX 2001A; GX 2172, p. 2395, 6/9/31.

companies were interested in using the patents in the manufacture and resale of moistureproof cellophane tubes for cigars. DuPont purchased these patents. It agreed to grant Dobeckmun and Humitube, and no one else, licenses to manufacture and resell cigar tubes as described in the patents.[1088] DuPont at that time had no "Promotional Converters" as such, and there is no proof either Dobeckmun or Humitube was bound by contract to purchase all moistureproof cellophane from duPont. On advice of counsel, duPont licensed the sealing patents generally, except for manufacture of a specified size of cigar tubes for resale, by a label attached to shipments of duPont moistureproof cellophane.[1089]

494. DuPont acquired patents covering sealing of moistureproof cellophane to remove a source of annoyance to its customers and to avoid the possibility the patents might be used to retard expansion of the use of cellophane. The patents covered the principles of sealing used in automatic wrapping machinery.[1090]

495. In connection with acquisition of sealing patents from Dobeckmun and Humitube, duPont agreed to sue infringers manufacturing and selling cigar tubes of the dimensions defined in the Dobeckmun patents.[1091] Because of this obligation, duPont brought an infringement suit against Vis-O-Tube.[1092] Sylvania, in 1935, suggested settlement of the suit, Vis-O-Tube being its customer, by a license from duPont to Sylvania under the sealing patents. DuPont felt it was obligated to prosecute the suit and refused to settle.[1093] The sealing patents were adjudged invalid in 1936, and duPont did not appeal.[1094]

496. In 1933, Saniwrap Company sought to purchase moistureproof cellophane from duPont to manufacture cigar tubes which would infringe the Dobeckmun patents. On advice of counsel, duPont refused to sell. Representatives of the Federal Trade Commission then called on Humitube, Dobeckmun, and duPont and reviewed the contracts pursuant to which the patents had been acquired by duPont and licensed to the other companies.[1095] After discussion of these with duPont management and legal counsel, the FTC representatives informed duPont there were no grounds for valid complaint against duPont in connection with the sealing patents.[1096]

497. In licensing its ribbon patents to customers in 1931–1933 duPont reserved right to cancel the license at will on 30 days' notice.[1097] There is no proof duPont ever communicated to a customer any thought the licenses might be cancelled if other cellophane were used to make the patented ribbons, and there is no proof duPont ever exercised its 30-day cancellation clause in the ribbon licenses for any reason. Since 1938, duPont had a specific policy no license of a patent shall be conditioned upon the use of duPont's products.[1098]

498. DuPont granted royalty-free licenses to certain customers under patents covering specific types of cellophane ribbons. The patents were Brandenberger 1,406,148, Wertheimer, 1,543,634, Cohn, 1,958,033, and Lees, 1,849,747.[1099]

1088. GX 2173, p. 2397, 11/12/31. GX 2174, p. 2403, 11/25/31. GX 2178, p. 2422, 12/4/31.

1089. GX 2180, p. 2428, 4/13/32. GX 2181, p. 2430, 4/20/32.

1090. GX 2831, p. 6101, 6/11/31.

1091. GX 2173, p. 2399, 11/12/31.

1092. GX 2186, p. 2440, 8/3/33. GX 2188, p. 2442, 9/23/36.

1093. GX 2187, p. 2441, 9/25/35.

1094. GX 2188, p. 2442, 9/23/36.

1095. GX 2183, pp. 2435–36, 5/15/33.

1096. GX 2185, pp. 2438–39, 12/12/33.

1097. GX 2104, p. 2219, 12/29/31. GX 2105, p. 2220, 12/30/31. GX 2106, p. 2222. GX 2107, p. 2225, 2/11/32. GX 2108, 2/26/32. GX 2109, p. 2233, 10/4/33.

1098. DX 661, p. 1367, 11/2/38. DX 674, p. 1408, 11/27/42. DX 662, p. 1376, 4/2/47.

1099. GX 2146, pp. 2354–57, 2/18/38. GX 2147, pp. 2358–61, 2/18/38. GX 2107, pp. 2224–26, 2/11/32. GX 2108, pp. 2228, 2230, 2/26/32. GX 2109, pp. 2232–33. GX 2142, p. 2336, 2/18/38.

DuPont acquired patent rights under these patents in order to secure freedom for customers in the use of cellophane.[1100] Patent rights were acquired in 1923, 1932, 1933 and 1936.[1101]

499. DuPont brought infringement suits on two ribbon patents against the Hy-Sil Co.[1102] Sylvania, which sold cellophane to Hy-Sil, suggested settlement on a royalty basis with an understanding royalties would be accumulated to finance prosecution of infringers.[1103] DuPont rejected this arrangement as a patent pool.[1104] After negotiations, duPont licensed Sylvania under all four ribbon patents, by two agreements of April 1, 1937. These licenses were non-exclusive, with the right to sub-license to a stated number of manufacturers of ribbons. A royalty was payable by Sylvania to duPont on the net selling price of ribbons manufactured under the licenses. Sylvania was free to pay the royalty or to pass it on to its sub-licensees. DuPont agreed not to grant more than a stated number of additional licenses.[1105]

500. April 1, 1937 agreements between duPont and Sylvania were terminated in March, 1940.[1106]

501. No proof was offered the number of licenses and sub-licenses permitted to duPont and Sylvania under the ribbon license agreements of April 1, 1937, did not exceed the number of actual customers the companies had, for ribbon manufacturing. Sylvania had three customers classed as fabricators, which would include ribbon manufacturers, in 1935, 1940, and 1945.[1107] There is no proof any company unsuccessfully sought a license under the ribbon patents to manufacture ribbons. Sylvania granted one sub-license under the ribbon patents, although under its agreement with duPont it was entitled to more than one.[1108]

502. Cellophane used for ribbons was non-moistureproof cellophane for a specialty use. DuPont sales of cellophane for that purpose amounted to less than 1% of the total sales in 1938.[1109]

503. DuPont, on May 20, 1942, granted a non-exclusive license to Sylvania under Snyder U. S. Patent 2,087,008.[1110] Glycerine and glycerol were in short supply.[1111] This patent covered use of ethylene glycol as a softener for moistureproof cellophane, in place of glycerol. Due to its volatile character, ethylene glycol could not be used in non-moistureproof film, but only in film that was to be coated. Sylvania was practicing the invention and wanted a license. Since the patent was related to manufacture of moistureproof film, the royalty of 2% of selling price was waived on products on which Sylvania paid a royalty under the 1933 Agreement.[1112]

504. Use of the invention in the Snyder patent was not limited to moistureproof film, which was why duPont granted a separate license for that patent. The ingredient was not a component of the moistureproof coating, but of the base film.[1113]

505. On April 9, 1943, duPont and Sylvania entered into an agreement by which duPont licensed two Cupery patents, 2,142,115 and 2,142,116 to Sylvania,

1100. DX 726, p. 1522, 1/10/33. DX 670, p. 1402, 1/22/32. GX 2886, p. 6196, 1/23/33. GX 2115, pp. 2445, 2247, 7/31/33.

1101. GX 2001–A, GX 2128, p. 2266, 1/8/39.

1102. GX 2128, p. 2267, 1/8/37.

1103. GX 2128, p. 2267, 1/8/37.

1104. GX 2128, p. 2267, 1/8/37.

1105. GX 2132, p. 2278, 4/1/37. GX 2133, p. 2293, 4/1/37.

1106. DX 728, p. 1525, 12/30/39. DX 729, p. 1526, 1/22/40. DX 730, 1527, 2/2/40.

1107. GX 414, p. 5618.

1108. DX 729, p. 1526, 1/22/40.

1109. GX 2139, pp. 2330, 2332, 2/11/38.

1110. GX 2534, pp. 3327–31, 5/20/42.

1111. GX 496, p. 6769, 1/11/43. GX 495A, p. 6703, 1/21/42.

1112. GX 2530, p. 3318, 4/1/42. GX 2531, p. 3321, 4/6/42.

1113. DX 731, pp. 1528–29, 8/31/37. GX 2530, p. 3318, 4/1/42.

and Sylvania licensed its Cornwell Patent 442,202 and Morgan Patent 2,288,413 to duPont.[1114] The term of the licenses was six months after the cessation of the war or three years from date of contract, whichever was shorter.[1115] The licenses were non-exclusive, royalty-free, and were limited to regenerated cellulose film, but not limited to moistureproof cellophane.[1116] The license agreement was negotiated at arm's length as a separate transaction.[1117]

506. DuPont needed a license under Sylvania's Morgan Patent to permit it to use ethylamine hydrochloride as a softener because of wartime shortage of glycerine. The ingredient was useful for flame-proofing, which was necessary in cellophane duPont was manufacturing for war use. Sylvania needed a license under duPont's two Cupery patents to cover its use of ethanolamine sulfonate as a softening and flame-proofing agent in its types of cellophane for war uses.[1118]

507. DuPont and Sylvania entered into agreement on October 22, 1937, which provided for a non-exclusive, non-assignable, royalty-free license to Sylvania under duPont's Hunter patent 2,062,179, and a similar license to duPont of Sylvania's Morgan patent 2,043,860.[1119] Both patents were concerned with cellophane which gave protection against ultra violet light and were so related neither duPont nor Sylvania could develop light protective wrappers without infringing the patent of the other.[1120]

508. DuPont performed research which formed the basis for its Hunter ultra violet patent.[1121] This patent dominated Sylvania's Morgan patent on ultra violet light protective cellophane, but it was theoretically possible to practice the Morgan patent without infringing the Hunter patent.[1122]

509. DuPont's negotiation of the cross-license of the Hunter and Morgan patents was an arm's length transaction.[1123] There was no understanding between the parties other than the formal agreement.[1124]

510. In negotiating the ultra violet light protective film licensing agreement, duPont proposed non-exclusive licenses royalty-free.[1125] Sylvania proposed price fixing provisions and provisions requiring consent of the other party to further licensing. DuPont rejected these proposals.[1126] After negotiation, duPont consented to a provision in the contract that would require each party to give 30 days' notice to the other before granting further licenses. This provision was for notice and did not limit right of either party to grant further licenses under its patents.[1127]

511. DuPont's reason for entering ultra violet light protective film cross-licenses was it was charged by Sylvania with infringement, and desired freedom

1114. GX 2051, pp. 2122–24, 4/9/33.

1115. GX 2051, p. 2122, Para. 4, pp. 2123–24, 4/9/33.

1116. GX 2051, p. 2122, Para. 1, 2, 3, pp. 2123–24, 4/9/33.

1117. GX 2063, pp. 2142–43, 6/7/43. GX 2044, pp. 2113–14, 3/12/43. GX 2050, pp. 2120–21, 3/29/43. DX 723, p. 1517. DX 724, p. 1519.

1118. GX 2050, pp. 2120–21, 3/29/43. GX 2044, p. 2113, 3/12/43. GX 2063, p. 2142, 6/7/43.

1119. GX 2198, p. 2463, 10/22/37.

1120. GX 2197, p. 2461, 10/18/37.

1121. DX 720A, pp. 1495–1501, 10/32. DX 721A, p. 1502, 1/31/34.

1122. GX 2197, p. 2461, 10/18/37. GX 2190, p. 2190, 5/27/37.

1123. W. W. Smith, Tr. 6629–39. GX 2191, p. 2450, 6/8/37. GX 2192, p. 2451, 6/30/47. GX 2193, p. 2455, 7/13/37. GX 2194, p. 2456, 7/28/37. GX 2195, p. 2458, 8/3/37. GX 2196, p. 2460, 8/6/37.

1124. W. W. Smith, Tr. 6638.

1125. DX 1004, 3/2/37. W. W. Smith, Tr. 6632–33.

1126. W. W. Smith, Tr. 6633–34.

1127. W. W. Smith, Tr. 6634–38. GX 2191, p. 2450. GX 2192, pp. 2451–52. GX 2193, p. 2455. GX 2194, pp. 2456–57. GX 2195, pp. 2458–59. GX 2196, p. 2460. GX 2197, pp. 2461–67.

to develop sales of ultra violet protective cellophane.[1128]

512. There is no proof any person other than duPont and Sylvania wanted to manufacture ultra violet protective cellophane, or ever asked duPont or Sylvania for a license under a patent relating to such film.

513. In 1939 when the ultra violet license agreement between duPont and Sylvania was made, ultra violet protective film was an insignificant product sold at a premium over the price of other cellophane.[1129] It remained a high priced specialty[1130] and accounted for less than ½ of 1% of duPont sales in 1947.[1131]

514. Settlements of interferences declared by the United States Patent Office are a recognized way of resolving disputes between rival applicants. An interference proceeding is a proceeding which if carried through the stage of testimony can be quite expensive in both time and money.[1132]

515. DuPont settled by agreement interferences declared by the United States Patent Office between duPont patent applications relating to cellophane and patent applications of others.[1133] DuPont's policy was it was always willing to make a reasonable settlement that did not impair its rights under its basic cellophane patents.[1134]

516. Each settlement of the 15 interferences as to which evidence was received in this action was a separate transaction, except in instances where several interferences were settled by a single agreement. There was no over-all

agreement between duPont and any party to an interference.[1135]

517. There is no proof any parties to the interferences other than duPont and Sylvania ever had any intention or desire to engage in the manufacture of cellophane.[1136]

518. Eight of the 15 interferences involved moistureproofing compositions relating to resin wax.[1137] No one could have practiced the inventions to coat plain cellophane with such wax and produce moistureproof cellophane without infringement of duPont's basic product patent, 1,737,187.[1138]

519. There is no proof duPont did not settle the patent interferences in good faith and no proof all rights duPont obtained in the interference settlements extended duPont's cellophane manufacture or sales to any measurable degree.

520. There is no proof upon which validity of patent claims involved in interferences settled by duPont can be determined,[1139] and plaintiff conceded all claims issued to duPont were valid.[1140]

521. Interference 63558 concerned use of cellulose tubes for covering a golf club grip. Priority on all counts was awarded to duPont. The invention was never commercially successful. Under settlement agreement, Spalding obtained an exclusive license to sell if it maintained a stated volume of business. It did not maintain volume, and the license became non-exclusive.[1141]

522. Interference 74629 involved aluminum rolls for drying cellophane in the process of manufacture. Priority as to invention was divided as to various claims. DuPont received an exclusive

---

1128. W. W. Smith, Tr. 6629. W. W. Smith, Tr. 6638. GX 2197, p. 2461, 10/18/37.

1129. GX 2197, p. 2461, 10/18/37.

1130. GX 396, p. 5490, 5/15/50.

1131. GX 395, p. 5488, 5/15/50. GX 396, p. 5490, 5/15/50.

1132. W. W. Smith, Tr. 6547.

1133. GX 2001, p. 2030 (Schedule C).

1134. W. W. Smith, Tr. 6547.

1135. W. W. Smith, Tr. 6548.

1136. W. W. Smith, Tr. 6548–49.

1137. W. W. Smith, Tr. 6561.

1138. W. W. Smith, Tr. 6515, 6567–68.

1139. McAuliffe, Tr. 2804–05, 2823–24.

1140. Minicus, Tr. 6960–62.

1141. GX 2001C, p. 2031. W. W. Smith, Tr. 6566–67.

148

license with the right to sublicense limited to regenerated cellulose.[1142]

523. Interference 74837 with the American Can Company concerned a greaseproof container, in which cellophane could be a component. The product was never a commercial success. DuPont thought it was the senior party by a considerable period, but in fact American Can Company won priority.[1143]

524. Interferences 69624 and 73959 involved claims by duPont, Union Carbide & Carbon Company, Eastman Kodak Company, Hazel Atlas Glass Company, and Sylvania, as to resin wax moistureproofing compositions. DuPont considered technology involved was important, but thereafter the invention lost technical significance and made a negligible contribution to cellophane technology. The interferences were settled by bargaining between the parties. DuPont was willing to settle only if there was no effect on duPont's basic moistureproof position, for the resin wax coating, if applied to plain cellophane, would produce a product within claims of duPont's basic patent. DuPont obtained in the settlement exclusive rights to the invention so far as they concerned moistureproof cellophane.[1144] Carbide also got from settlement what it wanted.[1145] DuPont's inventor was prior on all counts. The resin wax patents involved in these interferences are on the Register of the United States Patent Office available for licensing and no company involved in the interference has sought a license from duPont.[1146]

525. Interferences 71448 and 71449 involved claims by duPont, Eastman Kodak, and Swann Company (Monsanto) with respect to estergum wax. DuPont would settle if it got exclusive rights to use such wax compositions on regenerated cellulose film, and obtained such rights in the settlement agreement. Its basic product patent would have been infringed by moistureproof cellophane produced by coating plain cellophane with estergum wax compositions.[1147] DuPont considered its chances of winning the interference good.[1148] The subject of the interference was cellulose acetate film, as to which the settlement granted exclusive rights to Eastman.[1149]

526. Interference 70341 involved claims of duPont and Monsanto for a specific type of resin wax of possible utility for moistureproofing cellophane.[1150] DuPont was willing to settle to save expense of litigating the interference, but only if it could obtain exclusive rights to the wax for coating moistureproof cellophane, since the resin wax if applied to plain cellophane would produce a product within the claims of duPont's basic product patent.[1151] Settlement gave duPont an exclusive license with unlimited right to sublicense, to make, use and sell the wax for manufacturing moistureproof cellophane and cellophane coated with wax.[1152] DuPont's application was filed two years before Monsanto, and it expected to win priority, but priority was eventually awarded to Monsanto.[1153] DuPont's rights to use for manufacturing moistureproof cellophane the wax covered by the patent involved in the interference are available for licensing and Monsanto has not sought a license.[1154]

1142. GX 2001C, p. 2031. W. W. Smith, Tr. 6563–64.

1143. GX 2001C, p. 2032. W. W. Smith, Tr. 6564–66.

1144. W. W. Smith, Tr. 6549–52.

1145. Davidson, Tr. 5869–72.

1146. W. W. Smith, Tr. 6628.

1147. W. W. Smith, Tr. 6555–58. GX 2001C, p. 2032.

1148. GX 2862, p. 6153, 10/2/35.

1149. W. W. Smith, Tr. 6557.

1150. W. W. Smith, Tr. 6552–53.

1151. W. W. Smith, Tr. 6552–53, 6612. GX 2854, p. 6141, 3/1/35.

1152. W. W. Smith, Tr. 6613–14. GX 2379, p. 2883, 11/18/37.

1153. W. W. Smith, Tr. 6553. GX 2854, p. 6141, 3/1/35. GX 2915, 8/12/38.

1154. W. W. Smith, Tr. 6627–28.

527. Interferences 68801 and 68197 concerned claims by Eastman Kodak and duPont as to plasticizers for films. These were settled by the exchange of royalty-free non-exclusive licenses.[1155]

528. Interference 72191 involved claims of duPont and Eastman Kodak for a specific plasticizer useful in a coating composition. Settlement was reached by negotiation between the companies.[1156] DuPont obtained an exclusive license to the claims, so far as they affected regenerated cellulose film, with the right to sublicense.[1157]

529. Interference 73673 involved claims of duPont, Goodyear Tire & Rubber Co. and Marsene, with respect to a specific resin in a resin wax moistureproofing composition. Originally Marsene was eliminated by the Patent Office, and duPont and Goodyear then negotiated a settlement agreement. Marsene appealed and was reinstated. This vitiated the agreement with Goodyear. Interference was litigated; Marsene won priority; and duPont's patent issued with one narrow claim.[1158]

530. Interference 71566 involved claims of duPont and Marbo Company with respect to rubber hydrochloride. Its relation to cellophane was the possibility of using this as a component of a moistureproof coating composition.[1159] DuPont was unwilling to settle unless it could obtain rights that would cover the use of the composition for producing moistureproof cellophane that would fall within the claims of its basic product patent.[1160] Under the settlement it obtained an exclusive license under the patent for the use of synthetic rubber in the coating of moistureproof cellophane.[1161]

531. Interference 68654 concerned claims of Hercules Powder Company and duPont to a specific resin that might be useful in moistureproof coatings.[1162] After negotiations, the interference was settled by an exclusive license to duPont, royalty-free, for use of the composition on cellophane and a royalty-free license to Hercules for use of the composition on certain other materials.[1163] DuPont's inventors were prior as to use of the composition on cellophane. The Hercules inventor was prior on specific counts as to use of the material with paper.[1164]

532. After duPont's basic product patent on moistureproof cellophane, 1,-737,187, had issued in 1929, the United States Patent Office in 1931 declared Interference 63420 between this patent and an Eaton application owned by Rosenberg.[1165] DuPont believed Rosenberg had no case, but offered to purchase the Eaton application for $10,000 to avoid a possible interference suit and for its nuisance value. Rosenberg rejected this and asked at least $150,000.[1166] DuPont then presented its evidence. After hearing it, Rosenberg's patent counsel conceded he had no case and suggested settlement,[1167] which was effected by duPont paying $5,000 for the Eaton application. This was what it would have cost duPont to complete prosecution of the interference proceeding.[1168]

XII. DuPont Did Not Conspire to Monopolize.
A. With Sylvania.
(Findings 533–591)

1. PATENT LICENSE AGREEMENT.
(Findings 533–583)

533. Sylvania began manufacture of moistureproof cellophane after issuance

1155. W. W. Smith, Tr. 6563.

1156. W. W. Smith, Tr. 6562–63.

1157. GX 2387, p. 2906, 10/29/36.

1158. W. W. Smith, Tr. 6559–61.

1159. W. W. Smith, Tr. 6561–62.

1160. GX 2408, pp. 2989–92, 11/15/35.

1161. GX 2418, p. 3008, 4/8/36.

1162. W. W. Smith, Tr. 6554.

1163. GX 2462, p. 3105, 8/3/36.

1164. W. W. Smith, Tr. 6555.

1165. GX 2802, p. 6057. GX 2803, p. 6059, 3/21/32.

1166. GX 2802, p. 6057.

1167. GX 2804, p. 6060, 11/15/33.

1168. GX 2804, p. 6060, 11/15/33. GX 2805, p. 6063, 11/15/33. GX 2806, p. 6064, 11/17/33.

to duPont of its basic product patent 1,-737,187 on November 26, 1929.[1169] Sylvania's manufacture and sale of moistureproof cellophane infringed the claims of this patent,[1170] as Sylvania was aware.[1171]

534. Sylvania conducted manufacture of moistureproof cellophane without obtaining a license from duPont after the issuance to duPont on October 6, 1931 of U. S. Patents 1,826,696–1,826,699, which covered coating compositions useful in the manufacture of moistureproof cellophane and apparatus and processes for its manufacture.[1172] Sylvania developed a process and moistureproofing composition which avoided the claims of these four patents. It used a three ingredient coating composition rather than the four ingredient composition patented by du-Pont.[1173] Sylvania's non-infringing composition and process were more expensive to operate than those patented by duPont and produced moistureproof cellophane inferior in quality to that made under the duPont process and composition patents.[1174]

535. Sylvania in February, 1931, advised duPont it planned to manufacture moistureproof cellophane and duPont informed Sylvania the product patent would be enforced.[1175] In July, 1931, Sylvania approached duPont with the suggestion Sylvania would allow duPont to use a newly developed ingredient for moistureproof cellophane, if duPont would agree not to take action on Sylvania's infringement of duPont's product patent. DuPont rejected this suggestion and informed Sylvania it proposed to defend the product patent, but offered to license Sylvania non-exclusively under all present and future moistureproof patents at a royalty of 3% of the selling price and with Sylvania sales to be limited to 10% of total sales of moistureproof. Sylvania declined.[1176]

536. On November 19, 1931, duPont notified Sylvania of infringement of the moistureproof patents stating unless assurances were given infringement had ceased duPont would take steps to protect its rights under its patents.[1177] An action against Sylvania for infringement of moistureproof patents was filed in the United States District Court for the District of Delaware on January 28, 1932,[1178] and refiled in Virginia in January, 1933.[1179] The suit charged infringement of duPont's five basic moistureproof patents.[1180]

537. DuPont was confident of validity of its five moistureproof patents.[1181] After filing suit, it engaged in preparation for trial.[1182]

538. After duPont's infringement action against Sylvania was commenced counsel for Sylvania suggested the case should be settled.[1183] Negotiations between the parties led to a license agreement, dated April 26, 1933, pursuant to

1169. Yerkes, Tr. 6929.

1170. GX 2482, pp. 3204, 3205, 2/18/31. Yerkes, Tr. 6929. Reichel, Tr. 6038, 6039.

1171. Yerkes, Tr. 6928. Reichel, Tr. 6038–39. GX 2482, p. 3204–05, 2/18/31. GX 2478, p. 3181, 11/19/31.

1172. GX 2478, p. 3181, 11/19/31.

1173. DX 543, p. 1007, 1934. Reichel, Tr. 6038–39.

1174. Reichel, Tr. 6038–39.

1175. GX 2482, pp. 3204–05, 2/18/31. GX 2475, p. 3177, 2/26/31.

1176. GX 2478, p. 3181. GX 2483, p. 3206, 7/13/31.

1177. GX 2478, pp. 3181–82. GX 2810, p. 6072, Nov. 1931. GX 2479, p. 3183, 1/28/32. GX 2480, p. 3192.

1178. GX 2478, pp. 3181–82. GX 2479, p. 3183, 1/28/32.

1179. GX 2478, p. 3182.

1180. GX 2479, p. 3183, 1/28/32.

1181. Yerkes, Tr. 6932–33, GX 2811, p. 6073, 6075, 8/4/32. GX 2469, p. 3160, 8/26/30.

1182. GX 487, p. 6463, 1/23/33. GX 489, p. 6491, Dec. 1934. DX 725, p. 1521, 1/24/33.

1183. GX 2811, pp. 6073–74, 8/4/32. Yerkes, Tr. 6931.

which the infringement suit was withdrawn.[1184]

539. Neither party dictated the terms of the license agreement by which the suit was settled.[1185]

540. DuPont did not settle its patent suit against Sylvania by a licensing agreement because of lack of faith in its patents or it feared other methods of moistureproofing might soon be found, or because it desired to minimize competition by restricting the number of manufacturers.[1186]

541. DuPont settled its infringement suit against Sylvania and licensed Sylvania under its moistureproof patents. DuPont's reasons were there was always a possibility duPont would not win the suit, and even if duPont did win, it would have licensed Sylvania anyway.[1187]

542. Sylvania's reason for settling the infringement suit by moistureproof license was it had been unable to avoid infringement of duPont's product patent and there was risk validity of that patent would be sustained, and because the process Sylvania had developed to avoid duPont's composition and process patents was more expensive, so it was economical to settle on a reasonable royalty basis rather than to continue to bear high production costs.[1188]

543. The 1933 Agreement between duPont and Sylvania did not provide for the license of future patents without additional fee.[1189] DuPont never had understanding with Sylvania in connection with the 1933 Agreement the two companies would present a united front to keep other people from manufacturing cellophane.[1190]

544. DuPont offered Sylvania a nonexclusive license, but in course of negotiations for settlement of the suit the license to be granted was at Sylvania's request made exclusive.[1191]

545. The 1933 Agreement contained these terms:

(1) The patents licensed were 1,737,-187 and 1,826,696–99, all issued to duPont and consisting of duPont's basic product patent and its four composition and process patents.[1192]

(2) DuPont granted to Sylvania a license to manufacture, import and sell moistureproof cellophane in the United States, its territories and possessions.[1193]

(3) DuPont agreed to grant Sylvania, at Sylvania's election, licenses under future patents granted to or acquired by duPont, provided the inventions claimed related to moistureproof cellophane and fell within the scope of the five recited patents.[1194]

(4) Sylvania agreed to grant to duPont, at duPont's election, a license under any future patent granted to or acquired by Sylvania prior to October 6, 1948 where the inventions claimed were concerned with the manufacture of moistureproof cellophane and fell within the scope of the five recited patents.[1195]

(5) Licenses granted under the agreement did not obligate the licensee to operate under the licensed patent, and could not be sub-licensed or assigned, except in connection with the transfer of the entire business of the party.[1196]

(6) Licenses granted under the contract extended to October 6, 1948 (the expiration date of duPont's composition and process patents), provided licenses

1184. GX 2486, p. 3210, 8/9/32. GX 2485, p. 3208, 8/11/32. GX 2487, p. 3212, 1933. Yerkes, Tr. 6931, 6933–34. Carpenter, Tr. 6283. Reichel, Tr. 6037–38.

1185. Yerkes, Tr. 6931–36.

1186. Yerkes, Tr. 6933–34.

1187. Yerkes, Tr. 6932–33. Carpenter, Tr. 6283–85.

1188. Reichel, Tr. 6038–39.

1189. GX 2487, pp. 3212, 3216–19, 4/26/33.

1190. Yerkes, Tr. 6935.

1191. Yerkes, Tr. 6935. GX 2483, p. 3206, 7/13/31. GX 2487, p. 3212, 4/26/33.

1192. GX 2487, p. 3212, Par. 1, p. 3213, 4/26/33.

1193. Id. Par. 1, p. 3212.

1194. Id. Par. 2, p. 3213.

1195. Id. Par. 3, pp. 3213–14.

1196. Id. Pars. 4, 16, pp. 3214, 3226–27.

under future patents should continue as to patents under which either of the parties had begun commercial manufacture prior to October 6, 1948.[1197]

(7) Election of a party to take a license under a future patent was required to be made within three months of notice from the other party to exercise the right to election, and the right to a license under the patent expired otherwise.[1198]

(8) Sylvania agreed to pay duPont royalty of 2% of its net selling price of all moistureproof cellophane sold by Sylvania for use within the United States, its territories and possessions, moistureproof cellophane being defined in the language of U. S. Patent 1,737,187.[1199]

(9) Sylvania agreed to pay duPont the 2% royalty on products sold by Sylvania for use within the United States, its territories and possessions, when such products were licensed under future duPont patents, provided the 2% royalty under future patents should be in addition to that payable under the five recited patents only if such future patents covered different processes from those claimed in the five recited patents. The maximum royalty was 2% for the five recited patents and 2% for all future patents, or a total of 4%.[1200]

(10) If duPont acquired a license under a future patent of Sylvania, it was obligated to pay a royalty of 2% of the net selling price of the licensed product sold by it for use within the United States, its territories and possessions, provided the future patent covered different processes from those covered by the five recited patents. The maximum royalty payable by duPont under such future patents was 2%.[1201]

(11) Each of the parties was required to keep records of its sales and imports under the provisions of the agreement, and make quarterly reports to the other showing quantities of goods sold and royalties due. Such records were subject to inspection by the other party. Royalties were payable quarterly with the submission of the quarterly report.[1202]

(12) The royalty payments by Sylvania would be increased to 20¢ per pound or 30% of the net selling price, whichever was greater, on all licensed articles sold by Sylvania for use in the United States, its territories and possessions, constituting quantities in excess of 20% of the combined annual sales of moistureproof cellophane during 1933 of duPont and Sylvania in that area. For each year for nine years subsequent to 1933, 1% was added to the 20% to mark the limit for the corresponding year above which the additional royalty was to be paid. After 1942, percentage of combined sales of moistureproof cellophane which Sylvania might make in the area without imposition of the additional royalty was 29% in each year. Additional royalties were computed on an annual and not a quarterly basis. Each party was required to keep records and permit examination of them by the other to determine additional royalties.[1203]

(13) Royalty payments duPont was obligated to make were increased by 20% or by 30% of the net selling price of the licensed articles, whichever was greater, on all such licensed articles sold by duPont for use in the United States, its territories and possessions, and constituting quantities in excess of 80% of the combined annual sales of duPont and Sylvania of moistureproof cellophane as licensed by Sylvania to duPont during 1933 in that area. For each year for nine years subsequent to 1933, 1% was deducted from the 80% to mark the limit for the corresponding year above which duPont was obligated to pay the additional royalty. After 1942, percentage of the aggregate sales of the articles li-

1197. Id. Par. 5, pp. 3214–15.

1198. Id. Par. 5, p. 3215.

1199. Id. Par. 6, p. 3215.

1200. Id. Par. 8, pp. 3216–17.

1201. Id. Par. 9, pp. 3218–19.

1202. Id. Par. 10, pp. 3219–20.

1203. Id. Par. 11, pp. 3220–21.

censed under Sylvania patents, which du-Pont could make without imposition of the additional royalty, would be 71%. Similar provisions as to annual payment of the royalty and keeping of the records were included as in the case of Sylvania's additional royalty.[1204]

(14) If a third party infringed any patent under which a license had been given under the contract in such a way as to affect sales of licensed material by licensee, licensor was required to sue to stop the infringement, and if it did not do so licensee could discontinue payment of royalty under the infringed claim; if the infringement related to the five recited duPont patents, Sylvania could terminate the agreement; if the infringement related to patents other than the five recited duPont patents, licensee could file suit against the infringer.[1205]

(15) DuPont agreed it would not grant a license to a third party under the five recited patents in respect to the subject matter licensed to Sylvania without Sylvania's consent. Each party agreed it would not grant to any third party any license under the future patents covered by the agreement during the three months period within which the other party had a right to obtain a license, or at any time while a license so acquired remained in force, unless duPont and Sylvania agreed to the terms of the license to the third party.[1206]

(16) Sylvania represented at the date of the execution of the contract it had no U. S. patent relating to the manufacture of moistureproof cellophane, and duPont represented as of the same date it had no U. S. patent relating to the manufacture of moistureproof cellophane except the five recited patents.[1207]

(17) Sylvania acknowledged validity of the five recited patents for the period and for the scope of Sylvania's licensed operations under them. DuPont and Sylvania agreed they would not assist others in infringing or contesting validity of any patent under which a license was granted pursuant to the agreement.[1208]

(18) The right of each party to examine the records of the other as to articles manufactured and sold under the agreement was stated not to include any right to inspect the plants or processes of the other, or to acquire any confidential information concerning plants or processes or other confidential matters.[1209]

546. The 1933 Agreement contained the understandings between the parties and there was no side agreement of any kind.[1210]

547. DuPont was advised by counsel in connection with its negotiation of the 1933 Agreement and the attorneys approved the agreement at the time it was made.[1211]

548. No person connected with Sylvania ever stated to any duPont official Sylvania considered the 1933 Agreement to be illegal.[1212]

549. There was no understanding between duPont and Sylvania for the exchange of patents or technology.[1213]

550. DuPont had no understanding with Sylvania to pool patents and did not exchange patent applications with Sylvania.[1214]

551. The 1933 Agreement did not apply to plain cellophane, only to moistureproof cellophane. It did not provide for exchange of technology. It contained no provisions for fixing of prices or limitation on Sylvania's right to export. It

1204. Id. Par. 12, pp. 3221–22.

1205. Id. Par. 13, pp. 3222–25.

1206. Id. Par. 17, p. 3227.

1207. Id. Par. 20, pp. 3228–29.

1208. Id. Par. 22, pp. 3229–30.

1209. Id. Par. 25, pp. 3231–32.

1210. Yerkes, Tr. 6931–32.

1211. Yerkes, Tr. 6936.

1212. Yerkes, Tr. 6936. Reichel, Tr. 6676–78, 6702.

1213. W. W. Smith, Tr. pp. 6541–43. Reichel, Tr. 6050. Yerkes, Tr. 6931–32.

1214. W. W. Smith, Tr. 6542. Reichel, Tr. 6049–50.

required no payment of royalty on export sales and no royalty on any sales of non-moistureproof cellophane.[1215]

552. At the time of the 1933 Agreement, Sylvania owned no rights under any patent relating to moistureproof cellophane; duPont owned basic patents on its inventions of the product moistureproof cellophane, of moistureproofing compositions, and of processes of manufacture. Consequently, no rights relating to moistureproof cellophane passed to duPont from Sylvania at the time of the 1933 Agreement.[1216] The 1933 Agreement was co-extensive in scope with the claims of duPont's product patent 1,737,187 on moistureproof cellophane, and did not apply to plain cellophane.[1217] At the time of the 1933 Agreement, Sylvania was consciously infringing that patent.[1218] No technical information was licensed under the 1933 Agreement, and neither Sylvania nor duPont at any time transmitted such information to the other.[1219] No patent applications were exchanged pursuant to the Agreement.[1220] No competing processes were licensed.[1221] The 1933 Agreement was terminated January, 1945, two years prior to the expiration of duPont's basic product patent.[1222]

553. DuPont administered the 1933 Agreement according to its terms.[1223]

554. DuPont considered the merit of Sylvania patents as they were issued and when it decided the patent did not fall within the terms of the 1933 Agreement, did not assert a right to obtain a license under the Agreement.[1224]

555. Since execution of the 1933 Agreement, duPont and Sylvania entered into agreements in settlement of patent interferences,[1225] or granted licenses to each other on patents not within the scope of the 1933 Agreement.[1226] Each of these transactions was made individually after arm's-length negotiations and not pursuant to any understanding between duPont and Sylvania.[1227]

556. In determining whether it would take a license from Sylvania, duPont did not consider as a factor Sylvania would be free to license others.[1228]

557. The 1933 Agreement had no obligations or any agreement as to lines of business other than the manufacture and sale of moistureproof cellophane.[1229]

558. During life of the 1933 Agreement duPont obtained licenses from Sylvania on nine patents relating to moistureproof cellophane. DuPont reviewed the value of these patents from time to time, but none of them was of any significance and none was used by duPont in its operation. There is no proof any third party ever sought or desired a license under any of these nine Sylvania patents.[1230]

559. None of the nine patents licensed by Sylvania to duPont pursuant

1215. GX 2487, p. 3212, 4/26/33.

1216. Reichel, Tr. 6038–39. GX 1, p. 14, 2/17/44. Yerkes, Tr. 6929.

1217. W. W. Smith, Tr. 6603–05.

1218. Reichel, Tr. 6038–39. Yerkes, Tr. 6928. GX 2482, pp. 3204–05, 2/18/31. GX 2478, p. 3181, 11/19/31.

1219. W. W. Smith, Tr. 6541–43. Reichel, Tr. 6050. GX 1, p. 17, 2/17/44.

1220. W. W. Smith, Tr. 6542.

1221. W. W. Smith, Tr. 6539.

1222. GX 2737, p. 3606, 1/1/45.

1223. W. W. Smith, Tr. 6536–37, 6541.

1224. DX 714, p. 1478, 5/11/42. DX 715, p. 1480, 9/9/43. DX 716, p. 1482, 1/2/45. W. W. Smith, Tr. 6536–37.

1225. GX 2001, pp. 1954, 2031. GX 2036, p. 2659, 8/31/42.

1226. W. W. Smith, Tr. 6540–41. GX 2198, p. 2463, 10/22/37. GX 2531, p. 3321, 4/6/42. GX 2051, p. 2122, 4/9/43. GX 2132, p. 2278, 4/1/37. GX 2133, p. 2293, 4/1/37. GX 2295, p. 2646, 8/7/42.

1227. Reichel, Tr. 6050. W. W. Smith, Tr. 6548.

1228. W. W. Smith, Tr. 6540.

1229. GX 1100, p. 1208, 5/24/33.

1230. DX 715, p. 1480, 6/9/43. DX 716, p. 1482, 2/2/45. GX 2741, p. 3624, 5/1/44. W. W. Smith, Tr. 6537, 6540–41.

to the 1933 Agreement enhanced du-Pont's position in the manufacture of cellophane.[1231]

560. It was not possible to manufacture moistureproof cellophane under one or all of patents licensed by Sylvania to duPont.[1232]

561. The patents licensed to Sylvania by duPont under the 1933 Agreement were used by Sylvania in all its production of moistureproof cellophane. In making a non-heat-sealing moistureproof cellophane, Sylvania used seven patents, five of which were licensed to it by du-Pont.[1233] In making a heat-sealing anchored moistureproof cellophane, Sylvania used thirteen patents, eleven of which were licensed to it by duPont.[1234] In making various other types of moistureproof films, Sylvania used nineteen patents, fifteen of which were licensed to it by duPont.[1235]

562. There is no proof any person other than Sylvania desired a license from duPont to engage in the manufacture of moistureproof cellophane during the life of the five basic duPont patents. Marathon Corporation in the late 1930's, and several other companies during World War II, desired to purchase plain cellophane and apply it to a moistureproof coating or laminate.[1236] Marathon was licensed to engage in coating plain cellophane for cheese packaging.[1237] Other persons who desired to coat plain cellophane they purchased from cellophane manufacturers were not licensed.[1238]

563. DuPont licensed seven companies at times under one or more of its five basic moistureproof patents. The identity of the licensees was as follows:[1239]

(1) #1,737,187—Sylvania.
 Marathon Corporation.

(2) #1,826,696—Riegel Paper Company.
 Rhinelander Paper Company.
 Pyroxylin Company.
 Eastman Kodak Company.
 Sylvania.

(3) #1,826,697—Riegel Paper Company.
 Rhinelander Paper Company.
 Hercules Powder Company.
 Sylvania.

(4) #1,826,698—Riegel Paper Company.
 Rhinelander Paper Company.
 Hercules Powder Company.
 Sylvania.

(5) #1,826,699—Riegel Paper Company.
 Rhinelander Paper Company.
 Hercules Powder Company.
 Eastman Kodak Company.
 Pyroxylin Company.
 Sylvania.

564. At the time of execution of the 1933 Agreement, the provision for additional royalty was academic, since Syl-

1231. W. W. Smith, Tr. 6537–39. GX 2741, pp. 3624–25, 5/1/44.

1232. W. W. Smith, Tr. 6539.

1233. DX 711, p. 1463, 1467, 1/7/44. GX 2568, p. 3372.

1234. DX 711, pp. 1463, 1469, 1/7/44. GX 2568, p. 3372.

1235. DX 711, pp. 1463, 1470, 1/7/44. GX 2568, p. 3372. GX 403.

1236. GX 2524, p. 3309, 11/30/39. GX 2512, p. 3283, 6/11/45. GX 2717, p. 3564, 8/4/42. GX 2698, p. 3539, 2/24/42.

1237. GX 2515, p. 3287, 9/19/39. GX 2524, p. 3309, 11/30/39.

1238. GX 2718, p. 3565, 6/29/43. GX 2698, p. 3539, 2/24/42.

1239. GX 403.

vania's production of moistureproof cellophane was below the 20% allowed in the initial year.[1240]

565. During the period of April 1933-January 1, 1945, when the 1933 Agreement was in force, Sylvania could have sold in the United States without paying additional royalty of 20¢ per lb. 53,718,-658 lbs. of moistureproof cellophane manufactured under its licenses from duPont. This would have amounted to a 31.4% increase in its domestic sales of moistureproof cellophane during the period of the Agreement.[1241]

566. Sylvania's domestic sales of moistureproof cellophane under the 1933 Agreement, percentage such sales bore to combined domestic sales and percentage of combined sales Sylvania could have sold without paying additional royalty of 20¢ per lb. are shown for the years the 1933 Agreement was in force:

| Year | Sylvania Sales Subject to 1933 Agreement | Sylvania Sales as Percentage of Combined Domestic Sales | Percentage of Total Sylvania Could Sell Without Payment of 20¢ Royalty |
|---|---|---|---|
| 1933— | 2,287,595 | 12.7 | 20 |
| 1934— | 5,404,645 | 17.4 | 21 |
| 1935— | 7,517,440 | 20.4 | 22 |
| 1936— | 9,972,998 | 21.2 | 23 |
| 1937— | 10,948,310 | 20.6 | 24 |
| 1938— | 13,019,458 | 22.8 | 25 |
| 1939— | 14,615,780 | 21.2 | 26 |
| 1940— | 15,893,742 | 20.7 | 27 |
| 1941— | 20,208,342 | 20.7 | 28 |
| 1942— | 23,731,356 | 24.9 | 29 |
| 1943— | 23,933,070 | 22.7 | 29 |
| 1944— | 23,300,455 | 22.8 | 29 [1242] |

567. Sylvania was advised at each quarter by duPont of percentage of total domestic sales of moistureproof cellophane Sylvania had achieved in that quarter.[1243] The application of excess royalty for sales in excess of the percentage stated in the Agreement was on an annual rather than a quarterly basis.[1244]

568. Sylvania's plans for expansion of production were never affected by the existence of the 1933 Agreement. Sylvania never followed a policy of curtailing its production.[1245]

569. Royalties paid by Sylvania under the 1933 Agreement did not impair Sylvania's ability to compete with duPont.[1246]

570. Royalties paid by Sylvania under the 1933 Agreement amounted to less than 1¢ per pound.[1247]

571. Sylvania paid duPont approximately $1,500,000 in royalties under the 1933 Agreement during its effectiveness from April 1933 to January 1, 1945.[1248] In addition to obtaining rights under duPont's basic product patent Sylvania benefited from the Agreement by being able to use duPont's patented compositions and processes which were more economical than Sylvania's independent composition and process.[1249] Royalties never

1240. DX 712, p. 1471.

1241. DX 712, p. 1471.

1242. DX 712, p. 1471.

1243. Reichel, Tr. 6687. GX 2487, pp. 3212, 3219, 4/26/33. GX 2639, p. 3463, 11/20/35. GX 2681, p. 3515, 1/28/36.

1244. GX 2487, pp. 3212, 3219, 4/26/33.

1245. Reichel, Tr. 6042-44.

1246. Reichel, Tr. 6048.

1247. Reichel, Tr. 6088-89. DX 712, p. 1471.

1248. GX 2748, p. 3633, 11/27/44.

1249. Reichel, Tr. 6039, 6100-01.

prevented Sylvania from expanding its production, and Sylvania never considered the royalties an impediment to its ability to produce and expand.[1250] Its policies as to expansion in no way changed following the termination of the 1933 Agreement in 1945,[1251] although the new 1945 Agreement had no provision for increased royalty rates based on any amount of moistureproof cellophane sold.[1252]

572. The royalty provisions in the 1933 Agreement did not apply to sales of plain cellophane or exports of moistureproof cellophane.[1253] They did not apply to sales of cellophane made under patents of the selling party, but only to sales which the party made of products licensed under patents of the other party.[1254] Without being required to pay any royalty whatever to duPont, Sylvania was free to sell any amount of plain cellophane, any amount of moistureproof cellophane for export, and any amount of any cellophane utilizing solely Sylvania's own patents.

573. As there is no evidence of Sylvania's cost of manufacture,[1255] there is no proof of its domestic sales of moistureproof cellophane had ever exceeded the percentage of total domestic sales of moistureproof cellophane stated in the contract, payment of the extra royalty on the portion in excess would have caused Sylvania to take a loss on that portion of its moistureproof cellophane sales. There is no proof the additional royalty payable on excess sales would have caused Sylvania's entire sale of moistureproof cellophane to have been conducted at a loss.[1256]

574. Although Sylvania expanded its productive capacity as its financial condition would permit, it never reached a percentage of domestic sales of moistureproof cellophane that entailed payment of the additional royalty.[1257]

575. Sylvania's domestic sales of moistureproof cellophane approached the percentage in the 1933 agreement only in 1935.[1258] Sylvania continued to enlarge its production facilities, adding two casting machines in 1936 and an additional one in both 1937 and 1938.[1259]

576. Sylvania increased the number of its casting machines in operation from twelve in 1934 to fifteen in 1935, seventeen in 1936, eighteen in 1937, and nineteen in 1938.[1260] It increased the number of its machines for applying moistureproof coating from six in 1935 to seven in 1936, and to ten in 1937.[1261] Its production of moistureproof cellophane increased from 8.3 million pounds in 1935 to 11.9 million pounds in 1936, and 13.9 million pounds in 1937. Sylvania's total cellophane production increased from 13.8 million pounds in 1935 to 20 million pounds in 1936, to 20.7 million pounds in 1937, and to 21.3 million pounds in 1938.[1262]

577. Sylvania's production of moistureproof cellophane and its proportion of national sales of moistureproof cellophane increased in the period of 1933–1936, following a license to Sylvania by duPont of product and process patents on moistureproof cellophane.[1263] The license enabled Sylvania to improve the quality of its moistureproof film.[1264]

1250. Reichel, Tr. 6039, 6048.

1251. Reichel, Tr. 6040.

1252. GX 2755, p. 3642, 1/1/45. GX 2758, p. 3656, 1/18/45.

1253. GX 2487, p. 3212, Para. 8, p. 3216, 4/26/33. Id. Para. 9, p. 3218.

1254. Id. Para. 8, p. 3216. Id. Para. 9, p. 3218.

1255. DX 1026.

1256. Reichel, Tr. 6040–41.

1257. Reichel, Tr. 6040–41. DX 712, p. 1471.

1258. DX 712, p. 1471.

1259. GX 410, p. 5596.

1260. GX 410, pp. 5592, 5596.

1261. GX 410, pp. 5592, 5599.

1262. GX 410, p. 5592.

1263. GX 542. DX 543, pp. 1004–08, 1016.

1264. DX 543, p. 1008. Reichel, Tr. 6100–01.

The license removed reluctance of some consumers to use the Sylvania moisture-proof film because it infringed duPont patents.[1265]

578. Sylvania increased its assets from its organization until 1946, when it was acquired by American Viscose Corporation.[1266] American Viscose's total assets as of 1950 were approximately 272 million dollars.[1267] Much of its assets are devoted to production of products other than cellophane, notably rayon.[1268]

579. The 1933 Agreement was amended in 1938.[1269] The amendment eliminated the provision the consent of the other party had to be obtained before licensing a third party under patents licensed under the agreement,[1270] and substituted a provision that licenses granted under the agreement were exclusive rather than non-exclusive.[1271]

580. The 1933 Agreement was terminated January 1, 1945.[1272]

581. DuPont and Sylvania entered into an agreement on January 1, 1945 (called the "1945 Agreement") which differed from the 1933 Agreement in the following ways:

(1) Licenses granted were non-exclusive rather than exclusive.[1273]

(2) Licenses granted applied only to patents specified in the agreement without any provision for the licensing of future patents.[1274]

(3) Royalties under the five original moistureproof patents, which were to expire in 1946 and 1948, were 1¾% of the net selling price during 1945, reducing ¼% per year to 1% in 1948.[1275]

(4) Royalties on patents licensed to Sylvania under the 1933 Agreement subsequent to its execution, and specified in the 1945 Agreement, were 2% of net selling price. This 2% rate was not cumulative, but on products sold by Sylvania under patents with different rates of royalty, the higher royalty rate was to apply.[1276]

(5) DuPont was granted licenses under nine named Slyvania patents, under five of which it was to pay no royalty and under four of which royalty was 1% of net selling price.[1277]

(6) Each party agreed if it licensed the same patent to a third party under terms more favorable than those in the 1945 Agreement, it would notify the other party and give it the privilege of substituting the more favorable terms.[1278]

As in the 1933 Agreement, royalty payments applied only to sales in the United States, its territories and possessions, and were limited to sales of moistureproof cellophane as defined in duPont's basic product patent, 1,737,187.[1279]

582. During the quarter preceding expiration of duPont's four basic process patents in 1948, royalties from Sylvania were at a rate of approximately $40,000 per quarter. During the first two quarters of 1949 they dropped to slightly more than $3,000 per quarter. It seems the duPont patents widely used in Sylvania's production of moistureproof cellophane in addition to the product patent 1,737,187 were the process patents issued in 1931.[1280]

1265. DX 543, pp. 1007–08.

1266. DX 538, p. 994, 1951. Reichel, Tr. 6018.

1267. DX 538, p. 994, 1951.

1268. Reichel, Tr. 6019.

1269. GX 2488, p. 3238, 7/12/38.

1270. GX 2487, p. 3212, Para. 17, p. 3227, 4/26/33.

1271. GX 2488, pp. 3238–40, 7/12/38. GX 2489, p. 3242, 7/19/38.

1272. GX 2737, p. 3606, 1/1/45.

1273. GX 2487, p. 3212, 4/26/33. GX 2755, p. 3642, 1/1/45.

1274. GX 2755, Para. 1, pp. 3642–44, 1/1/45.

1275. Id., Par. 2, pp. 3644–45.

1276. Id., Par. 2(B), (C), p. 3645.

1277. Id., Pars. 3, 4, pp. 3645–46.

1278. Id., Par. 10, p. 3649.

1279. Id., Par. 3, p. 3645.

1280. GX 2920, p. 7853, 10/9/49.

583. The 1933 Agreement did not have the effect of channeling to duPont from Sylvania technical information and significant patent rights. No technical information or patent application was transmitted.[1281] None of the 9 patents licensed to duPont had commercial significance.[1282]

## 2. PRICES.

### (Findings 584–591)

584. There was no express or implied agreement between duPont and Sylvania as to prices either would charge for cellophane of its own manufacture.[1283]

585. DuPont established prices for its cellophane independently of Sylvania. There were no agreements as to what prices should be charged, one company would follow the prices of the other, or published prices would be observed. Proof does not support an inference of agreement between duPont and Sylvania as to prices.[1284]

586. DuPont changed prices for cellophane and without notice of any kind to Sylvania a change was planned.[1285]

587. When duPont made a price reduction on its cellophane during the period 1930–1947, Sylvania would obtain from its customers a copy of the new duPont price list, and thereafter, in order to remain competitive, would issue its own price list back dated to an effective date the same as on the duPont list. Although effective date of the two lists was the same, the lists were not issued to the trade at the same time.[1286]

588. Identity of duPont and Sylvania price lists prior to 1947 was due to Sylvania's desire to obtain as high a price for its cellophane as it could and its inability to sell its product at higher prices in competition with duPont cellophane.[1287] During 1949 Sylvania's list prices were higher than those of duPont and its sales suffered as a result.[1288]

589. DuPont's price reductions did not diminish Sylvania's ability to compete with duPont. DuPont's price reductions appeared to Sylvania to be normal in an expanding business and had the effect of stimulating business and opening up new uses.[1289]

590. Sylvania made profits throughout its existence, except during 1937 and 1938 [1290]

591. There is no proof duPont's prices were identical to those of Sylvania for sales to jobbers, agents, or for export.[1291]

## B. With foreign concerns to exclude imports.

### (Findings 592–645)

592. Cellophane produced by duPont has been manufactured with the use of the basic machinery and process obtained from La Cellophane.[1292] DuPont's developments in equipment and techniques for production of the base film have been improvements on Brandenberger's discovery of machinery and a process for manufacturing a film of thin transparent regenerated cellulose in continuous sheet form.[1293]

---

1281. W. W. Smith, Tr. 6541–43. Reichel, Tr. 6050.

1282. W. W. Smith, Tr. 6537–40.

1283. Yerkes, Tr. 6947. Reichel, Tr. 6045.

1284. Hamburg, Tr. 1619. Replogle, Tr. 1923. Reichel, Tr. 6045, 6069–73. Yerkes, Tr. 6947.

1285. Hamburg, Tr. 1619. Replogle, Tr. 1923. Reichel, Tr. 6069. Yerkes, Tr. 6947.

1286. Hamburg, Tr. 1619. Reichel, Tr. 6069–73.

1287. Reichel, Tr. 6045–46. Reichel, Tr. 6069–6078.

1288. Reichel, Tr. 6099. DX 591, p. 1128, 1951. DX 596, p. 1169, 4/7/50.

1289. Reichel, Tr. 6045–46.

1290. Reichel, Tr. 6074. DX 538, p. 994, 1951.

1291. Cook, Tr. 2201, 2226–28. Hamburg, Tr. 1611–14.

1292. Ernst, Tr. pp. 5341–67. DX 369, p. 689.

1293. McCune, Tr. 5542–80. DX 369, p. 689.

**160**

593. When La Cellophane licensed duPont Cellophane Co. under its patents and secret processes for North and Central America, it reserved its patents and processes for itself in the rest of the world.[1294] La Cellophane continued to employ its patents and processes in the manufacture and sale of cellophane in areas outside North and Central America.[1295] Subsequently it licensed Kalle & Co., A. G., and British Cellophane, Ltd. exclusively under its patents and processes for certain countries.[1296]

594. Kalle & Co., A. G. (hereinafter referred to as "Kalle") prior to advent of World War II was a German corporation and then had principal place of business in Wiesbaden-Biebrich, Germany.[1297] Prior to World War II Kalle manufactured plain cellophane in Germany under a license from La Cellophane for certain central European countries and China.[1298]

595. British Cellophane, Ltd. (referred to as BCL) is a United Kingdom corporation with principal place of business at London, England. It was formed as a jointly owned subsidiary of La Cellophane and Courtaulds, Ltd., and was such a subsidiary for some time thereafter. It produces cellophane in England.[1299]

596. By Article 6 of the Agreement of December 26, 1923, future licensees of La Cellophane should receive technical information and inventions of duPont Cellophane Company free of charge.[1300] This provision was put into effect following La Cellophane's license to Kalle and to BCL, by duPont Cellophane Company's entering into a technical exchange agreement with each of these concerns so that rights under patents and technical information were transmitted between duPont and each of La Cellophane's European licensees directly instead of indirectly through La Cellophane.[1301]

597. Canadian Industries Limited is a Canadian corporation with principal place of business in Montreal. It was organized by duPont and Imperial Chemical Industries, Limited in 1910 for the purpose of making explosives in Canada. Each of these companies owned approximately 42% of CIL voting stock, and each had four representatives on CIL's Board of Directors of fifteen directors. CIL manufactures a wide range of chemical products in Canada, including explosives, ammunition, alkali, fertilizer, nylon, cellophane, paints, artificial leather, general chemicals, etc.[1302] Total sales of CIL for 1950 were $120,669,602.00 of which cellophane accounted for 6.7%.[1303]

598. Imperial Chemical Industries, Ltd. is not a manufacturer of cellophane.[1304]

599. DuPont sub-licensed Canadian Industries Ltd. exclusively for Canada under the patents and processes it had received from La Cellophane.[1305]

600. DuPont put CIL in the cellophane business, furnishing all technical assistance, plant construction, engineering service, etc.[1306]

601. License agreements between duPont and La Cellophane, Kalle, BCL and CIL represented the only agreements between duPont and foreign manufacturers.[1307] Each of these agreements was

1294. GX 1001, p. 1, 6/9/23.

1295. Answer, Par. 4, 16. Goland, DX 1015, pp. 178–80.

1296. Carpenter, Tr. 6290–92.

1297. Answer, Par. 7.

1298. Carpenter, Tr. 6290–92. GX 1396, p. 1805, 5/27/26. GX 1089, p. 1193, 10/4/29. GX 1091, p. 1195, 10/30/29.

1299. Answer, Par. 5.

1300. GX 1002, pp. 998–1003, 12/26/23.

1301. Carpenter, Tr. 6290–92. GX 1, pp.

7–8, 2/7/44. GX 1087, pp. 1183–86, 5/7/29. GX 1109, pp. 1229–35, 5/3/35.

1302. Swint, Tr. 6215.

1303. DX 766, p. 1626.

1304. Swint, Tr. 6219. GX 1143, p. 1302, 2/1/36.

1305. Swint, Tr. 6219–20. DX 1002, 11/1/33. GX 1157, pp. 1346–47, 12/8/33.

1306. Swint, Tr. 6219. Ernst, Tr. 5367.

1307. Swint, Tr. p. 6234. Swint, Tr. p. 6206. Carpenter, Tr. p. 6273.

carried out in accordance with its terms.[1308]

602. DuPont Cellophane Co. under its agreement with La Cellophane was licensed to use La Cellophane's technical information for manufacture and sale only in North and Central America.[1309] Kalle, BCL and CIL were each licensed by their separate agreements with du-Pont to use duPont's technical information for manufacture and sale only in the countries specifically covered by their respective licenses.[1310]

603. Until October 17, 1940, duPont did not attempt to sell its cellophane, manufactured with the use of information received from La Cellophane, in countries where no license had been granted to it by La Cellophane.[1311]

604. On October 17, 1940, duPont notified Kalle, La Cellophane, BCL and CIL territorial limitations placed upon use of unpatented secret processes and technical information would no longer be observed.[1312] From date of this notice each of these companies was free to sell cellophane made with duPont secret processes in the United States except as barred by unlicensed patents. Immediately duPont made an effort to investigate and exploit foreign markets where it had not previously sold, and thereafter sold wherever it could get an order and obtain payment.[1313] These exports went to customers in Europe, the Far East, the Middle East, nearly every country of the British Commonwealth and India.[1314] DuPont competed in these markets with La Cellophane, BCL, Kalle, Wolff, and other European manufacturers, as well as Sylvania.[1315]

605. Since October 17, 1940, duPont has not observed any territorial limitations upon the import or export of cellophane.[1316]

606. Since 1940, duPont has exported the following quantity of cellophane to countries from which it was previously barred from selling under the terms of the license from La Cellophane.

1308. GX 1096, p. 1201, 2/16/32. GX 1099, p. 1206, 3/20/33. GX 1102, p. 1210, 4/27/34. GX 1119, p. 1261, 1/19/37. GX 1131, p. 1282, 8/22/38. GX 1132, p. 1283, 7/24/43. GX 1134, p. 1286, 1/5/45.

1309. GX 1002, p. 1000, 12/26/23. GX 1001, p. 986, 6/9/23.

1310. GX 1087, pp. 1183–86, 5/7/29. GX 1109, pp. 1229–35, 5/3/35.

1311. GX 1273–76, pp. 1602–05, 10/17/40. GX 399, pp. 5569–70, 5/15/50. DX 794, p. 1682, 10/18/40. DX 799, p. 1695, 12/18/40.

1312. GX 1273–76, pp. 1602–05, 10/17/40.

1313. DX 794, p. 1682, 10/18/40. DX 795–96, pp. 1683–89, 10/23/40. DX 798, p. 1693, 11/5/40. DX 799, p. 1695, 12/18/40.

1314. GX 399, pp. 5569–70, 5/15/50.

1315. GX 445, pp. 5822–24, 1/48. DX 593, pp. 1133–34, 1947. DX 594, p. 1140, 1948. DX 595, pp. 1151–52, 1949. DX 596, pp. 1171–72, 4/7/50.

1316. Swint, Tr. 6215. GX 1273–76, pp. 1602–05, 10/17/40. DX 794, p. 1682, 10/18/40. DX 799, p. 1695, 12/18/40. GX 399, pp. 5569–70, 5/15/50. DX 791, p. 1677. DX 792, pp. 1678–79, 1951.

| Country | 1940 | 1941 | 1942 | 1943 | 1944 | 1945 | 1946 | 1947 | 1948 | 1949 | 1950 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Angolia | — | 1,951 | — | — | — | — | — | 110 | 3,899 | — | — |
| Australia | — | — | 70,028 | 432,228 | 142,106 | 71,238 | — | — | — | — | — |
| Austria | — | — | — | — | — | — | — | — | — | 20,098 | — |
| Azores | — | — | 1,169 | — | — | — | — | — | — | — | — |
| Belgium Congo | — | — | — | — | — | — | — | — | — | — | — |
| Belgium | — | 1,652 | — | — | — | — | — | — | 4,714 | 752 | 498 |
| Canary Islands | 4,075 | 3,007 | — | — | — | — | — | — | — | 966 | 12,119 |
| Celebes | — | — | — | — | — | — | — | — | — | — | — |
| China | — | 5,666 | 4,462 | — | — | — | — | — | 44,047 | — | (1,887) |
| Denmark | 41,774 | — | — | — | — | — | — | — | — | — | 5,395 |
| Egypt | — | 33,453 | — | — | — | — | — | — | — | — | — |
| England | — | — | — | — | — | — | — | — | — | 11,226 | — |
| Ethiopia | — | — | — | — | — | — | — | — | — | 7,119 | 7,134 |
| Finland | — | — | — | — | — | — | — | — | 1,086 | — | — |
| France | — | — | — | — | — | — | — | — | — | 259 | — |
| Germany | — | — | — | — | — | — | — | — | — | 1,729 | — |
| Greece | — | — | — | — | — | — | — | — | 465 | 368 | — |
| Iceland | 872 | — | — | — | — | — | — | — | — | — | — |
| India | — | — | 3,439 | 899 | 592 | — | — | — | 6,466 | 5,787 | 8,554 |
| Iran | — | — | 119 | 614,909 | — | 542,306 | — | — | 22,365 | — | 1,243 |
| Iraq | — | — | — | — | — | — | — | — | — | — | 278 |
| Italy | 60,237 | 107,086 | 193,244 | 143,535 | 66,797 | 48,896 | — | — | — | 83,835 | 2,868 |
| Java | 46 | 95 | 21,920 | — | — | — | — | — | — | 9,149 | — |
| Liberia | — | — | — | — | — | — | 76 | — | — | — | — |
| Luxembourg | — | — | — | — | 2,302 | 2,443 | — | — | — | 4,372 | 21,887 |
| Morocco (French) | — | 373 | — | — | — | — | — | — | — | — | — |
| Netherlands | — | — | — | — | — | — | — | — | 432 | — | — |
| New Zealand | — | — | 45,158 | — | 4,492 | 1,943 | — | — | — | — | — |
| Palestine | — | 711 | — | — | — | — | — | — | 1,074 | — | — |
| Philippine Is. | 123,466 | 173,864 | — | — | — | — | — | 166,012 | 159,900 | 210,311 | 492,745 |
| Portugal | 1,295 | 29,473 | 26,721 | 16,859 | 1,497 | 27,202 | — | — | 10,588 | — | — |
| Port E. Africa | — | 1,126 | — | — | 881 | — | — | — | 3,922 | 3,186 | — |
| Siam | — | — | — | — | — | — | — | — | — | — | — |
| Spain | — | — | — | — | — | — | — | 70 | — | — | 9,949 |
| Sumatra | — | — | — | — | — | — | — | — | — | — | — |
| Sweden | — | — | — | — | — | — | — | — | — | 958 | 23,547 |
| Switzerland | — | 10,877 | 104,874 | — | — | — | — | 3,391 | 8,545 | 88,667 | 122,175 |
| Tangiers | — | — | — | — | — | — | — | — | 2,184 | — | 139 |
| Union of S. Africa | 2,444 | 35,438 | — | — | — | — | — | — | 93,952 | 165,242 | 79,484 |

Limitations that have prevented larger shipments have been:
(1) Wartime shortage of cellophane in the United States.
(2) Wartime restrictions on shipping.
(3) Wartime and postwar import and currency restrictions abroad.[1317]

1317. DX 791, p. 1677, 1951.

607. DuPont continues to sell cellophane to any market abroad where an order may be obtained.[1318] Sales have been limited in nearly all countries of the world because of foreign restrictions on payment in United States currency.[1319]

. 608. DuPont cancelled its technical exchange agreements with Kalle and with La Cellophane in 1941, when German authorities made it impossible for Kalle or La Cellophane to exchange technical information with duPont.[1320] Du-Pont cancelled its agreement with BCL in 1948.[1321] In each of these cases, cancellation was final and bona fide, and du-Pont ceased to conduct itself in accordance with the cancelled agreements.[1322] The evidence contains no indication of possibility these agreements will be revived in any form.

609. DuPont Cellophane Company exchanged rights under technical information, inventions, patent rights, etc. as to cellophane with La Cellophane, Kalle, and BCL as provided for in the agreement of December 26, 1923 and in agreements with Kalle and BCL.[1323] This continued until the termination of these agreements.[1324] In contrast with the initial communication of the process from La Cellophane to duPont, the later exchanges did not disclose to duPont any important or commercially useful inventions or information.[1325]

. 610. Rights under few patents of any importance were received by duPont from the foreign manufacturers of cellophane with whom duPont had technical exchange agreements. In all, 21 patents came from La Cellophane, 3 from BCL, and 14 from Kalle.[1326] This was less than half of the patents under which licenses were offered to duPont by these concerns.[1327]

611. Of the 21 patent rights received by duPont from foreign manufacturers with which it had technical exchange agreements, three related to moisture-proof cellophane. One was obtained from Kalle, two from BCL, and none from La Cellophane.[1328]

612. DuPont did not file for United States patents equivalent to foreign patents on cellophane obtained by La Cellophane, Kalle, and BCL. DuPont actually filed for United States patents in less than half of the cases submitted to it by the foreign companies.[1329]

613. There is no proof duPont received patents or technical information relating to cellophane from any European concern other than La Cellophane and its licensees Kalle and BCL, or any of these three transmitted any patent or technical information to duPont except as provided in their formal technical exchange agreements with duPont.

614. Transmission of technical information and patent rights to duPont by La Cellophane, BCL and Kalle, subsequent to the transmission to duPont by La Cellophane of the essential secret process and technical information, did not provide duPont with information or patent rights of any commercial impor-

1318. Swint, Tr. 6214–15. GX 399, pp. 5569–70, 5/15/50. DX 791, p. 1677.

1319. GX 580, pp. 7331–32, 8/8/50. DX 594, p. 1140, 1948. DX 801, p. 1784, 12/6/48. DX 596, pp. 1171–2, 4/7/50.

1320. Answer, Par. 41. Swint, Tr. 6214. Yerkes, Tr. 6928. DX 759, pp. 1616–17, 3/26/41. GX 1278, pp. 1607–11, 3/17/41. GX 1279, pp. 1612–13, 3/26/41. GX 1280, pp. 1614–16, 3/26/41.

1321. DX 765, pp. 16.23–25, 8/1/48.

1322. Swint, Tr. 6214–15. Yerkes, Tr. 6928. DX 760, p. 1618, 2/14/47. DX 761, p. 1619, 3/11/47. GX 399, pp. 5569–70, 5/15/50.

1323. Mitchell, Tr. 5535. GX 1051, p. 1095, 6/23/32.

1324. GX 1279, pp. 1612–13, 3/26/41. GX 1280, pp. 1614–16, 3/26/41. DX 765, pp. 1623–25, 8/1/48.

1325. Mitchell, Tr. 5535. W. W. Smith, Tr. 6528–32.

1326. W. W. Smith, Tr. 6528–32. Mitchell, Tr. 5535.

1327. W. W. Smith, Tr. 6528.

1328. W. W. Smith, Tr. 6530–32.

1329. W. W. Smith, Tr. 6528.

tance. Evidence is uncontradicted the information duPont received relating to moistureproof cellophane had no value whatever to duPont and was never used,[1330] and inventions related to such inconsequential matters as the use of cellophane as cigarette paper or lamp shades, and coating compositions for which the ingredients were not available in the United States.[1331] The record does not indicate any such information or patent right received by duPont from these companies contributed in any way to duPont's productive efficiency or the volume of duPont sales of cellophane.

615. About 1924, Ernest Bleibler, Chief Engineer of La Cellophane, and one of the La Cellophane's principal sales and administrative personnel, absconded with blueprints and complete information as to La Cellophane's secret process for cellophane manufacture.[1332] These men, with financial support of a Belgian syndicate, founded the Belgian concern, Societe Industrielle de La Cellulose (SIDAC).[1333] This concern built a plant in Belgium after the French model, using La Cellophane's process and information.[1334]

616. After this, affiliates of SIDAC were founded in the United States, the United Kingdom and Italy, known as Sylvania, British SIDAC and Italian SIDAC.[1335]

617. On April 15, 1929, Sylvania, SIDAC, and Compagnie Internationale des Industries Chimiques executed an agreement under which Sylvania got rights to processes and financing to enter cellophane manufacture, and by the terms of which SIDAC agreed not to manufacture or sell cellophane in the United States for a period of 30 years.[1336] DuPont had nothing to do with this contract.[1337]

618. Belgian SIDAC took a substantial share in the stock of Sylvania.[1338] In addition, all of the processes, engineering assistance, technical information and operating knowhow used by Sylvania were supplied to it by Belgian SIDAC.[1339] Ernest Bleibler was sent to Fredericksburg to supervise the planning, building and commencement of manufacture of Sylvania's cellophane plant.[1340] In 1929 the two companies entered into a technical exchange agreement, and technical information, patent rights, and inventions have been exchanged between the two companies ever since.[1341]

619. La Cellophane sued SIDAC in Belgium for theft of the secret processes and the patent infringement,[1342] but terminated the suit in 1930 upon an offer of SIDAC to settle the litigation by turning over to La Cellophane approximately one-third of the shares of SIDAC.[1343] The amount of indemnity was negotiated between the two parties. Some substantial stockholding in SIDAC, the precise amount of which is not clear, was issued to La Cellophane.[1344]

620. When La Cellophane took stock in SIDAC in settlement of the litigation over piracy of the process, it became indirectly interested in Sylvania. This was a breach of the agreement between La Cellophane and duPont of June 9,

1330. Mitchell, Tr. 5535.

1331. W. W. Smith, Tr. 6530–32.

1332. Reichel, Tr. 6056; Ernst, Tr. 5365.

1333. Reichel, Tr. 6056. GX 1, p. 12, 2/17/44.

1334. Reichel, Tr. 6056–57. Ernst, Tr. 5366.

1335. Reichel, Tr. 6036.

1336. DX 999, 4/15/29.

1337. Reichel, Tr. 6034.

1338. Reichel, Tr. 6053–54. DX 999, Art. 6, 4/15/29.

1339. Reichel, Tr. 6031.

1340. Reichel, Tr. 6031.

1341. Reichel, Tr. 6035–36. DX 999, Art. 4, 4/15/29.

1342. Swint, Tr. 6194. GX 1410, p. 1831, 11/14/29.

1343. GX 1410, p. 1831, 11/14/29. GX 1007, p. 1012, 10/25/29.

1344. GX 1410, p. 1831, 11/14/29. GX 1010, p. 1020, 1/14/30.

1923, which provided in Paragraph 11 La Cellophane should not directly or indirectly engage in the cellophane business in North or Central America except through its interest in the duPont Cellophane Company.[1345] Negotiations ensued between La Cellophane Company and the duPont Cellophane Company as to means of compensating duPont Cellophane Company for contract breach.[1346] Executives of duPont and the duPont Cellophane Company considered compensation in the form of cash, of stock of SIDAC or Sylvania (if obtainable), or a relaxation of the terms of the license from La Cellophane to grant duPont Cellophane Company a non-exclusive license for additional territories.[1347] The third form of compensation was adopted as the policy of the duPont Cellophane Company and was supported by the executives of duPont, and by both duPont and foreign representatives of the duPont Cellophane Company Board.[1348] Frederick W. Pickard and Wendell R. Swint commenced the negotiations with La Cellophane toward this end in January, 1930.[1349]

621. La Cellophane refused to grant the duPont Cellophane Company the rights it sought to sell world-wide cellophane made with the use of French information, and it was agreed, after meetings with La Cellophane's executives, duPont Cellophane Company would receive rights for South America and Japan.[1350] During these negotiations, La Cellophane was carrying on separate negotiations with certain European manufacturers of cellophane (Kalle, Wolff, SIDAC) in an attempt to reach agreement between themselves as to territorial rights, prices and technical exchange.[1351] Since La Cellophane at the time of its negotiations with Pickard and Swint had not come to an agreement with these European companies, rights which La Cellophane had power to grant as to non-moistureproof cellophane depended in part upon the outcome of the meetings with Kalle and SIDAC. The duPont Cellophane Company Board, in May 1930, ratified a modified form of La Cellophane's proposal. The ratified agreement, accepted by La Cellophane, provided La Cellophane and duPont Cellophane Company should have equal rights in South America. It deleted La Cellophane's proposals of uniform prices, and of sales dependent in any way upon the outcome of the prospective European Convention.[1352]

622. During negotiations between La Cellophane and Pickard and Swint, these individuals by invitation attended as observers only the first day of a two day meeting between European producers.[1353] No commitment or agreement on the part of duPont resulted from this. At conclusion of the meeting (Feb. 11–12, 1930), the second day of which Pickard and Swint did not attend, the Europeans signed a tentative agreement among themselves.[1354] No duPont official signed this document, although it was subsequently sent to duPont for its information by La Cellophane.[1355]

623. DuPont did not join any convention, or cartel of European manufacturers.[1356] No such convention was long lived, even among the Europeans.[1357]

1345. Carpenter, Tr. 6272. Swint, Tr. 6194–95. GX 1410, p. 1832, 11/14/29.

1346. GX 1410, p. 1832, 11/14/29.

1347. GX 1010, pp. 1020–22, 1/14/30. Carpenter, Tr. 6272. Yerkes, Tr. 6923–24.

1348. GX 1014, p. 1030, 3/13/30. GX 1015, p. 1031, 5/8/30.

1349. Swint, Tr. 6196–6204.

1350. Swint, Tr. 6196. Carpenter, Tr. 6272. Swint, Tr. 6203. GX 1014, p. 1030, 5/13/30.

1351. Swint, Tr. 6199–6202.

1352. GX 1014, p. 1030, 5/13/30. GX 1016, p. 1033, 5/23/30. GX 1017, p. 1032, 6/2/30.

1353. Swint, Tr. 6199, 6201.

1354. GX 1414, p. 1841.

1355. Swint, Tr. 6236–37.

1356. Yerkes, Tr. 6926. Swint, Tr. 6205–06.

1357. GX 1427, p. 1878, 11/16/32. GX 1438, p. 1893, 10/16/34.

DuPont did not deal with any convention either directly, or indirectly through any of its individual members.[1358]

624. DuPont's refusal to join the European convention was understood by the convention itself. In 1932, this fact was acknowledged in writing by La Cellophane.[1359]

625. From the outset of duPont's cellophane sales in South America and Japan pursuant to its agreement of 1930 with La Cellophane, duPont sold at an independent price, and in quantities limited only by the ability of duPont's salesmen and agents to get business in those markets.[1360] DuPont's price was not the same as prices of European manufacturers. Instead it was higher at the beginning, and lower shortly before World War II.[1361] DuPont observed no quota in quantity of sales in those markets. Even between European manufacturers there was great disparity of price.[1362]

626. Cellophane business in South America was highly competitive. European manufacturers tried to take business from duPont and from each other by price concessions.[1363] After World War II, all foreign manufacturers were placed at a disadvantage in Brazil and Argentina, the two principal markets, because of the initiation of domestic manufacture of cellophane in those two countries.[1364]

627. DuPont was not a party to any agreement to exclude Wolff or SIDAC from selling in the United States. Wolff did sell in North American territories for which duPont had been licensed by La Cellophane, particularly Cuba and Mexico,[1365] and SIDAC was excluded from selling in the United States by the express terms of its agreement with Sylvania.[1366]

628. There are other foreign concerns manufacturing cellophane abroad —many of these companies have been in business since before World War II while some have started since. They include concerns with plants located in the following countries:[1367]

Argentina
Belgium
Brazil
Canada
Chile
Egypt
England
France
Germany
Italy
Japan
Spain
Sweden
Switzerland

629. Competition has existed between duPont and importers of foreign made cellophane.[1368] This competition is il-

1358. Yerkes, Tr. 6927.

1359. GX 1022, p. 1044, 4/1/32. GX 1476, p. 6038, 12/15/32.

1360. Swint, Tr. 6223–24. DX 789, p. 1671, 8/17/39. GX 1038, p. 1071, 1/31/35.

1361. DX 776, p. 1655, 10/28/31. DX 780, p. 1659, 9/26/32. DX 783, p. 1662, 6/10/35. DX 786, p. 1666, 3/15/38.

1362. Swint, Tr. 6214. GX 1031, p. 1057, 3/10/34. GX 1031-A, p. 1058-A, 3/28/34. DX 790, p. 1673, 11/19/40. DX 778, p. 1657, 7/29/32.

1363. Swint, Tr. pp. 6212–13. DX 790, pp. 1673–76, 11/19/40. DX 773, p. 1647, 7/23/29. DX 774, p. 1649, 11/1/30. DX 775, p. 1652, 4/30/31. DX 776, p. 1655, 10/28/31. DX 778, p. 1657, 7/29/32. DX 779, p. 1658, 9/1/32.

DX 780, p. 1659, 9/26/32. DX 781, p. 1660, 7/11/33. DX 783, p. 1662, 6/10/35. DX 784, p. 1663, 4/3/36. DX 785, p. 1665, 3/22/38. DX 789, p. 1671, 8/17/31. DX 790, p. 1673, 11/19/40. GX 1445, pp. 1919–22, 8/6/38.

1364. Swint, Tr. 6213.

1365. GX 1022, p. 1044, 4/1/32. DX 774, p. 1649, 11/1/30. DX 779, p. 1658, 9/1/32.

1366. DX 999, 4/15/29.

1367. Swint, Tr. 6213, 6229. Goland, DX 1015, pp. 178–84. DX 592, p. 1130, 1946. DX 593, pp. 1133–34, 1946. DX 594, p. 1149, 1948. DX 595, p. 1152, 1948. DX 596, p. 1171, 1949. DX 856, p. 1800, 8/21/31. DX 857, p. 1801, 1932.

1368. GX 596, 4/7/50, p. 1169.

lustrated by shifts of customers between various importers and duPont. In some instances, duPont gained business at the expense of importers of foreign film; in other instances, importers of foreign film gained business at the expense of duPont. Foreign importers of foreign film have lost business to duPont because of the poorer quality and higher price of foreign cellophane.[1369]

630. Up to 1929, there were substantial importations of European cellophane in the United States. This foreign film constituted approximately 20% of total U. S. consumption during the period 1924–1929.[1370]

631. From 1924 until 1930 importers of foreign cellophane competed with duPont on a price basis.[1371] DuPont's lowering of its cellophane prices made it difficult to undersell.[1372] Little cellophane was imported from 1930 until 1949 due to increasing importance of moistureproof cellophane, inferior quality of foreign cellophane, and the tariff of 45% ad valorem.[1373] Imports did occur in some quantity in 1949.[1374]

632. During the 1920's importers of foreign cellophane offered a price advantage against duPont cellophane. DuPont fought this competition by emphasizing the following points:

1. Assured source of supply.
2. One price to all users.
3. Uniformity of thickness.
4. Uniformity of strength.
5. Uniformity of packages well wrapped in waxed paper.

6. Insurance of full count.
7. Reduced waste and expert cutting.
8. Full adjustment of defective material.
9. Wrapping instructions by duPont salesmen for economical handling.
10. Research laboratory service to customers.
11. Cooperative advertising.
12. Merchandising service by which duPont salesmen solved customer's problems.[1375]

633. Import duties on cellophane were established by Congress not as result of action by duPont. In the late 1920's, duPont filed with an agency of the Government a manufacturer's protest against an administrative agency's tariff classification of transparent cellulose sheeting as a gelatin compound rather than as a cellulose compound. DuPont's protest was the normal act of a business concern engaged in active competition with importers of foreign products. After refusal by the agency to change the classification, on appeal the U. S. Customs Court in 1929 changed the classification of such sheeting to cellulose compound. The Tariff Act of 1930 established the duty that remained in force until 1951.[1376]

634. United States tariff on cellophane was reduced as of October 1, 1951, from 45% ad valorem to 22½% ad valorem in 1951 for rolls over 36″ wide, and from 30¢ per pound to 20¢ per pound

1369. GX 431, pp. 5681–84, 4/26/29. GX 432, pp. 5695–99, 7/29. GX 433, pp. 5706–11, 9/29. GX 444, p. 5821, 2/9/37. DX 526, p. 978, 9/18/35. DX 527, p. 979, 10/17/35. DX 528, p. 980, 11/27/35. Martin, Tr. 6429.

1370. Cook, Tr. 2219.

1371. GX 431, p. 5686, 4/26/29. Minicus, Tr. 1887–88.

1372. GX 433, pp. 5702, 5710, 1929.

1373. Cook, Tr. 2111. Goland, DX 1015, p. 182. Horn, DX 1010, pp. 66–67. DX 504, p. 943, 11/19/24. DX 506, p. 945, 1/27/26. DX 514, p. 959, 5/31/29. DX

525, p. 977, 7/16/35. DX 526, p. 978, 9/18/35.

1374. GX 6021, p. 8096, 5/5/50. GX 580, p. 7331, 8/8/50.

1375. GX 6029, pp. 8149–52, 8/9/27.

1376. DuPont C. Co. v. U. S., T.C.No. 43232; 55 T.D. 327 (Feb. 20, 1929). DuPont Cellophane Co. v. Birn & Wachenheim, 17 C.C.P.A., Customs, 122, T.D. No. 43454; 55 T.D. 926 (June 12, 1929), Act of 1930. Tariff Act of June 17, 1930, c. 497; 46 Stat. 590; 19 U.S.C.A. § 1001, especially par. 31(c). GX 1046, p. 1089, 7/26/27. GX 4469, p. 6249, 2/28/29. Roache, Tr. 3464.

for rolls under 36" wide. Average selling price before duty for foreign film had been about 50¢ per pound. Even reduced tariffs raised final quotations of foreign film to users over domestic prices.[1377]

635. Plaintiff conceded imported cellophane cannot be sold in volume in the United States because of its unavailability, its high price and its quality compared to U. S. made film.[1378]

636. Some cellophane of foreign manufacture has been sold in the United States during periods of short supply both before and after World War II. These imports have not been large because of certain obstacles to acceptance of this film:

1. Low quality.[1379]
2. Lack of technical service rendered by the foreign manufacturers to customers.[1380]
3. Fluctuation in price, depending upon time of shipment.[1381]
4. Slow delivery schedules and unpredictable time of shipment.[1382]
5. High price.[1383]
6. High tariff, increasing the delivered price.[1384]

637. Up to World War II European cellophane producers did not offer price, quality or service that would have satisfied U. S. cellophane customers. Cellophane in Europe was considered a luxury, was high priced, was not generally moistureproof and was not used for packaging low cost products.[1385]

638. Some cellophane manufactured in Japan has been imported into the United States.[1386] Despite its low price only a small volume of Japanese cellophane has been sold in the U. S., due to its brittleness, poor machine running ability and generally low quality.[1387]

639. Foreign cellophane from La Cellophane and BCL was imported to some extent in 1950 when cellophane was in short supply. It was offered at higher prices than domestic cellophane. Foreign producers offered no technical service and in some cases insisted purchaser must take a considerable proportion of non-moistureproof film in order to get moistureproof cellophane.[1388]

640. As of 1950, price of imported 300 gauge moistureproof cellophane was 52¢ per pound plus 30¢ duty, or 82¢ per pound, while U. S. film of the same type and grade was priced at 48¢ per pound.[1389] Plaintiff conceded imported cellophane could not be successfully sold in the United States at this price differential during periods of free supply.[1390]

641. When U. S. cellophane and foreign cellophane are both available, U. S. users and converters will not purchase foreign cellophane at an equal or even lower delivered price.[1391] This is due to

1377. DX 1000. GX 6024, p. 8103, 5/51.

1378. Minicus, Tr. 6982–83.

1379. Goland, DX 1015, p. 182. Horn, DX 1010, pp. 66–67. DX 504, p. 943, 11/19/24. DX 506, p. 945, 1/27/26. DX 514, p. 959, 5/31/29. DX 525, p. 977, 7/16/35. DX 526, p. 978, 9/18/35.

1380. Horn, DX 1010, pp. 66–67. Goland, DX 1015, pp. 180–183.

1381. Goland, DX 1015, pp. 180–83.

1382. Goland, DX 1015, pp. 180–83.

1383. Martin, Tr. 6428–29. Jakes, DX 1006, p. 8. Goland, DX 1015, pp. 180–83. McCurry, DX 1016, p. 215.

1384. Martin, Tr. 6428–29. Goland, DX 1015, pp. 180–83. DX 518, p. 965, 4/10/30. DX 335, p. 641.

1385. Goland, DX 1015, pp. 177–78, 180.

1386. GX 26, p. 248, 5/21/46. DX 523, p. 974, 8/24/34.

1387. DX 526, p. 978, 9/8/35. DX 527, p. 979, 10/7/35.

1388. Horn, DX 1010, pp. 66–67. Leeds, DX 1011, pp. 99–100. McCurry, DX 1016, p. 215. Goland, DX 1015, pp. 178–79. GX 6021, p. 8096, 5/5/50.

1389. GX 580, p. 7331, 8/8/50.

1390. Minicus, Tr. 6981.

1391. Leeds, DX 1011, p. 100. Goland, DX 1015, pp. 181–83. Horn, DX 1010, pp. 66–67.

inferior quality of foreign cellophane, lack of technical and sales service, delays in delivery and requirement of foreign producers for payment in advance.[1392] Reduction of duty in 1951 was not significant on the purchase of foreign cellophane due to these other reasons for the preference of U. S. customers for U. S. cellophane.[1393]

642. In 1951 two-thirds of European production was non-moistureproof and the remaining one-third was moistureproof of a single type. European concerns asked high prices, offered no service, and did not analyze the American market or try to improve their product.[1394]

643. DuPont's basic product patent on moistureproof cellophane gave it the right to exclude all imports of moistureproof cellophane.[1395] While there is no evidence duPont sought to assert this patent against imports it did not grant licenses to any importer nor did any importer seek a license.[1396]

644. Birn & Wachenheim in 1921 was a distributor of waxed paper, glassine and cellophane. It obtained its cellophane from La Cellophane. It continued selling and promoting use in the United States of cellophane manufactured in Franch until about 1927, despite the sale in 1923 by La Cellophane of its patents, processes and technology to duPont Cellophane Company. In 1927, Birn & Wachenheim began distributing Belgian cellophane manufactured in SIDAC and continued to do so until Birn & Wachenheim was absorbed by Sylvania in 1929.[1397]

645. The record establishes imports of cellophane have been small since 1929, because of the quality and higher price of foreign cellophane, the existence of U. S. patents relating to moistureproof cellophane, and because of U. S. tariff.

### XIII. DuPont Did Not Attempt and Is Not Now Attempting to Monopolize.

(Findings 646–686)

#### A. General.

(Findings 646–660)

646. DuPont acted in good faith in development of its cellophane business. It sought to act in ways that would not violate United States law.[1398]

647. DuPont's purpose in the cellophane business was to make money by enlarging its activities in industry, and it was offered a means by acquiring a secret process for a new product.[1399]

648. In the development of its cellophane business, duPont sought to enlarge the market from a narrow one to a broad one. At outset, demand was narrow and price high. By research directed to quality of product and efficiency of manufacture, cost was reduced and quality improved. By this means duPont wanted to get volume sales in the wrapping industry. As costs went down, prices were reduced, markets expanded, so duPont's return on investment was satisfactory. DuPont's motive in taking these steps was to make money and to compete.[1400]

649. DuPont did not seek to attain success in the cellophane business with intent of suppressing or excluding competition.[1401]

650. In conduct of its cellophane business, duPont took no step contrary to le-

1392. Goland, DX 1015, pp. 179–83. Horn, DX 1010, pp. 66–67.

1393. Goland, DX 1015, p. 181.

1394. Goland, DX 1015, pp. 178–180.

1395. W. W. Smith, Tr. 6514–15, 3/24/49. Minicus, Tr. 6960–62.

1396. W. W. Smith, Tr. 6517.

1397. Reichel, Tr. 6036–37. Hamburg, Tr. 1616–17. DX 515, p. 962, 11/1/29. DX 516, p. 963, 11/1/29. GX 433, p. 5702, Oct., 1929. GX 1066, p. 382, 8/25/23.

1398. Carpenter, Tr. 6275–83.

1399. Carpenter, Tr. 6275.

1400. Yerkes, Tr. 6940–42. Carpenter, Tr. 6275–76, 6278–79. DX 369, pp. 689–91, 1944.

1401. Carpenter, Tr. 6283. McCune, Tr. 5589–90, 5594–96. Yerkes, Tr. 6949–50.

gal advice. Counsel was consulted by management on all important actions and a suggested course of action was not followed unless advance approval of its legality was obtained.[1402]

651. Foreign shareholders in Sylvania and SIDAC placed quantities of shares on the market from time to time. DuPont had opportunities to acquire such shares. For legal reasons, and because it thought the investment unwise, duPont declined to acquire any stock in Sylvania or SIDAC.[1403]

652. DuPont devoted manpower and expense to development of packaging machinery and did not attempt to assert any control over the use or sale of machinery to which its efforts had contributed, although the same machines handle competing cellophane and other flexible wrapping materials. DuPont encouraged end users to employ such machinery for packaging with unprinted cellophane, rather than protecting sales of duPont's converters.[1404] DuPont did not vertically integrate, either forward by engaging in conversion of cellophane, or backward by engaging in manufacture of wood pulp, the principal raw material.[1405] These actions are inconsistent with a monopolistic intent, but are consistent with a purpose to stimulate use of cellophane for volume packaging purposes.

653. DuPont expanded for the business purpose of meeting forecasted short range demand and not with intent to have excess productive capacity.[1406]

654. Glassine manufacturers purchase moistureproof coatings from du-Pont which enables them to produce an improved packaging material that is sold in competition with cellophane.[1407]

655. When glassine manufacturers sought to use for producing an improvement in their wrapping materials moistureproofing compositions on which du-Pont held patents, duPont did not institute or threaten infringement suits, but instead granted licenses under its patents.[1408]

656. DuPont had an opportunity to purchase certain patents relating to a cellulose base film, of which Union Carbide and Carbon Company was considering the manufacture. DuPont declined to purchase the patents although it recognized Union Carbide and Carbon Company was attempting to get them with a view to competition.[1409]

657. Despite a belief Union Carbide and Carbon Company would enter the manufacture of film, duPont refused to make any deal as to manufacture of the product or the purchase of relevant patents.[1410]

658. During the period 1924–47, du-Pont granted approximately 340 separate licenses under its patents relating to cellophane and caps and bands.[1411]

659. Plaintiff conceded duPont owns no patents relating to cellophane currently in effect which would foreclose anyone desiring to do so from entering the manufacture and sale of cellophane.[1412]

1402. See, e. g., GX 1410, p. 1831, 11/14/29. GX 1008, p. 1015, 11/19/29. GX 1231, p. 1537, 2/10/30. Carpenter, Tr. 6283.

1403. DX 762, p. 1620, 5/21/29. DX 763, p. 1621, 12/13/33. GX 67, p. 210, 1/3/35. DX 764, p. 1622, 5/8/35.

1404. DXs 410–435.

1405. DX 483, p. 918, 10/15/40. DX 446, p. 874, 7/23/25. GX 495A, pp. 6702–03, 1/21/42. DX 622, p. 1266.

1406. DX 605A, p. 1231, 4/23/30. DX 610, p. 1243, 4/19/38.

1407. Nelson, DX 1020, p. 315. DX 323, p. 616, 10/18/32.

1408. DX 308, p. 592, Dec. 1931. DX 309, p. 594, 12/4/31. DX 310, p. 595, 12/7/31. DX 311, p. 597, 12/4/31. DX 323, p. 616, 10/18/32. GX 403, pp. 696, 697, 698, 699, 5/15/50.

1409. DX 637, pp. 1295–96, 7/10/33.

1410. DX 638, p. 1297, 1/16/34. DX 639, p. 1298. DX 640, p. 1299, 11/13/34. DX 641, p. 1300, 11/22/34.

1411. GX 403, p. 5580–A.

1412. Minicus, Tr. 2310–11.

660. Plaintiff conceded the cellophane industry today is not under patent control and there are no existing predatory practices.[1413]

## B. Olin license.

### (Findings 661–686)

661. DuPont licensed Olin to manufacture cellophane;[1414] assisted it in construction of a plant,[1415] following arm's-length negotiations conducted by du-Pont [1416] with purpose and intent of establishing another wholly independent and competing cellophane producer.[1417]

662. DuPont had plans for increasing production by construction of a new eight casting machine plant when the complaint was filed in this action. These plans were dropped because duPont management did not believe it was prudent to risk stockholders' capital in a new plant in view of the uncertainties created by plaintiff's efforts in the suit to divest duPont of plant.[1418]

663. DuPont's decision in 1948 to attempt to interest other concerns in manufacture of cellophane was to supply needs of the public. United States capacity was then insufficient to meet demand. DuPont had an obligation to attempt to supply cellophane since it had created demand for the product. Since it was attacked for existing capacity, it sought to meet the demand by encouraging others to engage in manufacture.[1419]

664. DuPont in 1948 offered to license its patents to any qualified company for a fee, and to assist such company to enter manufacture of cellophane. This offer developed:

(a) In May, 1947, duPont Rayon Department initiated an appropriation request to cover the expense of preliminary designs for a new eight casting machine cellophane plant at Clinton, Iowa. The estimated total cost of this expansion was $12,800,000. Reason for expansion was the inability of existing and planned capacity to meet forecasted demand for cellophane. Capacity with existing plant was expected to approximate 176,000,-000 lbs. by the middle of 1948, whereas the sales forecast for 1949 was 235,000,-000 lbs. This appropriation for preliminary design was approved by the Executive Committee and Finance Committee of duPont.[1420]

(b) The complaint in this action was served December 22, 1947.[1421]

(c) On January 12, 1948, Rayon Department made a further appropriation request for $250,000 to cover site studies and design for the proposed new cellophane plant.[1422]

(d) This appropriation request was considered by the Executive Committee on January 21, 1948, and again on March 17, 1948. After discussion with representatives of the Rayon, Development and Legal Departments, duPont's Executive Committee did not approve the request for appropriation, but directed efforts be made to interest one or more concerns in going into the manufacture of cellophane and cellulose bands on the basis of duPont furnishing its commercial practice and licenses under its patents for a moderate fee.[1423]

(e) DuPont made proposals of this nature to various companies. These were Tennessee Eastman Co., associated with Eastman Kodak Co., Air Reduction Co., Freeport Sulphur Co., Visking Corp., Allied Chemical Co., Kalamazoo Vegeta-

1413. Minicus, Tr. 2313–15.

1414. DX 974, pp. 1985–2001, 11/4/49.

1415. Olsen, Tr. 6828.

1416. Olsen, Tr. 6818–27.

1417. Olsen, Tr. 6820–21. GX 594, p. 7556, 5/27/49. DX 621, p. 1265, 3/17/48.

1418. DX 620, pp. 1262–64, 5/8/47. DX 621, p. 1265, 3/17/48. GX 582 (Imp.Doc. No. 582), 3/9/48.

1419. DX 620, pp. 1262–64, 5/8/47. GX 582 (Imp.Doc.No. 18), 3/9/48. DX 621, p. 1265, 3/17/48.

1420. DX 620, pp. 1262–64, 5/8/47.

1421. Comparison of Answer & Complaint, p. 60.

1422. DX 621, p. 1265, 3/17/48.

1423. DX 621, p. 1265, 3/17/48.

ble Parchment Co., Phillips Chemical Co., Crown-Zellerbach Co.; and Goodyear Tire & Rubber Co.[1424]

(f) Olin was not approached by du-Pont, but approached duPont, without invitation, in October, 1948,[1425] and a license agreement was made in November, 1949.[1426] Olin had studied possibility of manufacturing cellophane for many years and had considerable research and market information at its disposal.[1427]

665. The license contract between du-Pont and Olin includes the entire understanding between the parties[1428] and contains the following provisions, among others:[1429]

(1) Relates to plain and moisture-proof cellophane.

(2) Is non-exclusive.

(3) DuPont is obligated to give Olin technical information relating to cellophane manufacture and used by duPont in its cellophane manufacturing operations at the date of the agreement and for four years thereafter.

(4) DuPont is obligated to undertake design and construction of an eight casting machine plant with a design capacity of 33,700,000 lbs.

(5) DuPont is to assist Olin in hiring and training plant personnel and to assist the establishment of engineering, research, sales and administration organizations for the plant, obligation as to training of personnel to terminate six months after initial plant operations.

(6) DuPont is obligated for five years after the agreement upon request by Olin to undertake design and similar construction with respect to an additional plant of the same capacity as the first.

(7) Olin is entitled to unrestricted use and disposition of technical information received from duPont, but is required to keep it confidential for ten years.

(8) Olin is granted non-exclusive licenses to manufacture, use and sell cellophane under every patent owned by du-Pont and issued on any application filed prior to six years after date of the agreement.

(9) DuPont is to receive $400,000 for the information and know-how given Olin, $100,000 for the patent licenses and $500,000 for work done with respect to design and construction of the first plant.

(10) Olin is free without payment to duPont to build plant capacity to any extent it desires in addition to that provided for in the agreement.

(11) DuPont has no reciprocal rights to obtain technical information from Olin.

666. DuPont's performance under the duPont-Olin contract has been satisfactory to Olin.[1430]

667. DuPont has no agreement or financial relationship with Olin Industries by which duPont is in position to influence Olin's competition in manufacture or sale of cellophane.[1431]

668. No agreement or understanding of any kind exists between duPont and Olin relating to cellophane other than contained in the contract of November 4, 1949, as amended.[1432]

669. DuPont owns no stock in Olin.[1433]

670. In 1896 duPont acquired 29% of the equity in Equitable Powder Co., one of Olin's many subsidiaries, and increased its interest to 49% in 1905. Du-Pont still owns 49% of Equitable stock. Throughout this minority ownership by

1424. GX 594, Book 43, pp. 7545-46, 12/14/49.

1425. Olsen, Tr. 6818, 6840. DX 973, pp. 1983-84, 10/25/48.

1426. Olsen, Tr. 6819-24, 6839-40. DX 974, pp. 1985-2001, 11/4/49. GX 595, pp. 7559-60, 7562, 5/27/49. GX 597, p. 7566, 1/31/49.

1427. Olsen, Tr. 6838-39.

1428. Olsen, Tr. 6827.

1429. DX 974, pp. 1985-2001, 11/4/49.

1430. Olsen, Tr. 6828.

1431. Olsen, Tr. 6827, 6833-34.

1432. Olsen, Tr. 6827.

1433. Olsen, Tr. 6833.

duPont, Olin interests have owned or controlled 51% of Equitable and managed and operated the company.[1434]

671. Equitable is a manufacturer of black powder.[1435] It also owns 85% of the stock of Egyptian Powder Company, a manufacturer of black powder, and 100% of Columbia Powder Company, a manufacturer of dynamite.[1436] Equitable has an asset value somewhat in excess of $6,000,000.[1437]

672. DuPont has no representation on the Board of Directors of Equitable since 1918.[1438]

673. No assets or credit of Equitable were used by Olin in Olin's cellophane operations.[1439]

674. DuPont never had any participation in management or operation of Equitable.[1440] DuPont's stock interest in Equitable and its inability to participate in management has been a cause of friction between duPont and Olin.[1441] Olin's policy was to maintain a large surplus in Equitable.[1442] DuPont on occasions sought to have this surplus distributed to the stockholders. Olin refused to comply with duPont's wishes.[1443] Olin used portions of surplus for investment in other enterprises in which Olin had interest. DuPont protested against this.[1444]

675. On occasions duPont sought to eliminate joint ownership of Equitable by liquidation of Equitable, purchase by Olin of duPont's interest, or purchase by duPont of Olin's interest. Attempts have been unsuccessful.[1445]

676. No proof was shown of any relationship between duPont and Olin arising out of Equitable since 1933, except for routine payments of dividends on duPont's Equitable stock and duPont's attempts to eliminate joint ownership of Olin.[1446]

677. No charge or proof was shown of relationship between duPont and Olin violative of the Sherman Act.[1447] In fact, the two concerns have been vigorous and unfriendly competitors in powder, ammunition and guns.[1448]

678. Olin Industries, Inc. is a concern with sufficient resources and experience to compete with duPont and Sylvania in the manufacture and sale of cellophane.[1449]

679. Olin manufactures guns, ammunition, sheet brass, smokeless powder, high explosives, flashlight batteries, cigarette and fine papers, cellophane and polyethylene sheeting.[1450] It also owns timber interests.[1451] Olin's assets as of 12/31/51 were approximately 180 million dollars and its annual gross sales about 170 million.[1452]

1434. GX 605, p. 7601. GX 599, p. 7587, 10/12/42. GX 611, p. 7614, 5/1/24. Olsen, Tr. 6820, 6845–46, 6848–49, 6858–59. Carpenter, Tr. 6314, 6320.

1435. Carpenter, Tr. 6311. Olsen, Tr. 6849.

1436. GX 602, p. 7596, 7/5/51. Olsen, Tr. 6848.

1437. Olsen, Tr. 6846. GX 602, p. 7597, 7/5/51.

1438. Minicus, Tr. 7146. Olsen, Tr. 6820. GX 606, p. 7605, 5/2/22. GX 609, p. 7611, 1930. GX 616, p. 7624, 5/20/29. DX 1024, 4/18/31. Carpenter, Tr. 6314.

1439. Olsen, Tr. 6829. DX 1025, 10/28/49.

1440. Carpenter, Tr. 6314, 6320. Olsen, Tr. 6820.

1441. E. g., GX 606, pp. 7605–07, 5/2/22. Olsen, Tr. 6818–19.

1442. GX 606, pp. 7605–07, 5/2/22. GX 600, pp. 7590–92, 12/4/42. GX 602, p. 7597, 12/31/50.

1443. GX 614, pp. 7620–21, 11/10/27. GX 606, pp. 7605–07, 5/2/22.

1444. GX 606, p. 7606, 5/2/22.

1445. GX 605, pp. 7602–03, 3/9/49. DX 1022, 1/1/32. DX 1023, 1/7/32. GX 599, p. 7587, 10/12/42. GX 601, p. 7594, 1/29/45.

1446. GX 605, pp. 7602–03, 3/9/49. GX 603, p. 7599, 12/26/50. DX 1028, 2/23/49.

1447. Minicus, Tr. 7135–36, 7189–90.

1448. Olsen, Tr. 6808, 6818–19, 6833–34.

1449. Olsen, Tr. 6808–10.

1450. Olsen, Tr. 6809.

1451. Olsen, Tr. 6834.

1452. Olsen, Tr. 6810.

680. Olin's cellophane plant at Pisgah Forest, North Carolina, began production of cellophane on June 11, 1951.[1453] The plant was financed largely by a loan from Prudential Insurance Company.[1454] Olin's investment exceeded $15,000,000 for the cellophane plant, plus some portion of another $25,000,000 spent for a cigarette paper plant on the same site, with which the cellophane plant shares some facilities.[1455]

681. Olin's cellophane plant has a capacity of 34,000,000 lbs. Its construction is efficient, producing cellophane of equal quality to duPont's.[1456]

682. Olin plans to build an additional plant. Olin's second plant is planned to have 10 machines with possibility of expanding it to 20 machines if business warrants.[1457]

683. Olin plans to integrate its timber production with its cellophane manufacturing activities so to be its own supplier of raw pulp.[1458]

684. Olin has built up a strong research organization for its cellophane operation.[1459] For years it conducted extensive cellulose research in an effort to develop various films and to improve products made by it. This work has aided it in its cellophane activities.[1460]

685. Olin is selling cellophane to the trade at a profit. It has been able to secure adequate converter and distribution outlets and to take customers from both duPont and Sylvania.[1461]

686. On the basis of exhibits introduced by both parties and testimony of witnesses, it is established past relations between duPont and Olin have been unfriendly rather than cooperative. Ownership by each company of stock in Equitable Powder Company aggravated hostility. Olin has ability and intent to compete as an independent cellophane producer. Uncontradicted evidence establishes licensing of Olin was a bona fide transaction, Olin has made a large investment in cellophane production, and it will compete aggressively.

## XIV. DuPont Has Not Monopolized.

### (Findings 687–732)

687. Waxed paper, glassine, and sulphite paper were dominant flexible packaging materials in 1924 and are today.[1462]

688. Other flexible packaging materials such as polyethylene, Pliofilm, cellulose acetate and Saran are increasing in volume of use, both in quantity and in proportions of the total wrapping materials production. This growth is so recent the relatively small quantity of these materials produced up to 1948, or even at the time testimony was taken, is not a reliable index of their future importance.[1463]

689. DuPont's percentage of cellophane production is declining. In May, 1952, Sylvania's annual productive capacity was 72,000,000 lbs.,[1464] Olin's was 34,000,000 lbs.,[1465] and duPont's was 218,000,000 lbs.[1466] Thus, duPont's productive capacity had dropped proportionately to 68% of total U. S. cellophane capacity. Olin has plans to double its capacity in the future,[1467] and Sylvania

1453. Olsen, Tr. 6829. DX 978, p. 2008.

1454. Olsen, Tr. 6829.

1455. Olsen, Tr. 6829–30.

1456. DX 974, p. 1990, 10/28/49. DX 596, p. 1169, 4/7/50. DX 978, p. 2008, 6/11/51. Olsen, Tr. 6830–33. McCurry, DX 1016, p. 216.

1457. Olsen, Tr. 6832–33.

1458. Olsen, Tr. 6834.

1459. Olsen, Tr. 6831.

1460. Olsen, Tr. 6811, 6815–18, 6834–35, 6837–39.

1461. Olsen, Tr. 6830–33.

1462. DX 981. Ramsey, DX 1017, pp. 226, 233. Nelson, DX 1020, p. 301.

1463. DX 982. Leeds, DX 1011, p. 92.

1464. Reichel, Tr. p. 6063.

1465. Olsen, Tr. 6830. DX 974, p. 1990, 10/28/49.

1466. McCune, Tr. 5548.

1467. Olsen, Tr. 6832–33.

plans to expand capacity to 1,000,000 lbs.[1468]

690. DuPont has been unable to achieve as much as 20% of production of flexible packaging materials.[1469]

691. There are other producers of cellophane who can supply if duPont is unable to supply or duPont were to seek to create a shortage of cellophane.[1470]

692. Purchasers of cellophane purchase other flexible packaging materials interchangeably for same purpose as they use cellophane in event cellophane is not supplied by duPont. Such materials are as low or lower in cost and perform the same functions in packaging as cellophane.[1471]

693. The record establishes due to competitive circumstances duPont cannot determine the amount of cellophane that can be made and sold at any given time.

694. During the years from 1924 to 1929 duPont had a single plant which was increased in size from two casting machines to eight.[1472]

Demand accelerated with acceptance of moistureproof cellophane after its commercial introduction in 1927.[1473] To meet demand duPont in the period 1929–1932 constructed four plants each having eight machines, or a total increase of thirty-two casting machines.[1474] During this period demand increased more rapidly than capacity.[1475]

The depression reduced demand for duPont cellophane to such extent duPont's capacity exceeded its ability to sell.[1476] Some of duPont's productive facilities were shut down during the period from May, 1932, to March, 1936.[1477]

In 1937 duPont planned to build a new eight machine plant in Clinton, Iowa, but the project was postponed when forecasts of sales indicated additional capacity was not required.[1478] In 1939 Clinton project was reinstated and culminated in Clinton #1, which went into production in March, 1941.[1479] Demand for duPont cellophane exceeded its productive capacity from about 1939 until late 1941.[1480]

From December, 1941, until 1942, duPont's productive capacity exceeded demand.[1481] By May, 1942, twenty of duPont's fifty-six casting machines were idle, due to raw materials shortages and lack of demand brought about by wartime controls.[1482] DuPont then closed down Buffalo #1, the oldest plant.[1483] This plant was later converted to the production of rayon tire yarn at the request of plaintiff.[1484] From September, 1942, to early 1949, duPont's productive capacity was not sufficient to meet demand for duPont cellophane.[1485] During war years production was limited by Governmental restrictions on necessary raw materials,[1486] and the amount available for civilian consumption was limit-

1468. GX 410, p. 5602, 2/1/50.

1469. DX 981.

1470. Olsen, Tr. pp. 6830–33. Reichel, Tr. 6063. GX 410, Book 33, p. 5602, 2/1/50. DX 596, p. 1168. GX 583, p. 26, 5/16/49.

1471. See findings, supra.

1472. GX 394, p. 5482.

1473. GX 395, p. 5488. GX 432, p. 5700, 1929. GX 435, p. 5728, 7/21/30.

1474. GX 394, p. 5482. DX 602, pp. 1218–19, 9/13/28.

1475. GX 455, pp. 5889–90, 4/21/30. DX 605A, p. 1231A, 4/23/30.

1476. GX 394, p. 5481. GX 395, p. 5488. DX 352, p. 667, 12/23/32.

1477. GX 394, p. 5482.

1478. DX 610, p. 1243, 4/19/38.

1479. GX 424, pp. 5646–47, 5/8/39. GX 32, p. 154, 8/23/44.

1480. DX 555, p. 1065, 10/10/41. GX 32, pp. 153–54, 8/23/44.

1481. GX 32, pp. 153–4, 8/23/44.

1482. GX 32, p. 154, 8/23/44.

1483. GX 394, p. 5482. GX 32, p. 155, 8/23/44.

1484. Hanson, DX 1018. Yerkes, Tr. 6950. GX 394, p. 5482. GX 32, pp. 153–61, 8/23/44.

1485. R. R. Smith, Tr. 6003. GX 84, p. 321, 3/1/43. DX 372, 374. GX 497, 498, pp. 85–88.

1486. GX 88, p. 339, 3/10/47. GX 495A, pp. 6702–03.

ed by extensive war use of cellophane.[1487] From 1945 to March 1949, pent-up demand for duPont cellophane that had been restricted during the war exceeded duPont's productive capacity,[1488] despite an increase in production by duPont from 96,000,000 lbs. in 1945 to 179,000,000 in 1949.[1489] Both increased demand and production were in moistureproof cellophane.[1490] DuPont's plain cellophane production was lower in 1949 than in 1939, 1940 or 1941.[1491]

For six months commencing March, 1949, duPont's productive capacity exceeded its ability to sell its output.[1492]

From late 1949 to early 1952, demand for duPont cellophane again exceeded duPont's capacity to produce, despite increases in such capacity.[1493]

Commencing in 1952 and continuing to the closing of the record, duPont's ability to produce again exceeded its ability to sell duPont cellophane.[1494]

695. Aware Sylvania and Olin planned expansion of cellophane capacity to 100,000,000 lbs. and 67,000,000 lbs.[1495] duPont in 1949 and 1950 conducted research to determine what investment and what technological improvements would be necessary if duPont was to expand cellophane production.[1496] The final report on this research project was submitted in April, 1950. It considered neither construction of new plants nor addition of more casting machines.[1497] It outlined possibilities for increasing productivity through an improved manufacturing process and other technological improvements that were in the blueprint stage.[1498]

The report was premised on these factors:

(1) Cellophane demand would continue to exceed available supply,

(2) If cellophane demand did continue to rise, duPont management could authorize expansion of capacity to help meet this demand, and

(3) If such expansion were authorized, necessary technological improvements could be reduced to commercial practice to make increased production actuality.[1499]

After filing of this report, future prospects for cellophane changed. DuPont's net return on its Film Department investment for the first seven months of 1951 fell 50% below the preceding year,[1500] and cellophane has been a glut on the market since the beginning of 1952.[1501] There is no proof duPont management authorized expenditures for increased cellophane capacity after filing of this report. There is no proof duPont research and engineering personnel achieved revolutionary technological improvements outlined in the report.

696. The record establishes domestic buyers of cellophane do not lack alternative sources of supply, and duPont does not have power to restrain free competition at the distribution level of the industry.

697. Free competition exists and has existed at distribution level of the flexi-

1487. GX 85, p. 327, 2/28/44. GX 86, pp. 331–332, 3/1/45. GX 87, p. 336, 3/11/46. GX 497, p. 6800, 1/15/44.

1488. GX 87, p. 336, 3/11/46. GX 88, p. 339, 3/10/47. GX 570 (Imp.Doc.No. 1), 1/26/48. DX 374, p. 703, 1/26/48. DX 596, p. 1167, 4/7/50.

1489. GX 393, p. 5476.

1490. GX 395, p. 5488. GX 393, p. 5476.

1491. GX 393, p. 5476.

1492. R. R. Smith, Tr. 6003. DX 596, p. 1167, 4/7/50.

1493. R. R. Smith, Tr. 6003. GX 572 (Imp.Doc.No. 9), 1/20/50. GX 573 (Imp.

Doc.No. 13), 1/26/51. GX 574 (Imp.Doc. No. 14), 8/24/51.

1494. R. R. Smith, Tr. 5761, 5845, 5980.

1495. GX 587 (Imp.Doc.No. 46), p. 5, 4/28/50.

1496. Ibid., pp. 1–75.

1497. Ibid., pp. 5, 28, 38, 50, 59.

1498. Ibid., pp. 22, 68.

1499. Ibid., pp. 1–75.

1500. GX 574 (Imp.Doc.No. 14), 8/24/51.

1501. R. R. Smith, Tr. 5761, 5845. Martin, Tr. 6459.

ble packaging materials markets. DuPont has no power to prevent or restrain that competition.[1502]

698. No proof was shown duPont's methods of distribution were adopted for the purpose of obtaining monopoly powers or such methods tended to create such powers.

699. Facts do not support plaintiff's contention when duPont cellophane displaces another flexible wrapping material, or when another material displaces duPont cellophane, then the two alternative materials are not in competition with one another. There is rivalry, on basis of quality, service and price, between cellophane and other packaging materials in various end uses, and frequent shifting of buyers back and forth. In this competition, cellophane or its rivals might, at any given moment, be winner of the business of a particular customer or customers.

700. Facts do not support plaintiff's contention a customer is an element in the cellophane market only as long as he is using cellophane. The price, quality, and supply of cellophane have in fact been directed at non-users of cellophane. Changes in price, quality, and supply have had the effect of diverting some of them to cellophane. Manufacturers of competing materials have exerted same efforts toward users of cellophane. All would-be sellers have tried to capture non-users.

701. The record does not support plaintiff's contention a customer is an element in the cellophane market only so long as he is actually using cellophane. Purchasers of materials other than cellophane are active in making laboratory tests and inquiries as to possibility of using cellophane at a better price or of a quality better tailored to their needs; while purchasers of cellophane are active in ascertaining feasibility of more advantageous use of materials other than cellophane.[1503]

702. Sales of cellophane by producers are made not to household consumers but to business concerns. Price each buyer is willing to pay depends on profit gained or loss avoided by using cellophane, as compared with profitability of using other flexible wraps. Customers make close calculations of advantage of the competing wrapping materials for each specific end use.[1504]

703. No account is supplied with flexible packaging materials for longer than a few months at a time. Inventory periods are short, turnover is constant, products themselves, i. e., flexible packaging materials, are consumed soon after incorporated in a package. Packages employing flexible materials have short lives, and are always destroyed at the time of the use of the product in the package.

Every account is back on the market with further packaging requirements every few weeks or months. Sources of supply are constantly shifting.[1505]

704. There is no proof duPont's policy of developing converter business and rendering service to converters tended to give it monopoly power.

705. DuPont's converters are not dependent on it for supply. Shellmar, largest of general line converters, converts cellophane, Pliofilm, Saran, polyethylene, cellulose acetate, aluminum foil, glassine, sulphite, kraft paper, greaseproof paper, vegetable parchment and tissue. Shellmar sells wraps of different material to every trade.[1506]

1502. R. R. Smith, Tr. 5881. Martin, Tr. 6371–74.

1503. E. g.: Southwick, DX 1008, pp. 25, 32. Horn, DX 1010, pp. 68–69. McCurry, DX 1016, pp. 211–212, 221. R. R. Smith, Tr. 5843–44.

1504. E. g.: Jakes, DX 1006, pp. 8, 10, 13. Horn, DX 1010, pp. 65, 68–69. McCurry, DX 1016, p. 210. Elmstrom, DX 1019, pp. 279–280.

1505. Leinbach, Tr. 6805–06. Martin, Tr. 6355–58. Russell, Tr. 6471–72.

1506. Martin, Tr. 6334.

706. Milprint, another general line converter, converts glassine, cellophane, sulphite, greaseproof paper, vegetable parchment, waxed paper, cellulose acetate, Pliofilm, polyethylene, Saran and Aluminum foil. Among uses for which milprint converts are:[1507]

| Uses | Materials |
|---|---|
| Potato Chips | cellophane |
| | aluminum foil |
| | Pliofilm |
| | glassine |
| Butter | aluminum foil |
| | vegetable parchment |
| | waxed paper |
| Oleomargarine | vegetable parchment |
| | aluminum foil |
| | waxed paper |
| Candy | cellophane |
| | glassine |
| | aluminum foil |
| | Pliofilm |
| | polyethylene |
| Baked Goods | cellophane |
| | cellophane-waxed paper combination |
| Cheese | aluminum foil |
| | rubber-wax coated cellophanes |
| | Pliofilm |
| Frozen Foods | aluminum foil |
| | cellophane |
| | waxed paper |
| Bacon | cellophane |
| | greaseproof paper |
| | vegetable parchment |
| | waxed paper |
| | glassine |

707. Nashua Gummed and Coated Paper Company converts waxed paper, waxed glassine, cellophane, Pliofilm, polyethylene, cellulose acetate and other converted paper products. The uses to which its wrappers are put into varieties of materials supplied to each trade by Nashua are listed:

| Use | Material Sold |
|---|---|
| Bread | Wax paper, cellophane, glassine |
| Crackers, Cookies and Biscuits | Paraffin wax paper, cellophane, glassine |
| Candy | Wax paper, cellophane, glassine |
| Chewing gum | Wax paper, cellophane, glassine |
| Frozen foods | Wax paper, cellophane Pliofilm |
| Potato Chips, Popcorn, Snacks | Glassine, cellophane |
| Fresh produce | Pliofilm, cellophane, polyethylene |
| Nut meat | Cellophane, glassine |
| Dairy products | Wax paper, cellophane |
| Tobacco products | Cellophane, wax paper, glassine |
| Textiles and Hose | Polyethylene, Pliofilm, cellophane, glassine |
| Razor blades | Wax paper, cellophane |
| Sugar | Wax paper, coated sulphite |

Converting of transparent films accounts for only 10% of Nashua's annual sales.[1508]

708. Marathon Corporation is largest converter in the country of opaque rubber-paraffin coated cellophane cheese wraps for the direct wrapping of processed cheese, and one of the largest converters of waxed paper. Converted waxed paper wraps are supplied by Marathon to frozen food packing trade, dairy trade, baking industry and meat packing industry. Marathon Corporation also converts small quantities of aluminum foil.[1509]

709. Manufacturers of packaging machinery design machines for facility of conversion between a number of flexible packaging materials including cellophane. This enhances salability of machinery and makes it possible for users

1507. Hanson, DX 1018, pp. 248–51.
1508. Ramsay, DX 1017, pp. 225–28.

1509. Croy, DX 1021, pp. 333–34, 339–40.

of machinery (a) to shift their packaging business between cellophane and other materials and (b) to operate when such shifts are made.[1510]

710. Cellophane prices have not been arbitrary and noncompetitive.[1511]

711. When duPont considered a price increase in 1948 it took into account the effect of a price increase upon duPont's ability to sell its output, the effect upon duPont's return on investment, and the relationship between proposed increased prices and prices of waxed paper, glassine and other packaging materials. This incident was offered by plaintiff as its strongest evidence of duPont's power to set arbitrary non-competitive prices. The incident negatives the existence of such powers.[1512]

712. DuPont has no power to set cellophane prices arbitrarily. If prices for cellophane increase in relation to prices of other flexible packaging materials it will lose business to manufacturers of such materials in varying amounts for each of duPont cellophane's major end uses. Relative increases would make competition more difficult to obtain new business.[1513]

713. Improvement in relative composite properties of cellophane increases its value and enables cellophane to gain business from other materials.[1514]

714. DuPont has made profits. Net return on cellophane during the period of 1937–1949 has varied between a high of 28.7% in 1939 and a low of 8.4% in 1942.[1515]

715. DuPont charged prices for cellophane that would yield a return on investment, but was never able to determine in advance what rate of profit it would achieve.[1516]

716. Whether it should increase cellophane prices, duPont, in May, 1948, took into account the question of whether its capacity output could be sold. DuPont.District Sales Managers were divided as to whether this could be done during the remainder of 1948,[1517] although at the time Sylvania's prices for major types of moistureproof cellophane were four to five cents higher per pound than duPont's prices.[1518] DuPont did raise its prices on August 1, 1948.[1519] New prices were still one to four cents per pound below Sylvania's prices on major types of moistureproof cellophane.[1520] DuPont's price increase was less than the increased cost of duPont's material and labor since its preceding price increase, and price advances on duPont's cellophane from before World War II to August 1, 1948, were less than those of wax paper and glassine.[1521] Despite further increase in cost of manufacture of one cent per pound, duPont in July, 1950, decided not to increase its cellophane prices, but to review the situation later for possible action effective October 1. The Korean War, commencing late in June, 1950, had effect in forcing costs upward. On September

1510. Tindal, DX 1012, pp. 105–06. Leinbach, Tr. 6746. Russell, Tr. 6464–69.

1511. Yerkes, Tr. 6941–42.

1512. Minicus, Tr. 7063. GX 591, p. 7538, 5/27/48. DX 375, p. 704. DX 377, p. 707, 6/2/48. DX 378, p. 708. DX 379, p. 709.

1513. R. R. Smith, Tr. 5841–42. Yerkes, Tr. 6940–47. Jakes, DX 1006, pp. 10–11. Horn, DX 1010, pp. 69–70. McCurry, DX 1016, pp. 210–11. Nelson, DX 1020, p. 318.

1514. Jakes, DX 1006, pp. 10, 13. Horn, DX 1010, pp. 65, 68–70. McCurry, DX 1016, p. 210. Elmström, DX 1019, p. 279. Nelson, DX 1020, p. 318.

1515. GX 572 (Imp.Doc.No.9), 1/20/50. GX 591 (Imp.Doc.No. ——), 5/27/48.

1516. Yerkes, Tr. 6943–44. Compare GX 351, p. 874, 12/16/36 (estimate) with GX 591 (Imp.Doc.No.——), 5/27/48 (actual). Compare GX 355, p. 888, 8/30/38 (estimate) with GX 591 (Imp.Doc.No.——), 5/27/48 (actual). DX 372, p. 695, 6/27/47. GX 572 (Imp.Doc.No.9), 1/20/50. GX 573 (Imp.Doc.No.13), 1/26/51.

1517. GX 591, p. 7539, 5/27/48.

1518. GX 591, p. 1128.

1519. DX 377, p. 707, 6/22/48.

1520. DX 591, p. 1128.

1521. DX 375, p. 704, 6/22/48.

1, 1950, Sylvania, which in May, 1949, had lowered its prices to meet those of duPont, raised its prices on the major types of cellophane to four cents per pound above duPont prices.[1522] On October 1, 1950, duPont raised prices to equal Sylvania on moistureproof cellophane but to a level still one cent below Sylvania prices on moistureproof heat-sealing cellophane.[1523] Continued impact of rising costs on prices is evident from the fact within three months, on December 15, 1950, Sylvania again raised its prices from four cents to five cents higher per pound than duPont.[1524] Despite price increases on cellophane, net return of the duPont Film Department during the first seven months of 1951 was less than half that of its net return during 1949–50.[1525]

717. DuPont's rate of return on its cellophane investment did not vary with volume of its sales. Volume of dollar sales increased from 29.3 million dollars in 1939 to 55.3 million dollars in 1947, but operating return and net return on investment were lower in the latter year.[1526] DuPont's dollar sales of cellophane in 1947 were 31% higher than in 1946, but operative earnings were 21% less than in 1946.[1527]

718. No proof was shown rate of return made by duPont on its cellophane investment was greater than the return earned by Sylvania on its cellophane investment. Evidence shows Sylvania's return as a percentage of sales of all its products (which included artificial horsehair, textile sizing, millinery straw, and bands, as well as cellophane) was lower than duPont's rate of return on its cel-lophane investment.[1528] There has been no segregation of what percentage of Sylvania's sales resulted from other products.[1529]

719. No proof was shown duPont's rate of return on its cellophane investment has been greater or less than the rate of return made by other producers of flexible packaging materials.

720. DuPont's ability to earn a return on its cellophane investment was assisted by increases in efficiency.[1530] DuPont's annual permanent investment per pound of production of cellophane was reduced from $1.76 in 1925 to 61¢ in 1928, 52¢ in 1934, 37¢ in 1939, and 33¢ in 1944. These reductions resulted from chemical and mechanical improvements in manufacturing process, not from existence or exercise of monopoly power.[1531]

721. DuPont does not have power to fix and maintain arbitrary and non-competitive terms of sale. Terms at which duPont cellophane is sold must meet customs and requirements of the flexible packaging trade.

722. There is no proof any particular customer is obliged to purchase duPont cellophane in order to package its products.

723. DuPont's terms of sale have not been arbitrary.[1532]

724. There is no proof duPont treated any customer for cellophane arbitrarily. Plaintiff conceded it had no complaint from any customer. No customer testified to arbitrary treatment at trial.[1533]

1522. DX 591, p. 1128.

1523. DX 591, p. 1128.

1524. DX 591, p. 1128.

1525. Compare GX 574 (Imp. Doc. No. 14), 8/24/51 with GX 573 (Imp. Doc. No. 13), 1/26/51.

1526. GX 395, p. 5488. GX 483, 487, 488, 490. GX 591 (Imp. Doc. No. ——), 5/27/48. GX 571 (Imp. Doc. No. 22), 2/3/49. GX 572 (Imp. Doc. No. 9), 1/20/50. GX 573 (Imp. Doc. No. 13), 1/26/51.

1527. GX 501, p. 6895, 1/27/48.

1528. Reichel, Tr. 6079–80. DX 1026.

1529. Reichel, Tr. 6097–98.

1530. Carpenter, Tr. 6275–76. DX 369, pp. 689–91, 1944.

1531. GX 483, p. 6410, 1/21/29. DX 369, pp. 689–91, 1944.

1532. Yerkes, Tr. 6941–42. DX 407, p. 789, 4/1/49.

1533. Minicus, Tr. 11.

725. DuPont's large customers are demanding in their standards for performance of a flexible packaging material, and maintain laboratory facilities for keeping a constant check on performance of materials they purchase. These customers include General Foods, cigarette companies, Kraft Foods, National Biscuit, Kroger, and others. Neither duPont nor other suppliers of flexible packaging materials can afford to let quality deteriorate or service lag.[1534]

726. Every packaging problem requiring one or more physical properties in a packaging material may be satisfied by one or a number of flexible packaging materials, including cellophane, or by laminations and combinations of these materials. Few packaging applications are satisfied by a single material. Range of available properties and prices gives users of wrapping materials a choice of solutions to their technical and price requirements.[1535]

727. The record establishes duPont does not have power to exclude others who would engage in the manufacture and sale of cellophane.

728. No evidence was shown anyone desired to manufacture cellophane and was unable because of any act done by duPont.

729. No proof was shown duPont has economic power to prevent others from manufacturing cellophane.

730. No proof was shown duPont sought to exclude others from manufacturing cellophane.[1536]

731. No proof was shown duPont has power to subvert the use and to engross cellophane patents, trademarks, trade secrets or "know-how".

732. Cellophane patents under which duPont has right to grant licenses are listed on the United States Patent Register as available for license and have been licensed to Olin Industries. Some have been licensed to others. In no instance has a license been refused.[1537]

## CAPS AND BANDS.

### (Findings 733–819)

733. Caps and bands are made of regenerated cellulose.[1538] They are extruded so as to form types of coverings which, when placed around the openings of containers or tubing, while in the wet state, shrink upon drying to form a closure.

Caps and bands are shipped in a wet rather than a dry state.[1539]

734. Caps and bands are used as secondary bottle closures and are different products from plain and moistureproof cellophane.[1540] Plaintiff charges two monopolies, a monopoly of plain and moistureproof cellophane and a monopoly of caps and bands.[1541]

735. DuPont began commercial manufacture of caps and bands in 1929.[1542]

Although it withdrew from the manufacture of caps in May, 1947,[1543] du-Pont continues to manufacture bands today.[1544] Since 1941 duPont has had only two band casting machines both located at its Buffalo plant.[1545]

1534. R. R. Smith, Tr. 5842–44. Horn, DX 1010, pp. 67–69. Wilcox, DX 1013, pp. 127–28. McCurry, DX 1016, pp. 211–12.

1535. Southwick, DX 1008, p. 31. Horn, DX 1010, pp. 75–76. Ramsay, DX 1017, pp. 230–242, 244. Hanson, DX 1018, pp. 248–254.

1536. Olsen, Tr. 6829–30, 6863, 6872. Reichel, Tr. 6046–49. Pickens, Tr. 6153. DX 978. DX 542, p. 1001, 9/14/34. GX 574, 8/24/51.

1537. W. W. Smith, Tr. 6517.

1538. Answer, Par. 14.

1539. DX 863, p. 1812, 11/29/33. DX 955, p. 1954, 3/2/38. GX 999, p. 14, 10/41.

1540. Cook, Tr. 2202–03. Feagley, Tr. 6159.

1541. Complaint, Par. 22.

1542. GX 393, p. 5477, 5/15/50.

1543. GX 500, p. 6891, 1/14/47. DX 943, p. 1928, 2/8/49. GX 393, p. 5477.

1544. Answer, Par. 19.

1545. GX 394, p. 5487, 5/15/50.

736. As stated, duPont commenced commercial manufacture of caps and bands in 1929 [1546] following purchase on December 27, 1928 of Capes-Viscose, Inc., a New Jersey corporation,[1547] which had been a subsidiary of the Comptoir.[1548] Total purchase price was $192,-529.66, which included value of assets and certain interest payments.[1549] Acquisition of Capes-Viscose, Inc., resulted in the establishment by duPont Cellophane Company of the Cellulose Cap Division.[1550]

737. Sylvania has been a domestic producer of bands since 1934.[1551] It produced caps from 1933 to 1937 at which time it discontinued its caps business.[1552]

738. Celon Company of Madison, Wisconsin, produces caps and bands.[1553] It produced caps since 1927 and bands from 1934.[1554]

739. Societe de La Viscose Francaise, Societe Anonyme (referred to hereafter as "Viscose Francaise"), is a corporation of France with principal place of business at Paris, France. Viscose Francaise was associated with Comptoir. It was successor in interest to the caps and bands business of Societe Francaise des Crins Artificiels.[1555]

740. Viscose Development Company, Limited, is a corporation of the United Kingdom with principal place of business at Bromley, Kent, England. It manufactures caps and bands in England.[1556]

741. Cellulosic caps and bands are each closures which are functionally interchangeable with numerous other closures and sold to the same customers for the same purpose at competitive prices.

742. In selling cellulosic bands, I. F. Schnier Co., one of duPont's two agents for the sale of bands, encountered competition from other types of closures including the Guardian Seal, made of aluminum, attached to the bottle and requiring no secondary closure; the White Cap, which also requires no secondary closure; the Film-a-Seal, which is a secondary liner adhering to the lip of the bottle, forming a secondary closure; wrap arounds, a laminated foil attached to a paper with an adhesive on the inside giving the same decorative features as a cellulose band; and foil capsules, which are secondary seals.[1557]

743. In selling cellulosic bands Armstrong Cork Co., one of duPont's two agents for the sale of bands, encounters competition with caps on champagne or wine bottles, paper wrap arounds and specialty type closures, such as the aluminum seal roll-on or Guardian Seal. The latter seals compete with Cel-O-Seal bands even though they are primary seals because Armstrong in part claims a tamperproof feature on Cel-O-Seal bands since they must be destroyed before being taken off the bottle.[1558]

744. One reason cellulosic bands have lost business to other materials is it has been possible to apply some other materials automatically by machine whereas no satisfactory machines have been developed for applying cellulosic bands automatically.[1559] Efforts have been made by duPont to perfect a machine for the-

1546. GX 393, p. 5477.

1547. GX 1206, p. 1452, 12/27/28. GX 1207, p. 1455, 12/27/28. GX 1208, p. 1463, 5/24/28.

1548. Answer, Par. 16.

1549. GX 1206, 12/27/28.

1550. GX 483, p. 6413, 1/21/29.

1551. Answer, Par. 19. GX 535, p. 2101. GX 410, p. 5593.

1552. GX 536, p. 2102. GX 410, p. 5594.

1553. Answer, Par. 19.

1554. GX 530.

1555. Answer, Par. 8.

1556. Answer, Par. 9.

1557. Schnier, Tr. 6718-20.

1558. Feagley, Tr. 6171-73, 6175-76.

1559. DX 884, p. 1848, 7/31/39. GX 446, p. 5831, 2/12/40. DX 874, p. 1833, 12/8/44. DX 877, p. 1839, 7/24/47. DX 944, p. 1936, 2/6/50. GX 588, p. 7529, 2/7/50.

automatic application of cellulosic caps and bands.[1560]

745. Gelatin caps made by Parke-Davis are an illustration of competition between other materials and duPont's cellulosic caps. At one time they were the acute form of competition for du-Pont's cellulosic caps. They were transparent, had luster, could be shipped and stored in dry form, and their price was frequently lower than duPont's caps.[1561]

746. DuPont engaged in research to develop better cellulosic seals and efficient methods of manufacturing such products. Typical efforts have been du-Pont's attempts to improve printing,[1562] develop metallic-appearing bands,[1563] achieve higher casting speeds and increase capacity of existing machines.[1564] Result of success of such efforts, quality of duPont's seals has improved and price lowered.[1565]

747. DuPont attempts to apply research to develop seals which are tailor-made. Typical were its production of window bands for the liquor industry,[1566] seals to be used during airplane manufacture,[1567] cellulose tubing for textile mills,[1568] and seals for coffee and shortening producers.[1569]

748. For years caps and bands have been applied by hand to bottles. DuPont recognized desirability of developing automatic machinery which would facilitate application of caps and bands and conducted research to perfect such machines. Automatic machines would enable duPont to sell bands to customers now using other types of closures, such as in the field of food products, and to broaden its market.[1570]

749. DuPont reduced prices on its caps and bands in order to stimulate sales and enable it to compete.[1571]

750. Prices for bands were determined as result of competitive market factors and have not been arbitrarily fixed by duPont.[1572]

751. Prior to January 1, 1947, duPont allowed quantity discounts for caps and bands. DuPont paid the quantity discount from its funds regardless of whether customers bought the duPont-made caps and bands from duPont, Schnier or Armstrong.[1573]

752. Celon and Sylvania have granted more favorable discounts to customers than duPont at times.[1574]

---

1560. GX 498, p. 6832, 1/16/45. DX 874, p. 1833, 12/8/44. DX 595, pp. 1164–65, 2/49. DX 943, pp. 1930–31, 2/8/49. DX 596, pp. 1177–78, 4/7/50. Feagley, Tr. 6174.

1561. GX 474, pp. 5962–65, 1929. DX 863, p. 1816, 11/29/33.

1562. GX 491, pp. 6537–38, 1/20/37. GX 493, p. 6596, 1/20/39.

1563. GX 501, p. 6921, 1/27/48.

1564. GX 490, p. 6500, 1/22/36. GX 491, pp. 6537–38, 1/20/37. GX 493, p. 6596, 1/20/39. GX 452, p. 5881, 2/4/47. GX 88, p. 341, 3/10/47. GX 178, p. 507, 11/26/45.

1565. GX 356, pp. 890–92, 2/27/39.

1566. GX 491, p. 6537, 1/20/37. Schnier, Tr. 6720.

1567. GX 451, p. 5879, 2/4/46. GX 449, p. 5866, 1/25/44.

1568. GX 92, p. 367, 2/5/43.

1569. GX 451, p. 5879, 1/46. GX 449, p. 5863, 1943.

1570. DX 863, p. 1814, 11/29/33. DX 866, p. 1821, 6/38. GX 588, p. 7529, 2/7/50. Feagley, Tr. 6174.

1571. GX 490, p. 6500, 1/22/36. GX 471, p. 5950, 10/3/38. GX 474, p. 5972, 1929. GX 489, p. 6487, 1/22/35.

1572. DX 898, pp. 1865–66, 8/2/29. DX 938, p. 1912, 5/21/35. DX 900, p. 1868, 1/6/39. DX 901, p. 1868, 5/8/39. DX 903, p. 1871, 9/13/39. DX 908, p. 1877, 6/12/40. DX 910, p. 1879, 2/5/40. DX 911, p. 1881, 2/18/41. DX 913, p. 1883, 4/30/41. DX 914, p. 1884, 2/13/42. DX 931, p. 1905, 3/28/41. DX 933, p. 1907, 12/3/40. DX 934, p. 1908, 6/6/41. DX 935, p. 1909, 5/31/45. GX 489, p. 6487, 1/22/35. GX 490, p. 6500, 1/22/36. GX 471, p. 5950, 10/3/38. GX 356, p. 890, 2/27/39. GX 493, p. 6954, 1/20/39. GX 90, pp. 350–51, 2/2/39. GX 448, p. 5854, 2/5/42. Yerkes, Tr. 6956.

1573. GX 5034, pp. 4511–13, 11/29/46. Feagley, Tr. 6168.

1574. DX 938, p. 1912, 5/21/35. DX 903, p. 1871, 9/13/39. DX 908, p. 1877,

753. Types of materials have been sold in the closure market to same classes of customers and for same purposes as cellulosic caps and bands. Competition between these materials and cellulosic caps and bands has been intense.[1575] Materials competing with cellulosic caps and bands for similar end uses include products variously designated in the trade:

1. Aluminum Caps and Seals.[1576]
2. Metal Foil Caps.[1577]
3. Aluminum Foil Capsules.[1578]
4. Gold Foil Capsules.[1579]
5. Foil Wrap Arounds.[1580]
6. Metallic Papers.[1581]
7. Film-A-Seal.[1582]
8. Gelatin Caps.[1583]
9. Metal Screw Caps.[1584]
10. Corks.[1585]
11. Bakelite Caps.[1586]
12. Tape.[1587]
13. Lacquer Dipping.[1588]

754. At times cellulose seals and other materials have sold in the closure market to same customers for similar end uses including:[1589]

1. Distilleries.
2. Wineries.
3. Breweries.
4. Soft Drinks.
5. Bottled Water.
6. Other Beverages.
7. Food.
8. Drugs.
9. Chemicals .
10. Toilet Preparations.
11. Perfumes.
12. Airplane Parts.
13. Fire Extinguishers.
14. Textile Mills.

755. DuPont endeavored to expand the market for bands by selling bands for new uses.[1590]

756. The bulk of duPont's cellulosic band business is in the wine and liquor trade.[1591] DuPont has lost business in

6/12/40. DX 909, p. 1878, 11/5/40. DX 910, p. 1879, 12/5/40. DX 913, p. 1880, 4/30/41.

1575. GX 491, p. 6537, 1/20/37. GX 474, pp. 5956–58, 62–65, 82, 1929. GX 474, pp. 5956–83, 1929. GX 492, p. 6561, 1/25/38. GX 90, pp. 352, 354, 2/2/39. GX 1816, p. 1665, 3/25/46. GX 446, p. 5831, 2/12/40. GX 1391, p. 1792, 11/13/45. GX 451, p. 5879, 1/46. GX 594, pp. 1145–46, 1948. DX 595, p. 1163, 1949. DX 868, p. 1825, 6/29/39. DX 870, p. 1827, 3/6/40. DX 871, pp. 1828–29, 2/11/41. DX 872, p. 1830, 3/26/42. GX 588, Book 43, pp. 7528–29, 2/7/50. See also DXs 863–67, 869, 873–98, 941–44. Schnier, Tr. 6718–19. Feagley, Tr. 6171–73, 6175–76.

1576. See DXs cited, Tr. 5193. GX 491, p. 6537, 1/20/37. GX 492, p. 6561, 1/25/38. GX 89, p. 347, 2/1/38. GX 446, p. 5832, 2/12/40.

1577. See DXs cited, Tr. 5194. GX 89. p. 347, 2/1/38. GX 1316, DX 942, p. 1927, 2/4/48.

1578. See DXs cited, Tr. 5194. GX 89, p. 347, 2/1/38.

1579. DX 871, p. 1829, 2/11/41.

1580. See DXs cited, Tr. 5193. DX 943, pp. 1930–31, 2/8/49. DX 944, p. 1935, 2/6/50.

1581. See DXs cited, Tr. 5193. GX 449, pp. 5866–67, 1/25/44.

1582. See DXs cited, Tr. 5193. DX 944, p. 1936, 2/6/50.

1583. See DXs cited, Tr. 5194. GX 474, pp. 5956–58, 62–65, 82, 1929. GX 90, pp. 352, 358, 2/2/39. GX 446, pp. 5834–35, 2/12/40. GX 83, p. 318, 2/27/42. DX 944, p. 1936, 2/6/50.

1584. DX 895, p. 1860, 12/29/49. GX 474, p. 5967–71, 82, 1929.

1585. DX 895, p. 1860, 12/29/49. DX 491, p. 6537, 1/20/37. DX 944, p. 1936, 2/6/50.

1586. GX 474, pp. 5969–71, 1929.

1587. DX 863, p. 1816, 11/29/33.

1588. See DXs cited, Tr. p. 5193. DX 944, p. 1936, 2/6/50.

1589. GX 474, p. 5955, 1929. GX 448, pp. 5851, 5854, 2/5/42. GX 941, p. 1925, 1/23/45. DX 942, pp. 1926–27, 2/4/48. DX 943, pp. 1928–32, 2/8/49.

1590. GX 447, pp. 5845–46, 2/21/41. GX 448, p. 5857, 2/5/42. GX 92, pp. 363–64, 2/5/43. GX 449, pp. 5860, 5863–64, 1/25/44. GX 85, p. 328, 2/28/44. DX 877, p. 1839, 7/24/47. DX 943, p. 1930–31, 2/8/49.

1591. GX 588, p. 7527, 2/7/50.

these trades due to competition from other materials.[1592] Other materials have been used to replace cellulosic bands in the wine and liquor trades including lead and aluminum foil wrap arounds, and various metal closures.[1593] Certain roll-on "tamper proof" metal closures have constituted a threat to use of cellulosic caps and bands due to their economy, since they were designed to act as a primary and secondary closure and can be applied automatically by machinery in one operation.[1594]

757. Armstrong's important outlet for duPont's bands at present is liquor trade. Customers in liquor trade to whom it tries to sell bands are prospects for all types of bottle closures.[1595]

758. Result of competition between cellulose caps and bands and other materials has been shifting customers from one material to another. Customers using cellulosic caps and bands often shifted to other types of closures while customers using other types of closures shifted to cellulosic caps and bands.[1596]

This is illustrated by competition between cellulose caps and bands and other types of closures over a period of years from 1929 to 1949. In 1929 there was competition from gelatin caps made by Parke-Davis, and duPont was endeavoring to develop new uses for cellulose caps to offset loss of volume to other manufacturers;[1597] in 1936, National Distillers and Seagram's changed from aluminum seals to wood-embossed top corks and cellulose bands;[1598] in 1937 cellulose bands cut into the business of the Aluminum Seal Company and it started advertising campaign aimed at duPont bands;[1599] in 1938 sales of 525,000 bands were lost in favor of foil in the beverage industry;[1600] in 1939 duPont lost business of Gluek Brewing Co., which changed to foil;[1601] and of Century Distilling Company which changed from bands to aluminum Guardian Seal;[1602] in 1948, following a period of less active competition during the war years due to governmental limitation orders,[1603] there was pressure from manufacturers of metal foil and aluminum closures, with large distillers such as Frankfort Distilling Company, Schenley's and National Distillers becoming more interested in those closures;[1604] and in 1949 lead and aluminum foil and aluminum tamper-proof closures continued to make inroads on the cellulose bands business.[1605]

759. Shifts of customers between cellulose caps and bands and other types of closures have occurred at times for various reasons, including price,[1606] quali-

1592. DX 868, p. 1825, 6/29/39. GX 446, p. 5831, 2/12/40. GX 446, p. 5832, 2/12/40. DX 874, p. 1833, 12/8/44. DX 888, p. 1852, 12/5/47. DX 890, p. 1854, 5/6/48. DX 891, p. 1855, 5/14/48. DX 594, p. 1146, 1948. DX 595, p. 1163, 1949. DX 943, pp. 1930–31, 2/8/49. DX 944, pp. 1934–36, 2/6/50.

1593. DX 595, p. 1163, 1949. DX 944, pp. 1935–36, 2/6/50.

1594. GX 588, p. 7529, 2/7/50.

1595. Feagley, Tr. 6176.

1596. DX 594, pp. 1146, 1948. DX 880, p. 1843, 1/8/41. DX 943, p. 1930, 2/8/49. GX 451, p. 5879, 1/46. DX 874, pp. 1832–33, 12/8/44. DX 877, p. 1839, 7/24/47. DX 884, p. 1848, 7/31/39. DX 888, p. 1852, 12/5/47. DX 890, p. 1854, 5/6/48. DX 898, pp. 1865–66, 8/2/29.

1597. GX 474, pp. 5956–58, 5962–65, 5982, 1929.

1598. GX 491, p. 6537, 1/20/37.

1599. GX 492, p. 6561, 1/25/38.

1600. GX 90, p. 354, 2/2/39.

1601. GX 446, p. 5831, 2/12/40.

1602. GX 446, p. 5832, 2/12/40. DX 868, 6/29/39.

1603. GX 449, pp. 5864, 5867, 1/25/44. GX451, pp. 5879–80, 2/4/46.

1604. DX 891, p. 1855, 5/14/48. DX 943, pp. 1930–31, 2/8/49. DX 594, p. 1146, 1948. DX 595, p. 1163, 1949.

1605. DX 944, pp. 1934–36, 2/6/50. GX 588, pp. 7528–29, 2/7/50.

1606. DX 398, p. 1912, 5/21/35. DX 944, p. 1936, 2/6/50.

ty,[1607] service,[1608] decorative effect,[1609] drying time and odor of cellulose seals,[1610] and suitability for machine application.[1611]

760. DuPont estimated it lost the sale of 30 million bands in the first six months of 1950 to aluminum seals, which have advantage of machine application and fact consumer can break the seal easily.[1612]

761. DuPont encounters continuing competition in the sale of bands from other manufacturers of cellulosic bands, including Celon and Sylvania, on the basis of quality and service.[1613]

762. Price competition has existed between duPont, Celon and Sylvania as to caps and bands and exists to bands now duPont has withdrawn from manufacture of caps.[1614] This is illustrated by shifts of caps and band customers between duPont, Ceylon and Sylvania on the basis of price.[1615]

763. Plaintiff conceded prices of the three producers of caps and bands have not been identical, and offered no proof of extent of price differences between the producers.[1616]

764. Competition between duPont, Celon and Sylvania, all of which manufacture cellulose seals for sale in the closure market, is illustrated by shifts in quantity of seals sold by these manufacturers for various end uses. This is demonstrated by a recapitulation of the sales of cellulose seals for different end uses in the years 1948 [1617] and 1949: [1618]

1607. DX 906, p. 1874, 4/5/40. DX 907, p. 1875, 4/16/40.

1608. DX 917, p. 1887, 5/14/43.

1609. DX 920, p. 1890, 6/15/45.

1610. DX 863, p. 1812, 11/29/33.

1611. DX 874, p. 1833, 12/3/44.

1612. GX 580, p. 7336, 1950.

1613. DX 920, p. 1890, 6/15/45. DX 937, p. 1911, 2/5/48. DX 943, p. 1930, 2/8/47. DX 941, pp. 1915-25, 1/23/45. GX 588, p. 7528, 2/7/50. DX 942, p. 1927, 2/4/48. DX 595, p. 1162, 1949. DX 944, p. 1935, 2/6/50. Feagley, Tr. 6176-78. Schnier, Tr. 6716-18.

1614. GX 474, pp. 5966, 77, 82, 85, 1929. GX 322, pp. 811, 830, 2/16/33. DX 938, p. 1912, 5/21/35. GX 89, p. 345, 2/1/38. DX 939, p. 1913, 1/18/38. DX 901, p. 1869, 5/8/39. GX 90, pp. 349-50, 2/2/39. DX 927, p. 1900, 4/16/40. DX 910, p. 1879, 12/5/40. DX 931, p. 1905, 3/28/41. Yerkes, Tr. 6956.

1615. GX 474, pp. 5979, 5982, 1929. DX 898, pp. 1865-66, 8/2/29. GX 90, p. 351, 2/2/39. DX 905, p. 1873, 11/21/39. DX 928, p. 1901, 4/17/40. DX 931, p. 1905, 3/28/41. DX 934, p. 1908, 6/6/41. DX 935, p. 1909, 5/31/45. GX 448, p. 5854, 2/5/42.

1616. Cook, Tr. 2200-01. Renninger, Tr. 1967.

1617. DX 595, p. 1160, 1949.

1618. GX 588, p. 7527, 2/7/50.

### SALES OF CELLULOSE SEALS BY TRADE CLASS—M UNITS

| | DuPont | | Celon | | Sylvania | | Total Sales for Industry |
|---|---|---|---|---|---|---|---|
| | 1948 Sales | % of Industry | 1948 Sales | % of Industry | 1948 Sales | % of Industry | |
| Drugs | 83,239 | 76 | 22,939 | 21 | 2,740 | 3 | 108,918 |
| Toilet Prep | 9,182 | 29 | 22,500 | 70 | 300 | 1 | 31,982 |
| Food Prod | 24,927 | 81 | 5,595 | 18 | 135 | 1 | 30,657 |
| Beverages | 3,057 | 67 | 1,550 | 33 | —— | —— | 4,607 |
| Distilleries | 649,580 | 63 | 351,255 | 34 | 36,058 | 3 | 1,036,893 |
| Wineries | 246,167 | 61 | 139,025 | 34 | 19,650 | 5 | 404,842 |
| Water Bottlers | 4,700 | 45 | 5,800 | 55 | —— | —— | 10,500 |
| Chemicals | 40,369 | 70 | 7,670 | 15 | 3,160 | 6 | 51,199 |
| Miscellaneous | 11,560 | 62 | 7,025 | 37 | 200 | 1 | 18,785 |
| Total | 1,072,781 | 63 | 563,359 | 33 | 62,243 | 4 | 1,698,383 |

| | DuPont | | Celon | | Sylvania | | Total Sales for Industry |
|---|---|---|---|---|---|---|---|
| | 1949 Sales | % of Industry | 1949 Sales | % of Industry | 1949 Sales | % of Industry | |
| Drugs | 89,964 | 76 | 23,597 | 20 | 3,860 | 4 | 117,421 |
| Toilet Prep | 8,271 | 28 | 20,600 | 69 | 1,050 | 3 | 29,921 |
| Food Prod | 26,350 | 85 | 3,895 | 13 | 635 | 2 | 30,880 |
| Distillers | 584,551 | 63 | 309,851 | 33 | 40,981 | 4 | 935,383 |
| Beverages | 4,274 | 96 | 180 | 4 | —— | —— | 4,454 |
| Wineries | 245,014 | 64 | 118,119 | 31 | 21,275 | 5 | 384,408 |
| Water Bottlers | 5,901 | 61 | 3,750 | 39 | —— | —— | 9,651 |
| Chemicals | 51,044 | 82 | 9,705 | 16 | 1,975 | 2 | 61,824 |
| Miscellaneous | 12,504 | 60 | 6,000 | 29 | 2,400 | 11 | 20,904 |
| Total | 1,027,873 | 64 | 495,697 | 31 | 71,276 | 5 | 1,594,846 |

765. No evidence was shown as to number of patents owned by Sylvania, Celon or third parties relating to caps and bands.

766. During past years duPont expanded productive facilities for bands. Expansions were made for variety of business reasons such as: to meet an increasing demand;[1619] to handle peak seasonal requirements:[1620] to reduce costs and price to expand sales;[1621] to penetrate lower priced markets;[1622] to meet forecasted sales;[1623] to recover trade which had switched to competitors during a shortage;[1624] or to relieve a supply shortage and regain business lost to competitors.[1625]

767. There is no proof duPont ever expanded productive facilities for bands in excess of the forecasted demand for purpose of discouraging new competition.

768. No proof was shown potential competitors were excluded from manufacture of caps and bands as a result of any act done by duPont.

1619. GX 488, p. 6475, 1/22/34.

1620. GX 428, p. 5659, 4/23/35.

1621. GX 490, p. 6500, 1/22/36.

1622. GX 355, p. 889, 8/30/38.

1623. GX 498, p. 6832, 1/16/45. GX 178, p. 507, 11/26/45. GX 179, p. 508, 12/18/45.

1624. GX 452, p. 5881, 2/4/47.

1625. GX 88, p. 341, 3/10/47.

769. No proof was shown duPont had any agreement with other producers of bands to exclude others from this business.[1626]

770. No proof was shown duPont excluded Visking from manufacture and sale of caps and bands.

771. No proof was shown American Viscose was excluded from the manufacture and sale of caps or bands by duPont.

772. There is no proof any distributors of caps and bands were excluded from the manufacture of caps and bands as a result of any action by duPont.[1627]

773. Armstrong Cork Company was never interested in manufacturing cellulose caps or bands. Armstrong devoted its money to a planned program of expansion along other lines.[1628]

774. Although certain contracts between duPont and Armstrong, distributor for duPont caps and bands, contained a provision under which Armstrong agreed not to manufacture caps and bands,[1629] Armstrong did not regard this as exclusionary since Armstrong was not interested in manufacturing competing line of caps and bands.[1630]

775. I. F. Schnier Co., Inc., a duPont band distributor, never desired to manufacture cellulose caps or bands. This was due to business reasons unrelated to any contract with duPont.[1631]

776. Contracts between duPont and I. F. Schnier and Company, distributor for duPont caps and bands on the West Coast, contained a provision under which

Schnier agreed not to manufacture caps and bands;[1632] Schnier did not consider this an interfering factor.[1633] Schnier did not regard this clause as having an exclusionary effect because Schnier did not desire to engage in the manufacture of caps and bands.[1634]

777. Price reductions were made by duPont because of lowering cost resulting from duPont's research and development and desire to broaden markets and to meet competitors' prices. Such price reductions were never made with the intent of excluding potential competition.[1635]

778. DuPont was interested in activities of other concerns which manufactured caps and bands. This included obtaining samples of these competitive materials from different sources.[1636] DuPont's purpose in seeking information represented nothing more than desire as a matter of business to be acquainted with all competitive developments.[1637]

779. No evidence was shown duPont did or now controls distribution outlets for caps and bands in the United States.

780. Both Celon and Sylvania use distributing organizations of substantial size as outlets for the cellulosic seals they produce.[1638]

781. DuPont sells bands to some purchasers in the United States. It markets its bands through a number of distributors including I. F. Schnier Co., Inc. and Armstrong Cork Co. in the United States and Freysing Cork Co. and Armstrong Cork Co. in Canada.[1639]

1626. Reichel, Tr. 6046.

1627. Schnier, Tr. 6712–14, 6727–31. Feagley, Tr. 6159–65, 6184–87.

1628. Feagley, Tr. 6162–65, 6185–86.

1629. GX 5290, p. 5033, 1/7/42.

1630. Feagley, Tr. 6162–63.

1631. Schnier, Tr. 6712–14, 6727–31.

1632. GX 5288, pp. 5027–31, 9/8/39.

1633. Schnier, Tr. 6727–28. GX 4519, p. 7860, 6/20/47.

1634. Schnier, Tr. 6730.

1635. GX 489, p. 6487, 1/22/35. GX 490, p. 6500, 1/22/36. GX 471, p. 5950, 10/3/38. GX 356, p. 890, 2/27/39.

1636. GX 4304, p. 4195, 3/23/42. GX 4313, p. 4207, 8/12/43. GX 4315, p. 4207, 8/12/43. GX 4481, p. 6268, 10/27/45.

1637. GX 4312, p. 4204, 7/3/43. GX 4305, p. 4196, 3/27/42. GX 4310, p. 4202, 4/15/43. GX 4360, p. 4272–73, 11/19/45.

1638. DX 925, p. 1898, 4/50. DX 926, p. 1899, 4/50. GX 322, p. 807, 2/16/33.

1639. GX 446, p. 5834, 2/12/40. GX 1269, p. 1596, 5/15/31. Schnier, Tr. 6711–15. Feagley, Tr. 6159.

782. I. F. Schnier and Co. is not owned by duPont and duPont does not tell Schnier to whom Schnier can sell bands.[1640] Although there are other manufacturers of cellulose bands in the United States, no manufacturer other than duPont has approached Schnier to be its distributor, nor has Schnier applied to other manufacturers of cellulose bands in the U. S. to be their distributor.[1641]

783. Although Armstrong has sold only duPont bands rather than Celon or Sylvania, it has done so as a matter of business judgment, preferring to promote use of duPont's bands. Neither Celon nor Sylvania has approached Armstrong to sell their bands, nor has Armstrong sought to handle bands manufactured by Celon or Sylvania.[1642]

784. DuPont filed its patent applications to protect its own research.[1643]

785. DuPont's licenses to manufacture bands were offered to any applicant at reasonable royalties.[1644]

786. DuPont has granted licenses to others under its patents pertaining to manufacture of caps and bands at reasonable royalties. These included licenses granted by duPont under the Webster, Fletcher and Vautier and Fays patents to Celon.[1645] The same patents were licensed to Sylvania royalty-free in exchange for three Sylvania patents.[1646]

787. Patent interferences between duPont and other manufacturers of bands were settled from time to time. No evidence was shown these settlements were arrived at as result of any-thing other than arm's-length negotiations, or were made for the purpose of deterring potential competition.[1647] Disputes so settled included Interference 79985 between duPont and Celon [1648] and Interference 73679 among duPont, Celon and Sylvania.[1649]

788. DuPont was owner of a patent (Vautier & Fays) covering method of manufacturing bands with alternating transparent and opaque sections, a type known as "Wind-O-Band" by duPont. It was owner of a patent (Evans) covering the combination of such a band, a liquor bottle, and a revenue stamp. Both patents were licensed by duPont to all other U. S. producers of cellulose bands.[1650]

789. DuPont never had an arrangement with Celon or Sylvania as owners of patents pertaining to caps and bands seeking to use those patents to monopolize or to exclude potential competitors from manufacture of caps and bands.[1651]

790. No proof was shown duPont ever had arrangement with any owners of patents on caps and bands seeking to use them to monopolize or to exclude others from manufacture of caps or bands.

791. DuPont never entered into agreement or conspiracy with Sylvania fixing producer's prices or resale prices of bands.[1652]

792. DuPont never entered into agreement or conspiracy with Celon fixing prices or resale prices of bands.[1653]

793. DuPont and Celon did not agree on standardization of cap or band sizes.

1640. Schnier, Tr. 6723–24.

1641. Schnier, Tr. 6715.

1642. Feagley, Tr. 6179, 6183–84.

1643. W. W. Smith, Tr. 6508–09.

1644. Olsen, Tr. 6843–44. W. W. Smith, Tr. 6517. GX 2248, p. 2575, 8/11/39. GX 2254, p. 2583, 1/1/40. GX 2262, p. 2599, 2/2/42. GX 2296, p. 2646, 8/2/42.

1645. GX 2242, p. 2565, 5/11/36. GX 2254, p. 2583, 1/1/40.

1646. GX 2296, p. 2646, 8/2/42.

1647. Reichel, Tr. 6046.

1648. GX 2294, pp. 2639–43, 7/15/42.

1649. GXs 2224–34, pp. 2518–53, 1937–38.

1650. GX 2242, p. 2565, 5/11/36. GX 2254, p. 2583, 1/1/40. GX 2296, p. 2646, 8/2/42.

1651. Reichel, Tr. 6046.

1652. Reichel, Tr. 6045. Yerkes, Tr. 6947, 6956.

1653. Yerkes, Tr. 6959. Eg.: GX 322, p. 830, 1/24/33. DX 901, p. 1869, 5/8/39.

In 1934 and thereafter each company used its own method of designating size.[1654]

794. Celon and Sylvania were not bound by agreement to follow duPont's price for caps or bands, and have sold at prices different from duPont.[1655]

795. DuPont never entered into agreement or conspiracy with I. F. Schnier fixing prices or resale prices of bands,[1656] and Schnier, in fact, sells du-Pont bands at prices different from du-Pont list prices.[1657]

796. DuPont never entered into agreement or conspiracy with Armstrong Cork Co. fixing prices or resale prices of bands.[1658]

797. DuPont never entered into agreement or conspiracy with anyone fixing prices or resale prices of bands.[1659]

798. Imports of bands have been excluded by a prohibitive U. S. tariff, 60% ad valorem, which has been in effect since 1922.[1660]

799. At time of purchasing Capes-Viscose, Inc., duPont did not know there were any territorial restrictions upon that company. Such restrictions were eliminated shortly after duPont learned of them.[1661]

800. In 1930, duPont entered into agreements for exchange of process, technical information, licenses, and patent applications with two foreign manufacturers of viscose bottle caps, the Viscose Development Company in England [1662] and Viscose Francaise in France.[1663] Latter was an affiliate of La Cellophane.[1664]

801. In Spring of 1930, duPont VDC and Viscose Francaise entered into letter agreements which stated the countries where each manufacturer of caps and bands was to have exclusive selling rights.[1665] DuPont Legal Department approved execution of these letters in belief the territorial divisions were based upon secret processes for manufacture of caps and bands acquired by duPont from Capes-Viscose.[1666]

802. Legal Department investigated and clarified circumstances of purchase of Capes-Viscose, and nature of processes and territorial commitments acquired with it. Legal Department then directed the territorial letter agreements be cancelled.[1667] This was done in the Autumn of 1930.[1668] Cancellations were final, and bona fide.[1669]

803. Following cancellation of these letter agreements, duPont observed no territorial limitations upon its exports of caps and bands. Exports were made to countries where, had the letter agreements remained in effect, duPont would not have been permitted to sell.[1670] Limitations upon the quantity of these products exported have been: (1) export shipment of caps and bands is made in containers of solution, which make shipments bulky and heavy; [1671] (2) cheaper

1654. GX 333, p. 847, 4/16/34.

1655. GX 5390, p. 5209, 3/20/44. GX 332. GX 322, p. 830. GX 492, p. 6560, 1/28/38. GX 89, p. 345, 2/1/38. GX 90, pp. 349–50, 356, 2/2/39. GX 448, p. 5854, 2/5/42. Yerkes, Tr. 6956.

1656. GX 5567A, 1/30/48.

1657. Schnier, Tr. 6715–16.

1658. Feagley, Tr. 6166–68.

1659. Yerkes, Tr. 6947, 6956. Reichel, Tr. 6045. GX 5567A, 1/30/48.

1660. Act of September 21, 1922, c. 356, 42 Stat. 863.

1661. Yerkes, Tr. 6954–55. GX 1217, 5/3/29. GX 1222, p. 1503, 7/1/29.

1662. GX 1260, p. 1584, 1/1/30. GX 1120, p. 1265, 2/7/41.

1663. GX 1245, p. 1561, 1/1/30.

1664. Answer, Par. 8.

1665. GX 1246, p. 1565, 5/29/30. GX 1247, p. 1566, 7/1/30. GX 1237, p. 1546, 5/29/30. GX 1261, p. 1588, 5/29/30. GX 1262, p. 1589, 6/24/30.

1666. GX 1226, p. 1528, 8/26/29.

1667. GX 1252, p. 1571, 9/30/30. GX 1253, p. 1574, 10/1/30. Yerkes, Tr. 6954–5. DX 946, p. 1938, 8/29/30. DX 947, p. 1939, 8/30/30. DX 948, p. 1942, 10/9/30. DX 949, p. 1944, 10/24/30.

1668. GX 1249, p. 1568, 11/7/30. GX 1257, p. 1580, 11/22/30. GX 1264, p. 1591, 11/11/30.

1669. GX 1314, p. 1661, 5/13/43. GX 1315, p. 1664, 5/20/43.

1670. GX 1391, p. 1791, 11/13/45. GX 399, 5/15/50.

1671. GX 999, p. 14, 10/41.

prices for caps prevail in markets supplied by Viscose Francaise and VDC.[1672]

804. In 1941 VDC informed duPont of an inquiry from Lockheed Aircraft Corporation for printed bands.[1673] DuPont owned Fletcher Patent 1,997,769 on printed bands. It advised VDC due to the patent, duPont had exclusive right to make and sell printed bands in the United States, but VDC was completely free to compete with duPont in any country in the world except as prevented by patents.[1674]

805. Technical agreement between duPont Cellophane Company and Viscose Francaise was terminated in 1941 in the circumstances and on the basis as the agreement between La Cellophane and duPont Cellophane Company.[1675]

806. DuPont terminated its technical agreement with VDC in 1947.[1676]

807. Technical agreements between duPont, Viscose Francaise and VDC as to caps and bands did not have effect of channeling duPont world technology as to caps or bands. Both Celon and Sylvania have manufactured and sold these products in the United States without receipt of technical information from duPont.

808. No proof was shown the terminated technical agreements with VDC and Viscose Francaise are continuing or will be revived.

809. No proof was shown duPont attempted to monopolize manufacture of caps and bands.

810. DuPont had opportunity to purchase Celon in 1933, and declined to do so.[1677]

811. DuPont's position in manufacture of cellulosic caps and bands has declined over a period of years. This is evident from study of the trend of annual quantity production of caps and bands in units by duPont, Sylvania and Celon at regular intervals, beginning with 1929 and running through 1949:

ANNUAL QUANTITY PRODUCTION OF CELLULOSIC CAPS & BANDS

(M Units)

| Year | Total | duPont | Sylvania | Celon [1678] |
|---|---|---|---|---|
| 1929 .............. | 97,845 | 68,426 | 0 | 29,419 |
| 1933 .............. | 103,204 | 86,715 | 294 | 16,195 |
| 1937 .............. | 912,446 | 721,456 | 51,670 | 139,320 |
| 1941 .............. | 1,712,523 | 1,170,675 | 103,254 | 438,594 |
| 1945 .............. | 2,017,951 | 1,314,962 | 101,754 | 601,235 |
| 1949 [1679] .......... | 1,594,846 | 1,027,873 | 71,276 | 495,697 |

PERCENT OF TOTAL PRODUCTION

| Year | duPont | Sylvania | Celon [1678] |
|---|---|---|---|
| 1929 .............. | 69.9% | | 30.1% |
| 1933 .............. | 84.0% | 0.3% | 15.7% |
| 1937 .............. | 79.1% | 5.7% | 15.3% |
| 1941 .............. | 68.4% | 6.0% | 25.6% |
| 1945 .............. | 65.2% | 5.0% | 29.8% |
| 1949 [1679] .......... | 64.4% | 4.5% | 31.1% [1680] |

1672. GX 506, p. 6953, 1/23/41. DX 964, p. 1967, 2/21/41.

1673. GX 1318, p. 1667, 5/26/41.

1674. GX 1322, p. 1673, 7/11/41.

1675. GX 1286, p. 1624, 2/5/45. GX 1278, p. 1609, 12/31/40. GX 1279, p. 1613, 3/26/41.

1676. DX 950, p. 1946, 6/5/47.

1677. DX 945, p. 1937, 4/26/33.

1678. Sales figures.

1679. Estimated domestic sales figures (exports not included).

1680. GX 393, p. 5477, 5/15/50. GX 410, pp. 5593–94, 2/1/50. GX 530, 1/5/51. GX 535. GX 536. DX 944, p. 1934, 2/6/50. GX 588, p. 7526, 2/7/50.

812. No proof was shown general decline over a period of years in percentage duPont's output represents of the total annual domestic output of caps and bands will be slackened or reversed.

813. Sylvania has expanded output and production facilities for bands since it began manufacturing bands. Its first machine was built in 1934, the second in 1940, the third in 1945 and the fourth in 1947.[1681]

814. Celon has expanded its output and production facilities for bands since it first began manufacturing bands.[1682]

815. DuPont has not produced or sold caps since May 31, 1947.[1683]

816. Celon's percentage of the total annual production of cellulosic caps increased from time it first began to manufacture caps and it now accounts for 100% of domestic production of caps.[1684]

817. DuPont's percentage of total annual domestic sales of bands decreased from 100% in 1929 to 64% in 1947.[1685]

818. Celon's percentage of annual domestic sales of cellulosic bands increased from 12% in 1934 to 30% in 1947.[1686]

819. No proof was shown duPont's return on its investment in manufacture of caps and bands was greater or less than return earned by Sylvania, and by Celon on their investments in such manufacture.

## OTHER FACTS.

### (Findings 820–834)

820. With consent of counsel, I visited duPont's Richmond plant to observe production of cellophane. I also attended the 1952 Annual Packaging Show at Atlantic City to observe exhibits offered by machinery manufacturers, converters and manufacturers of flexible packaging materials. Physical samples of different types of packaging materials and converted wraps were presented during trial and judicial notice taken of trade publications and writings pertaining to flexible packaging materials. These sources confirmed pertinent findings found herein.

821. Each narrative summary of depositions, admitted in evidence as DX 1006–1021, is an accurate statement of contents of the deposition to which it refers. Such summaries were admitted in evidence without objection by plaintiff as to accuracy and completeness. Plaintiff has not demonstrated any material inaccuracy or omission in such summaries.[1687]

822. B. M. May was unable to testify on behalf of defendant due to condition of his health.[1688]

823. DuPont requires salesmen to submit regular trade reports reflecting each call made. DuPont uses such reports for information on gain and loss of business, of trends in merchandising, on need for technical service, etc. Such trade reports are relied upon by duPont's sales management in the course of its business.[1689]

824. For purpose of obtaining data on distribution of cellophane as a guide to plans for future promotion and advertising, and efficiency of salesmen in the territory, duPont requested converters to inform it monthly of their shipments of duPont cellophane. During World War II, such reports were required by Limitation Order 20 to insure cellophane was being employed in permitted uses.[1690]

1681. GX 410, pp. 5600–91, 1/1/50.

1682. GX 530, 1/5/51. Cook, Tr. 2100.

1683. GX 500, p. 6891, 1/14/47. DX 943, p. 1928, 2/8/49. GX 393, p. 5477, 5/15/50.

1684. GX 536. GX 530, 1/5/51. GX 393, p. 5477, 5/15/50. GX 410, p. 5594. DX 943, pp. 1928–29, 2/8/49. DX 595, p. 1159, 1949. GX 588, p. 7526, 2/7/50.

1685. GX 544.

1686. GX 544.

1687. Tr. 6874–82.

1688. DX 1087 (Imp. Doc. No. 71).

1689. R. R. Smith, Tr. 5828–33.

1690. Limitation Order 20. GX 5601, p. 7912, 10/23/43. GX 5602, p. 7913, 10/29/43. GX 5603, p. 7914, 1/14/44. GX 5604, p. 7917, 8/15/47.

825. For purpose of enabling duPont to compete, duPont obtained information as to products, selling efforts, and activities of other flexible packaging material manufacturers, including Sylvania.[1691] It did not use unlawful methods to obtain information, but relied on observation of its customers, and upon analysis of competing products.[1692]

826. DuPont preferred sales of moistureproof cellophane types because of greater potential sales of such types, more satisfactory performance as a packaging material, larger production possible with the same equipment, and greater return on investment.[1693]

827. Increasing importance of moistureproof cellophane as compared to plain resulted from demand of consumers for a packaging material which would resist transmission of moisture vapor.[1694] Predominance of moistureproof cellophane as opposed to plain has been common to both duPont and Sylvania. Moistureproof-plain ratio of duPont sales changed from 44/17 in 1937 to 112/20 in 1947; while the ratio of Sylvania sales changed from 12/6 in 1937 to 34/5 in 1947.[1695] Predominance of moistureproof cellophane sales has been marked in case of Sylvania even more than in that of duPont. Use of plain cellophane and moistureproof cellophane is to a large degree mutually exclusive among cellophane users, since type used depends upon type of packaging required by the consumer's particular product.[1696]

828. Spread between duPont's prices for 300-gauge plain film and 300-gauge moistureproof transparent film has narrowed over the years. Taking pound price of roll stock, this spread was 35¢ in 1928 when list prices for moistureproof film were first published,[1697] declined to 30¢ in October, 1930,[1698] to 25¢ in 1931,[1699] to 22¢ in 1932,[1700] to 18¢ in 1933,[1701] to 11¢ in 1935,[1702] to 10¢ in 1938,[1703] to 8¢ in 1939,[1704] and to 2¢ in 1947.[1705]

829. Glycerin shortage curtailed production of plain film but did not have the effect on production of moistureproof film when substitute softeners were found.[1706]

830. During World War II restrictions on use of raw materials, particularly glycerin, required duPont to curtail production of plain cellophane.[1707] For a time duPont was unable to fill orders for plain cellophane and the continuing inability to obtain glycerin caused duPont to sell moistureproof cellophane to users who would have preferred plain cellophane.[1708]

831. Prior to January 1, 1947, duPont had higher prices for orders of less than 500 lbs. of cellophane rolls than those for orders of 500 lbs. and over, and higher prices for orders of less than 1,000,000 square inches of sheets than

1691. McCune, Tr. 5584. E.g.: GX 4302, p. 4187, 4/1/43. GX 4303, p. 4194, 8/31/45. GX 4319, p. 4211, 3/30/45. GX 4340, p. 4243, 3/15/43.

1692. E.g., DXs 46–49, pp. 80–105. DX 67, p. 150, 8/15/49. DX 78, p. 175, 6/18/34. DX 193, p. 385, 7/18/34. DX 322, p. 614, 12/8/32. DXs 592–594, pp. 1129–46.

1693. DX 595, p. 1151, 1948.

1694. DX 595, p. 1151, 1948. DX 341, p. 655, 8/15/27. DX 346, p. 661, 8/1/29. GX 433, p. 5712. GX 435, p. 5728, 7/21/30.

1695. GX 395, p. 5488. GX 411, p. 547.

1696. GX 444, p. 5810, 2/9/37.

1697. GX 398, p. 5525—November 30, 1928.

1698. GX 398, p. 5533—October 1, 1930.

1699. GX 398, p. 5537—August 1, 1931.

1700. GX 398, p. 5541—May 2, 1932.

1701. GX 184, p. 519—Jan. 11, 1933.

1702. GX 101, p. 524—Dec. 1935.

1703. GX 190A, p. 531B—Dec. 1938.

1704. GX 191, p. 533—Oct. 1939.

1705. GX 398, p. 5543—October 1, 1947.

1706. GX 496, p. 6769, 1/21/43. GX 372, p. 926, 1/22/43.

1707. GX 496, p. 6769, 1/21/43. GX 372, p. 926, 1/22/43. GX 92E, p. 376, 1/19/43.

1708. GX 2723, p. 3572, 5/21/46.

those for orders of less than 1,000,000 square inches.[1709] Sylvania continues to quote higher prices for less than 500 pound roll orders.[1710]

832. Prior to November 1, 1941, when manufacture of stock size sheets was discontinued, duPont had lower price for a given area of a type of cellophane in stock size sheets than for the same area when furnished in cut-to-size sheets.[1711]

833. DuPont has charged different prices for colored cellophane as compared to uncolored cellophane, and different prices for different thicknesses of the same type of cellophane.[1712]

834. No proof was shown Birn and Wachenheim did not receive from La Cellophane every sheet of cellophane to which it was entitled under its contract with La Cellophane.[1713]

## CONCLUSIONS OF THE MASTER FACTS.

### (Findings 835–854)

835. The record establishes duPont has not monopolized trade and commerce in cellophane or in caps and bands.

836. The record establishes duPont has not attempted and is not attempting to monopolize trade and commerce in cellophane or in caps and bands.

837. The record establishes duPont has not combined to monopolize trade and commerce in cellophane or in caps and bands.

838. The record establishes plain cellophane and moistureproof cellophane are each flexible packaging materials which are functionally interchangeable with other flexible packaging materials and sold at same time to same customers for same purpose at competitive prices; there is no cellophane market distinct and separate from the market for flexible packaging materials; the market for flexible packaging materials is the relevant market for determining nature and extent of duPont's market control; and duPont has at all times competed with other cellophane producers and manufacturers of other flexible packaging materials in all aspects of its cellophane business.

839. The record establishes cellulose caps and bands are closures which are functionally interchangeable with numerous other closures sold at same time to same customers for same purpose at competitive prices; there is no cap and band market distinct and separate from the market for closures; the market for closures is a relevant market for determining the nature and extent of duPont's market control; and duPont has competed with other producers of caps and bands and manufacturers of other closures in aspects of its cap and band business.

840. The record establishes duPont has not achieved market control or monopoly power as to trade and commerce in cellophane nor attempted to achieve or to exert such power.

841. The record establishes duPont has not achieved market control or monopoly power as to trade and commerce in caps and bands nor attempted to achieve or exert such power.

842. Allegations of paragraphs 21, 22, 23 and 44 of the complaint are not supported by proof or the weight of evidence.

843. The record establishes duPont did not intend and does not now intend to monopolize trade and commerce in cellophane or in caps and bands.

844. The record establishes agreements between duPont and various French interests, under which duPont entered the cellophane business and received licenses for the French cellophane process, did not restrain trade.

845. The record establishes various technical exchange and licensing agree-

---

1709. E.g., GX 192, p. 535, 11/1/41. DX 370, p. 692, 12/30/46.

1710. DX 591, p. 1128.

1711. E.g., GX 191, p. 533, 10/30/38.

1712. E.g., GX 192, p. 535, 11/1/41.

1713. GX 4457A, 11/10/22. GX 4457, p. 6230, 6/4/23. GX 1006, p. 1136, 8/25/23. Roache, Tr. 3391–92, 3398.

ments between duPont and Kalle, BCL and CIL did not unreasonably restrain trade.

846. The record establishes the various technical exchange agreements relative to caps and bands entered into between duPont and Viscose Francaise and VDC did not unreasonably restrain trade.

847. The record establishes the moistureproof patent license agreement of 1933 between duPont and Sylvania did not restrain trade.

848. The record establishes duPont did not fix cellophane prices by agreement with anyone.

849. ·For the purpose of this litigation, all claims of cellophane and cap or band patents obtained by duPont or licensed or assigned to it have not been shown other than to be valid.

850. DuPont's moistureproof product patent 1,737,187 gave duPont lawful right throughout the life of the patent to exclude others from the manufacture or sale of moistureproof cellophane in the United States.

851. DuPont's four original composition and process patents 1,826,696—1,826,699 gave duPont lawful right to forbid others to manufacture moistureproof cellophane in the United States by use of compositions or processes claimed in the patents.

852. The record establishes duPont's prices did not discriminate against any particular customer or group of customers and the different prices charged different customers did not have purpose or effect of suppressing or restraining competition between producers or between distributors or purchasers.

853. The record establishes duPont did not suppress competition of any existing or potential competitor.

854. The record establishes duPont's position as a manufacturer of cellophane resulted from lawful business conduct undertaken for legitimate motives and not from any restraint of trade or predatory practice pleaded in the complaint or claimed by plaintiff at trial.

## RESUMPTION OF THE OPINION.

■ I recognized through trial the principal issue is whether duPont's position gives it market control, and hence monopoly power arbitrarily to raise prices and to exclude competitors. The complaint charges duPont "has had for many years past virtually absolute control of the markets in the United States for cellophane" and such market control has resulted in monopoly powers that have "become self-sustaining and self-perpetuating". The complaint describes these powers in detail. They were, moreover, epitomized by the Supreme Court in American Tobacco Co. v. United States, 328 U.S. 781, 811, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575, where it said:

"The authorities support the view that the material consideration in determining whether a monopoly exists is * * * that power exists to raise prices or to exclude competition when it is desired to do so." See also Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 52, 31 S.Ct. 502, 55 L.Ed. 619, and United States v. Griffith, 334 U.S. 100, 107, 68 S.Ct. 941, 92 L.Ed. 1236. Throughout trial duPont had proof establishing absence of these powers.

The determination, here, depends upon an analysis of the "particular circumstances of the industry" and the "economic realities of the market situation".

Thus master factual questions are presented:

1. Does duPont have power, without regard to competitive forces, to raise price of cellophane either directly or by limiting production, deteriorating quality, or by any other means?

2. Does duPont have power alone to exclude competition in the production and sale of cellophane?

While plaintiff recognizes these are tests which govern the decision, it is in error in assuming the mere statement of these tests leads to a judgment in plain-

tiff's favor. The controversy begins rather than ends with a definition of the monopoly powers which must be proved.

Throughout trial, plaintiff has offered no guides for determining whether market control and the resulting monopoly powers are in fact present. It says little as to what these powers actually are.

■ Monopoly power can be distinguished from the normal freedom of business only in degree. Nothing except death is an absolute. Plaintiff cannot rest on a showing duPont makes cellophane and has some degree of control over its sales, production and prices. Cf. United States v. Columbia Steel Co., 334 U.S. 495, 68 S.Ct. 1107, 92 L.Ed. 1533; United States v. Aluminum Co. of America, D.C.S.D.N.Y., 91 F.Supp. 333, 346.

Many sellers have some freedom over their price, production and general business conduct. Each must make his best guess of his future requirements; he must set price at which he will attempt to sell; and he may raise price if costs or other factors dictate. Such business decisions do not represent degree of control over prices or production which constitutes monopoly power. Prohibited degree of control is that which permits disregard for competitive factors. There is nothing in the decided cases which limits evidence that may be considered by a court in deciding whether these powers exist or do not exist.

Plaintiff avoids an analysis of evidence by seeking to confine it in accordance with its theoretical assumptions. It would limit discussion to a part of proof in order to prevent consideration of many competitive facts which are essential to a resolution of the issue. Decisions say this cannot be done. No fact standing alone can determine whether monopoly power exists. All facts and circumstances relating to manufacture and sale of a product claimed to be monopolized must be considered, and facts of each case are different.

Defendant contends plaintiff fails to present evidence to show cellophane is a distinct part of trade and commerce within the meaning of the statute. Plaintiff insists cellulose caps and bands are a different part of trade and commerce from cellophane. There are other products more similar to moistureproof than is plain cellophane, which are sold at the same time, for the same purposes, to the same classes of customer as moistureproof cellophane and are functionally interchangeable. Plaintiff insists these products are to be considered as a separate "part" of trade or commerce. None of the decisions on which it relies presents precise tests for resolving this issue, which is admittedly a difficult and somewhat novel one.

There is a recognition by plaintiff the issues cannot be decided by percentages alone and ultimate tests in determining monopolization are the existence of power to control price and power to exclude competition. We have to go directly to the issue by determining what facts are to be taken into consideration in adjudicating the issues of monopoly power.

Whether cellophane itself, or plain cellophane, or moistureproof cellophane, or colored cellophane, be "parts" or merely some of several products constituting a "part", the controlling question is whether duPont possesses the requisite monopoly powers over price and competition. This is not a case concerned with an explicit charged exclusion, or monopoly in a particular section of the country, such as would make the "part" issue crucial to the final judgment. Here, the decision of the charge in the complaint rests on existence or nonexistence of monopoly powers. The cases on which the United States relies were argued to the court and it ruled all competitive facts should be shown. Even plaintiff concedes the issues must be determined by economic realities.[1714]

---

1714. For example, plaintiff's statement in one of its briefs is pertinent (Brief p. 81):
"The structure, nature, and detailed workings of the market place must be researched and the pertinent facts, attendant thereupon, must be garnered from the entire record of the trial proceedings. Only in this manner is it pos-

Need for market analysis is the teaching of every major monopoly power case since Judge Hand's Alcoa decision.[1715] United States v. Aluminum Co. of America, 2 Cir., 148 F.2d 416.

█ § 2 cases teach weight to be given to various statistical or other appraisals of a company's business can only be made when relevant competitive factors are known. Thus, in United States v. Columbia Steel Co., 334 U.S. 495, 68 S.Ct. 1107, 92 L.Ed. 1533, where the issue involved was the propriety under the Sherman Act of the United States Steel Company's acquisition of the Consolidated Steel Corporation, the Court stated that: "the relative effect of percentage command of a market varies with the setting in which that factor is placed." 334 U.S. at page 528, 68 S.Ct. at page 1124, 92 L.Ed. 1533. The Government had recognized in its brief in the Supreme Court that "products performing the same functions but differing somewhat in their characteristics may be just as competitive as products which are identical." And, while the Court acknowledged "the difficulty of laying down a rule as to what areas or products are competitive one with another", it set out certain guides for determining the propriety of the merger which are of aid as indicating criteria to be taken into account in determining existence of monopoly power. The Court said, 334 U.S. at pages 527–528, 68 S.Ct. at page 1124, 92 L.Ed. 1533:

"In determining what constitutes unreasonable restraint, we do not think the dollar volume is in itself

of compelling significance; we look rather to the percentage of business controlled, the strength of the remaining competition, whether the action springs from business requirements or purpose to monopolize, the probable development of the industry, consumer demands, and other characteristics of the market. We do not undertake to prescribe any set of percentage figures by which to measure the reasonableness of a corporation's enlargement of its activities by the purchase of the assets of a competitor. * * *"

█ "Market control" or lack of "market control" are ultimate facts. They are determined by fact-finding processes, and on the basis of knowledge and analysis of all competitive factors which bear on a seller's power to raise prices, or to exclude competition. Existence of monopoly powers is not made on the basis of assumptions as to competitive markets. If the price, quantity of production and sale, and the quality of a seller's product are determined by pressures exerted on him by buyers and sellers of another's product, the products and the sellers must, for purposes of any realistic analysis, be in the same "market" and must be in competition with each other.

b. Competitive conditions preclude acquisition of market control and hence of monopoly powers over cellophane.

█ Facts, in large part uncontested, demonstrate duPont cellophane is sold under such intense competitive conditi-

---

sible to isolate the constituent influences of market control, so that a judgment may be rendered as to whether or not the defendant possesses that degree of influence over prices and over the entry of competitors, which is necessary to bring it within the policy interdictions of the Sherman Act."

1715. See American Tobacco Co. v. United States, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575; United States v. Griffith, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236; Schine Chain Theatres, Inc. v. United

States, 334 U.S. 110, 68 S.Ct. 947, 92 L.Ed. 1245; United States v. Paramount Pictures, Inc., 334 U.S. 131, 167–175, 68 S.Ct. 915, 92 L.Ed. 1260; United States v. Columbia Steel Co., 334 U.S. 495, 68 S.Ct. 1107, 92 L.Ed. 1533; United States v. Paramount Pictures, Inc., D.C.S.D.N.Y.1949, 85 F.Supp. 881; United States v. Aluminum Co. of America, D.C.S.D.N.Y. 1950, 91 F.Supp. 333; cf. United States v. General Electric Co., D.C.S.D.N.Y. 1948, 80 F.Supp. 989; United States v. General Electric Co., D.C.N.J., 1949, 82 F.Supp. 753.

tions acquisition of market control or monopoly power is a practical impossibility.

### i. "MARKET SETTING"

"Market setting" in which cellophane is sold was fully developed at trial. Evidence was of a most practical type. Defendant did not rely on economic theory but rested its proof on testimony of independent businessmen engaged in various aspects of the flexible packaging business. Not a single market witness was called by the Government. Defendant presented testimony of competing manufacturers, from large and small converters, and from users of packaging materials located in different parts of the country and engaged in different lines of business. This evidence was supplemented by a market survey, by studies from trade associations, by reports of duPont's own salesmen, by physical samples of materials and wraps, by testimony of company officials concerned with competitive problems, and by reference to extensive documentation in reliable trade journals and authoritative texts. I attended in Atlantic City together with counsel for both sides the Annual Packaging Show in April, 1952 to see the manner in which these materials are offered to the trade.

Market evidence is complete. Defendant has showed a detailed development of evidence to bring before me an appreciation of the intense competition existing in the flexible packaging markets, and an understanding of the business considerations which motivated duPont in the various steps it took to develop cellophane.

United States concedes there is a degree of competition between cellophane and other materials. To resolve the ultimate issue as to duPont's alleged market control and monopoly power, I must examine the nature of the competition encountered by cellophane. This inquiry cannot rely on any single fact. Ultimate conclusions as to degree of competition must be made from an appraisal of all commercial activities disclosed by the record.

Nature of market must be based upon proof. DuPont by evidence makes speculation superfluous by bringing facts of the market place to the surface. It includes identity and nature of other flexible packaging materials, analysis of uses within the trade, prices, variety of factors governing selection of one wrap over another, business conditions that vary these factors from one end use to another, character, purpose and effect of promotion and research activities of different manufacturers, thrust of advertising and trade literature, and effect of competition in actual paying customers gained, lost, divided, and shifted.

Any appraisal of this evidence must be made in the face of master facts. Proof is not looked at under a hypothetical set of conditions cellophane might have been a substitute for other products. It shows duPont had to break into an industry dominated by other products, particularly waxed paper and glassine, which were sold in larger volumes and at lower prices. These materials were, in the 20's, and still are, manufactured and converted in quantity by large concerns. The question facing duPont was whether cellophane could substitute for them in uses where they were well entrenched. Proof deals with continuing intense competition for specific orders, with never ending interchanging of materials as the normal and characteristic experience.

The point is there are no final victories in competition. Every purchaser is back on the market in a matter of months or weeks with new requirements, and necessity of making a new selection. This means a purchaser's choice is frequent. In these circumstances, customers retain freedom of choice, and exercise it frequently.

Proof shows competition to be increasing, not decreasing. Packaging business has grown in volume with advent of the supermarket and self-service retailing. The years since World War II have wit-

nessed a striking increase in packaging of consumer units for sale in these supermarkets. New techniques of processing flexible packaging materials have been developed by manufacturers and converters. New materials have appeared on the market, adding to variety; and stimulating established producers to match newer products. Competition is increasing, in the volume of business, the number and variety of producers competing for this business and the range of properties which a purchaser may obtain.

There are over one hundred varieties of cellophane, dozens of varieties of glassine, and diversified types of waxed paper, aluminum foil, cellulose acetate and other wraps. Variety is the result of effort to please everybody. Not only is every material offered by its seller in a maximum of types, but there is wide range of price among different types. Prices and types are further refined by converters whose particular business is to employ their technical skills to tailor a package to their customer's product by blending materials, applying a variety of inks and designs and pricing accordingly. The result of this variety is a graduated spectrum of physical properties and prices from which a purchaser may select combination of quality and economy that appeals to him. Products of each manufacturer appear in many places on this spectrum, across its whole range, and the measure of success is the number of individual solutions each seller can provide.

Best combination of properties and of cost is what buyers seek. Buyers purchasing for the same use, may make different appraisals of the same combination, for selection is far from a scientific process. Selection represents best efforts of buyer to arrive at a judgment of composite of properties and to balance his cost against it, in the light of competitive conditions existing in his own business at the time.

This range of properties and price is the product of competitive influences in the market: of technical advances of manufacturers, of efforts to widen market and reduce prices; and of arrival on the scene of new packaging materials.

Qualities and prices offered by duPont and competitive producers of flexible packaging materials must satisfy their purchasers. General Foods, Armour, Swift, E. J. Brach, Curtiss Candy Company, Ward Baking Company, cigarette companies, A & P, Kraft Foods and others are among the group. They are cost-conscious. They are sensitive to economies offered by sellers of packaging materials. They have technical expertness in mechanized packaging, and they require packaging materials of standards of quality to run on high speed production lines and to be, in packaged form, a credit to their products. They have laboratories where packaging materials are subjected to scrutiny for deficiencies. Similarly, converters, operating high speed presses and bag machines, require packaging materials that will behave uniformly on machines, and provide a quality package for the converter's customer. Defendant sells to these purchasers. Standards and requirements of these purchasers control.

Evidence shows working of these facts of competition. Evidence at trial disclosed there is an established trade press and literature which covers all types of packaging and lays bare every advantage in one material or another. Manufacturers of flexible materials have sales organizations calling on the same customers and classes of customers. In addition, numerous converters of flexible packaging materials employ hundreds of salesmen calling on users. They offer their know-how in justifying best possible material for a specific purpose of a specific buyer at the particular time. They make available their skills in processing many different types and providing new combinations of materials. Competitive pressures which are generated by this group are of significance in intensifying the interest of each manufacturer in providing better service, lowering cost and improving quality.

Independent concerns manufacture different types of flexible packaging ma-

terials. Many of these have been in business for a long time. The record shows their business has grown. There is no evidence any one has been forced by duPont's competition to withdraw from participation in the flexible packaging business. Similarly, the number of converters handling various types of flexible packaging materials has increased. There are today three manufacturers of cellophane with plants located in the United States. The two other companies, American Viscose and Olin, are not in any way restricted by agreements with duPont. Both concerns are expanding and each has substantial resources. DuPont's percentage of cellophane production is declining and accounts for less than 20 per cent of the flexible packaging market.

In this, as in all competition, the customer's order is the pay-off. The evidence deals with the end result of competition, and disposes of plaintiff's contention cellophane has its own narrow market within the flexible packaging field.

Proof shows preoccupation of duPont executives with price advantages of waxed paper and glassine and with technical advances in these and other flexible packaging materials. Proof documents numerous occasions on which duPont cellophane price reductions and technical developments were made necessary by the advantages of other products.

Shifts of business have been proved. It has been proved in every major end use; duPont cellophane has lost and gained actual paying customers, as a result of cost and quality judgments by these customers. It has been proved these gains and losses are substantial.

### ii. Candy—A Case History.

To show competition, actual histories of duPont's competitive effort in each major end use are documented by the record. Packaging in the candy industry may be used as an example to show working of competitive factors.

One of the earliest uses for duPont cellophane was wrapping of boxed choco-lates, and duPont's first big customer was an account in this field, Stephen F. Whitman, which, in December, 1924, "is now putting up about 40% of their packages in cellophane". This was plain cellophane, wrapped by hand and purchased at over $2.50 a pound. This type of business provided little volume.

DuPont realized its sales were too small and its costs too high, looked to other parts of the candy industry for additional business to increase its volume. Candy was comprised of cheaper boxed goods, lollipops, plastic candy, caramels, which were packaged in waxed paper or glassine or unpackaged. Waxed paper and glassine were then selling at a fraction of the price of cellophane, offered satisfactory moisture resistance qualities and could easily be used on wrapping machines. These were serious competitive obstacles.

Price problem was the principal block to expansion of sales, and duPont addressed itself to this problem. In 1924 Yerkes presented the case in these terms:

"I am in favor of lowering the prices. I think we are taking a chance on whether we are going to increase volume sufficient to make up the difference, but my feeling is that a substantial reduction in price should be made. Think it will undoubtedly increase sales and widen distribution. Inclined to think it will increase distribution in candy trade. The Whitman Company is now putting up about 40% of their packages in cellophane. I really do believe that a reduction of say 25% would widen distribution and increase sales to present customers. Our price I think is too high based purely on manufacturing cost, and too high in comparison with other wrapping papers on the market, and while we cannot approach the price of glassine or other oil papers, if we make a substantial reduction we will in some cases get somewhere near them."

With reduction in price differential between cellophane and waxed paper and glassine, duPont's business in the candy industry did, as predicted by Yerkes, increase. In 1925, over $357,000 worth was sold to the candy industry, and over $445,000 worth in the following year. A contemporary report to the Board of duPont by Yerkes shows some new candy uses had been tapped:

"The use of Cellophane continues satisfactory in this industry.

"The use of Cellophane for small bar candies has increased and we are continuing our work in this direction.

"Some of the larger operators have started to wrap a cheaper grade of boxed candy which has not heretofore been wrapped.

"This industry is well posted on the advantages of Cellophane and each price reduction we make opens up new opportunities in wrapping lower priced goods and small units."

Lack of moistureproofness in cellophane was the next major block to larger volume sales. Subsequent invention of moistureproof cellophane was a factor in development of large volume sales.

In the 1930's duPont began an extensive effort to develop packaging of candy bars, the largest volume candy item in the market. Cost of cellophane again was the main obstacle to this effort, and initially the attitude of the trade was that encountered at the Mars Company:

"1—Mars' attitude at first was very cold, and he said he would have to buy printed Cellophane as cheaply as he could printed glassine before he would consider it.

\* \* \* \*

"His present attitude is simply what Long said it was. He states he cannot increase cost of wrapper without either taking it out of the quality of the bar, or making the bar smaller, and he is willing to do neither. He also stated he does not intend to decrease his unit profit for a sales increase, which would be in-

definite—stating that Curtiss and Schutter Johnson both tried selling bars without a profit and then said 'and look at the fix they are in' ".

In spite of this, several of the nationally known brands adopted the cellophane wrapper. Contemporary trade reports show that "Baby Ruth" bars, "Butterfingers", "By Jiminey", "Oh Henry", "Oh Honey" and "Rosio" bars all appeared in cellophane wrappers. This adoption of cellophane was "the belief that the cellophane dress-up would have a sales appeal and a sales advantage", which would offset its higher cost.

Cellophane was not able to hold competitive victory over glassine in this important field. 1933 saw beginning of the reaction:

"They have decided to discontinue the use of transparent sheeting on their Old Nick and other chocolate bars." (DX 77, p. 174, 9/18/33).

"Within one to two years Curtiss shifted back to a glassine outer wrapper at the insistence of the Sales Division, because the wrapper, particularly in the case of Baby Ruth Bars, had become so well associated with the bar that customers and retailers complained of the change." (Jakes, DX 1006, p. 2).

Retreat became general, the basic reason being the bar manufacturers,

"when they added up the situation at the end of a year and a half or two years their profit position was not as good as it had been when they were using glassine; so they went back to glassine."

Since change of fortune in the candy bar trade duPont has been chipping against cost advantage of glassine, gaining an account here and losing an account there. Situation was summed up by a duPont sales bulletin in 1937:

"As pointed out at the recent annual meetings, while our total business in the candy industry has shown an increase, we have lost ground on 5¢ and 10¢ bars. The discontinuance of transparent wrap-

ping on certain candy bars seems to be principally due to:

"1. Rising ingredient costs (as pointed out in Bulletin 8–MM), forcing the manufacturer to trim expenses elsewhere—and packaging has been the target.

"2. Intensive selling efforts on the part of the foil and glassine manufacturers.

"This seems to be a situation where, in our effort to stimulate individual candy wraps, we have slackened off our attack on bars, setting the stage for inroads by selling campaigns of other types of wraps. We now have the job of stopping these inroads and striking back in a positive manner."

In 1940 Peter Paul Company, a large candy manufacturer, discontinued cellophane on one of their bars because of "high cost of manufacture due to milk chocolate and almond prices; either had to reduce size or go into Glassine". Six months later the same bar manufacturer dropped cellophane from another of his bar line "replacing it with glassine which they will print themselves * * * this is due to rise in material costs of Mounds—saving of 25¢ per M wrappers at approx. $36,000 per year". Thus lower price of competing wrapping materials continued to be an obstacle.

"Blomquist gave little encouragement based on additional costs. He contends any additional expenditure should go into the quality of the bar itself".

DuPont hung onto business in the bar field in spite of cost disadvantage:

"Unprinted cellophane, foil and glassine are used interchangeably as the primary chocolate bar wrap, under a printed paper wrapper, in amounts depending upon the available supply of aluminum foil and cellophane."

From the salesmen's view, competition with glassine on candy bars remains lively. Smith testified:

"Q. Do you have any bar business today, or have you lost it all?

"A. No. No, we have what I consider to be a very nice bar business.

"Q. I am talking about bar business apart from this packaging of groups of bars. I am talking about business in the individual wrap. You have some of that, you say?

"A. Yes, we do. We have a very nice business in that respect, which I should certainly hate to lose. We have a very nice number that is nationally distributed, made by the Elmer Candy Company of New Orleans. I think they call it Golden Nougat. We have an account in Kansas City that comes to my mind, the Donaldson Chocolate Company, that just on one item uses a very substantial amount of cellophane.

"Q. In those cases where you have the business, are manufacturers of glassine calling on those accounts?

"A. Yes, they are. As a matter of fact, we replaced the glassine on the bars of the Donald Chocolate Company not too long ago with printed cellophane, at a higher cost."

Competition with Sylvania on basis of price and quality followed much the pattern as between duPont cellophane and other materials. On occasions duPont encountered "inside prices" of Sylvania. Case lot prices for split shipments were given by Sylvania, to the Nunnally Company and Brock Candy Company, though "Sylvania only doing this for preferred accounts". In such cases the report duPont salesmen could make would be "assured me a good share, or all of his business, at such time when he is no longer able to secure the above concessions".

Evidence discloses competition in the case of other types of candy as well. As price disadvantage of cellophane decreased, duPont looked for a greater volume of sales in penny goods, hard candies, lollipops and plastic types of candy

such as caramels, kisses, taffy, etc. Here, glassine and waxed papers were used as wraps in these fields. These candies were wrapped by machine in great volume, at low unit cost, and sold at low prices. Hand wrapping was impossible on such priced goods, so duPont undertook to develop means for converting existing candy wrapping machines to cellophane, carrying out an effort to interest machinery manufacturers in machines to handle waxed paper, cellophane and glassine interchangeably. By 1935, increased cellophane sales made possible by widespread mechanical wrapping with cellophane in the candy business was "already running into very large tonnage". Cellophane sales to the candy industry for the year 1935 were nearly 2½ million pounds. 1936 showed a 10% increase.

DuPont was selling moistureproof heat-sealing cellophane to the candy industry, and discovered one type of film did not perform uniformly on different types of candy. Some candy required protection against moisture transfer, some types of candy had more or less sugar content than others, and some were made and wrapped while hot—others when cold. It was clear more tailoring of different types of film had to be done to provide a satisfactory wrap for variety of candy products.

By 1939:

"A special film has been developed and is now available for wrapping sticky plastic types of candy.

"Our regular MT and MST films are being used successfully by many customers for this purpose, but in the case of certain types of candy have not been entirely satisfactory due to sticking of the film to the product.

"This refers particularly to the grades of caramels with low butterfat content, kisses, taffy, etc.

\*　\*　\*　\*　\*　\*

"More important, however, is the opportunity for new business—particularly on kisses and taffy where we have never had an entirely satisfactory film."

In 1948, types of duPont cellophane for candy included MT–36, MST–51, MT–35, MST–53, MST–54, MST–56 for sticky candy, cold hard candy, not hard candy, lollipops, lozenges and marshmallows.

Waxed paper and glassine made similar quality improvements to hold their position in the trade.

"The quality of printing on waxed paper has been quite improved and there has been a decided improvement in opacity as a background for printing. Glassine in the last fifteen or twenty years has improved in tensile strength, opacity, finish and ability to take printing \*　\*　\* The improvements in wax paper and glassine have affected their acceptability to Curtiss as packaging mediums and caused Curtiss to continue using them".

\*　\*　\*　\*　\*　\*

"Waxed paper has been improved because cellophane was being sold for uses formerly served by waxed paper, in order to win back a position in those same uses. The waxed paper industry could see the inroads that new products, such as cellophane, Pliofilm, other transparent materials and glassine, might make into waxed paper sales. The improvements were made to maintain waxed paper's volume of sales. These recent improvements in waxed paper include greater opacity, superior coatings and progressive advancement in reproduction and printing, and they helped waxed paper maintain its volume".

\*　\*　\*　\*

"You've got waxed paper, which, when you look at a sheet that is manufactured today as against something that was manufactured ten or twenty years ago there is a terrific improvement. It is shinier, it is glossier.

"It used to be that waxed paper was sticky, but now it is nice and

hard and has a glossy surface and looks clean and sparkling"

\* \* \* \* \* \*

"We can make more transparent, we can make stronger papers than we did then, a greater variety of papers to meet different requirements. Our laminations are much more moistureproof, our coatings are more varied, and we are doing a lot more work in these combination jobs of combining glassine with other materials, foils or films or whatever and working with other people who do the same thing."

These quality improvements have been forced upon manufacturers of flexible packaging materials by critical customers, including candy manufacturers, equipped with laboratory and testing facilities to discern deficiencies in available materials. Examples of this are Kraft's Glen View Laboratory demands and standards for wrapping material.

Competition between flexible packaging materials for packaging in the candy industry has revolved about competition in price, and competition in the qualities each may offer to the trade. Result of this competition has been to produce a fluid group of customers, for whose trade the different flexible packaging materials vie. From duPont's point of view "We are still continuing, however, to try to get that individual bar business."

Advertisements directed to candy trade point out "Four of the six largest makers of chocolate bars buy Riegel Papers regularly"; or "Trix are fresher, crisper in Pliofilm"; or Riegel's Diafane has "proven practical in many fields" including candy bars; or "Our machines are making packages with practically every known form of packaging material —plain Cellophane, printed Cellophane, printed paper wrappers, glassine, foil, etc."

Losses of business to Sylvania cellophane for candy packaging reached substantial volume, 20,000 pounds in six months on a single chewing gum account, and 170,000 pounds in 1934 on a total of 22 candy accounts, as examples from but a single year. Other examples of shifts working both ways are: a shift of Kraft Foods Company to Sylvania; Wilcox, and partial shifts in the cases of Schutter Johnson, Peter Paul and Planter's.

DuPont's sales to the candy industry grew from $357,893, or about 185,750 pounds at the average price for the period, in 1925 to 17 million pounds in 1949 and 20 million pounds (including gum) in 1951. But percentage of candy industry's output packaged in cellophane has actually decreased from 46% (for all cellophane) in 1931, to an estimated 25% (for duPont cellophane) at the present time.

Strength of this competition continues. Recent replies by 150 candy manufacturers to an industrial questionnaire disclosed while these manufacturers used over 7 million pounds of cellophane, this represented but 24.4% of their use of three principal flexible packaging materials, and even a lesser percent when other materials were taken into account. Glassine and waxed paper accounted for more than three times the volume of cellophane.

### iii. TESTIMONY OF INDEPENDENT WITNESSES.

Testimony of independent witnesses discloses evidence of competition.

The Sales Director for Films of Celanese Corporation of America, the largest manufacturer of cellulose acetate, testified on competition, and his deposition is summarized on this point:

"Mr. Hopping knew of no packaging use for CA (Cellulose Acetate) film of which cellophane does not have a part of the market (38). Celanese has 'always aimed at cellophane' in its marketing and in its pricing, and CA's 'major competition is cellophane' (12, 13)." (Hopping, DX 1007, p. 20).

The Production Manager for Foil of Aluminum Company of America:

"Foil competes with glassine for some end uses, particularly chocolate bars now in glassine that in many instances were formerly wrapped in foil. Foil competes with cellophane, cellulose acetate, pliofilm and vegetable parchment" (Torrence, DX 1009, p. 42).

Manager of Films for the Goodyear Tire and Rubber Company, only producer of Pliofilm:

"Competition with other packaging materials is met primarily as follows * * * cellophane for most uses, one of the largest being self-service meats * * *" (Ellies, DX 1014, p. 136).

Vice President of Nashua Gummed and Coated Paper Company, producers of waxed paper and substantial converters of cellophane, glassine, Pliofilm, etc., testified on competition between cellophane and a number of materials handled by his company (Ramsay, DX 1017, pp. 229, 230):

"Cellophane competes with other flexible packaging materials sold by Nashua, and also competes with other packaging materials that Nashua does not produce.

"From their point of view the end uses for cellophane are not separate and distinct from the end uses of other flexible packaging materials. Similarly, the customers and prospective customers for cellophane are not separate and distinct groups from the customers for other packaging materials."

Vice President of Rhinelander, one of largest glassine producers in the world (Nelson, DX 1020, p. 304):

"Cellophane is the product with which Rhinelander's products compete most directly and is Rhinelander's most annoying competitor."

Testimony of Vice President for Marketing of the Marathon Corporation, one of the largest producers and converters of waxed paper, corroborates the testimony of Ramsay of Nashua Gummed &

Coated Paper Company (Croy, DX 1021, p. 345):

"Wax paper and cellophane compete with each other and are offered to the same trade."

Each of the above excerpts from the evidence are from summaries of depositions. Following quotes at length from verbatim testimony of Frederick S. Leinbach of the Riegel Paper Corporation (Leinbach, Tr. 6767–6768):

"Q. Now, you said these uses that you exemplified by physical samples were illustrative. Would you give us in your judgment some of the end uses in which you find the competition from cellophane most intense?

"A. There is a terrific competition now going on in bread in the bake field, cakes, and as I mentioned before, potato chips; the snack specialty field, of which Fritos (indicating) are an example. It is all the time in a state of flux; we lose them, we get them back. The same thing happens with cellophane. Frankly, (6768) almost any one of these barrier jobs here is a competing point, as you see. Even in cereal we have to compete with a cellophane because a fellow can put his stuff up in a duplex cellophane bag or a waxed paper barrier of some sort. It is a choice he has to make.

"Q. Does glassine have complete dominance of end use to the exclusion of all other flexible packaging materials?

"A. No, sir, I wish it did.

"Q. Now, in your sales planning, to what extent do you find that people who are using cellophane for packaging are the actual or prospective customers for your papers?

* * * * * *

"The Witness: The people who use cellophane are excellent prospects for our papers, because the reasons that they would use cellophane in my opinion resolve into

qualities which we can furnish in our material."

Character of the flexible packaging markets, measured by proof, establish duPont as a manufacturer of cellophane does not have market control or monopoly power.

### c. DuPont has not "power to raise cellophane prices".

Power arbitrarily to raise prices is principal indicium of monopoly power and market control. This is the test to be applied in adjudicating monopolization. Under market conditions which have prevailed, duPont does not possess power to raise cellophane prices without regard for competitive pressures. The market would penalize any attempt to do so with lower sales and smaller profits.

Cellophane has been sold at price disadvantage. It costs more per square inch than wax paper and glassine, the two principal packaging materials which dominated the flexible packaging markets at the time cellophane was introduced and still dominate these markets today. Buyers of flexible packaging materials are shown by evidence to consider the relative composite properties of cellophane and these other materials in the light of their respective prices. Cellophane has few, if any, end uses where wax paper and glassine are not also sold.

DuPont could not have developed volume of cellophane business without lowering its prices. It was only as duPont lowered price and narrowed relative spread between cellophane prices and the prices of these other materials that it was accepted for end uses where wax paper and glassine were established. Only by reduction of price has cellophane been able to achieve an appreciable volume of sales in competition with other packaging materials.

Evidence shows a degree of price sensitivity in the flexible packaging markets. This is reflected both statistically and in terms of concrete experience with specific accounts.

DuPont's sales grew whenever spread between prices of cellophane and other materials narrowed. This relative price relationship was presented by graphs. From these, it shows gap between moistureproof cellophane prices and glassine prices and between moistureproof cellophane prices and waxed paper prices sharply diminished in the period from 1929–1949. In January 1929 price of moistureproof cellophane was seven times that of glassine. In June 1934 it was 4½ times price of waxed paper and 3¾ times price of glassine. By January 1949, moistureproof cellophane prices were only twice those of waxed paper and a little more than twice those of glassine. In 1948 and 1949 gap between moistureproof cellophane and waxed paper and glassine prices was the smallest in the 20 years of moistureproof cellophane history. Graphs show duPont's productive proportion of flexible packaging materials increased as gap between prices for cellophane and glassine and waxed paper narrowed.

Experience in markets further illustrates degree of price sensitivity, and absence of power in duPont to control price. By annotations to certain of its proposed findings, duPont called my attention to specific examples of business lost or gained as a result of price. The record shows duPont was unable to sell a particular account or retain the business of a particular account due to price. It disclosed as prices were reduced, business became available to duPont which it could not obtain at higher prices. The pull and tug of price competition in the market was emphasized by many witnesses and shown to permeate the entire market, both geographically by category and type of account. Large accounts, as well as small, responded to price changes.

There is no cellophane, glassine or wax paper price, nor is there a clear-cut margin between cellophane prices and prices of other materials. There are many types of duPont cellophane, selling at prices from $.45 per lb. to $.85. Each has properties and qualities different from other types. Each type represents a particular price—multiplied by vary-

ing opinions and appraisals of combination by buyers, each of whom makes an individual appraisal in the light of his specific package needs and the economics of his business.

Glassine, for example, demonstrates this. Rhinelander lists over 30 varieties of glassine, from $.235 per lb. to $.475 ($23.50 to $47.50 per cwt.). Each is different in weight, transparency (supertransparent to opaque), in form of coating or lamination, heat-sealing and moistureproof properties.

Variations in price occur as materials are printed, laminated, or processed into wraps designed to meet specific packaging uses. This produces a closely-packed range of price-quality values, with much overlapping and duplication, with multiplicity of choices, for each buyer who wants certain price-quality combinations. Here, duPont is forced, as a matter of business judgment, to be bound by wishes of its critical customers.

Character of this price competition is emphasized by evidence of quality competition. It is recognized throughout the period of cellophane development. Evidence discloses these quality improvements affected duPont's ability to sell. In instances where its quality was inferior, it lost business. In instances where its quality was superior, it gained business. The record shows examples of shifts of business due to quality.

Willingness of buyers to switch rapidly from one wrapping material to another has been demonstrated. The nature of products, organization of market, its requirements, its growth, behavior of buyers and sellers in the market, nature of buyers' demands and other factors all point in the direction of degree of price and quality sensitivity and, hence, competition to which duPont's cellophane prices must be responsive.

Greater responsiveness of the market to small price changes or small quality changes, the greater is the pressure on the seller, and the less control he can exert. Great sensitivity of customers in the flexible packaging markets to price or quality changes, in final analysis reflects the fact these customers have adequate alternatives to purchasing from duPont. Price sensitivity of these customers is a reason why duPont's control over its prices is not such as to give it monopoly power. Competitive influences in the flexible packaging markets, place limitations upon duPont's pricing policies and procedures. They force reduction of duPont's prices and deny it power to raise prices in the manner of a monopolist.

Cellophane prices have become competitive with glassine and wax paper. This was made possible by price reduction—not increases. The arbitrary power to raise price has not been evidenced in the history of duPont's cellophane business.

■ Plaintiff was not able to advance convincing evidence power to raise prices exists. It rested on the single fact duPont is the "dominant"—the largest— supplier of cellophane. As to this, power over price cannot be shown by economic theory nor by mere assertion. United States v. United States Steel Corp., 251 U.S. 417, 448–449, 40 S.Ct. 293, 64 L. Ed. 343. Proof of dominant position in the supply of a particular product is not, in law, proof of monopoly power over price. United States v. United States Steel Corp., supra; United States v. Columbia Steel Co., 334 U.S. 495, 68 S.Ct. 1107, 92 L.Ed. 1533. Judge Knox stated in United States v. Aluminum Company of America, D.C., 91 F.Supp. 333, 346:

"The conclusion is inescapable, from the Columbia Steel decision, that the possession of monopoly power is something other than the status in a market of a dominant firm. The dominant firm may have neither the power to exclude competitors, nor the power to fix prices." Again, in the first Aluminum case Judge Hand found long-range supply of secondary aluminum, which would have been a competitive factor in the market, was controlled in the first instance by Alcoa itself, and the amount of im-

ports was controlled by the price set by Alcoa, rather than Alcoa's price being controlled by imported ingot. See, 148 F.2d at pages 424–426. But, in the second Aluminum case, and this has master significance, despite a showing Alcoa still supplied from 85 to 90% of the primary aluminum sold by domestic producers, 91 F.Supp. at page 356, Judge Knox found, the Government failed to establish price domination in the market by Alcoa because the degree of participation by Alcoa's two competitors was a matter within their control rather than in that of Alcoa. 91 F.Supp. at pages 364–365.

Power in a seller must be measured by degree of power in other sellers, over their own actions, and by the effect of that power on the actions of seller under attack. If prices set by others who supply different types of flexible packaging materials determine duPont's price, then to that degree duPont does not have monopoly power.

■ There is no evidence of collusion here to fix prices but evidence shows the price identity occurred as a result of competitive factors. Sylvania, duPont's competitor, was obliged to charge prices comparable to duPont in order to remain competitive, since its quality was inferior. Evidence shows where Sylvania's prices were higher under distribution conditions, it could not retain the business. Thus, Sylvania followed duPont but this adherence to duPont's prices does not prove any monopoly power in duPont.

The prices duPont charged were prices which it was obliged to charge as a result of the competitive conditions in the market.

The Government argues duPont's power to control prices is evidenced by its profits, and duPont was able to achieve predetermined rates of return. Plaintiff's own proposed findings, however, disclose rates of return varied substantially from year to year. There is no evidence as to rate of return earned by any other manufacturer of flexible pack-

aging materials, such as waxed paper or glassine. Evidence did show duPont's rates of return were somewhat higher than Sylvania's, but this resulted from duPont's superior efficiency. Years of profit do not establish monopoly power over prices. They establish this: duPont was an efficient business company.

Monopoly cases do not rest on such insubstantial evidence to support complete power over price. In the Aluminum case, Alcoa was proved to have controlled competition in the fabrication stages of the industry by means of a "price squeeze" in which Alcoa, as the sole supplier of ingot, set price of ingot to independent fabricators so high those fabricators could not successfully compete with Alcoa in the fabricated products made in its integrated fabrication plants. 148 F.2d at pages 436–438. In the Reading cases, there was proof of control over competition and prices in the sale of coal by means of the acquisition of the only means of transportation from the fields to the New York market, and by means of the so-called 65% contracts, which tied the price of independent producers forced to use the defendant's railroad to the price set by the defendant in the New York market. United States v. Reading Co., 226 U.S. 324, 33 S.Ct. 90, 57 L.Ed. 243; United States v. Reading Co., 253 U.S. 26, 40 S.Ct. 425, 64 L.Ed. 760. Other cases showed prices remained unchanged despite drastic economic changes and business pressures: see United States v. Trenton Potteries Co., 273 U.S. 392, 397–398, 47 S.Ct. 377, 71 L.Ed. 700; United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 221, 60 S.Ct. 811, 84 L.Ed. 1129; that prices were with intent manipulated to exclude competitors, often by concerted action, United States v. Corn Products Refining Co., 2 Cir., 234 F. 964, 985–994, appeal dismissed 249 U.S. 621, 39 S.Ct. 291, 63 L.Ed. 805; and American Tobacco Co. v. United States, 328 U.S. 781, 806–807, 66 S.Ct. 1125, 90 L.Ed. 1575; that prices have been raised at the height of a depression in direct disregard for the economic tide of the times, American To-

bacco Co. v. United States, 328 U.S. at pages 804–806, 66 S.Ct. 1125, 90 L.Ed. 1575; or that control of resale and other distribution prices existed, American Tobacco Co. v. United States, 328 U.S. at pages 807–808, 66 S.Ct. 1125, 90 L.Ed. 1575.

In contrast with proofs in other cases showing arbitrary exercise of power to control price, there exists in this case evidence duPont's prices were lowered over a period of many years; these prices were set independently of anyone else and in response to competitive influences; strong independent sellers existed in the market whose price policies placed limitations on duPont's own price freedom; duPont exercised no control over resale or distribution prices; it never raised prices for the purpose of squeezing out competitors in the manner of Alcoa, or manipulated prices in other ways to exclude competition. DuPont's prices have been competitive as the gap between cellophane and glassine and waxed paper prices narrowed.

### d. DuPont has not the "power to exclude competition".

#### 1. GENERAL.

There is no contention duPont has power to exclude competitors from entering the flexible packaging markets. DuPont has but a single position in the manufacture of any material other than cellophane and has no control over any patent, raw material or other resource which would inhibit entry of other companies into the manufacture of the many different types of materials which are sold in the package market. Its position in the flexible packaging market amounted in 1949 to less than 20% of consumed materials.

Plaintiff contends duPont has power to exclude competitors from the manufacture of this product.

There is no proof duPont has any corner on raw materials necessary for manufacture of cellophane. Evidence shows there are qualified suppliers of wood pulp for cellophane viscose manufacture who are ready to supply the trade. None of these suppliers are tied to duPont in any way by requirement contracts. No charge is made raw materials are controlled by duPont.

After a look at technology, evidence shows duPont does not own any patent which enables it to exclude others from the manufacture of cellophane. All of duPont's cellophane patents are available for licensing at reasonable royalties; evidence shows these patents will not bar others from engaging in this particular business. Evidence also discloses as to technology American Viscose and its predecessor, Sylvania, have been able to engage in the business to produce commercial quality cellophane without any technical assistance from duPont. American Viscose has a research organization and a background in the field of viscose chemistry. This is, too, the case as to Olin, which has its own technical facilities and has been engaging in important research in fields pertaining to cellophane. Apart from technical aspects, there is no proof duPont has any control over any essential piece of equipment for the manufacture of cellophane by patent, lease, contract or otherwise. The fact companies throughout the world are engaged in cellophane manufacture without any assistance from duPont, is further evidence of its lack of technological control.

As to capacity, duPont acquired no plants but built all its capacity itself. Evidence discloses no condition of over production; no idle capacity overhanging the market. In fact, duPont's expansion has been geared to anticipated demand, and evidence is there is, if anything, need for further cellophane production when the full potentiality of the markets is examined. Demand has fluctuated and duPont has been both oversold and undersold, swinging from one condition to the other as market factors change.

After an examination of raw materials, technology and plant capacity to distribution, there is no evidence of power

to exclude competition. Evidence shows duPont has not by any device monopolized outlets of distribution or isolated any type of customer from other sources of supply. There are qualified converters. None are tied by contract to duPont. Converters handle duPont cellophane as well as the cellophane of other manufacturers. Testimony from both American Viscose and Olin establishes neither of these companies had difficulty in securing adequate converter outlets or has been subjected to restrictions in developing their converter businesses.

As to distribution, customers who purchase cellophane directly from manufacturers or from converters are in no way tied to duPont. DuPont has no control over the equipment they use to make packages. No particular group of customers deal only with duPont. Large customers and small customers are served by all producers. Many of these customers buy from more than one producer and customers shift back and forth between suppliers in response to competitive pressures.

Thus, there are not present in the cellophane business any of the orthodox indicia of monopoly which appear in monopoly cases.

## 2. POTENTIAL COMPETITORS.

There is no proof any existing competitor was eliminated by acquisition or activities that forced his withdrawal from competition. This case is concerned only with alleged exclusion of the threatened "potential competitors", persons whom the Paramount case spoke of as having the desire or the capacity to enter the business. United States v. Paramount Pictures, Inc., 334 U.S. 131, 152, 68 S.Ct. 915, 92 L.Ed. 1260.

In pretrial proceedings, plaintiff named 10 American companies as potential competitors excluded by duPont from the manufacture of cellophane. These were:

American Viscose Company
Visking Corporation
Rayonier, Inc.
Union Carbide & Carbon Corp.
Transparent Package Co.

Marathon Corporation
Goodyear Tire & Rubber Co.
Eastman Kodak Company
Monsanto Chemical Co.
Skenandoa Rayon Co.

Plaintiff after trial does not contend the last six of these concerns were excluded potential competitors, and asks no findings as to them. By written notice, it withdrew the charge as to Skenandoa Rayon. Plaintiff offered no evidence as to exclusion of Marathon, Goodyear, Eastman, Monsanto, or Transparent Package Co. Responsible executives of Marathon and Goodyear, called by duPont, testified their companies had at no time any desire to manufacture cellophane. My consideration is thus narrowed to Visking, Rayonier, American Viscose and Union Carbide. Proof as to each of these companies establishes none were potential competitors in the judicial language of the Paramount case and none were excluded.

As to Visking, evidence shows this concern was organized with the aid of duPont; duPont contributed essential patents, technology, capital and managerial assistance. This company was organized for the purpose of engaging in the manufacture of cellulose sausage casing, to the development of which Visking's founder had devoted his life and resources. No witness for this concern appeared. But the prime mover, and long-time president of the company, Mr. Freund, deceased at the time of the trial, spoke through a detailed letter to Judge Jerome Frank received in evidence. He wrote Judge Frank in this fashion:

"* * * it was a pleasant surprise to me to find duPont courteous, fair and cooperative. We came to an agreement and worked out a license agreement. In drawing it I can recall that it was I that made all the demands, not duPont * *

"I have never examined the contract since the day it was signed back in 1925, nor do I think duPont have either. It was the most fortunate event in my whole life." There is no evidence Visking desired to enter the cellophane business. Even after duPont offered to license its patents and to give technical assistance to assist new concerns to enter the business, Visking did not take advantage of this opportunity. There is no evidence duPont took any action which prevented Visking from manufacturing cellophane. The license agreement between duPont and Visking put Visking into business and gave it the right to use patents and secret information which duPont had the lawful power to withhold completely.

Plaintiff's case as to exclusion of Rayonier is also without support. As to Rayonier's ability to make cellophane, the Vice President of Rayonier testified simply: "They had no knowledge of cellophane manufacture".

As for Rayonier's inclination to make cellophane, evidence shows Rayonier's entire experience and preoccupation was with pulp manufacture and

"We are still in that position and that has occupied our full time and attention and funds * * *

"Q. Can you tell me whether or not the effect of this contract was to exclude you from cellophane manufacture?

"A. We never considered it so, and it certainly did not exclude us because we were not interested in the manufacture of cellophane in any of those years."

Plaintiff's proof duPont excluded American Viscose from competitive manufacture of cellophane should be considered with the fact this company, the largest rayon manufacturer in the world, is now the second largest cellophane manufacturer in the United States, with an expansion program under way growing to a capacity of 100 million pounds.

Asked by me whether duPont ever asked Carbide not to compete, as opposed to a more formal agreement, Dr. Davidson said:

"What could they offer me? We had a very rapidly growing business in a new line of industry that no other chemical company at that time was following. Our future was a lot brighter than anything that they could offer us."

The reason why Carbide did not undertake commercial manufacture of a packaging film was, simply:

"* * * why should we take some millions of dollars and go off into a field which had some mechanical operations which we were not familiar with and in the end we might not even be able to compete. So we put our money and energy into the production of chemicals, into the enlarged production of chemicals. This was one of the most important reasons."

Only instances of alleged exclusion urged by plaintiff, then, involved four companies which are proved to have had no inclination to enter the cellophane business. In these instances, Visking, Rayonier and American Viscose, duPont was granting licenses under its patents, and alleged exclusion consisted of placing lawful and reasonable limitations on use in the licenses. In the other, alleged exclusion took the form of duPont's drawing its concededly valid moistureproof patent to the attention of a large and powerful concern (Carbide), which had no interest in making a competing product. None involved any unlawful act or unlawful intent, and none had effect on duPont's position in the cellophane industry.

### 3. PATENTS.

DuPont did not get cellophane patents to exclude competition. There is no evidence duPont purchased a quantity of patents or its purposes in acquiring such patents were anything but proper. The Supreme Court said in Automatic Radio Manufacturing Co., Inc. v. Hazeltine Research, Inc., 339 U.S. 827, 70 S.Ct. 894, 898, 94 L.Ed. 1312, "the mere accumula-

tion of patents, no matter how many, is not in and of itself illegal." An examination of duPont's patent portfolio and circumstances under which its patents were acquired, fails to show acquisitions affected its ability to exclude competition.

This case is concerned, in the main, with moistureproof cellophane. Other patents which duPont secured by its own invention or from third parties did not enhance duPont's power to exclude others from moistureproof cellophane production. None of these patents could have been practiced by anyone to produce moistureproof cellophane without rights under the basic product patent.

It is undisputed duPont at no time controlled patents which stopped others from manufacturing plain cellophane on a commercial basis.

Proof shows the entire patent portfolio of duPont relating to cellophane, including both patents derived from its own research and patent rights obtained from others, represented a small percentage of the total number of patents relating to cellophane.

The patents flowed from research of duPont and the regulations issued to govern the patent matters of all Departments of duPont, wholly without reference to this litigation.

### 4. SYLVANIA COMPETITION.

Evidence shows cellophane competition has not in fact been excluded, but flourished. In the case of Sylvania, for example, evidence discloses year by year shifts of business between duPont and Sylvania are in response to competitive pressures. Customers of duPont have been taken away from it by Sylvania and vice versa. Relative proportion of business enjoyed by duPont and Sylvania in the case of particular accounts has changed. It is reflected in differing rates of increase or decrease in the sales of the two companies year by year. There have been competitors in all sectors of the markets where cellophane is sold. Moreover, these shifts of customers have taken place both as to large and

small accounts, and have been present not only in the case of users of packaging materials, but in the case of converters as well, with important converters shifting their business from duPont to Sylvania and from Sylvania to duPont. Sylvania has continued to expand to the full extent of its financial resources; its growth has been substantial and it has increased capacity productivity at a greater rate than duPont. Competition has been present in degree and character of service rendered to customers; it has been present on the technological side, as quality differences have brought about shifts of business between the companies; it has been present as to prices; and it has been present in the development of specific types of films. DuPont in these respects has been superior to Sylvania and its greater success is attributable to this superiority. But this in no way diminishes the continuing character of the competition itself. In the case of Olin, a newcomer to cellophane, it has succeeded in establishing a profitable business by taking business away from both duPont and Sylvania. It is a growing company and like Sylvania has plans for substantial increase in its capacity.

I think duPont's 75% of cellophane production represents nothing more than its superior skill and some advantage it had by reason of having been a pioneer in the business and the inventor of the principal cellophane product sold. Indeed, the 75% no longer represents duPont's proportion of the production capacity. For, with the advent of additional capacity installed by Olin and Sylvania, duPont now accounts for but approximately 68% of United States capacity. Absent proof of exclusion, recognizing intensity of competition, and failing to find any phases of the business where duPont is in a position to or does exercise control, it cannot be said duPont has power to exclude competitors. DuPont is engaged in a competitive business and all of the benefits which full and free competition are designed to create under the policy and objectives of

the Sherman Act are present and operating in full force. This is true if it is regarded the "market" is simply cellophane in contradistinction to my finding the market is the flexible packaging market where cellophane is in competition with a host of other substitute materials.

e. Application of recognized economic tests further evidences the lack of monopoly power.

In its briefs plaintiff gave much space to discussion of various economic tests for determining whether monopoly power exists. I discussed these at the beginning. It analyzed views of the behaviorists and then the views of the structuralists. The Government recognized economic doctrine and legal doctrine as to monopoly power are in many respects identical. It concluded "duPont's monopoly cannot be countenanced under either school of economic thought".

I shall not engage in any extended discussion, as I suggested at the opening, as to which group of economists has the better of the argument.

Field of argument on interpretation and enforcement of the antitrust laws is a wide one. I think excellence of corporate function in this country, whether it be small, or big business, calls for a critical re-examination by the Congress, after a half-a-century of the enforcement of the Sherman and allied Acts.

2. DuPONT'S POSITION IS NOT TO BE ATTACKED BECAUSE IT RESULTS FROM TECHNICAL SKILL AND COMPETITIVE ACTIVITY.

For reasons before summarized, du-Pont urges as defense the proof fails to establish market control and monopoly powers requisite to the offense of monopolization.

a. The moistureproof patent is, I conclude, a defense.

This is the first monopoly case where the owner of a product patent has been accused of having monopolized the patent product of his own invention. It represents a departure from cases which have assumed a product patent confers a lawful monopoly. Bement & Sons v. National Harrow Co., 186 U.S. 70, 91, 22 S.Ct. 747, 46 L.Ed. 1058; United States v. General Electric Co., 272 U.S. 476, 485, 47 S.Ct. 192, 71 L.Ed. 362; United States v. United Shoe Machinery Company of New Jersey, 247 U.S. 32, 57, 38 S.Ct. 473, 62 L.Ed. 968; United States v. Aluminum Company of America, 2 Cir., 148 F.2d 416, 422; United States v. General Electric Company, D. C., 82 F.Supp. 753, 806, 815.

Evidence shows on November 26, 1929, U.S. Patent No. 1,737,187 issued. This was the basic product patent. It claimed moistureproof cellophane in comprehensive language. The first two claims read:

"1. An article of manufacture comprising a sheet or film of regenerated cellulose combined with a moistureproofing composition.

"2. An article of manufacture comprising a sheet or film of regenerated cellulose combined with a moistureproofing composition, said article being transparent, flexible, and non-tacky."

Validity of these claims and other broad claims contained in the basic product patent was conceded. They are reinforced by basic and equally valid process patents. There is no proof any moistureproof cellophane could have been or in fact ever was made during the life of the product patent which was not equally covered by its claims. Indeed, this patent covered the entire field of moistureproof cellophane, and its strength and broad coverage was recognized.

The patent was based on inventions made by two duPont chemists. DuPont prosecuted the application and held the patent from the outset. The discovery grew out of duPont's desire to develop a product that could compete in the flexible packaging markets with other moistureproof packing materials.

██ This basic product patent had a life from November 1929 to November 1946. Quality was improved, new types and uses were developed, production and capacity steadily increased, and prices declined. The Government is in the position of granting to duPont a monopoly to promote the progress of science and useful arts and then charging duPont with violations of law because it has been successful in doing what the laws of the United States invited, and empowered it to do. Powers which are granted under a valid patent are not powers on which plaintiff may rely to establish monopolization. Mere possession of a validly issued patent cannot be made the basis for a prosecution under the monopoly provisions of the Sherman Act. Plaintiff cannot rely, to prove power or intent, upon acts lawfully undertaken to exploit the patent. No action by plaintiff under the antitrust laws can succeed on the ground of power and intent possessed by a defendant if such action is brought while defendant's right to possess such powers and intent was assured through its lawful ownership of a valid patent.

For years courts have tussled with the task of reconciling the Sherman Act with lawful monopolies by patent grant. Many cases under the Act have drawn the line according to the larger aims of public policy—a vigorously competitive economy. Courts have recognized new processes and patents are perhaps the most desirable form of competition. The holder of a patent is, in accordance with the patent laws, permitted to exert monopoly control over what he has created.

██ Evidence does not disclose combining of competing or independent process patents or efforts to control unpatented products. We have here a case involving the grant to duPont on its own invention of a broad product patent, the validity of which is conceded by plaintiff, and a patent which evidence discloses was of such scope that no one without a grant of a license under it could have manufactured lawfully the product claimed. No case of this kind has ever been brought before. To declare, as plaintiff seeks, the award of this patent, with the rights implicit in its ownership, is to be ignored in applying the Sherman Act, is to ask the court to declare the Sherman Act repealed statutory provisions under which patents are granted. This I will not do.

No judge has ever said where an inventor discloses his invention in return for the grant by the Government of a 17-year exclusive right to practice the same, and, having been awarded the patent, produces the product, he is guilty of monopolization. The valid product patent represents a defense to the monopoly charge.

b. Monopolization requires a factual showing of illegality.

Defendant contends the offense of monopolization requires, in addition to proof of monopoly power or market control, proof such power or control was achieved in a manner prohibited by the statute. Plaintiff contends mere possession of the power, no matter how acquired, in itself establishes a violation. Once power has been obtained, plaintiff argues, it does not even have to be exercised. Mere possession of power, it is argued, is sufficient to constitute offense of monopolization.

██ It has been recognized under the Sherman Act "monopoly in the concrete" is not prohibited under the section. Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 62, 31 S. Ct. 502, 516, 55 L.Ed. 619. The Act, using the verb "monopolize", prohibits conduct rather than status. It is directed against activities rather than results. This is not a matter of semantics. It is a matter of facts. That this is so is obvious from fact the statute carried criminal as well as civil sanctions. Thus, decisions recognized the manner in which a monopoly position was obtained was a crucial consideration in determining whether or not a defendant has monopolized within the meaning of the Act.

The decisions state a defendant may lawfully obtain a monopoly position if

that position is "thrust upon it". Thus the right to normal growth and to enjoy the results of technical achievement and successful competition has been preserved. But plaintiff, to avoid the teaching of the cases, argues only a monopoly which has been thrust upon a defendant "through circumstances beyond his control" comes within the "thrust upon" exception. As plaintiff makes clear, it means by this, as I get it, only a monopoly obtained by a defendant who can be shown not to have done anything to further its own interests comes within the exception.

This position is theoretical. It is not supported by decisions. On analysis, plaintiff is contending the manner of acquisition of monopoly power is irrelevant to the charge of monopolization. The decisions, on the contrary, demonstrate, if the challenged position is acquired, as it has been in this case, by superior technical skill and effective competitive activity, the resulting power from that position does not establish monopolization within the meaning of the statute.

During discussions in Congress leading to the enactment of the Sherman Act, managers of the bill stated categorically the Act was not directed against one "who happens by his skill and energy to command an innocent and legitimate monopoly of a business." 21 Cong.Rec. 3151 (1890). This view has been followed by the courts. In United States v. American Tobacco Co., 221 U.S. 106, 31 S.Ct. 632, 648, 55 L.Ed. 663, the Supreme Court stated "the statute did not forbid or restrain the power to make normal and usual contracts to further trade by resorting to all normal methods, whether by agreement or otherwise, to accomplish such purpose." The reasoning by which it reached this conclusion was fully set forth in the case of Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L. Ed. 619. Lower federal courts prior to that time had reached decisions to the same effect. In re Greene, 6 Cir., 52 F. 104; United States v. American Naval Stores Co., 5 Cir., 172 F. 455; and United States v. Standard Oil Co. of New Jersey, 8 Cir., 173 F. 177. Thus, in the Greene case it was said [52 F. 115]: " * * * congress could not, and did not * * * declare that, when the accumulation or control of property by legitimate means and lawful methods reached such magnitude or proportions as enabled the owner or owners to control the traffic therein, or any part thereof, among the states, a criminal offense was committed * * *." In the American Naval Stores case the Court said [172 F. 459]: "The size of business, and the gaining of business popularity, fair dealing, sagacity, foresight, and honest business methods, even if it should result in acquiring the business of competitors, would not make an illegal monopoly. It is the acquisition and use of unfair and illegal power in defeating competition which makes such illegal monopoly." And in the Standard Oil decision it was said that "monopolies of part of interstate and international commerce by legitimate competition, however successful, are not denounced by the law, and may not be forbidden by the courts." [173 F. 191.]

The rule thus set down in the early decisions was followed. United States v. United Shoe Machinery Co. of New Jersey, 1 Cir., 222 F. 349, affirmed 247 U.S. 32, 38 S.Ct. 473, 62 L.Ed. 968; United States v. United States Steel Corp., 251 U.S. 417, 40 S.Ct. 293, 64 L.Ed. 343; United States v. International Harvester Co., 274 U.S. 693, 47 S. Ct. 748, 71 L.Ed. 1302; Apex Hosiery Co. v. Leader, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311; United States v. Pullman Co., D.C., 64 F.Supp. 108. In the United States Steel Corp. case, in attacking the contention that size alone constituted an offense under the monopoly statute, the Supreme Court said [251 U.S. 417, 40 S.Ct. 299]: "Competition consists of business activities and ability—they make its life; but there may be fatalities in it. Are the activities to be encouraged when militant, and suppressed or regulated when triumphant,

because of the dominance attained? To such paternalism the government's contention, which regards power, rather than its use, the determining consideration, seems to conduct." Even dissenting judges in this case recognized when "size and power have been obtained by lawful means and developed by natural growth" a corporation having even "a dominating place" is "entitled to maintain its size and the power that legitimately goes with it, provided no law has been transgressed in obtaining it. * * * "

There cannot be controverted the rule of law established by these cases. Plaintiff, however, relies on an interpretation of the decision of Judge Hand in United States v. Aluminum Co. of America, 2 Cir., 148 F.2d 416. The Aluminum case did not change the law on "monopolization"; at the most, Judge Hand but changed the verbalistic metaphor by which that law is described.

Judge Hand preceded his discussion of the facts which showed "monopolization" by Alcoa with the following language, 148 F.2d at page 430:

"Since the Act makes 'monopolizing' a crime, as well as a civil wrong, it would be not only unfair, but presumably contrary to the intent of Congress, to include such instances (as the following). A market may, for example, be so limited that it is impossible to produce at all and meet the cost of production except by a plant large enough to supply the whole demand. Or there may be changes in taste or in cost which drive out all but one purveyor. A single producer may be the survivor out of a group of active competitors, merely by virtue of his superior skill, foresight and industry. In such cases a strong argument can be made that, although, the result may expose the public to the evils of monopoly, the Act does not mean to condemn the resultant of those very forces which it is its prime object to foster: finis opus coronat. The successful competitor,

having been urged to compete, must not be turned upon when he wins." (Emphasis mine.)

Following this warning Judge Hand turned to discussion of facts in the Alcoa case and, in describing those facts, used the language on which plaintiff relies. This language was not a statement of a rule of law. It described the means employed by Alcoa over a thirty-five-year period to eliminate and prevent all competition. The means included, as Judge Hand noted, the strengthening of its position from 1909 to 1912 by unlawful practices, the actual anticipation and forestalling of "at least one or two abortive attempts to enter the industry" 148 F.2d at page 430, undisputed success in discouragement or elimination of all potential competition throughout the entire history of the aluminum industry, and proof Alcoa's perpetual monopoly not only offered it an "opportunity for abuse", but that it used its monopoly powers for abuse.

Judge Hand noted examples of monopoly power which would not constitute "monopolization", including monopoly position achieved by "superior skill, foresight and industry" 148 F.2d at page 430. Later the Supreme Court cited Judge Hand's analysis with approval and mentioned as a fourth example a monopoly position achieved by one who made "a new discovery or an original entry into a new field". American Tobacco Company v. United States, 1946, 328 U.S. 781, 786, 66 S.Ct. 1125, 1128, 90 L.Ed. 1575.

The basic question is not determination whether one monopoly is good or the other bad. The teaching of the cases is concerned with how power is achieved. They place acts, not results in issue. A position achieved by "superior skill, foresight and industry" or one resulting from "a new discovery or an original entry into a new field" cannot be achieved through circumstances beyond a defendant's control. Intense research activity, market development and expansion of productive capacity were a necessary part of duPont's de-

velopment of cellophane. The Sherman Act was not intended to discourage these things by condemning them as violations of § 1, or by condemning their result as a violation of § 2, as long as results do not flow, in fact, from a course of monopolistic behavior such as followed by Alcoa—"a persistent determination to maintain the control" which it had come to be possessed of, in that case, by reason of originally unlawful acts, 148 F. 2d at page 430.

The position taken by plaintiff, the existence of monopoly power standing alone is condemned under the Act, unless thrust upon a defendant by "circumstances beyond his control" has no substance as a matter of business reality. Plaintiff's theory leads it to the conclusion when duPont pioneered the cellophane business and thus became the sole manufacturer of cellophane in the United States, in view of its 100% position, it necessarily had monopoly powers and everything it did from that day on was a violation of the Act.

Such views find no support in the decisions or the statute and cannot be made basis for a determination duPont has monopolized. Its "monopoly" was "thrust upon" it within the true meaning of the decisions and, wholly apart from the existence of the moistureproof patent, the facts as to how duPont achieved its position constitutes a defense to the charge of "monopolization".

c. Technical skill and other competition were responsible for duPont's position in the field.

██ I am able, after critical examination of the record, to determine duPont's position is the result of research, business skill and competitive activity. Much of duPont's evidence was designed to show research, price and sales policies of that Company are responsible for its success and these policies were conceived and carried forward in a coordinated fashion with skill, gaining for duPont substantial recognition in the packaging industry.

DuPont was a pioneer. It was the first American company to manufacture cellophane and the first company to recognize this product could be introduced as a competitor in the established packaging market. Nobody at the time recognized the potentials existed in this country for the development of this product, which had only limited acceptance abroad. As pioneer, it entered the business with a legitimate head start. It had the first contacts with the trade; it established the first research facilities; and it was the first to gain experience with the manufacturing processes.

If the product cellophane could be made at lower cost, if it could be made with improving quality, if it could be made and sold in a manner that would enable it to compete in the flexible packaging markets, duPont's business and profits would grow.

This record discloses from the outset duPont set on an intensive research program to improve the quality and characteristics of cellophane and to lower its cost. Starting with a single cellulose chemist in 1924, it built a substantial research organization, equipped not only to engage in fundamental research, but to conduct research directed toward improving both the manufacturing processes and to develop special cellophane types and qualities which would serve the needs of particular categories of customers. Expenditures for this activity grew and were substantial. There is no proof contradictory to statements of the witnesses and the other evidence which establishes research was not only successful but it was one of the factors in the development of duPont's business. Evidence discloses at every stage of the manufacturing process and as to every aspect of cellophane, continuing improvements were made, frequently of a revolutionary nature.

Starting with a product which was brittle, sticky, of uneven gage and which could not be made in rolled form suitable for packaging machinery operations and

which was non-moistureproof and in other respects unsatisfactory, duPont by research brought about continuing improvements which gave cellophane acceptability in the trade. Its research energies were confined not to its own manufacturing processes but branched out and involved creative assistance to manufacturers of packaging machines, to converters with their printing and other problems, and to customers in the development of special types of materials designed to serve specific needs.

DuPont's superiority enabled it to make strides in the field of selling. Testimony has outlined in detail the steps duPont took to introduce cellophane into new and different end uses. Cellophane was sold not by ordinary means of national advertising and high-pressure tactics fortified with elaborate salesmen's entertainment expenses. Cellophane was sold to knowledgeable buyers on the basis of quality performance. Exceptional steps taken by duPont to introduce cellophane into such trades as bread, candy and frozen foods demonstrate acceptance of cellophane because of its creative approach to problems of the industries with which it was dealing and the ability of duPont to solve those problems with the useful results of its research organization.

Findings cover evidence on the many relevant aspects of this problem in detail.

## B. IS ORIGIN OF DuPONT'S POSITION LAWFUL?

 Plaintiff contends duPont acquired an illegal monopoly at the time it entered the business for the reason its basic contracts with the French were part of a plan to divide world markets and thus isolate duPont from import competition. DuPont's embarcation upon cellophane manufacture was lawful and had neither the purpose nor effects attributed to them.

The agreements made by duPont at the time it entered into the manufacture of cellophane in 1923 are the series of formal contracts between duPont and La Cellophane under which the duPont Cellophane Company was organized and rights obtained for it to manufacture under the French secret process.

Each of these undertakings was lawful in the circumstances under which it was made. From an antitrust point of view the form of the transaction is of no consequence. I must be concerned with substance and purpose. The record establishes basic contracts with La Cellophane arose from legitimate business considerations and were what they purported to be in form, namely organization of a partnership with La Cellophane for the manufacture of cellophane in the United States coupled with license agreements under which significant technology was made available exclusively to the partnership in return for stock in the venture. These facts are:

1. La Cellophane developed a successful proven process for the commercial manufacture of cellophane. This process was secret, novel and of commercial value. Plaintiff does not attempt to challenge this fact of importance.

2. When duPont learned of cellophane, it entered upon the manufacture of the product. It was not then engaged in any business which would cause it to fear the competition of cellophane. Rather, it desired to diversify its business and take the business risk of entering this new field. La Cellophane, in turn, had no reason to fear duPont's competition, for duPont had neither the necessary knowledge nor technical experience to compete in cellophane. No one else in the United States was making cellophane or seeking to get La Cellophane's process. It was not practicable to enter upon the manufacture of cellophane without having access to the French process. DuPont had had previous successful business ventures in partnership with the French interests who controlled La Cellophane. DuPont and La Cellophane negotiated in good faith the basic agreements and entered into them in good faith with advice of counsel. There were logical business reasons for the organization of the joint

enterprise known as duPont Cellophane Company. DuPont contributed capital; duPont contributed trained management familiar with United States business conditions who had worked with the French in the manufacture of rayon; duPont could make available facilities at Buffalo which would help get the enterprise going. La Cellophane was in a position to contribute, in addition to capital, substantial technical assistance in the form of operating manuals and procedures, the designing and manufacture of secret equipment, the training of personnel, the imparting of all phases of production line know-how. DuPont and the French thus each had a legitimate stake in the venture, a participation in the management and profits of the enterprise, and neither party was motivated by anti-competitive considerations. It was a corollary to such a partnership La Cellophane would undertake not to enter into other manufacturing enterprises in the United States in competition with the enterprise that it was assisting to create. The company was thus jointly created to do business in North and Central America and the licenses granted by La Cellophane limited the new company's rights to this area although duPont sought wider rights. Under the license agreement La Cellophane made available designs, process information and trade secrets of a comprehensive character. The data was secret and novel. It had high commercial value and was precisely imparted. It was essential to the manufacture of the product. It was used in actual practice and in fact even today, almost thirty years later, is at the core of duPont's processes for the manufacture of cellophane.

■ Plaintiff's argument a territorially limited license under a secret process is *per se* illegal is not accepted.

Defendant's evidence has shown the French process was the only existing commercial process for the manufacture of cellophane, and it was a proven process that worked. It was not known in the trade, nor disclosed in issued patents. It was guarded against public disclosure. Its value is clear not only from the price paid for it at the time but from the expert testimony received as to the amount of effort and money which would have been required to enter the business without it. It was made available in an explicit way, both by writing and plant disclosure. All steps of the process were covered, all aspects of machinery design revealed. Elaborate chemical controls requiring years to develop were explained. The process covered the entire manufacturing process from viscose through casting and drying machines to the plain cellophane itself.

■ It is not the purpose of the Sherman Act or the common law of restraints of trade to discourage establishment of a new business in a new territory. Trade secrets have always been considered in the nature of a property right. E. I. duPont de Nemours Powder Co. v. Masland, 244 U.S. 100, 37 S.Ct. 575, 61 L.Ed. 1016; and my views in International Industries, Inc. v. Warren Petroleum Co., D.C.Del., 99 F.Supp. 907. See, Restatement of Torts, § 516, relied on in United States v. Bausch & Lomb Optical Co., D.C., 45 F.Supp. 387, 398, affirmed on this point, 321 U.S. 707, 719, 64 S.Ct. 805, 88 L.Ed. 1024; United States v. Addyston Pipe & Steel Co., 6 Cir., 85 F. 271. Among the ancillary restraints which are considered reasonable, both under common law and the Sherman Act, are those which limit territory in which the contracting parties may use the trade secret. Fowle v. Park, 131 U.S. 88, 9 S.Ct. 658, 33 L.Ed. 67; Central Transportation Co. v. Pullman's Palace Car Co., 139 U.S. 24, 53, 11 S.Ct. 478, 35 L.Ed. 55; Dr. Miles Medical Co. v. John D. Parke & Sons Co., 220 U.S. 373, 402, 31 S.Ct. 376, 55 L.Ed. 502; Thoms v. Sutherland, 3 Cir., 52 F. 2d 592, 595.

■ Apart from secret process, it is not illegal *per se* for competitors to combine their resources in a manufacturing joint venture to exploit a particular product or a particular market. The Sher-

man Act forbids only unreasonable restraints of trade. Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 60, 31 S.Ct. 502, 55 L.Ed. 619; United States v. American Tobacco Co., 221 U.S. 106, 180, 31 S.Ct. 632, 55 L.Ed. 663. This rule of reason applies to horizontal combinations between competitors as well as to other restraints. Appalachian Coals, Inc. v. United States, 288 U.S. 344, 53 S.Ct. 471, 77 L.Ed. 825; United States v. International Harvester Co., 274 U.S. 693, 47 S.Ct. 748, 71 L.Ed. 1302; United States v. United States Steel Corp., 251 U.S. 417, 41 S.Ct. 293, 64 L.Ed. 343. Such combinations occur in American business, as the trade reports of new joint ventures to exploit specific products bear witness. A horizontal combination of two domestic American competitors in an American market was recently upheld in a case arising in this Court in United States v. Columbia Steel Co., 334 U.S. 495, 68 S.Ct. 1107, 92 L. Ed. 1533.

It is lawful for an American and a French concern who are not competitors to combine their resources in a joint venture absent an overriding unlawful purpose. That was done here. The purpose of the agreement was the development and exploitation of a new business to function in American markets. The reasonableness of the ancillary restraints on competition—here at the most potential competition since the participants were not in fact competitors—is enforced by the inherent legality of imposing a territorial limitation on an assignment of a secret process. The result of the agreement, in the case at bar, was the creation of the American cellophane industry.

The license arrangements were entered into during early stages of duPont's cellophane business, when it was struggling to establish plain cellophane as a competing product in the flexible packaging market. La Cellophane was a larger and more established producer and owned the essential processes. Its pre-eminence in the field, however, did not continue for long. Under duPont man-

agement, as the opportunities of the bigger American market were realized, the business here rapidly grew. Within a short time La Cellophane was not able to make any further technical contribution, and the direction of the business had shifted from plain cellophane to duPont's own patented product, moisture-proof cellophane. With the development of this product, duPont's production rapidly mounted. Throughout the entire period under review in this case, the bulk of duPont production was in moisture-proof cellophane. DuPont owned the product patent which gave it the right to exclude imports into the United States. In addition, it was protected by high tariffs. Evidence discloses duPont's technical superiority and contacts with the trade gave it further assurance against import competition. Foreign cellophane cost more; it was of poorer quality and the foreign manufacturers were not in a position to render the sales service required, nor did they have research facilities to serve the needs of the trade.

Factors that limited imports to the United States from abroad are plain. For a period during the 1930's, Japanese producers sold cellophane in the United States. Their sales were small and soon ceased. These producers had no agreements with anyone in the United States, and were not blocked by the tariff since their delivered prices were lower than price of domestic cellophane. Yet even their sales stopped. They could make only plain, whereas moistureproof was the core of the business. They could not make rolls satisfactory to users, and overall quality was so poor customers would rarely try Japanese cellophane more than once. American standards of quality and service are confirmed, as the obstacles to invasion of the United States market by foreign producers, by the testimony of businessmen who had purchased or considered purchasing foreign cellophane. Their testimony was, due to deficiencies of quality and inability to obtain technical service, they did not buy.

Plaintiff looks at origins of duPont's cellophane business by claiming that, beyond the license agreements, duPont was carrying on a broad commercial understanding with foreign producers to allocate world territory and thus avoid competition. Failure to prove any effect from it, this cartel aspect of the case raises a straight issue of fact. DuPont did not make such an agreement. The evidence proves this.

Plaintiff's proof on this issue is a meeting at Paris in February 1930 among representatives of European producers, resulting in a master plan for price fixing and market divisions of the world's trade in cellophane. Plaintiff's contentions were denied by Yerkes and the testimony of Swint and Carpenter, and were supported by uncontroverted proof of basic facts; duPont did not sign the undertaking; its representatives attended as guests and observers, did not listen in on the second day of the two-day conference; facts show they were not authorized to make commitments for duPont and of more importance made none, and of equal importance the head of the Foreign Relations Department of duPont was unaware of the existence of the document until it was offered as evidence by plaintiff at the trial of this case.

Actual conduct of all producers implicated in this agreement is inconsistent with the existence of any cartel. La Cellophane wrote to duPont in 1932, two years after the meeting on which plaintiff places great reliance:

"Owing to the fact that you preferred not to join the Convention we could not keep Wolf and S.I.D.A.C. away from your markets, i. e., the United States, Canada, Etc., as they would not get anything in return, whereas ourselves would, of course, as in the past, refrain from selling in your territory.

"Cuba: being situated north of the Panama Canal, belonging thus to your territory, Wolf & Co. are quite free to fix their selling prices and enter into open competition with yourselves."

Evidence established Wolff sold in North America, though not in the United States. Wolff sought to manufacture in the United States to get behind the tariff wall. Wolff could not get over the tariff, and the tariff was the primary obstacle to Wolff.

SIDAC did not sell in North America after 1929. The Government recognizes SIDAC was free to do so. Intricate theories of a conspiratorial network is cast aside. SIDAC's agreement with the Sylvania Industrial Corporation ceded to the latter's exclusive rights to "use the said processes above mentioned in all the North American continent north of the Panama Canal * * * and the Republic of Cuba," much in the manner of the license granted duPont Cellophane Company by La Cellophane. There is no proof duPont was connected with the making of the Sylvania-SIDAC agreement.

Plaintiff has held out GX–1013 as the agreement between duPont and La Cellophane extending rights of duPont to South America. Witnesses and documents show GX–1013 was not ratified by defendant. Its proposals for a price agreement and quota assignments for South America were, in fact, rejected. A new agreement was adopted by duPont and agreed to by the French, calling for equal rights in South America.

For a period duPont was prepared to respect the construction placed upon "equal rights" by La Cellophane, i. e., a 50–50 division with La Cellophane of South American business. It became clear La Cellophane was not prepared to devote effort to South American business, nor did La Cellophane provide duPont with any information as to how division was to be computed. Thus, Yerkes' advice to La Cellophane less than two years later: "Considering all of the circumstances we must consider ourselves free to pursue our own policy of sales in South America, Japan and China". The reasons for this action,

and duPont's relationship with other Europeans as to South America business are summed up by May (GX-1036, p. 1068):

"The attempt at reparations took the form of extending our territory beyond North and Central America, but that extension was based upon some fancy European 'consortium' that apparently never worked out * * * the whole thing was based upon an impracticable premise and I thought so at the time * * *

"When we talk about 'equal rights' with La Cellophane, it is, among other things, assumed that their rights with others can be maintained—otherwise what rights have we except to assert our own to solicit business in South America and to derive the benefits that come from a real sales effort free from a lot of impracticable European business politics? While they were 'negotiating' and talking about 'quotas' and doing other 'easy chair' things, we attempted to develop a market by real work, consisting of sending qualified salesmen using the very methods that were successful in this country. The result has been that our business is expanding because we did something about it and the reward is a claim upon us to divide."

The basic fact is duPont refused to divide; it competed vigorously.

Price quotations of every producer in South America were different. Proof shows a pattern of price cutting by British, French, Belgian and German producers and efforts of all of them and of duPont to get business wherever it could be found. One trade report develops a case history of price competition between duPont and SIDAC over a single order, and exemplified the type of furtive warfare that characterized the South American trade. This was the norm for that market as is emphasized by a witness who saw it first-hand (Swint, Tr. 6212).

Evidence disproving any theory of quota assignments in South America has been shown. Quantities sold to South America from different nations demonstrate ratios between American, British, French and Belgian producers were not the product of anything but ability of each producer to make a sale. At outset, duPont sold in excess of what plaintiff contends it was limited to. This fact brought requests from La Cellophane that duPont permit the French to even the sales, or duPont make offsetting payments, requests which duPont declined. Thus, in every market where duPont sold, it fought the cartel group.

## C. WAS DuPONT'S POSITION MAINTAINED BY PREDATORY ASSERTION OF MONOPOLY POWER?

### 1. TESTS TO BE APPLIED.

Plaintiff contends duPont acquired its position unlawfully and has maintained that position by various predatory practices. Thus, plaintiff rests its case upon so-called predatory practices. These are said to be responsible for duPont's start in the business, to be responsible for its success, and to have been the motif of its entire conduct.

 Exercise of monopoly power can be shown only where the act can be directly related to the company's aggressive use of a monopoly position to accomplish an exclusionary result. For example, the concerted acts of the tobacco companies in raising and lowering prices to eliminate specific types of competition, without regard for manufacturing cost or other competitive considerations, was found to be an exercise of monopoly power. American Tobacco Co. v. United States, 328 U.S. 781, 804–807, 66 S.Ct. 1125, 90 L.Ed. 1575. This conduct had an exclusionary intent and an exclusionary result. Plaintiff, on the other hand, has only suggested a series of transactions which it seeks to claim were restraints of trade and asks the court to infer these restraints could only have taken place in the area of monopoly power.

It is necessary for plaintiff to show restraints not only existed but they contributed to the achieving or maintenance of duPont's power. For example, considerable proof was offered as to whether or not prices of plain cellophane were fixed in Brazil for a period of several years in the 1930's. While evidence shows they were not, there could be no connection between such price activity and duPont's position in the manufacture of cellophane in the United States. Similarly, evidence was offered at one time an employee of duPont referred to a cancellation provision of a use patent license as being a provision by which the licensee could be forced to purchase cellophane from duPont, but there is no proof any tying took place, that any licensee under a use patent was forced to buy from duPont, or any contract was cancelled for failure so to buy. The claim is made duPont's pricing methods were at some points inconsistent with interpretations of the Robinson-Patman Act. But, evidence shows Sylvania followed identical pricing methods; and there is no proof any particular purchaser had its purchases channeled to du-Pont because of the discounts allowed or Sylvania was injured thereby. Testimony is to the contrary both on the part of purchasers and of Sylvania. It is charged duPont restrained trade by acquiring patents from others which it did not use. While the reasons for this non-use are clear, the use or non-use of the patents had nothing to do with duPont's position as a manufacturer of cellophane, for there is no showing patents were acquired from others who intended to use them in the manufacture of cellophane. Moreover, patents could not have been practiced by others without a license under the basic moistureproof patent.

■ This is not a case brought under § 1 of the Sherman Act, or § 3 of the Clayton Act or the Robinson-Patman Act. I have no reason to determine whether a particular practice does or does not restrain trade in a manner that violates these laws until it has first been shown one of two conditions has been satisfied. Unless evidence shows the particular practice was an assertion of power to fix arbitrary prices or to exclude competitors or, in the alternative, practice is shown to have been reasonably related to the maintenance or acquisition of duPont's position, it has no relevance to this case. Plaintiff has not by its attack been able to uncover any conduct to demonstrate duPont's position has been either acquired or maintained by predatory acts. Plaintiff has burden of proof in this regard, and it has failed to sustain that burden. Cf. United States v. Aluminum Co. of America, 2 Cir., 148 F.2d 416, 423, 426, 434, 435.

## 2. ALLEGED SUPPRESSION OF SYLVANIA.

Plaintiff claims Sylvania was suppressed and failed to name Sylvania as a defendant. Plaintiff contends Sylvania was a willing collaborator with duPont, the suggestion being the two companies joined to exclude others. Without attempting to sort out conflicting contentions, plaintiff attacks validity of the moistureproof license agreement and it charges a conspiracy to fix prices.

### a. The Moistureproof Patent License Agreement.

Terms of moistureproof license agreement of 1933 are not in dispute. Sylvania commenced manufacture and sale of moistureproof cellophane after duPont's basic product patent issued and with the knowledge it was infringing that patent. DuPont was confident of its patent and, after warning Sylvania, brought an infringement action. After suit, there followed a settlement of the patent controversy. Evidence is the resulting agreement, negotiated at arm's length between the parties, constituted the entire understanding. Under the agreement, duPont granted to Sylvania what was an exclusive license under the basic product patent, and under certain important process patents for the manufacture of the product which had issued at that time. The agreement was limited to the field of moistureproof cellophane which was dominated by duPont's

basic moistureproof product patent. There were no provisions for disclosure of applications or technical information and no commercial provisions relating to price, limiting exports or the like. Royalty rates were set which provided for increased payments to duPont whenever Sylvania's domestic sales under the patents exceeded specified percentages of total domestic sales of moistureproof cellophane.

Plaintiff looks to an unsigned memorandum apparently written by Yerkes, which he does not recall, in which it is suggested all improvements and patents relating to regenerated cellulose coatings should be thrown "into the pot" for mutual protection during life of the agreement. It is suggested this memorandum establishes the existence of an illegal closed patent pool. To me it does nothing of the sort. The particular memorandum deals with a proposal by Dr. Wallach and suggests provisions in the agreement which were not finally adopted. No "pot", in fact, existed, for many patents were cross licensed only for additional royalty and others not licensed at all. It was a closed arrangement only in the sense the licenses granted were exclusive and nobody, not even Sylvania, could make moistureproof cellophane without a license under duPont's basic product patent.

■■■ As owner of these patents, duPont had right to grant an exclusive license and under the cases such a license in no way violates the provisions of the Sherman Act. Bement v. National Harrow Co., 186 U.S. 70, 94, 22 S.Ct. 747, 46 L.Ed. 1058; Virtue v. Creamery Package Mfg. Co., 227 U.S. 8, 36–37, 33 S.Ct. 202, 57 L.Ed. 393; DeForest Radio Telephone Co. v. United States, 273 U.S. 236, 242, 47 S.Ct. 366, 71 L.Ed. 625. As patentee, duPont's right to license included the right to select or reject prospective licensees and to prefer one over others for considerations within its discretion. Standard Oil Co. of Indiana v. United States, 283 U.S. 163, 179, 51 S.Ct. 421, 75 L.Ed. 926. See also United States v. United Shoe Machinery Co. of New Jersey, 247 U.S. 32, 58, 38 S.Ct. 473, 62 L. Ed. 968; American Equipment Co. v. Tuthill Bldg. Material Co., 7 Cir., 69 F.2d 406, 408; Westinghouse Electric & Mfg. Co. v. Cutting & Washington Radio Corp., 2 Cir., 294 F. 671, 673; United States v. Parker-Rust-Proof Company, D.C., 61 F.Supp. 805.

■■■ This agreement contained provisions for licensing of certain future patents, but these were drawn so as to limit both the number of patents and the effect of any future licensing. DuPont was obligated only to license those patents which related to moistureproof cellophane and to offer them for licensing so long as the basic patents were in effect. In addition, duPont reserved right to charge additional royalty for significant inventions and, in fact, made such charge in certain cases. Sylvania, on the other hand, was obligated only to offer licenses to duPont under patents which it might develop at a later date which fell within the field of the basic moistureproof patent.

This grant-back, which in actual practice involved the licensing of only nine patents, was within the rule most recently enunciated in Transparent-Wrap Machine Corp. v. Stokes & Smith Co., 329 U.S. 637, 67 S.Ct. 610, 91 L.Ed. 563. The patents which duPont received from Sylvania under the agreement in no way enhanced duPont's power as to moistureproof cellophane. Sylvania could not have lawfully manufactured moistureproof cellophane without a license. It used a number of the patents licensed under the agreement, which enabled it better to compete with duPont. There is no proof any one ever requested a license under either duPont's patents or Sylvania's patents to manufacture moistureproof cellophane and was refused a license.

Legal significance of these facts is made clear by Judge Hand's opinion on the remand of the Transparent-Wrap case. In considering the possible application of the Supreme Court's caveat as to the possible illegality of grant-back

provisions, where Transparent-Wrap had licensed the basic Zwoyer product patent, Judge Hand wrote:

"In support of this plaintiff argues that, when the defendant fortified the monopoly of its own patents by acquiring the plaintiff's patents, it secured a 'double monopoly,' which was an unlawful restraint of trade, even though taken by itself the acquisition of those patents was lawful. The period, to which any such restraint is necessarily limited, is that during which both the Zwoyer patents and the plaintiff's patents will be in existence; for we must obviously disregard any period after the expiration of the Zwoyer patents, during which the plaintiff's patents may remain in force. In that period the defendant's control will be precisely the same as the plaintiff's would have been, had it not assigned. During what we may, however, call the joint period it is true that the defendant will have a monopoly, not only of the Zwoyer machine itself, but of any improvements upon it covered by the plaintiff's patents: verbally, that is a 'double monopoly'; actually that phrase adds nothing to the defendant's control over production. No one will be able to use, make or vend the Zwoyer machine without its consent, and no one can use, make or vend an improvement without using, making or vending the machine improved. The defendant's control over the industry will be no greater by virtue of the improvement patents; all it will gain during the joint period is a freedom to add the improvements to the Zwoyer machine, which it would not otherwise have had, for its license from the plaintiff terminated with the contract.

"Moreover, even though the plaintiff had proved that there were machines which some of its own patents cover, but which the defendant's patents do not, the record would not be sufficient to raise any question of the Anti-Trust Acts. That would have shown that during the joint period, the defendant would have extended its control over the industry; but extension, merely as such would not be enough. It would remain possible that, while the Zwoyer patents were in existence, any putative machines which they did not cover, and which the plaintiff's patents did cover, would not be important competitors with the Zwoyer machine itself; and it is hornbook law that not every restraint of competition is 'unreasonable' and that only 'unreasonable' restraints are unlawful. All this the plaintiff should have developed at the trial, if we were to pass upon it; upon the record as it comes to us, no restraint of trade appears —to say nothing of any 'unlawful' restraint." 2 Cir., 161 F.2d 565, 567, certiorari denied 13 U.S. 837, 67 S.Ct. 1524, 91 L.Ed. 1849, rehearing denied 332 U.S. 787, 68 S.Ct. 36, 92 L.Ed. 369.

There is a failure here to show the grant-back provisions had the restrictive effects demanded in the tests laid down by Judge Hand.

Plaintiff has sought to bring the moistureproof license agreement within the holding in the Cracking case, Standard Oil Co. of Indiana v. United States, 283 U.S. 163, 51 S.Ct. 421, 75 L.Ed. 926, and other cases which have followed it, condemning patent agreements under which dominant members of an industry cross license competing process patents in a manner that restrains trade. The moistureproof patent license agreement was not such an agreement and the holding in these cases is not in point.

The license in the Cracking case was a cross license of competing process patents. There were no product patents involved as to the field of the agreement. Royalties were pooled, dominant licensors were given the right to sublicense each other's patents, and technology was cross licensed as well. This fact situation involved wholly different con-

siderations than are present here, under an agreement involving merely a one-way grant of a license under a basic product patent and related process patents with strictly limited grant-backs having no restricting effect.

Similarly, the National Lead, [U. S. v. National Lead] 332 U.S. 319, 67 S.Ct. 1634, 91 L.Ed. 2077; Line Material, [U. S. v. Line Material] 333 U.S. 287, 68 S.Ct. 550, 92 L.Ed. 701; and Besser v. U. S., 343 U.S. 444, 72 S.Ct. 838, 96 L.Ed. 1063, cases, cited by plaintiff, are not controlling. The National Lead case cross-license went far beyond improvement patents and included all patents in the titanium pigment field. The Line Material case involved price fixing under pooled patents. The Besser case was not even a cross-license case, but involved an arrangement between licensees restricting the freedom of action of the licensor.

There is no decision which I could find, after long research, which holds a license agreement such as the one involved here violates the Sherman Act. Granting validity and scope of duPont's basic moistureproof patent, it is difficult to show how duPont can be held to have restrained trade by granting a license which permitted another to manufacture lawfully the patented product, when there is no showing that as a result of the agreement duPont's position was in any way enhanced or others who might have desired a license were precluded from entering the field. Cases on which plaintiff relies deal with combinations of patents under circumstances where the cross licensing parties sought to create a position of market control beyond that which either of them was entitled to through the exercise of its own patents. None of the cases affect legality of the grant-back provisions of the Sylvania license under the tests stated by Judge Hand in the Transparent-Wrap case.

■ As patentee duPont had right to fix royalties at graduated scales on amount of Sylvania's production. United States v. General Electric Co., 272 U. S. 476, 47 S.Ct. 192, 71 L.Ed. 362; General Talking Pictures Corp. v. Western Electric Co., 305 U.S. 124, 59 S.Ct. 116, 83 L.Ed. 81. No limitation of production by Sylvania under its own patents existed or is charged.

In its contentions of suppression of competition and assertion of monopoly power, plaintiff fails to come to grips with fact throughout the period that graduated royalties were in effect, Sylvania's entire moistureproof production fell within valid claims of the broad product patent. The record shows Sylvania produced moistureproof cellophane utilizing the patent. It was not required to pay any royalty if it developed types of cellophane not covered by the patent. On these facts, there is no authority to support the contention it would have been in any way illegal under the Sherman Act for duPont to limit Sylvania's production. The cases are to the effect owner of a valid product patent may by license restrict production of the licensee to a specified quantity, at a specified place.

■ As far as this monopoly case is concerned, evidence is clear the royalty provisions did not limit Sylvania's production. Sylvania never sold an amount of cellophane which exceeded the amount allowed before additional royalty was assessed. During the period the agreement was in force, it could have sold, without paying additional royalty, 54,-000,000 additional pounds of moistureproof cellophane, which would have amounted to a 31.4% increase in its domestic sales. And in all years, its domestic sales fell far short of the poundage permissible without additional royalty. More than that, its officials testified its plans for expansion of production were not affected by the royalty provisions of the agreement, the company never followed a policy of curtailing its production, and the royalties did not impair the company's ability to compete. From the evidence Sylvania expanded and to the full extent of its financial abilities. It was not impeded by the royalty provisions of the agreement. Without a license it could not have competed at all.

## b. The Alleged Price Agreement.

■ Plaintiff originally urged du-Pont and Sylvania fixed prices for plain and moistureproof cellophane.

To support price fixing charge, plaintiff sought to introduce price lists of Sylvania which reflected identical prices to those charged by duPont and bore identical effective dates. DuPont's objections forced an authenticating witness to the stand—Hamburg, Assistant Sales Manager for Sylvania. On cross-examination it developed Sylvania price lists were not what they purported to be. They were not issued on their effective date, but were issued several days later. Hamburg testified Sylvania "in every instance" first heard from duPont's price lists by picking up copies from customers in the trade.

Specifically, Hamburg said "there is no one in our organization, so far as I know, that had any inkling of an impending price change. That also came through the customers and prospects."

When copies of the price changes were obtained from the trade by Sylvania, it reprinted its own price lists conforming the prices to duPont's prices, and back dated its price lists to the effective date of the duPont list. Thus, from cross-examination, it was made clear, there was no understanding between duPont and Sylvania price identity arose from collusive action.

Testimony of Hamburg was confirmed by Sylvania's President, by its Vice President in Charge of Sales, and by Yerkes. All denied existence of any plan or agreement or arrangement between the two companies to fix prices or to charge identical prices.

There is no evidence in the documents there was any discussion between the representatives of the two companies looking toward any such agreement. The contemporaneous documents show Yerkes desired no action be taken which would in any way prevent duPont from having complete independence of Sylvania as to prices.

Evidence shows repeated activity by Sylvania cutting prices below list prices. Many different techniques were used by Sylvania to depart from its price lists to obtain business by price advantages offered customers. It departed from discount schedules. It gave wholesale prices for retail purchases and shaved prices.

There could not have been disparity for the evidence shows when price differences existed between duPont and Sylvania, the company with the higher price had difficulty selling its product. Indeed, Sylvania was forced to bring its prices into line with duPont after attempting to charge a higher price, because it lost business. In fact, price disparities appeared with greater frequency than plaintiff acknowledges. It is not correct they existed only subsequent to bringing of this litigation. Not only were the terms of sale different from 1941 on, during which period duPont had no cash discount and Sylvania had a one per cent cash discount, a difference of almost one-half cent a pound, or $5 per thousand pound order, but basic price lists were different throughout the year 1947. DuPont made many special types of cellophane not made by Sylvania. These were "tailormade" for specific end uses, and even where price identity on the list existed, the value of the product for the price paid was greater when acquired from duPont.

Proof fails to show the price conspiracy claimed.

### 3. PATENT PRACTICES.

■ Plaintiff pointed to a group of patent license agreements which it claimed affected duPont's position and demonstrate unlawful exercise of monopoly power. Each of these patent agreements involves valid patents, and it cannot be contended in the exercise of lawful rights under valid patents duPont was improperly exercising monopoly power. Legality of these agreements is not challenged. Examination of the various patent licenses must be made to demonstrate absence of proof as to their

effect on duPont's position or of any relation between them and the charges of monopolization.

1. ULTRA-VIOLET LIGHT LICENSE. This agreement involved a non-exclusive cross license of conflicting patents. The type of film is a high-priced specialty, accounting for a negligible volume of business. No person is shown to have been denied a license under these patents.

2. RIBBON LICENSES. The complicated story of these licenses pertains to two agreements which were in effect from 1937 to 1940. They concern plain cellophane as used in the fabrication of ribbons, a use which never accounted for as much as 1% of duPont's business. No evidence appears the royalties charged Sylvania for its licenses were unreasonable or limited Sylvania's production, and no evidence the arrangements kept anyone from making cellophane ribbons.

3. ETHYLENE GLYCOL LICENSE. This was another non-exclusive license and no exclusionary effect was shown. Sylvania needed a license to use ethylene glycol as a softener for its cellophane manufacture and under the license obtained the right and used the patents. No person was denied a license under these patents.

4. MARATHON LICENSE. This was a non-exclusive license granted to Marathon to permit it to make its own patented and competitive cheese wrap using moistureproof cellophane. The license had no restrictive effect upon Marathon. Both duPont and Sylvania were free to sell to Marathon. The license was in effect for a few years, and Marathon operated under it for a short time. Marathon was not restricted as to supply or prevented from doing anything it desired to do.

5. THE SEALING LICENSES. These licenses were in effect from 1931 to 1936. There is no evidence duPont's licensing arrangements extended the scope of the patents. Plaintiff criticized duPont for suing an unlicensed Sylvania customer under the patents, which were held invalid as a result of the litigation. Du-Pont acquired the patents in order to protect its customers from infringement suits, and was obligated to bring such suit by its contract with the original owners of the patents. In any event, it lost the suit, and no evidence exists it placed unreasonable restraints upon anyone. The agreements soon terminated and the inventions in issue were supplanted by more modern technology.

6. INTERFERENCES. The 15 settlements of patent interferences arose in the normal course of duPont's business and were made in accordance with the rules of the Patent Office which declared the interferences in the first place. Each settlement was an arm's-length transaction. No evidence shows anyone was prevented by the terms of the settlement from engaging in any phase of the cellophane business. The parties to the interferences were concerned with other products and other activities. To the extent these parties had inventions that related to some aspect of the cellophane business, duPont received rights under these inventions. But the evidence shows in many instances duPont was prior and would have received the rights anyhow, had the interferences been litigated through the Patent Office. Evidence shows even had the inventions been awarded to other parties, there were no instances where they could have been practiced in any phase of cellophane manufacture without rights under du-Pont's dominant moistureproof patent. In most instances the inventions were of minor consequence, particularly the group pertaining to resin wax compositions.

7. TYING PROVISIONS. The tying situations on which plaintiff relies occurred a decade and a half ago. It is clear du-Pont as a matter of policy took effective steps to prevent any tying immediately after the Supreme Court decision in Leitch Manufacturing Co. v. Barber Co., 302 U.S. 458, 58 S.Ct. 288, 82 L.Ed. 371. There is no evidence of tying after that date. The proof shows implementation of the duPont policy. Technical questions are present as to whether there was, in fact, an illegal tying in any of

the instances prior to that date. Of greater consequence is the fact no actual tying is shown. No evidence shows anyone was forced to buy an unpatented product from duPont by the license of a patent. No evidence shows threats being brought to tie unpatented goods. There is no evidence the two or three instances stressed by plaintiff had any effect whatsoever.

The few license agreements and interference settlements are of minor consequence when judged as a group against a whole area of duPont's patent activity over a quarter of a century. Many of the agreements were of limited duration. They pertain to minor aspects of the business. They did not affect an appreciable volume of sales, nor do they show any measurable effect. The record discloses duPont had scores of other licenses and patent relationships which, while scrutinized by the Government, were given a clean bill of health, for they are not challenged now. It is difficult to see how the few instances to which plaintiff directs its criticism can serve to support the contentions duPont's patent practices evidenced the intentional predatory assertion of monopoly power.

### 4. CONTROL OF DISTRIBUTION OUTLETS.

This phase of plaintiff's predatory practice case has been difficult to understand. Plaintiff offered proof of some distribution practice and when challenged conceded the practice was normal as a matter of business conduct, as well as lawful. Plaintiff's position appears to be since duPont had a substantial percentage of cellophane production, any distribution plan adopted would have been improper and that its only recourse was to sit back and wait for people to come to its plant and take away cellophane. DuPont had to sell the goods it made. It had to adopt a plan of distribution.

Plaintiff sought by an incessant reiteration of assertions that "this was done to promote and maintain a monopolistic position", "this was arbitrary treatment of customers", and "this was discriminatory". These claims have not been supported by proof.

In a business involving thousands of customers over a period of almost 30 years, one would expect in some way at least one customer would develop a grievance from some real or fancied situation he deemed unjust. Plaintiff called no witnesses who were customers of duPont. Plaintiff conceded it had no complaint whatever from any customer as to duPont's treatment. Eleven customers of duPont were cross-examined by plaintiff at trial or on deposition. Not one suggested his company had received anything but fair treatment throughout its entire dealings with duPont.

Plaintiff's proposed findings concentrate especially upon duPont's selective converter policy and its discount policy. In the former case, reliance is placed upon a single exhibit, GX 5047, which outlines the selective converter program. That program is conceded to be legal, for it entailed little more than duPont's wholly independent and lawful exercise of its undisputed rights to select the persons to whom it would sell. United States v. Bausch & Lomb Optical Co., 321 U.S. 707, 64 S.Ct. 805, 88 L.Ed. 1024; Camfield Mfg. Co. v. McGraw Electric Co., D.C.Del., 70 F.Supp. 477. DuPont chose to sell through a limited but steadily expanding number of converters, rather than by offering its goods to converters generally. In promoting its new and high-priced material, it concluded this would enable it to select concerns who were interested in promoting cellophane and would encourage these concerns to give their best efforts to the distribution of cellophane. In selecting its converters, duPont acted independently and not in concert. Such a selective policy is a recognized distribution method and encouraged by the Department of Commerce in memoranda it has given business concerns.

The master fact revealed by GX 5047 is disregarded by plaintiff in its proposed findings of fact and in its brief. Given legality of this distribution meth-

od, its only significance can be in terms of intent. Plaintiff ignores that portion of the document stating the intent. As the document makes clear, duPont entered upon a selective converter system because it found this essential to compete with the principal competitor of cellophane, namely paper.

DuPont is charged with executing "exclusive" contracts with some of its converters, thereby channeling the business of the principal converters to itself. Such arrangements are of course lawful *per se* under the Sherman Act. United States v. Bausch & Lomb Optical Co., D.C., 45 F.Supp. 387, affirmed by evenly divided court, 1944, 321 U.S. 707, 64 S.Ct. 805, 88 L.Ed. 1024; Appalachian Coals, Inc. v. United States, 288 U.S. 344, 53 S.Ct. 471, 77 L.Ed. 825; D. R. Wilder Manufacturing Company v. Corn Products Refining Company, 236 U.S. 165, 35 S.Ct. 398, 59 L.Ed. 520; Virtue v. Creamery Package Manufacturing Co. and Owatonna Co., 227 U.S. 8, 33 S.Ct. 202, 57 L.Ed. 393; Continental Wall Paper Co. v. Louis Voight and Sons Co., 212 U.S. 227, 29 S.Ct. 280, 53 L.Ed. 486; American Sea Green Slate Co. v. O'Halloran, 2 Cir., 229 F. 77; Carter-Crume Co. v. Peurrung, 6 Cir., 86 F. 439; United States v. Western Union Telegraph Co., D.C., 53 F.Supp. 377; Baran v. Goodyear Tire & Rubber Co., 2 Cir., 256 F. 571; United States v. American Can Co., 4 Cir., 230 F. 859; 234 F. 1019, appeal dismissed on mot. U.S., 256 U.S. 706, 41 S.Ct. 624, 65 L.Ed. 1181; In re Greene, 6 Cir., 52 F. 104; cf. Camfield Mfg. Co. v. McGraw Electric Co., D.C. Del., 70 F.Supp. 477; Federal Trade Commission v. Paramount Famous-Lasky Corp., 2 Cir., 57 F.2d 152; Westway Theatre, Inc. v. Twentieth Century-Fox Film Corp., D.C., 30 F.Supp. 830; Whitwell v. Continental Tobacco Co., 8 Cir., 125 F. 454; see United States v. Columbia Steel Co., 334 U.S. 495, 524, 68 S. Ct. 1107, 92 L.Ed. 1533.

The converter contracts had little effect upon duPont's position. These contracts were in effect from late 1938 to January 1, 1947. They were term contracts running for but one year, and terminable by either party on 30 days' notice. Converters shifted back and forth between duPont and Sylvania. The record shows the exclusivity feature of the contracts was more theoretical than real. Moreover, duPont did not compel converters to sign the promotional converter or so-called "exclusive" converter contracts, and the majority of converter contracts had no such provision.

The evidence shows there were always many well qualified converters in no way under duPont's control who effectively competed by converting Sylvania cellophane, and that Sylvania at all times had fully adequate converter outlets. The proof is clear the volume of duPont's sales to converters has been due to the superior quality of duPont cellophane, better service, and creative selling.

Plaintiff's attack is principally directed against alleged violations of the Robinson-Patman Act in the sale of cellophane. This is not a litigation to determine whether such violations took place. The complex issues of cost justification and competitive relationships between different categories of buyers have not been litigated. Cf. Bruce's Juices, Inc. v. American Can Co., 330 U.S. 743, 745–746, 67 S.Ct. 1015, 91 L.Ed. 1219. DuPont sought to comply with everchanging interpretations of this very complex statute. No intent to violate the Robinson-Patman Act was shown. DuPont's discounts were reviewed by counsel upon the passage of the Robinson-Patman Act, and revised in accordance with the legal advice. As later interpretation of the statute occurred, the discounts were again reviewed by counsel, and legal advice was again followed. DuPont believed at the time both its quantity and functional discounts have been in accord with the Robinson-Patman Act as contemporaneously interpreted.

DuPont established its discounts to purchasers before Sylvania had come into existence. Quantity discounts followed custom trade practice and appeared to be within the requirements of the Act. Cf. American Can Co. v. Bruce's Juices, Inc.,

5 Cir., 187 F.2d 919, 923; Minneapolis-Honeywell Regulator Co. v. Federal Trade Comm., 7 Cir., 191 F.2d 786, certiorari granted, 342 U.S. 940, 72 S.Ct. 552, 96 L.Ed. 699. Functional discounts were set so different discounts were never granted to purchasers performing the identical function and hence were within the requirements of the statute. Cf. Chicago Sugar Co. v. American Sugar Refining Co., 7 Cir., 176 F.2d 1, certiorari denied 338 U.S. 948, 70 S.Ct. 486, 94 L.Ed. 584. See Shniderman, "The Tyranny of Labels"—A Study of Functional Discounts Under the Robinson-Patman Act, 60 Harv.L.Rev. 571.

Throughout trial, plaintiff sought to supply proof of competition between classes of purchasers given different functional discounts by complaints it does not understand the difference between a converter and fabricator, and since both classes process cellophane they must compete. This does not supply the non-existent proof a maker of cellophane straws or of Christmas tree ornaments competes with a maker of cellophane bread wraps or potato chip bags. No violation of the Robinson-Patman Act can be inferred from different functional discounts granted to such disparate enterprises.

DuPont's practice prior to January 1, 1947 of charging a higher price per pound on orders less than 500 pounds, which plaintiff terms "the price list discount", needs passing consideration. Sylvania had the same discounts, and plaintiff did not even attempt to prove a single customer ever purchased from one company rather than the other because of this pricing system.

Proof of monopolistic effect of duPont's functional discounts is absent. The evidence is clear Sylvania had the same discounts, so no advantage was to be gained by purchasing from duPont. Again, there is no proof any customer ever ordered a single pound of cellophane from duPont rather than Sylvania because of the existence of functional discounts. If such proof existed, plaintiff would have presented it. Proof establishes quality, service and selling effort were controlling factors in the struggle for sales.

The question of duPont's quantity discounts, which were in effect from before 1928 to 1947, was resolved at trial by plaintiff's concession it could offer no evidence that any duPont quantity discount caused any restriction on Sylvania's production or sales. Plaintiff's case as to effect was admittedly theoretical and came to grief when it encountered the facts. The facts are: (1) Sylvania offered the same quantity discounts as those currently offered by duPont; (2) Sylvania sold its capacity; (3) the record fails to show an instance in which a customer bought a pound of duPont cellophane rather than Sylvania because of the existence of duPont's quantity discounts.

Plaintiff's remaining effort to find some competitive effect on Sylvania is the assertion Sylvania was disenabled "to a substantial degree from competing with its full effectiveness" because on occasions it indemnified purchaser for a loss of quantity discount not earned from duPont. Dr. Reichel testified Sylvania was able to sell its entire output at all times and was usually oversold, that on some unspecified number of occasions Sylvania did indemnify customers on quantity discounts, but that "it didn't work this way everywhere and it was always voluntary with us where we would permit it to work or whether we wanted the business, see, on that basis". Monopolistic effect and impairment of ability to compete cannot be derived from a factual situation of a company always selling to capacity and in the course of its sales choosing of its own free will whether it will supply one customer at its regular discount rate and another on a more favorable basis. Evidence shows many quantity discount customers bought from both suppliers, and there is no evidence that all or any measurable part of these ever received anything oth-

er than the regular quantity discount of each supplier.

Plaintiff's charges as to the distribution aspect of the case are without foundation in the record.

### 5. EVIDENCE PLAINTIFF IGNORES.

Plaintiff asks a · finding duPont throughout the 30 years of its cellophane business was motivated by a deliberate unlawful intent. It points to no single transaction to support this contention. It sought to draw from normal business conduct inferences of criminal motive and proof of illegal acts.

As part of this studied tactic, I cannot ignore the testimony. Witnesses cannot be brushed to one side.

There were 39 witnesses who testified in this case. Of these, 31 were not employees of duPont. This group of independent witnesses was principally made up of businessmen from many different parts of the country. They included alleged potential competitors whom plaintiff continues to urge duPont sought to prevent from going into the business of making cellophane, but who testified categorically to the contrary. They included converters of cellophane, whom plaintiff urges were restricted and controlled by duPont, but who testified explicitly to the contrary. They included manufacturers of flexible packaging materials whom plaintiff insists do not compete with duPont, but who explicitly testified to the contrary. They included buyers and converters of materials sold in the flexible packaging markets who testified to conditions in those markets which plaintiff continues to assert do not exist. They included three representatives of American Viscose who denied charges of suppression and conspiracy. Testimony of all witnesses is supported by substantial documentary proof.

Witnesses from duPont were called to testify as to questions of motive, purpose and intent. Testimony of these witnesses stood the acid test of cross-examination. The principal executive of duPont responsible for the development of cellophane through almost the entire period of the complaint categorically denied plaintiff's charges in general and in particular by explicit testimony, and was not even cross-examined. One of the leading research chemists of duPont responsible for the largest group of patents in its cellophane portfolio was not even cross-examined. Other witnesses such as Mr. Walter Carpenter, a chief executive of duPont, during the period of cellophane development, were examined perfunctorily.

To reach inferences which plaintiff seeks this court to draw from its selected use of documentary materials would necessitate a determination by this court the testimony of these witnesses was false. After months of study and critical examination of the Record and recollection of seeing and hearing these witnesses throughout many long trial days, such a conclusion I cannot reach with validity. They were not discredited—in many instances, not even challenged—and such a conclusion is beyond my ken.

It is impossible to believe over a period of 30 years every act of those engaged in the development of duPont's cellophane business is tainted by illegal motive, undertaken with knowledge of illegal purpose, and an urge to achieve monopoly by predatory practice. This was not the dominant motif of duPont's entire conduct.

### PART II—CAPS AND BANDS.
### NO FACTUAL BASIS EXISTS FOR CLAIMING A VIOLATION OF § 2 AS TO CAPS AND BANDS.

One tag end of this case remains—alleged monopolization of cellulosic caps and bands. Plaintiff conceded in response to the court's questions caps and bands represent a distinct and separate product monopolized, and asserted in effect the Government was charging two monopolizations, the first of cellophane and the second of caps and bands. While contending cellophane and caps and bands are separate parts of trade and commerce, it has undertaken to mix these

two different fields of business activity together in the manner of the complaint. This leads to confusion.

DuPont does not make caps. It withdrew from the manufacture at the time the complaint was filed. Obviously it could not have monopolized caps and has no monopoly now.

DuPont makes bands in one plant at Buffalo on two machines. Its production accounts for 64.4% of total caps and bands production, compared to 84% in 1933.

There is no competition from imports because of a 60% ad valorem tariff which has been in effect since 1922, long before duPont engaged in the business.

: DuPont, however, encounters intense band competition from both Sylvania and Celon. Both of these companies have expanded. Sylvania has twice as many band machines as duPont. Celon's percentage of domestic band sales in the period when duPont's was substantially declining, grew from 12% in 1934 to 30% in 1947.

Additional effective competition in this line of business is offered by manufacturers of many other types of secondary closures which are functionally interchangeable with duPont's bands and are used by the same classes of customers for the same purposes. Thirteen different types of competing closures are listed in the findings with facts as to their uses and the degree of competition. Competition as to service, competition as to price and competition as to quality exist, and shifts of business within the various major end uses are proven. The relative percentage of business enjoyed by the different cellulose band manufacturers has varied substantially from year to year.

Plaintiff concedes absence of price identity. Celon's prices are lower than duPont's in many important segments of the trade. All manufacturers are licensed non-exclusively under the principal patents in the art. There are no patent obstacles to manufacture. There is no proof of anyone being excluded from the business and no proof duPont exercises any degree of control over patents, raw materials, distribution outlets or the like which would enable it to exclude anyone from any phase of band manufacture. Alleged potential competitors denied they desired to enter the business, or ever were excluded.

Whatever may have been the technical reasons that persuaded plaintiff it should include a charge of band monopolization within its general attack, it is apparent the charge of monopolization is without foundation in fact or in law.

## CONCLUSION OF LAW.

The facts destroy the charges here made. There has been no monopolization or conspiracy or combination or attempt to monopolize shown. The record reflects not the dead hand of monopoly but rapidly declining prices, expanding production, intense competition stimulated by creative research, the development of new products and uses and other benefits of a free economy. DuPont nor any other American company similarly situated should be punished for its success. Nothing warrants intervention of this court of equity. The complaint should be dismissed.